# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNEAPOLIS AREA SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, MINNESOTA CONFERENCE OF THE UNITED CHURCH OF CHRIST, AND FATHER CHRISTOPHER COLLINS, SJ, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | |
| Defendants. | |

## INTRODUCTION AND NATURE OF ACTION

1.      The Bishop Henry Whipple Federal Building ("Whipple")—named for Minnesota's first Episcopal bishop, a 19th-century advocate for the dignity and rights of non-citizens—now stands in stark contrast to its namesake's legacy. The federal government is using the building to hold Minnesotans detained by Immigration and Customs Enforcement ("ICE") while barring faith leaders from offering prayer, pastoral guidance, sacramental ministry, and spiritual comfort to detainees in moments of profound fear, isolation, and despair. By prohibiting faith leaders from providing essential pastoral care to individuals in ICE detention, the federal government unconstitutionally obstructs their sacred obligation to exercise their faith through ministry to community members in the greatest need of spiritual comfort.

2.      Plaintiffs, the Minneapolis Area Synod of the Evangelical Lutheran Church in America, the Minnesota Conference of the United Church of Christ, and Father Christopher Collins represent congregations and clergy across Minnesota whose faith compels them to minister to those who are detained, imprisoned, and torn from their families. This ministry is not political advocacy. It is not symbolic presence. It is a core and non-negotiable religious obligation rooted in Scripture and centuries of practice. The Constitution protects their right to carry out that calling. Yet Defendants have imposed a categorical ban preventing Plaintiffs from entering Whipple to provide pastoral care.

3.      This is not a minor administrative disagreement over building access. By categorically barring faith leaders from praying with detainees, offering sacraments, or providing spiritual guidance, the government imposes a profound and unjustified burden

on religious exercise at the precise moment it is most urgently needed. The ability to provide pastoral care ensures that even in the most dire legal processes that could result in deportation or prolonged detention, individuals are treated with dignity and humanity, not as mere inventory. Detainees endure separation from loved ones, transfers far from Minnesota, and the threat of permanent removal from the United States often to places they no longer know, all while enduring harsh and destabilizing conditions. Plaintiffs challenge the government's blanket denial of pastoral access as a violation of the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act—restrictions that cannot be justified by any compelling governmental interest pursued through the least restrictive means.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.

5.    Venue is proper under 28 U.S.C. §§ 1391(b)(2), (e)(1) because, at the time of filing, Plaintiffs are based in this district, a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this District, and Defendants are officers or employees of the United States acting in their official capacities.

## PARTIES

6.    Plaintiff Minneapolis Area Synod of the Evangelical Lutheran Church in America ("ELCA") is a regional judicatory of the ELCA, a national Protestant Christian denomination with congregations throughout the United States and the Caribbean. The Synod operates under the constitution, bylaws, and resolutions of the ELCA and provides

ecclesiastical oversight, governance, and support to ELCA congregations and ministers within its designated Minnesota region. It conducts its affairs through its elected bishop, synod council, officers, and committees, and maintains its principal offices in Minneapolis, Minnesota. As an intermediate judicatory between congregations and the churchwide organization, the Synod exercises authority and responsibilities defined by ELCA governing documents and encompasses 137 worshipping communities in the Minneapolis area. Clergy from the Synod sought to exercise, but were denied by Defendants, their right to free exercise of religion under the First Amendment to the Constitution and the Religious Freedom Restoration Act by being denied the right to provide pastoral care to detainees at Whipple.

7.     Plaintiff Minnesota Conference of the United Church of Christ is a regional judicatory of the United Church of Christ ("UCC"), a Protestant Christian denomination with congregations nationwide. The Minnesota Conference is organized and operates pursuant to the constitution and bylaws of the UCC and its own governing documents, exercises the authority and responsibilities of a Conference as defined by the UCC governing documents, and is responsible for providing ecclesiastical oversight, support, and coordination for UCC local churches and ministers within its designated region in Minnesota. The Conference conducts its affairs through its elected officials, governing board, and committees, and maintains its principal offices in Minnesota. Clergy members from the Minnesota Conference of the United Church of Christ sought to exercise, but were denied by Defendants, their right to free exercise of religion under the First Amendment to

the Constitution and the Religious Freedom Restoration Act by being denied the right to provide pastoral care to detainees at Whipple.

8.    Plaintiff Father Christopher Collins is an ordained priest of the Roman Catholic Church and professed member of the Society of Jesus (Jesuits), a religious order within the Catholic Church. Father Collins currently serves as Parochial Administrator of St. Peter Claver Catholic Church in St. Paul, Minnesota. Father Collins sought to exercise, but was denied by Defendants, his right to free exercise of religion under the First Amendment to the Constitution and the Religious Freedom Restoration Act by being denied the right to provide pastoral care to detainees at Whipple.

9.    Defendant United States Department of Homeland Security ("DHS") is a federal executive agency responsible for enforcing federal immigration laws. DHS is responsible for policies implemented at Whipple.

10.    Defendant Kristi Noem is the Secretary of the DHS. She is sued in her official capacity.

11.    Defendant United States Immigration and Customs Enforcement ("ICE") is a federal law enforcement agency within DHS. ICE is responsible for the enforcement of immigration laws, including detention and removal of immigrants.

12.    Defendant Todd Lyons is the Acting Director of ICE. He is sued in his official capacity.

13.    Defendant Marcos Charles is the Acting Executive Director for ICE's Enforcement and Removal Operations ("ERO"). He is sued in his official capacity.

14.     Defendant David Easterwood is the Acting Field Office Director for ICE's ERO St. Paul Field Office, which has jurisdiction over the ERO detention at Whipple. He is sued in his official capacity.

15.     Defendant Federal Protective Service ("FPS") is a federal law enforcement agency within DHS. FPS is responsible for security and protection of federal buildings, including Whipple.

16.     Defendant Faron K. Paramore is the Director of FPS. He is sued in his official capacity.

## BACKGROUND

### I.     History of Clergy Presence at Whipple

17.     Since at least 2018, faith leaders in the Twin Cities have led regular prayer vigils at the Whipple Federal Building, the regional ICE headquarters for a five-state area and the site of both immigrant detention facilities and an immigration court.

18.     Prior to 2025, immigrants routinely visited Whipple for court hearings, immigration interviews, and other related proceedings.

19.     The prayer vigils held outside Whipple have been an interfaith demonstration of solidarity and support for immigrants and their treatment by the federal government.

### II.     Operation Metro Surge

20.     Beginning in early December 2025, Defendants launched what they refer to as "Operation Metro Surge." Operation Metro Surge started in the Twin Cities Metro area and later expanded statewide.

21.    At one point, more than 3,000 DHS agents were conducting enforcement activity on the streets of the Twin Cities Metro and beyond. This was reportedly the largest immigration enforcement operation in American history.

22.    For context, the number of federal agents in Minnesota equaled nearly one agent for every 1,000 of the Twin Cities' 3.2 million residents. The number of federal agents was more than five times the number of officers in the Minneapolis Police Department and roughly equivalent to the combined total of the ten largest law enforcement agencies in the area. That number also dwarfed the 150 federal agents typically present in the Metro area prior to Operation Metro Surge.

23.    As of the date of this filing, public reports indicate that at least 500 federal agents remain in Minnesota.

24.    Since the start of Operation Metro Surge, hundreds of individuals have been arrested by ICE for potential removal ("detainees") each day. The vast majority of these individuals have been transported directly to Whipple for detention.

25.    Despite stating publicly that Whipple serves only as a "processing" facility, Defendants regularly hold detainees in Whipple for days at a time before transferring them to other state or holding facilities.

26.    Because of recent allegations of Fifth Amendment violations at Whipple, a federal judge ordered that Defendants shall not transfer detainees out of Minnesota during the first 72 hours of their detention. *Advocates for Human Rights v. U.S. Dep't of Homeland Security et al.*, No. 26-cv-00749 (NEB/DLM) (D. Minn. Feb. 2, 2026), Dkt. No. 95, at 39.

27.     Whipple, named for Minnesota's first Episcopal bishop and a prominent 19th-century advocate for the rights of non-citizens, has become the epicenter of systematic deprivation of fundamental constitutional and legal rights by the federal government.

### III.    Defendants' Repression of the Right to Free Exercise

28.     Throughout Operation Metro Surge, Defendants have repeatedly infringed on Minnesotans' rights to freely exercise their religion through acts of force and intimidation. A non-exhaustive list detailing these incidents includes the following:

- On the morning of December 7, 2025, ICE vehicles circled the Church of the Assumption of the Blessed Virgin Mary, apparently waiting to arrest churchgoers as they left morning services at the church.[1]

- On January 7, 2026, at least two pastors were shoved, shot at with pepper rounds, and exposed to pepper spray while protesting the actions of federal immigration agents in Minneapolis. One pastor, Rev. Ashley Horan, explained that her Unitarian Universalist faith compels her to protest because it affirms the inherent worth and dignity of every human being and the interdependence of all people.[2]

- Also on January 7, 2026, Minneapolis Pastor Kenny Callaghan was detained by ICE during a protest near his church. Reports recount that ICE agents

_____

[1]Biestman Decl. ¶ 1, *Tincher v. Noem*, No. 25-cv-4669 (KMM/DTS) (D. Minn. Dec. 17, 2025), Dkt. No. 1-2.
[2] Jack Jenkins, *Minneapolis Clergy Exposed to Pepper Spray after Rushing to Scene of Deadly ICE Shooting*, NCR, (Jan. 8, 2026), https://www.ncronline.org/news/minneapolis-clergy-exposed-pepper-spray-after-rushing-scene-deadly-ice-shooting.

repeatedly attempted to intimidate the pastor, including by waving a gun in his face.[3]

- On Sunday, January 11, 2026, a local Catholic church in Pelican Rapids, Minnesota cancelled Sunday mass due to fear of ICE agents.[4]

- On January 13, 2026, clergy members who sought to offer pastoral care to detainees at Whipple were denied access to the facility.[5]

29.     On January 23, 2026, in one of the largest and most public displays of religious oppression during Operation Metro Surge, approximately ninety-nine clergy members were arrested while hundreds more protested at the Minneapolis-Saint Paul International Airport, calling for an end to the ICE Surge.[6]

30.     Rev. Mariah Tollgaard, senior pastor of Hamline Church United Methodist in St. Paul, Minnesota, was among those arrested on January 23, 2026. According to news

---

[3] Ashley Vega, *Minneapolis Pastor Says He Was Detained by ICE After Joining Protest Told 'You're White' and 'Wouldn't Be Any Fun Anyway' on Release*, People, (Jan. 13, 2026), https://people.com/minneapolis-pastor-says-ice-detained-him-after-joining-protest-told-he-wouldnt-be-any-fun-because-youre-white-11884703.

[4] Kevin Wallevand, *Palpable Fear: Pelican Rapids Reacts to ICE in Town*, INFORUM (Jan. 12, 2026), https://www.inforum.com/news/minnesota/palpable-fear-pelican-rapids-reacts-to-ice-in-town.

[5] Jack Jenkins, *Faith Leaders are Denied Access to Immigration Detainees in Minnesota*, NCR, (Jan. 14, 2026), https://www.ncronline.org/news/faith-leaders-are-denied-access-immigration-detainees-minnesota.

[6] Adam Duxter, Nick Lunemann, *Clergy Arrested Protesting ICE at MSP Share Story: 'It was Holy*,' CBS NEWS, (Feb. 9. 2026), https://www.cbsnews.com/minnesota/news/clergy-arrested-protesting-ice-share-story-bigger-than-belief/.

reports, Rev. Tollgaard stated that she felt it was her religious duty as a Christian to stand with her neighbors in opposition to what she described as a federal occupation of her state.[7]

31.    In sum, Defendants have engaged in a documented pattern and practice of substantially burdening the free exercise of religion. These incidents reflect only a fraction of the disruption, intimidation, and chaos associated with Operation Metro Surge and related ICE activities in Minnesota. They illustrate how Defendants' actions have interfered with religious expression and the ability of clergy and faith communities to carry out their ministries.

## IV.    Plaintiffs' Religious Practices

### A.    Plaintiff Minneapolis Area Synod of the Evangelical Lutheran Church in America

32.    Plaintiff Minneapolis Area Synod of the Evangelical Lutheran Church is led by Bishop Jennifer Nagel.

33.    The Minneapolis Area Synod includes 137 worshipping communities, with more than 700 church leaders and approximately 143,000 members in Minneapolis and the surrounding area.

34.    The Evangelical Lutheran Church in America unequivocally believes in offering pastoral and legal counsel to persons without legal status.[8]

---

[7] *Id.*

[8] Evangelical Lutheran Church in America, *A social message on Immigration*, at 4 (Nov. 16, 1998) (updated April 2018), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/ImmigrationSM.pdf.

35.    The Evangelical Lutheran Church in America works to advocate on behalf of detained individuals and encourages congregations to provide services for the detained in recognition that people in detention, including women and children, are often isolated from pastoral and legal services and subject to abuse and neglect.[9]

36.    The Evangelical Lutheran Church in America's 1998 social message on immigration acknowledges the Church's *responsibility* for ministering to and advocating for the human rights of undocumented individuals specifically.[10]

37.    Consistent with this responsibility, the Evangelical Lutheran Church in America's Constitution requires that "[e]very minister" provide pastoral care and "speak publicly to the world" to support the most oppressed and marginalized, and advocate for dignity, justice, and equity for all people, and embrace racially and ethnically diverse populations.[11]

---

[9] Evangelical Lutheran Church in America, *A social message on Immigration*, at 5 (Nov. 16, 1998) (updated April 2018), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/ImmigrationSM.pdf.

[10] Evangelical Lutheran Church in America, *A social message on Immigration*, at 5 n.7 (Nov. 16, 1998) (updated April 2018), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/ImmigrationSM.pdf (quoting Lutheran Church in America, *Implementing Resolutions for Human Rights Social Statement* (1978)).

[11] Evangelical Lutheran Church in America, *Constitutions, Bylaws, and Continuing Resolutions of the Evangelical Lutheran Church in America*, at 28 (adopted Apr. 30, 1987) (current as of Nov. 2025), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/ELCA_Constitutions_Bylaws_and_Continuing_Resolutions_2025_11.pdf; *see also id.* at 191, 221 (stating the same).

38.    Additionally, the Evangelical Lutheran Church in America requires Congregations to include in their Constitution the commitment that their congregation provide pastoral care and respond to human need, work for justice and peace, care for the sick and suffering, and participate responsibly in society.[12]

39.    The Evangelical Lutheran Church in America endorses the enhancement of worship materials to reach out to those in detention and calls on its members to hold in public prayer those who might otherwise be invisible and to proclaim boldly Jesus' declaration of "release to the captive" as a sign of God's coming reign (Luke 4:18).[13]

40.    Indeed, the Evangelical Lutheran Church in America calls its members "to seek justice and to bear one another's burdens compassionately and wisely."[14]

41.    This calling is integral to the Evangelical Lutheran Church in America: "Christians do not seek out suffering for its own sake. Rather, we seek out those in need,

---

[12] Evangelical Lutheran Church in America, *Constitutions, Bylaws, and Continuing Resolutions of the Evangelical Lutheran Church in America*, at 200 (adopted Apr. 30, 1987) (current as of Nov. 2025), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/ELCA_Constitutions_Bylaws_and_Continuing_Resolutions_2025_11.pdf (laying out the statement of purpose, including C4.03); Evangelical Lutheran Church in America, *Guide for Use of the Model Constitution for Congregations*, at 1 (2025), https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/Guide_Use_of_Model_Constitution_Congregations_122025.pdf (explaining that one of the required provisions for Congregations is C4.03).
[13] Evangelical Lutheran Church in America, *A Social Statement on The Church and Criminal Justice: Hearing the Cries*, at 24 (adopted April 17, 2013) https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/Criminal_JusticeSS.pdf.
[14] Evangelical Lutheran Church in America, *A Social Statement on The Church and Criminal Justice: Hearing the Cries*, at 24 (adopted Apr. 17, 2013) https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/Criminal_JusticeSS.pdf.

those who are isolated, those who are afraid, and those who yearn in hope. If our seeking leads to finding, and finding to ministry, then we accept that burdens and ambiguity may well mark our responsive love. Reform of entrenched systems, merciful response to harms caused by crime, and the courage to face injustice will inevitably involve struggle and uncertainty. The exercise of baptismal vocation in the way of the crucified Christ risks suffering and bears burdens as it bears the mark of the cross to a broken and crying-out world."[15]

**B.     Plaintiff Minnesota Conference of the United Church of Christ**

42.     The Minnesota Conference of the United Church of Christ ("UCC") believes "that the UCC is called to be a prophetic church" and that "in the tradition of the prophets and apostles, God calls the church to speak truth to power, liberate the oppressed, care for the poor and comfort the afflicted."[16]

43.     In recognition of these beliefs, the duty to provide pastoral care is enshrined in the UCC's Constitution. The UCC's Constitution delineates the duties of its clergy and states that: "[a]n Ordained Minister of the United Church of Christ is one of its members

---

[15] Evangelical Lutheran Church in America, *A Social Statement on The Church and Criminal Justice: Hearing the Cries*, at 23–24 (adopted Apr. 17, 2013) https://elcamediaresources.blob.core.windows.net/cdn/wp-content/uploads/Criminal_JusticeSS.pdf.
[16] Minnesota Conference of the United Church of Christ, *What We Believe*, https://www.uccmn.org/about/what-we-believe/ (last visited Feb. 19, 2026).

who has been called by God and ordained *to preach and teach the gospel*, to administer the sacraments and rites of the Church, *and to exercise pastoral care* and leadership."[17]

44.     This responsibility is echoed in the governing documents of the Minnesota Conference of the UCC, which similarly describe an ordained minister as a Church member called by God and ordained to preach and teach the Gospel, administer sacraments and rites, and carry out pastoral care and leadership within the faith community.[18]

45.     Fundamentally, "[t]he United Church of Christ recognizes that God calls the whole Church and every member to participate in and extend the ministry of Jesus Christ by witnessing to the Gospel in church and society."[19]

46.     The commitment to offering pastoral care and support to immigration detainees has longstanding roots. As far back as 2018, the Immigration Team of the Minnesota Conference encouraged members to participate in a recurring interfaith vigil held on the second Tuesday of each month at 7:30 a.m. outside Whipple.[20]

47.     During its 2018 Annual Meeting, authorized ministers and local church delegates of the Minnesota Conference voted to designate the Conference as an "Immigrant

---

[17] United Church of Christ National Ministries, *The Constitution of the United Church of Christ*, at 4 (Oct. 13, 2018), https://www.new.uccfiles.com/pdf/UCC_Constitution.pdf (emphasis added).

[18] Minnesota Conference of the United Church of Christ, *Bylaws of Minnesota Conference of the United Church of Christ*, at 3 https://www.uccmn.org/wp-content/uploads/2020/10/Final-2020-revisions-as-approved-at-June-AM.pdf (effective June 13, 2020).

[19] United Church of Christ National Ministries, *The Constitution of the United Church of Christ*, at 3 (Oct. 13, 2018)  https://www.new.uccfiles.com/pdf/UCC_Constitution.pdf.

[20] Minnesota Conference United Church of Christ, *Immigrants Among Us*, (Jan. 10, 2018) https://www.uccmn.org/2018/01/10/5715-2/ (last visited Feb. 19, 2026).

Welcoming Conference." That decision was grounded in Christian tradition, including the biblical teaching from Leviticus 19:33–34, which instructs believers not to oppress immigrants residing among them but to love them as they would their own citizens, remembering Israel's own history as strangers in Egypt.[21]

48.    The General Synod of the UCC has called upon its members to offer pastoral care to detainees and passed a resolution to that effect, strongly urging ministries "to support additional training, workshops, and educational opportunities for individuals  and congregations including, but not limited to, organizing pastoral care, legal education, community education, Know Your Rights trainings, accompaniment ministries, and sanctuary efforts for vulnerable immigrant communities in partnership with other immigrant-supporting organizations."[22]

49.    The General Synod of the UCC again urged its members to serve immigrants, migrants, and refugees, and to continue to do so even in the face of threats, in a recent Resolution of Witness[23] stating:  "[T]he Thirty-fifth General Synod of the United Church

---

[21] Minnesota Conference United Church of Christ, *Resolution Calling on the Fifty-Fourth Conference of the Minnesota Conference of the United Church of Christ and its Congregations to Covenant as Immigrant Welcoming Congregations*, at 1 https://uccmn.org/wp-content/uploads/2020/04/Immigration-Resolution-FINAL.pdf.

[22] United Church of Christ National Ministries, *Calling the United Church of Christ to Oppose the 2025 Immigration Rollbacks and Support Immigrants, Refugees, and Pacific Island Communities, While Amplifying Antiracist Work on Behalf of Black, Indigenous, and People of Color in Response to the Current Socio-Political Backlash*, at 4 (July 2025), https://uccresolutions.org/wp-content/uploads/2025/11/COREM-1.pdf (emphasis added).

[23] "A Resolution of Witness is an expression of Christian conviction concerning a moral, ethical, or religious matter confronting the Church, the nation, or the world." United Church of Christ National Ministries, *About UCC Resolutions*, https://uccresolutions.org/about-ucc-resolutions/ (last visited Feb. 19, 2026).

of Christ affirms the religious and constitutional rights of Immigrant Welcoming and sanctuary congregations, and all congregations and clergy engaged in this work, to continue to welcome, pray with and serve immigrants, migrants and refugees, as well as speak prophetically, even as they face extreme threat by the federal government, as well as certain state and local governments, putting at risk the safety of their place of worship, their financial stability, and their very existence."[24]

### C.    Father Christopher Collins, SJ

50.    Father Christopher Collins, SJ, is an ordained priest of the Roman Catholic Church and professed member of the Jesuits. He serves as the Parochial Administrator of St. Peter Claver Catholic Church in St. Paul, which is deeply committed to racial justice, human dignity, and outreach to marginalized communities. The parish community includes families from diverse cultural and national backgrounds, including immigrants navigating complex social, economic, and legal challenges.

51.    Throughout his priesthood, Father Collins has consistently ministered in culturally diverse and immigrant communities. Providing pastoral care across lines of culture, language, race, and nationality has been a defining characteristic of his vocation.

52.    As a Jesuit priest, providing pastoral care to immigrants and detainees is central to his religious vocation. The spirituality of the Society of Jesus calls its members to accompany those who are marginalized, displaced, and deprived of freedom. Catholic

---

[24] United Church of Christ National Ministries, *Responding to the Federal Government's Attack on Immigrants, Migrants, and Refugees*, at 3–4 (July 2025), https://uccresolutions.org/wp-content/uploads/2025/11/Immigrants-1.pdf (emphasis added).

teaching affirms the inherent dignity of every human person, including those in detention. Father Collins' priestly obligations include offering prayer, celebrating the sacraments, providing spiritual counsel, and being physically present to those who are afraid, isolated, or suffering.

53.    Father Collins' ministry has regularly included in-person pastoral care in institutional settings, including prisons and jails. In those settings, he has complied with security and other institutional protocols and is experienced in respecting facility rules while providing confidential, appropriate, and sacramental religious care.

## V.    Plaintiffs' Attempts to Provide Pastoral Care to Detainees

54.    Plaintiffs' ministers have made several attempts to provide pastoral care to detainees at Whipple since the inception of Operation Metro Surge.

55.    On December 12, 2025, the Feast of Our Lady of Guadalupe—a day of particular spiritual significance for many immigrants and for the broader Catholic community, Father Collins visited Whipple. Father Collins attempted to enter Whipple to pray for a detained mother of a local student, but when he arrived, he was blocked from even entering the parking lot to Whipple. He was prevented entirely from accessing the building and from ministering to those believed to be inside the building.

56.    On January 13, 2026, Rev. Hayward and Rev. Voelkel attempted to enter Whipple to provide pastoral care to detainees. However, Defendants barred the ministers from providing any spiritual guidance or care to detainees.

57.    Defendants' practice of barring faith leaders from providing pastoral care to detainees has continued, and continues to this date. The alleged drawdown of ICE agents

has had no impact on the inability of faith leaders to provide pastoral care to detainees at Whipple.

58.     On February 18, 2026, Rev. Gonzalez sought access to detainees at Whipple to provide pastoral care and impose ashes for Ash Wednesday—a holy day of prayer in the Christian faith.

59.     In the Evangelical Lutheran Church in America, the imposition and bearing of ashes is a powerful demonstration of faith, representing repentance, mortality, and the start of the Lenten season. Receiving ashes at one's darkest hour—such as in detention in horrendous conditions—is essential to practicing the Christian faith and is an essential pastoral obligation.

60.     Despite her religious calling and experience, Rev. Gonzalez was denied access to detainees at Whipple.

61.     Specifically, Rev. Gonzalez notified those at Whipple that she was a clergy member and requested entry for the specific purpose of providing religious care, including prayer, spiritual guidance, and the imposition of ashes, but she was denied such access and was not provided a reasonable alternative means to fulfill her pastoral obligations.

62.     In seeking access, Rev. Gonzalez was directed to the ICE waiting room, where she again identified herself as a clergy member and requested access to individuals who wished to receive pastoral care, including the imposition of ashes. She was denied access at that point.

63.     The individual representing Whipple informed Rev. Gonzalez that she would not be permitted access to detainees for "security" and "safety" reasons. When

Rev. Gonzalez asked for further explanation, the employee unfoundedly claimed that the detainees could become agitated. Rev. Gonzalez noted that for those who sought pastoral care, being provided with such care would likely make them *less* agitated.

64.     Rev. Gonzalez was not offered any reasonable alternative means of providing in-person pastoral care to detainees on Ash Wednesday. She was not permitted to meet with detainees individually or to offer ashes or prayer in person.

65.     Rev. Gonzalez was informed by the government employee that faith leaders had attempted to gain access to detainees at Whipple at least four times per week since Operation Metro Surge began and had been denied access each time.

66.     Rev. Gonzalez was also informed that the room would be too crowded. When she offered to meet with only one or two individuals at a time, this was not permitted either.

67.     The government employee also falsely informed Rev. Gonzalez that the government holds detainees at Whipple for only a few hours at a time. Rev. Gonzalez, however, knows people in her own congregation and community who were held at Whipple for days, not hours.

68.     The government employee also provided Rev. Gonzalez with an email address to contact regarding clergy access. Within an hour or two after Rev. Gonzalez attempted to visit Whipple, she sent an email to the address provided, requesting to provide pastoral care. Rev. Gonzalez received an automated message stating: "Your inquiry will be reviewed, and if appropriate, a response will be provided." As of the date of this filing, Rev. Gonzalez has not received a response.

69.     On February 18, 2026, Bishop Nagel also sought access to detainees at Whipple to provide pastoral care and impose ashes for Ash Wednesday.

70.     Bishop Nagel identified herself as clergy and requested entry for the specific purpose of providing religious care to any detainees who desired it. She was directed to a waiting room where she again identified herself as clergy, explaining that she sought to provide prayer, spiritual counseling, and the imposition of ashes.

71.     Bishop Nagel was denied access to detainees. She was told that the Federal Whipple Building is a processing facility and that no one is allowed access to provide pastoral care, purportedly for safety reasons. Defendants did not provide an individualized assessment and did not offer a reasonable alternative means to Bishop Nagel so that she could fulfill her pastoral obligations.

72.     A government employee also falsely informed Bishop Nagel that detainees are held at the Federal Whipple Building for only short-term processing. In her personal experience, however, individuals from the Minneapolis Area Synod congregations and community have been held at Whipple for days. Even brief detention does not diminish the urgent need for spiritual care, particularly when detainees may be transferred without notice.

73.     On February 18, 2026, Rev. Hayward and Rev. Voelkel attempted to provide pastoral care to detainees at Whipple on Ash Wednesday. As with Rev. Gonzalez and Bishop Nagel, Defendants denied them access and prevented them from fulfilling their religious duties.

74.     On February 23, 2026, Father Collins attempted to provide pastoral care to detainees at Whipple. Like Rev. Gonzalez, Bishop Nagel, Rev. Hayward, and Rev. Voelkel, Defendants denied him access. Father Collins was told that only legal representatives were allowed access for the sole purpose of providing legal services, and that pastoral visits were not allowed. He was denied access without any individualized assessment, accommodations, or reasonable alternative means to fulfill his religious obligations.

75.     Providing in-person pastoral care to immigrants in detention is an essential practice of faith in the Evangelical Lutheran Church in America, the General Synod of the United Church of Christ, and the Roman Catholic Church. Plaintiffs are called to visit and minister to immigrants, including detainees, to offer prayer, comfort, guidance, and spiritual support, and to be physically present with those in need, particularly the vulnerable and those experiencing isolation, fear, and uncertainty. Ash Wednesday is a particularly important day for such ministry.

76.     Pastoral care practice within the Evangelical Lutheran Church in America, the General Synod of the United Church of Christ, and the Roman Catholic Church emphasizes confidentiality, dignity, and physical presence. These religious components cannot be fully realized through indirect or impersonal means. In-person communication, including in Spanish when needed, is necessary to provide meaningful spiritual care, to receive and respond to pastoral needs, and to carry out my faith's mandate to care for the stranger, the suffering, and the imprisoned.

77.    Plaintiffs were and continue to be ready, willing, and able to comply with reasonable and neutral security and identification procedures required for entry to Whipple. Plaintiffs have complied with such procedures in other institutional settings without conflict. Plaintiffs' sole purpose in seeking access is to fulfill their religious obligations to provide pastoral care to detained immigrants.

78.    By denying Plaintiffs the ability to access Whipple to provide pastoral care, Defendants are denying Plaintiffs the right to practice that which is integral to their faith—to care for those most in need at their darkest hours. Spiritual care delayed is often spiritual care denied, especially where detainees may be transferred without notice. If Plaintiffs are prevented from visiting detained individuals while they are held at Whipple, they lose the opportunity to carry out that religious practice during their detention. Additionally, certain religious observances, including the Feast of Our Lady of Guadalupe and Ash Wednesday, occur only once each year, preventing Plaintiffs from performing specific religious rites if not permitted to do so at the time they are required.

79.    Plaintiffs intend to continue seeking access to Whipple to provide pastoral care to detained immigrants, including visitation, prayer, spiritual guidance, and sacramental ministry, consistent with their faith and ministerial duties, and subject to legitimate security protocols.

## COUNT I – VIOLATION OF THE FIRST AMENDMENT AND THE RELIGIOUS FREEDOM RESTORATION ACT OF 1993

80.    Plaintiffs re-state and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     The First Amendment of the Constitution broadly prohibits the government from restraining the free exercise of religious practices.

82.     In 1993, Congress enacted RFRA to continue to ensure broad protection for religious liberty, which is recognized in the Constitution as an "unalienable right." 42 U.S.C. § 2000bb(a)(1). Indeed, RFRA prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb–1(a).

83.     Defendants' policies and practices unreasonably burden Plaintiffs' free exercise of religion in violation of the First Amendment and the broad protections under RFRA.

84.     Defendants' policies and practices that deny Plaintiffs' ability to freely practice their religion neither advance any compelling government interest, nor constitute the least restrictive means of furthering any alleged compelling governmental interest.

85.     The United States has a long history of accommodating such religious freedom and practice inside of prisons and jails, and there is no reason to deny them at Whipple, particularly where the vast majority of detainees have no criminal records.

86.     Because of this history and lack of any compelling purpose being served by a total exclusion, Defendants have also violated their obligation to use the least restrictive means for advancing any alleged compelling purpose. Plaintiffs have extensive experience with prayer services in institutions, including prisons and detention centers, and with the procedures that are the norm in such facilities.

87.    There is a special religious need for Plaintiffs to enter Whipple because the isolation is longer, the conditions in which they are held are worse, and the trauma that many detainees have suffered due to separation from their families is greater. This is particularly true given the lack of criminal history for most detainees at Whipple.

88.    Under these circumstances, it is an even more unreasonable and unjustified burden on religion under RFRA to deny Plaintiffs the right to provide spiritual and religious care to detainees, as Plaintiffs' faith unequivocally directs them to do.

89.    The least restrictive means for furthering any government interest that burdens such religious freedom justifies no restriction that is greater than policy permitting, for example, access to counsel at Whipple, especially in the absence of any safety or security problem.

90.    By denying Plaintiffs' rights under the First Amendment and RFRA, Defendants have and continue to cause Plaintiffs irreparable harm.

91.    Because the violation of Plaintiffs' rights is continuing, and none of Defendants have made any attempt to rescind or vacate the denial of Plaintiffs' rights to provide pastoral care, Plaintiffs will continue to suffer irreparable injury from the denial to practice their faith for which they otherwise have no adequate legal remedy under the law.

92.    In the absence of an injunction, Defendants will continue to deny and restrain Plaintiffs' free exercise of their religion in violation of the First Amendment and RFRA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

1.    Declaring that by denying Plaintiffs the right to enter the Whipple facility at

reasonable times to provide pastoral care, the Defendants have denied the rights of Plaintiffs to practice their religion under the Free Exercise Clause and RFRA, and such loss of religious rights and freedom, even temporarily, by government action constitutes irreparable injury;

2.     Entering an injunction that:

a.    Permits in-person pastoral visits by faith leaders to all detainees at the Whipple Federal Building who wish to receive spiritual guidance, prayer, or sacramental ministry, including rites tied to specific liturgical dates.

b.    Requires Defendants to establish a clear, predictable process for scheduling visits by faith leaders, including a commitment to grant access requests within 1-2 hours and to accommodate urgent or time-sensitive religious observances.

c.    Allows faith leader visits at a regular frequency, including for urgent pastoral care or time-sensitive religious rites without unnecessary delay.

d.    Ensures reasonable security procedures that do not unduly restrict faith leaders from exercising their religious duties, including permitting one-on-one or small-group visits where appropriate and consistent with safety protocols.

e.    Prohibits Defendants from denying access to faith leaders based on vague or generalized safety concerns without individualized assessment and specific factual justification.

f.    Prohibits Defendants from retaliating in any manner against Plaintiffs for participating in this litigation or for raising concerns about any alleged violation of this Preliminary Injunction.

g.    Requires Defendants to disseminate notice of the order to all agents stationed at the Whipple Federal Building and those responsible for the building's operations, including providing copies in paper or electronic format, within 12 hours of its issuance.

3.     Granting Plaintiffs injunctive relief and their reasonable costs and expenses

incurred in this action, including counsel fees and costs; and

4.  Awarding Plaintiffs any other relief the Court deems just and equitable.

Dated:  February 23, 2026                    Respectfully submitted,

*/s/ Erin Westbrook*
Erin Westbrook (MN #0393072)
Maxwell Bremer (MN #0387408)
Kaitlin Yira (MN #0403458)
**SAUL EWING LLP**
33 South 6th Street, Suite 4750
Minneapolis, MN  55402
612-225-2946
erin.westbrook@saul.com
maxwell.bremer@saul.com
kaitlin.yira@saul.com

Irina Vaynerman (MN #0396759)
Chelsea Walcker (MN #0396792)
**GROUNDWORK LEGAL**
1650 West End Blvd., Suite 100
St. Louis Park, MN 55416
(612) 208-9349
irina@groundworklegal.org
chelsea@groundworklegal.org

*Attorneys for Plaintiffs*