# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNEAPOLIS AREA SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, MINNESOTA CONFERENCE OF THE UNITED CHURCH OF CHRIST, and FATHER CHRISTOPHER COLLINS, SJ, | Case No. 0:26-cv-1576-JWB-DTS |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | |
| Defendants. | |

## **INTRODUCTION**

Plaintiffs Minneapolis Area Synod of the Evangelical Lutheran Church in America, Minnesota Conference of the United Church of Christ, and Father Christopher Collins, SJ (collectively, "Plaintiffs") move this Court for a preliminary injunction requiring Defendants to permit reasonable in-person pastoral access to individuals detained by Immigration and Customs Enforcement ("ICE") at the Bishop Henry Whipple Federal Building ("Whipple") in Fort Snelling, Minnesota.

Plaintiffs are Christian congregations and clergy across Minnesota whose faith compels them to minister to those separated from their families, detained, and subjected to traumatic and destabilizing conditions. Their religious obligations are not abstract or symbolic; they require physical presence, prayer, sacramental ministry, and spiritual counsel—especially in moments of acute suffering.

Since the launch of what Defendants have called "Operation Metro Surge" Defendants have categorically barred clergy from entering Whipple to provide pastoral care to detainees. This denial has occurred even on Ash Wednesday—one of the holiest days in the Christian liturgical calendar—when Plaintiffs sought to administer sacraments.

This categorical denial violates the Free Exercise Clause of the First Amendment to the United States Constitution and the Religious Freedom Restoration Act. Because Plaintiffs are likely to succeed on the merits of their claims, are suffering ongoing and irreparable harm, and the balance of equities and public interest overwhelmingly favor protection of religious liberty, the Court should issue the requested preliminary injunction.

## BACKGROUND

**I.    "Operation Metro Surge" and Detention at Whipple**

In December 2025, Defendants launched "Operation Metro Surge," deploying thousands of federal law enforcement agents to Minnesota for the purported purpose of detaining and deporting noncitizens.[1] Within weeks, Defendants reported detaining thousands of individuals.[2] Families were separated. Parents were taken from homes and workplaces. And, in some instances, very young children were taken into custody.[3]

The majority of Minnesota residents arrested and detained as part of this operation have been held at Whipple, at least initially.[4] Some people are detained for hours before being transferred to other detention facilities, including facilities outside Minnesota, while others are held for days. (*See* Gonzalez Decl. ¶ 12.) Operation Metro Surge has continued to maintain an active law enforcement presence in Minnesota even after the official drawdown announcement.[5]

---

[1] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* AP (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817.

[2] Sec. Kristi Noem (@Sec_Noem), X (Jan. 19, 2026 at 9:40 AM CT), https://x.com/Sec_Noem.

[3] Sam Levin, *US immigration agents detain two-year-old Minnesota girl: "depravity beyond words,"* The Guardian (Jan. 23, 2026), https://www.theguardian.com/us-news/2026/jan/23/us-immigration-two-year-old-minnesota-girl.

[4] Matt Rivers, Janice McDonald & Armando Garcia*, Lawyers allege Dept. of Homeland Security is denying legal counsel to Minnesota detainees*, ABC News (Jan. 18, 2026), https://abcnews.com/US/lawyers-allege-dept-homeland-security-denying-legal-counsel/story?id=129335914.

[5] Madison McVan, *'Fewer than 500' ICE agents left in Minnesota, per federal officials*, Minnesota Reformer (Feb. 20, 2026), https://minnesotareformer.com/2026/02/20/fewer-than-500-ice-agents-left-in-minnesota-per-federal-officials/.

The conditions faced by detainees during this period of initial confinement are marked by uncertainty, trauma, and acute emotional distress. Many detainees have no opportunity to contact family members or legal counsel. Many do not know where they will be transferred. Others fear imminent removal from the United States.

For faith leaders—including Plaintiffs—whose religious calling centers on ministering to individuals in detention, this initial period of confinement is among the most critical for pastoral care.

## II.    Plaintiffs' Religious Mission

Plaintiffs represent Christian congregations and clergy across Minnesota whose faith commands ministry to the detained, the stranger, and the vulnerable.[6] For years, they have ministered to immigrant neighbors and parishioners in Minneapolis and throughout Minnesota by attending immigration hearings, leading vigils, and tending to the spiritual and emotional well-being of their community members at a time when fear and isolation are most acute.

Before Operation Metro Surge, clergy—including Reverand Rebecca Voelkel, Reverand Susan Hayward, Reverand Melissa Gonzalez, and Bishop Jennifer Nagel— regularly visited Whipple to attend hearings, accompany congregants, and conduct prayer vigils outside the building. (Voelkel Decl. ¶ 13; Hayward Decl. ¶ 8; Gonzalez Decl. ¶¶ 9–

---

[6] In support of this memorandum, Plaintiffs have filed herewith the Declarations of Father Christopher Collins, SJ, (Exhibit A), Bishop Jennifer Nagel (Exhibit B), Reverand Melissa Gonzalez (Exhibit C), Dr. Reverand Rebecca Voelkel (Exhibit D), and Reverand Susan Hayward (Exhibit E).

10.) In doing so, they complied with all security protocols, presented identification, and were not denied access. (*See id.*)

### III. Defendants Deny Plaintiffs Access to Whipple to Provide Pastoral Care to Detainees

Since Operation Metro Surge began, Defendants have categorically prohibited Plaintiffs from accessing Whipple to provide pastoral care to detainees. These denials have occurred even when clergy identified themselves and explained their religious purpose, and they have occurred repeatedly without individualized assessment or meaningful engagement.

After Operation Metro Surge commenced, Plaintiffs' clergy members were called to continue their ministry to individuals experiencing significant and acute trauma—individuals who Defendants held at Whipple for an indefinite period under threat of permanent removal from the United States, after Defendants tore these individuals from their families, homes, and workplaces. (Collins Decl. ¶ 9; Voelkel Decl. ¶ 20.) Plaintiffs' clergy members undertook multiple efforts to provide in-person ministry at Whipple, all of which were rebuffed.

On January 13, 2026, as part of this calling, several of Plaintiffs' clergy members participated in a prayer vigil outside Whipple in an effort to reach detainees indirectly, consistent with their understanding of their religious obligation to minister even under restricted access. (Voelkel Decl. ¶ 9; Hayward Decl. ¶ 8.) Despite identifying themselves as clergy and stating the religious purpose of their visit, Defendants denied these faith leaders access to Whipple. (Voelkel Decl. ¶ 11; Hayward Decl. ¶ 11.) Defendants gave the

faith leaders a phone number to submit a visit request, but when the faith leaders called the number, there was either no response or Defendants flatly denied the ability of faith leaders to enter Whipple to provide pastoral care, with no explanation for the denial. (Voelkel Decl. ¶ 12; Hayward Decl. ¶ 12.)

On Ash Wednesday, February 18, 2026, several of Plaintiffs' clergy members again sought access to Whipple to provide pastoral care and to administer the imposition of ashes to detainees—a once-a-year rite marking repentance, mortality, and mercy. (Gonzalez Decl. ¶¶ 14, 27; Voelkel Decl. ¶¶ 13, 21; Hayward Decl. ¶¶ 13, 17; Nagel Decl. ¶ 8.) Reverends Gonzalez, Voelkel, and Hayward, along with Bishop Nagel, arrived with identification, in visible clergy attire, and prepared to comply with reasonable security protocols. (Gonzalez Decl. ¶¶ 16–17, 26; Voelkel Decl. ¶ 19; Hayward Decl. ¶¶ 15–16; Nagel Decl. ¶¶ 9, 15, 19.) Defendants nevertheless denied each of these faith leaders access and the ability to provide pastoral care.

DHS employees further confirmed that, multiple times per week since Operation Metro Surge began, Defendants have denied clergy access to provide pastoral care to detainees at Whipple. (Voelkel Decl. ¶ 16; Hayward Decl. ¶ 15.) By denying Plaintiffs' clergy members the ability to provide pastoral care on Ash Wednesday, Defendants permanently prevented Plaintiffs from administering a once-a-year religious rite to detainees who wished to receive it.

Father Collins likewise attempted to gain access to provide pastoral care and was denied entry. (Collins Decl. ¶ 13.) These repeated refusals reflect a pattern and practice amounting to a blanket prohibition on clergy access.

In certain instances when Plaintiffs' clergy members attempted to provide pastoral care to individuals detained at Whipple, ICE employees referenced vague "safety" concerns as justification for denying access. Yet the ICE officials provided no individualized assessment and identified no meaningful alternative means that by which Plaintiffs could fulfill their religious obligations. (Gonzalez Decl. ¶ 18; Nagel Decl. ¶ 9.) On several occasions, officials offered Plaintiffs' clergy members an email address to submit a pastoral visit request, but offered no timeline for or assurance of approval. (Voelkel Decl. ¶ 17; Hayward Decl. ¶ 15; Gonzalez Decl. ¶ 23.) To date, Defendants have not responded to the written requests submitted by Plaintiffs' clergy members seeking access to provide pastoral care. (Voelkel Decl. ¶ 18; Gonzalez Decl. ¶ 23.)

By repeatedly and categorically denying access, Defendants have directly interfered with Plaintiffs' core religious practices—including prayer, sacramental ministry, and spiritual counseling—and have effectively foreclosed the exercise of time-sensitive religious rites, such as those associated with Ash Wednesday. The denial is not incidental; it is pervasive, ongoing, and absolute, affecting all Plaintiffs' clergy members and all detainees who seek pastoral care.

## IV.    Plaintiffs' Constitutional and Statutory Rights to Provide Pastoral Care

The United States Constitution safeguards Plaintiffs' right to provide pastoral care through the Free Exercise Clause of the First Amendment, which prohibits government actions that substantially burden the exercise of religion absent a compelling governmental interest pursued through the least restrictive means. Providing pastoral care—through prayer, spiritual counseling, the administration of sacraments, and religious guidance—is

a core religious exercise entitled to constitutional protection. In addition, the Religious Freedom Restoration Act ("RFRA") reinforces and codifies this protection by prohibiting the federal government from substantially burdening a person's exercise of religion unless it demonstrates that application of the burden is the least restrictive means of furthering a compelling governmental interest. Together, these constitutional and statutory protections secure robust rights for faith leaders to provide pastoral care free from unwarranted governmental interference.

## **ARGUMENT**

In determining whether to enter a preliminary injunction, courts consider four factors: (1) the likelihood that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between that harm and the injury that an injunction would inflict on other parties; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). No single factor is determinative, though likelihood of success on the merits is the most significant. *Id.* When constitutional rights are at stake, the *Dataphase* factors frequently merge, because a strong showing on the merits establishes irreparable harm and strongly favors the public interest. *See, e.g.*, *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc). Here, each factor weighs decisively in favor of injunctive relief.

I.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendants Denial of Access to Detainees to Provide Pastoral Care Violates Plaintiffs' Constitutional and Statutory Rights**

Plaintiffs are likely to succeed on the merits of their claims under both RFRA and the Free Exercise Clause of the First Amendment. Defendants have imposed a categorical

prohibition on in-person pastoral ministry at Whipple. That blanket denial substantially burdens Plaintiffs' religious exercise without a compelling justification and without employing the least restrictive means.

RFRA provides that the federal government "shall not substantially burden a person's exercise of religion" unless it demonstrates that application of the burden to the particular claimant (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1. This protection applies "even if the burden results from a rule of general applicability." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). The statute "provides very broad protection for religious liberty." *Id.* at 706.

The Eighth Circuit has further made clear that a strong showing of likelihood of success on the merits—particularly in cases involving RFRA or First Amendment violations—generally satisfies the remaining preliminary injunction factors. *See Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) ("While no single factor is determinative, the probability of success factor is the most significant."). Courts have likewise recognized that a RFRA violation is comparable to the deprivation of a First Amendment right, such that once likelihood of success is shown, "the other requirements for obtaining a[n] . . . injunction are generally deemed to have been satisfied." *Catholic Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1025 (D.N.D. 2024) (quoting *Minn. Citizens*, 692 F.3d at 870). Plaintiffs need only demonstrate a "fair chance" of success—not a greater-than-fifty-percent likelihood of prevailing. *Stanley M. Herzog*

*Found. v. EEOC*, 781 F. Supp. 3d 897, 914 (W.D. Mo. 2025). They readily satisfy that standard.

### A.   Defendants' Categorical Ban Imposes a Substantial Burden on Plaintiffs' Religious Exercise

The government places a substantial burden on the right to free exercise when the challenged action (1) significantly inhibits or constrains conduct that manifests a central tenet of a person's religious beliefs, (2) meaningfully curtails a person's ability to express adherence to his or her faith, or (3) denies a reasonable opportunity to engage in core religious activity. *See Satanic Temple v. City of Belle Plaine*, 475 F. Supp. 3d 950, 959 (D. Minn. 2020). Denying in-person religious visits based on generalized safety concerns constitutes a substantial burden. *See Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) (explaining that a "substantial burden" includes government action that "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a person's religion").

The burden here is neither incidental nor indirect—it is categorical. Defendants have barred Plaintiffs from entering Whipple to provide in-person prayer, sacramental ministry, spiritual counseling, and liturgically required rites such as the imposition of ashes on Ash Wednesday. For the faith leaders and clergy represented in this case, in-person ministry to those who are detained, suffering, and vulnerable is not optional; it is a central

and obligatory component of their vocation and religious identity. Their declarations establish that:

- Providing pastoral care to detained immigrants is a religious obligation rooted in Scripture and denominational teaching.

- Certain rites—particularly Ash Wednesday—are time-bound and cannot be replicated at a later date.

- Physical presence, spoken prayer, and sacramental acts are essential components of their religious exercise.

The Supreme Court has repeatedly emphasized that courts may not question the theological correctness of a religious claimant's understanding of their obligations. *Hobby Lobby*, 573 U.S. at 724–25. If Plaintiffs sincerely believe that in-person ministry to detainees is religiously required—and the record overwhelmingly supports that they do—then the Court must treat the prohibition as a substantial burden.

Moreover, the denial here is absolute. Defendants repeatedly communicated to Plaintiffs' clergy members that visits to provide pastoral care are not permitted. As reflected in the record, DHS staff conveyed this restriction explicitly in person, and Defendants have provided no meaningful response to written requests—indeed, they have not responded to Plaintiffs' written requests at all. A policy that categorically bars clergy from ministering to detainees renders their religious practice "effectively impracticable," which is the hallmark of a substantial burden. *See Coalition for Spiritual & Public Leadership v. Noem*, 25-cv-14168, 2026 WL 396349, at *2 (N.D. Ill. Feb. 12, 2026). In *Coalition for Spiritual and Public Leadership v. Noem*, the federal district court held that

11

denial of access to the facility satisfies the legal test for substantial burden, finding that the restriction "'bears direct, primary, and fundamental responsibility for rendering a religious exercise effectively impracticable.'" *Id.* at \*4 (quoting *Soc. of Divine Word v. USCIS*, 129 F.4th 437, 450 (7th Cir. 2025)). In that case, the plaintiffs were clergy members and a religious organization seeking to pray and provide pastoral care to detainees at the Broadview Federal Building during "Operation Midway Blitz"—the Chicago analog to Operation Metro Surge. *Id.* at \*3. The court concluded that "Defendants' bar on plaintiffs' visitation to Broadview is fundamentally responsible for rendering plaintiffs' religious practice of providing ministry to detainees and migrants effectively impracticable." *Id.* at \*4.

This case presents the same question: whether the government may prohibit faith leaders from practicing core religious beliefs by denying them access to provide pastoral care to detainees. The answer is clearly no.

### B. Defendants Cannot Demonstrate a Compelling Interest Advanced Through the Least Restrictive Means

Once a substantial burden is shown, the burden shifts to the government to show that applying the restriction to these Plaintiffs furthers a compelling interest and is the least restrictive means of doing so. This standard is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Defendants have relied on only vague and inconsistent references to "safety" and "security." Generalized claims of security concerns are insufficient under RFRA. The government must demonstrate a compelling interest in denying access to these particular

12

Plaintiffs—not hypothetical visitors—and must show why less restrictive alternatives would fail. *Hobby Lobby*, 573 U.S. at 726.

Here, Plaintiffs have decades of experience ministering in secure environments, including detention facilities, prisons, and hospitals, without incident. They are willing to provide pastoral care to small groups or even one-on-one, and only to those detainees who wish to receive it. Defendants, however, have refused to consider any such accommodations, even imposing a categorical ban on all faith leaders providing pastoral care.

RFRA requires precisely the type of inquiry Defendants have refused: whether regular visitation schedules, screening procedures, or other common institutional safeguards could accommodate religious exercise while preserving security. A categorical prohibition is neither a sufficient nor constitutional as the least restrictive means.

As this Court has recognized, the government cannot allocate vast resources to detention operations while disclaiming responsibility for safeguarding constitutional rights. *Advocates for Human Rights v. DHS*, 2026 WL 404457, at *29–30 (D. Minn. Feb. 12, 2026) (holding that detainees have a constitutional right to legal counsel that Defendants may not obstruct, noting "Defendants allocated substantial resources to sending thousands of agents to Minnesota, detaining thousands of people, and housing them in their facilities. Defendants cannot suddenly lack resources when it comes to protecting detainees' constitutional rights."). Defendants may not justify constitutional violations by claiming resource constraints. See *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980).

Because Defendants have failed—and cannot succeed—in demonstrating that a blanket denial of pastoral access is the least restrictive means of furthering a compelling interest, Plaintiffs are likely to prevail on the merits.

## II.   Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction

The U.S. Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The ability of religious leaders and clergy to provide in-person pastoral care to individuals detained by the government is a well-recognized constitutional and statutory right. *See Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005); *Ramirez v. Collier*, 595 U.S. 411, 425-26 (2022).

Plaintiffs have already suffered irreparable harm. They were denied access on Ash Wednesday—a once-a-year sacred observance that cannot be recreated. That loss is permanent. In this case, the harm is also ongoing. Each day Plaintiffs are barred from Whipple is another day in which clergy are prevented from fulfilling core religious duties, detainees are denied spiritual care, and time-sensitive religious obligations go unmet. This injury is neither speculative nor hypothetical; it is present, continuing, and constitutionally cognizable. Courts routinely hold that RFRA and Free Exercise violations establish irreparable harm as a matter of law. *See Minn. Citizens Concerned for Life*, 692 F.3d at 870. Absent a preliminary injunction, Plaintiffs' religious exercise will continue to be infringed daily.

## III.     The Balance of Equities Strongly Favors Plaintiffs

The balance of equities—"the relative injuries to the parties and the public"—further favors Plaintiffs' request. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). On one side of the scale lies Plaintiffs' fundamental constitutional and statutory right to exercise their religion. On the other lies the government's asserted interest in enforcing a blanket access ban unsupported by individualized findings.

Allowing clergy visits imposes minimal administrative burden. Institutions with security procedures nationwide routinely accommodate pastoral visitation. Defendants already manage attorney access and other forms of institutional visitation. Plaintiffs seek only reasonable access consistent with security protocols.

Where the government's action likely violates constitutional rights, it cannot claim equitable injury from being enjoined. See *Reinert v. Haas*, 585 F. Supp. 477, 481 (S.D. Iowa 1984). The equities therefore overwhelmingly favor Plaintiffs.

## IV.     The Public Interest Heavily Favors Protecting Religious Liberty

Public interest considerations strongly support a preliminary injunction in favor of Plaintiffs. *Cuomo*, 592 U.S. at 19. The public interest "is always served by protecting constitutional rights." *Id*. Religious liberty occupies a preferred place in our constitutional framework, and Congress enacted RFRA specifically to provide heightened protection for religious exercise against federal intrusion.

Ensuring that clergy may minister to detainees who seek spiritual care promotes human dignity, institutional stability, and respect for constitutional governance. Enjoining unconstitutional conduct does not harm the public; it vindicates foundational liberties.

15

## V.        Bond Should Be Waived

Although Federal Rule of Civil Procedure 65(c) permits courts to require security when issuing a preliminary injunction, district courts retain broad discretion to waive the bond requirement. A bond is intended to protect a party who is later found to have been wrongfully enjoined. *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, 460 F.3d 1047, 1059 (8th Cir. 2006). However, bond is not appropriate "where the damages resulting from a wrongful issuance of an injunction have not been shown." *First Lutheran Church v. City of St. Paul*, 326 F.Supp.3d 745, 769 (D. Minn. 2018) (internal quotations omitted) (waiving the bond requirement for an injunction preventing violation of the First Amendment because the government failed to demonstrate "any costs or monetary damages").

As in *First Lutheran*, Defendants here will face no risk of monetary loss from the requested injunction. Plaintiffs seek only prospective relief requiring Defendants to provide reasonable access for pastoral visitation consistent with constitutional and statutory obligations. The injunction would not impose financial liability, require expenditure of significant resources, or alter Defendants' legal rights beyond mandating compliance with RFRA and the First Amendment.

Because Defendants cannot identify any cognizable costs or damages that could result from the issuance of an injunction, there is no financial harm to mitigate and no basis for requiring security. Accordingly, the Court should exercise its discretion to waive the bond requirement.

16

## VI.    The Relief Requested is Necessary and Appropriate

For the foregoing reasons, immediate relief protecting Plaintiffs' constitutional and statutory rights is necessary to prevent irreparable harm while the Court considers the full merits of this case. Plaintiffs therefore request the same relief that other courts have granted in response to Defendants' violation of faith leaders' rights to provide pastoral care: an order requiring Defendants to provide reasonable access for faith leaders to minister to detainees. *See, e.g.*, *Coalition for Spiritual and Public Leadership et al. v. Noem et al.*, No. 25-cv-14168, Doc. 26 (Feb. 12, 2026 Memorandum Opinion and Order) (granting in part plaintiffs' motion for a preliminary injunction to minister to detainees in ICE custody). This Court should similarly require Defendants to provide faith leaders access to detainees at Whipple to provide pastoral care.

Plaintiffs respectfully request that this Court enter a preliminary injunction requiring Defendants to provide reasonable and timely access to detainees at Whipple. Specifically, Plaintiffs request an injunction that:

1. Permits in-person pastoral visits by faith leaders to all detainees at the Whipple Federal Building who wish to receive spiritual guidance, prayer, or sacramental ministry, including rites tied to specific liturgical dates.

2. Requires Defendants to establish a clear, predictable process for scheduling visits by faith leaders, including a commitment to grant access requests within 1-2 hours and to accommodate urgent or time-sensitive religious observances.

3. Allows faith leader visits at a regular frequency, including for urgent pastoral care or time-sensitive religious rites without unnecessary delay.

4. Ensures reasonable security procedures that do not unduly restrict faith leaders from exercising their religious duties, including permitting one-on-one or small-group visits where appropriate and consistent with safety protocols.

17

5. Prohibits Defendants from denying access to faith leaders based on vague or generalized safety concerns without individualized assessment and specific factual justification.

6. Prohibits Defendants from retaliating in any manner against Plaintiffs for participating in this litigation or for raising concerns about any alleged violation of this Preliminary Injunction.

7. Requires Defendants to disseminate notice of the order to all agents stationed at the Whipple Federal Building and those responsible for the building's operations, including providing copies in paper or electronic format, within 12 hours of its issuance.

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Defendants from violating the sacrosanct rights of faith leaders to provide pastoral care to detainees at Whipple. Granting this injunction will ensure that Plaintiffs can freely exercise their religious obligations by providing pastoral care to detainees, consistent with the First Amendment and the Religious Freedom Restoration Act, while allowing Defendants to implement reasonable security measures. Plaintiffs further request that the Court waive any bond, as there is no demonstrated harm to Defendants from compliance with this injunction.

Dated:  February 23, 2026

Respectfully submitted,

*/s/ Erin Westbrook*

Erin Westbrook (MN #0393072)
Maxwell Bremer (MN #0387408)
Kaitlin Yira (MN #0403458)
**SAUL EWING LLP**
33 South 6th Street, Suite 4750
Minneapolis, MN  55402
612-225-2946
erin.westbrook@saul.com
maxwell.bremer@saul.com
kaitlin.yira@saul.com

Irina Vaynerman (MN #0396759)
Chelsea Walcker (MN #0396792)
**GROUNDWORK LEGAL**
1650 West End Blvd., Suite 100
St. Louis Park, MN 55416
(612) 208-9349
irina@groundworklegal.org
chelsea@groundworklegal.org

*Attorneys for Plaintiffs*

19