# EXHIBIT A

## Declaration of Father Christopher Collins, SJ

1.      I am an ordained priest of the Roman Catholic Church and professed member of the Society of Jesus (Jesuits). I was ordained as a priest in 2006 and pronounced my final vows as a Jesuit in 2015. I presently serve as Pastor and Parochial Administrator at St. Peter Claver Catholic Church in Saint Paul, Minnesota. I make this declaration based on my personal knowledge.

2.      I earned a Bachelor of Arts in Philosophy from the University of St. Thomas in St. Paul, Minnesota. Following graduation, I entered the Society of Jesus, committing myself to a vocation rooted in intellectual formation, pastoral ministry, and service to communities experiencing poverty, displacement, and social exclusion.

3.      I completed theological studies at the Weston Jesuit School of Theology in Cambridge, Massachusetts, and was ordained to the priesthood in 2006. After ordination, I served in pastoral ministry at Holy Rosary Mission on the Pine Ridge Indian Reservation in South Dakota, ministering primarily to members of the Lakota Nation. I later earned a Doctorate in Sacred Theology (S.T.D.) from Boston College, further deepening my academic and pastoral expertise in Catholic theology and mission.

4.      I served for nearly a decade at Saint Louis University in St. Louis, Missouri, as Chief Mission Officer, Assistant to the President for Mission and Identity, and a faculty member in theology. These roles required me to provide pastoral leadership within large and diverse institutional settings.

5.      I currently serve as Parochial Administrator of St. Peter Claver Catholic Church in St. Paul. The parish is named for St. Peter Claver, S.J., a Spanish Jesuit priest known for his lifelong ministry to enslaved persons. In continuity with that legacy, St. Peter Claver Parish has long served as a spiritual home for African American Catholics and is deeply committed to racial justice, human dignity, and outreach to marginalized communities. The parish community includes families from diverse cultural and national backgrounds, including immigrants from various African and Latin American countries. A significant portion of our congregation consists of first- and second-generation immigrants navigating complex social, economic, and legal challenges.

6.      I also serve as Chaplain of St. Peter Claver School, where I celebrate weekly all-school prayer service and provide spiritual formation and pastoral care to students and families. Although the school is Catholic, it welcomes families of all faith traditions; approximately three-quarters of the students are not Catholic. The student body reflects substantial racial, cultural, and socioeconomic diversity.

7. I currently serve on the Board of Directors of Catholic Charities Twin Cities, Cristo Rey Jesuit High School, Ascension Catholic Academy, and the Aim Higher Foundation. Through these roles, I collaborate with organizations that serve economically disadvantaged families, immigrants, refugees, and communities historically excluded from social and economic opportunity.

8. Throughout my priesthood, I have consistently ministered in culturally diverse and immigrant communities. My ministry on the Pine Ridge Reservation required close pastoral accompaniment of Indigenous persons facing systemic poverty and historical trauma. At St. Peter Claver, I serve parishioners who are recent immigrants. Providing pastoral care across lines of culture, language, race, and nationality has been a defining characteristic of my vocation.

9. As a Jesuit priest, providing pastoral care to immigrants and detainees is not optional or peripheral—it is central to my religious vocation. The spirituality of the Society of Jesus calls its members to accompany those who are marginalized, displaced, and deprived of freedom. Catholic teaching affirms the inherent dignity of every human person, including those in detention. My priestly obligations include offering prayer, celebrating the sacraments, providing spiritual counsel, and being physically present to those who are afraid, isolated, or suffering. Personal presence—especially to persons deprived of liberty—is a core expression of my faith and a concrete requirement of my priestly office.

10. My ministry has regularly included in-person pastoral care in institutional settings such as hospitals, nursing homes, treatment centers, prisons, and jails. In those contexts, I have complied with security screenings, identification requirements, scheduling procedures, and other institutional protocols. I am experienced in respecting facility rules while providing confidential, appropriate, and sacramental religious care.

11. On December 12, 2025, the Feast of Our Lady of Guadalupe—a day of particular spiritual significance for many immigrants and for the broader Catholic community—I went to the Whipple Federal Building to pray for the mother of a student who had been detained by immigration authorities. I intended to join other faith leaders in offering a prayer service. When I arrived, I learned that two elderly lay ministers had been required to leave the building after attempting to hold a prayer service in a public room. Despite frigid weather conditions, they were escorted outside and denied the opportunity even to remain in the lobby. Shortly thereafter, I was informed by security personnel that we were not permitted to enter the premises, including the parking lot. As a result, we were prevented entirely from accessing the building and from ministering to those believed to be detained inside.

12. On February 20, 2026, I again went to the Whipple Federal Building for the express purpose of providing in-person pastoral care to immigrant detainees. I arrived

2

shortly after 4:00 p.m., identified myself as clergy, and requested entry to offer religious ministry to any detainees who desired it. I was informed that the ICE office had closed at 4:00 p.m. and that I would not be permitted to meet with any detainees. I was therefore denied access.

13. On the morning of February 23, 2026, I returned to the Whipple Federal Building to provide pastoral care to detainees. Upon arriving at the secure parking lot entrance, I identified myself to the guard at the parking lot entrance and explained the purpose of my visit. The guard initially informed me that my request would be denied and that ICE officials would not permit access, but when I asked if I could still try, he raised the gate, allowing me to enter. I proceeded to the building, waited in line to pass through security, and approached the ICE check-in office, where I spoke with a female ICE official named Sara. I identified myself and requested acess to provide pastoral care. She called a superior in detention, who stated that only legal representatives are permitted to visit detainees for legal representation and that pastoral visits are not allowed. I confirmed with Sara that my request was denied solely because I was not a legal representative and intended to provide pastoral care. I was denied access without any individualized assessment, accommodation, or reasonable alternative means to fulfill my religious obligations. Before leaving, the ICE employee identified herself as Catholic and asked me to pray for her, which I did.

14. I remain ready and willing to comply with any reasonable, neutral, and generally applicable security procedures necessary to enter the Whipple Federal Building. My sole purpose in seeking access is to fulfill my religious duties by providing pastoral and sacramental care to detained persons who request it. I do not seek to disrupt operations or interfere with governmental functions.

15. In-person pastoral ministry is an essential religious exercise. Catholic sacramental ministry—including prayer, spiritual counseling, and where appropriate, the Sacrament of Reconciliation and other rites—requires physical presence, confidentiality, and personal engagement. These elements cannot be meaningfully replicated through remote or delayed means. In the context of immigration detention, where individuals may be transferred without notice, denial of access can permanently foreclose the opportunity for spiritual care.

16. The categorical denial of clergy access to detainees at the Whipple Federal Building substantially burdens my sincere religious exercise. It prevents me from carrying out core, mandatory obligations of my priesthood and Jesuit vocation. It excludes faith leaders from ministering at the precise moment when detainees are most vulnerable and in need of spiritual consolation and hope.

17. I intend to continue seeking access to provide prayer, visitation, spiritual counseling, and sacramental ministry to immigrant detainees at the Whipple Federal

Building, consistent with my religious obligations and subject to legitimate and neutral security requirements.

18.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of February 2026.

_____
Father Christopher Collins, SJ

4