# EXHIBIT C

**<u>Declaration of Rev. Melissa Gonzalez</u>**

1.      I am an ordained pastor at Tapestry, a multicultural, Synodically Authorized Worshipping Community (SAWC) in the Minneapolis Area Synod of the Evangelical Lutheran Church in America ("ELCA"). I make this declaration based on my personal knowledge.

2.      I was ordained in the ELCA in 2014, and have provided pastoral care to immigrant communities continuously since that time.

3.      My work with immigrant communities began long before my ordination. Prior to entering the seminary in 2011, I lived in Mexico and became fluent in Spanish. After returning to Minnesota, I taught Spanish to English speakers and English to Spanish speakers. During seminary, I spent time researching and undertaking an independent study focused on how to share the gospel with Latino communities in the United States.

4.      I founded Tapestry to share the Gospel with immigrant communities, and our first worship service was on September 14, 2014. I was ordained in 2014 after founding Tapestry. Tapestry is a multicultural congregation that welcomes immigrant members from Latin America, Africa, and other regions. Tapestry provides bilingual worship services in Spanish and English at Oak Grove Lutheran Church in Richfield, Minnesota. Our ministry includes worship, language classes, education, and shared meals conducted in both Spanish and English, serving newly arrived immigrants, long-time residents, and individuals from diverse cultural backgrounds.

5.      Through my work at Tapestry, I have provided pastoral care to immigrants, including counseling, prayer, sacramental ministry, spiritual support, and accompaniment during times of crisis, detention, and family separation. My ministry consistently involves direct, in-person pastoral care to immigrants.

6.      I speak Spanish fluently. Spanish is essential to my ministry because many of my congregants are native Spanish speakers. Effective pastoral care requires the ability to communicate directly and compassionately in the language understood by the person receiving care. This is particularly important in detention settings, where access to Spanish speakers or interpreters is limited.

7.      Advocating for immigrants is essential to my ministry and my expression of my faith. As part of my ministry, I have partnered with students protected under the Deferred Action for Childhood Arrivals ("DACA") policy and traveled to Washington, D.C., to advocate for their rights. I have traveled to the southern border to bear witness to the treatment of immigrants, received immigrants entering the United States through the CBP One process, and assisted 39 Venezuelan immigrants in applying for humanitarian parole to reunite with their families, though these applications were not processed by USCIS because the program was terminated.

8.      Over the past several years, I have provided or attempted to provide pastoral care to detained immigrants in various settings. I have sought access to federal

buildings and county jails in Minnesota where detained immigrants were being held for my pastoral role. I have entered federal buildings with families who were being interviewed to provide support. In some instances, including at Sherburne County Jail, I was denied access via email notification despite identifying myself as clergy seeking to provide religious care.

9.      I visited the Whipple Federal Building ("Whipple") many times prior to when ICE's "Operation Metro Surge" began in about December 2025. Previously, I have accompanied congregants to immigration court hearings, interviews, and related proceedings at Whipple.

10.      For years, I have also participated in and led prayer vigils outside of Whipple as part of a regular vigil. For example, I helped lead a large vigil in December 2025 alongside other local organizations.

11.      Prior to Operation Metro Surge, I had not attempted to provide pastoral care generally at Whipple because Whipple was not used in the manner it is currently being used. Previously, Whipple was used to hold standard immigration court hearings, citizenship interviews, and related proceedings. The thought of going to Whipple did not induce terror among immigrant communities as it does now as a result of the government's recent enforcement activities in Minnesota.

12.      Since Operation Metro Surge began, members of my congregation and community have reported being detained at Whipple. Based on my communications with them or their family members, some individuals have been held there for extended periods.

13.      My faith teaches that everyone, including those who are detained, is entitled to dignity and respect. Providing pastoral care to persons who are detained, torn from their families, and housed in horrendous conditions, is a core component of my religious calling.

14.      On Ash Wednesday, February 18, 2026, I attempted to gain access to Whipple to provide pastoral care to immigrant detainees and, in particular, to impose ashes. In the ELCA, the imposition and bearing of ashes is a powerful demonstration of my faith, representing repentance, mortality, and the start of the Lenten season. I believe that receiving ashes at one's darkest hour—such as in detention in horrendous conditions—is essential to practicing the Christian faith and is an essential pastoral obligation.

15.      Although I tried to provide pastoral care, despite my religious calling and experience, I was denied access to detainees at Whipple.

16.      Specifically, I notified those at Whipple that I was a clergy member and requested entry for the specific purpose of providing religious care, including prayer, spiritual counseling, and the imposition of ashes, but I was denied such access and was not provided a reasonable alternative means to fulfill my pastoral obligations.

17.    In seeking access, I was directed to the ICE waiting room, where I again identified myself as a clergy member and requested access to individuals who wished to receive pastoral care, including the imposition of ashes. I was denied access at that point.

18.    The individual representing Whipple, whom I spoke to in the waiting room, informed me that I would not be permitted access to detainees for "safety" reasons. When I asked for further explanation, she told me that the detainees could become agitated. I noted that for those who sought pastoral care, being provided with such care would likely make them *less* agitated.

19.    I was not offered any reasonable alternative means of providing in-person pastoral care to detainees on Ash Wednesday. I was not permitted to meet with detainees individually or to offer ashes or prayer in person.

20.    I was informed that faith leaders had attempted to gain access to detainees at Whipple at least four times per week since Operation Metro Surge began and had been denied access each time.

21.    I was told the room would be too crowded. When I offered to meet with only one or two individuals at a time, this was not permitted either.

22.    I was also informed that detainees were held at Whipple for only a few hours at a time. In my personal experience, however, I have known people in my congregation and community who were held at Whipple for days, not hours.

23.    I was also provided with an email address to contact. Within an hour or two after I attempted to visit Whipple, I sent an email to the address provided, requesting to provide pastoral care. I received an automatic reply stating, "Your inquiry will be reviewed, and if appropriate, a response will be provided." As of the date of this declaration, I have not received a response.

24.    Providing in-person pastoral care to immigrants in detention is an essential practice of my faith. I am called to visit and minister to immigrants, including detainees, to offer prayer, comfort, counsel, and spiritual support, and to be physically present with those in need, particularly the vulnerable and those experiencing isolation, fear, and uncertainty. Ash Wednesday is a particularly important day for such ministry.

25.    My pastoral care practice emphasizes confidentiality, dignity, and physical presence. These religious components cannot be fully realized through indirect or impersonal means. In-person communication, including in Spanish when needed, is necessary to provide meaningful spiritual care, to receive and respond to pastoral needs, and to carry out my faith's mandate to care for the stranger, the suffering, and the imprisoned.

26.    I was and continue to be ready, willing, and able to comply with reasonable and neutral security and identification procedures required for entry to Whipple. I have complied with such procedures in other institutional settings during my ministry. My sole

purpose in seeking access is to fulfill my religious obligations to provide pastoral care to detained immigrants.

27. By being denied access to Whipple, I am being denied the right to practice what is integral to my faith—the care for those most in need at their darkest hours, particularly for Spanish-speaking detainees who rely on direct pastoral communication. Spiritual care delayed is often spiritual care denied, especially where detainees may be transferred without notice. If I am prevented from visiting detained individuals while they are held at Whipple, I lose the opportunity to carry out that religious practice during their detention. Additionally, certain religious observances, including Ash Wednesday, occur only once each year, preventing me from performing those specific religious rites at the time they are required.

28. I intend to continue seeking access to Whipple to provide pastoral care to detained immigrants, including visitation, prayer, spiritual counseling, and sacramental ministry, consistent with my faith and my ministerial duties, and subject to legitimate security protocols.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of February 2026.

_____
Rev. Melissa Gonzalez

4