UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 26-cv-01576 (JWB/DTS)

MINNEAPOLIS AREA SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, ET AL.,
Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL.,

Defendants,

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The Court should deny Plaintiffs' motion for a preliminary injunction, extraordinary relief requiring them to meet a high standard they have not attained. Although Plaintiffs have every right to follow the dictates of their faith, the law does not give them the right to do so at whatever time and place they choose. Plaintiffs do not claim to speak on behalf of any particular immigration detainee, and their ministry interests (while laudable and very real) do not outweigh the government's need to maintain safety, order, and the integrity of its enforcement operations within the confines of the particular short-term holding facility that is the focus of this case.

The parties actually agree on many things—such as the importance of religious exercise for both faith leaders and immigration detainees, and even the ability of the Whipple building during ordinary times to accommodate in-person visits with detained immigrants. The few areas of disagreement—particularly Plaintiffs' demand to be allowed

to make physical contact with detained individuals—do not present any legal violation and, even if they did, would not require the Court to alter the status quo.

Plaintiffs have not shown they are likely to succeed on the merits under either the Free Exercise Clause or the Religious Freedom Restoration Act, they have no ongoing irreparable harm from the temporary restrictions that were in place during Operation Metro Surge, and the equities do not weigh in their favor. In short, Plaintiffs cannot establish the factors necessary to justify the extraordinary remedy of equitable relief. Therefore, no injunction should be issued.

## II. BACKGROUND

### A. Factual Background

#### 1. ICE's operations

Defendant U.S. Immigration and Customs Enforcement (ICE) ICE is charged with removing noncitizens who lack lawful status in the United States. Declaration of Tauria Rich (Rich Decl.) ¶ 6. Detention is an important and necessary part of immigration enforcement. *Id.* ICE detains people for no purpose other than to secure noncitizens' presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, are a flight risk, or for whom detention is mandatory by law. *Id.* The ICE custodial facility within Whipple is a holding facility. *Id.*

ICE uses holding facilities, including Whipple, for processing of individuals awaiting removal, transfer, immigration court hearing, medical treatment, intra-facility movement, or other processing into or out of a facility. Rich Decl. ¶ 7. Confinement in

holding facilities like Whipple is intended to be brief, and such facilities are not generally designed for overnight stays. *Id.*

For several reasons, it is critical that visitors to the Whipple building not be allowed into the short-term holding space that houses immigration detainees. ICE must ensure safety for all detainees, officers, staff, and visitors at holding facilities. Rich Decl. ¶ 17. Holding facilities are staffed with enough officers and staff to process transitory detainees in and out of the facility, but there are not additional officers and staff to support in-person contact visits, as allowed in long-term detention facilities. *Id.*

For safety purposes, visitors cannot engage in physical contact with the detainees at Whipple, nor can they be placed with groups of detainees to announce their presence. Rich Decl. ¶ 18. Detainees may have convictions for violent crimes, or their criminal histories are unknown at the time they enter the facility. *Id.* Whipple recently processed a detainee convicted of murder, for example; and the administrator providing a declaration in this case witnessed a detainee attempting to kick the walls out of a hold room and the windows of a transport van, requiring six officers to restrain him. *Id.* Staff have reportedly been kicked, bitten, spit on, and punched. *Id.* Some detainees come to Whipple with undiagnosed or unknown mental illnesses that also make behaviors unpredictable. *Id.* Whipple cannot predict all potential dangerous behaviors when visitors are present. *Id.*

Because Whipple is a temporary holding facility, not equipped to allow for physical contact with detainees, doing so would require additional officers to be present to ensure the safety of the detainees, visitors, and DHS personnel. Rich Decl. ¶ 19. There are four small visitation rooms in the holding area at Whipple, each allowing a visitor to meet with

a detainee with glass between them. *Id.* Facilitating large group meetings or physical contact would require substantial reconfiguration of the space, as well as substantially increased staffing, and is simply not feasible in this temporary holding facility. *Id.*

### 2. Religious exercise by detainees within ICE facilities

ICE makes every effort, consistent with its mission and governmental objectives as dictated by Congress, to honor the religious rights of those in its custody, whether at a transitory hold facility like Whipple, a longer-term ICE detention center, or a contracted facility such as a county jail. The opportunities to engage in religious practice look different depending on the nature of the facility, with the most extensive opportunities—generally including periodic larger group meetings, the availability of sacraments and hands-on prayer, and so forth—being available in longer-term detention centers that are designed for such activities and have adequate staffing to facilitate it. Rich Decl. ¶¶ 7-10 and Exhibits 1-2. The 2025 National Detention Standards contains an entire section devoted to "Religious Practices." *Id.* Ex. 2, pp. 155-157. That section broadly sets forth the policy of "ensur[ing] that detainees of different religious beliefs are provided reasonable and equitable opportunities to participate in the practices of their respective faiths, limited only by a documented threat to safety, security and the orderly operation of the facility." *Id.* at 155. The standard also specifies that "[n]o one may disparage the religious beliefs of a detainee, nor coerce or harass a detainee to change religious affiliation. Attendance at all religious activities is voluntary and, unless otherwise specified by the facility, open to all." *Id.* Detention centers have chaplains or other individuals "designated as the facility religious services coordinator . . . responsible for managing religious

activities in the facility and providing information to detainees about how to request a religious practice accommodation." *Id.* at 156.

Detention centers "shall designate adequate space for religious activities that can equitably meet the needs of the detainee population." Chaplains are required to "schedule and direct the facility's religious activities," and to post current program schedules in living units or otherwise make them available to detainees. *Id.* In addition, every detention center "shall have resources available for community groups that provide religious services not provided by the chaplain or facility" as well as "access to pastoral care and counseling from external clergy and religious service providers." *Id.* at 156-57. Consistent with any security concerns and the need for orderly operation of the facility, detainees at ICE detention centers "will have the opportunity to engage in group religious activities" and to "observ[e] important religious holy days that involve special fasts, dietary regulations, worship, or work proscription." *Id.* Detainees are allowed to have access to "personal religious property," wear religious items, possess religious literature, and adhere to a religious dietary practice within the constraints of the secure and orderly running of the facility. *Id.* at 157.

Again, these robust detention-center standards do not apply to short-term holding facilities like the Whipple building. While basic religious freedom applies at holding facilities, the operational standards are often more streamlined, focusing on rapid intake rather than long-term detention. Nonetheless, in-person visits by clergy are also regularly allowed at Whipple. Rich Decl. ¶¶ 12-16.

### 3. Attempted visits to the Whipple building by faith leaders

The multipurpose Whipple building has been used by ICE and its predecessor immigration-enforcement agency for decades for various purposes, including for the short-term processing of undocumented individuals before they are transferred to detention centers in connection with removal proceedings. Nonetheless, among their 12 declarations, not one of the Plaintiffs or amici claims to have tried to visit any immigrants detained at Whipple prior to the December 2025 onset of Operation Metro Surge to provide prayer, sacraments, or other in-person ministry. Yet it was permissible and eminently possible to do so before the Surge, and it is once again possible now that Surge operations have subsided. *See* Rich Decl. ¶¶ 12-16. Indeed, a clergy member reportedly came to the Whipple building on March 6, 2026, in an effort to offer ministry to any detainees; this faith leader was not turned away but reportedly decided to leave after learning no immigrants happened to be in the holding area at the time. *Id.* ¶ 16.

Two of the Plaintiffs do allege having been to Whipple before the Surge, "accompany[ying] congregants to immigration court hearings, interviews, and related proceedings," Gonzalez Decl. ¶ 9, ECF 11 p. 3, or "to attend court hearings and support family members," Voelkel Decl. ¶ 8, ECF 12 p. 2. Apart from that, Plaintiffs allege attempting to visit detainees on four occasions: December 12, January 13, February 18, and February 23.[1] These visits all occurred while Operation Metro Surge was ongoing, including during its drawdown phase. Plaintiffs claim that each time, ICE denied their

---

[1] Amici do not appear to have attempted to visit detainees at Whipple.

requests for access. They do not allege discriminatory treatment on the basis of the religious purpose of the visits, and do claim to be aware of others being allowed to visit detainees at the Whipple building for any other reason during this time period.[2]

**B. Procedural Background**

Plaintiffs filed their Complaint on February 23, 2026. ECF 1. They raise claims under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq. Plaintiffs argue their right to freely practice their faith has been unreasonably burdened because, during Operation Metro Surge, they were allegedly prohibited from entering the Whipple building to offer prayer and other ministry to immigration detainees. ECF 1 ¶¶ 1-3. They contend this prohibition is ongoing and they are therefore suffering continued irreparable harm. *Id.*

The parties met and conferred as required by the Court, ECF 18, and submitted a joint status report to the Court on Friday, March 6. As Defendants indicated in that report, much of the relief Plaintiffs seek in their Complaint and preliminary injunction motion is already in place at Whipple according to current facility protocols now that Operation Metro Surge has ended. ECF 40 at 2-3. Specifically, the Whipple building's transitory holding space includes four private visitation rooms in which visitors and detainees can interact with glass between them. *Id.* at 11; Rich Decl. ¶ 19. Should any clergy or other faith leader show up at Whipple offering to meet with a detainee, ICE personnel would

[2] On February 12, 2026, the Court in *Advocates for Human Rights v. DHS,* 26-cv-749 (NEB/DLM) (D. Minn.), entered a temporary restraining order requiring access to detainees at the Whipple building by attorneys. *See id.* ECF 95.

announce the visitor's presence to those in the holding area, explaining the purpose of the visit and making clear that any detainee with interest may meet with the faith leader in one of the rooms. *Id.*; ECF 40 p. 5. Indeed, an attempted clergy visit to Whipple reportedly did occur on March 6, 2026, and the visitor was not turned away. Rich Decl. ¶ 16.[3]

## III. ARGUMENT

### A. Applicable Law

The purpose of a preliminary injunction "'is merely to preserve the relative positions of the parties'" until the case can be resolved. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The burden on the party moving for the preliminary injunction is great, as "[a] preliminary injunction is an extraordinary remedy never awarded as a right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (citations omitted).

The Eighth Circuit has established a four-factor test for determining whether to grant the extraordinary relief of a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties []; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th

[3] On March 5, following the parties' first meet-and-confer, Defendants' counsel emailed Plaintiffs' counsel to ask about any requests for access to by clergy over the prior two weeks, but has not heard back. During the parties' second meet-and-confer on March 11, Defendants' counsel extended a verbal invitation to Plaintiffs to come visit the Whipple building in order to minister to detainees.

Cir. 1981) (en banc)). The balance-of-harms and public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In this context, courts apply heightened scrutiny when the requested relief goes beyond maintaining the status quo. The status quo is typically defined as the last uncontested status preceding the pending controversy. *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993). Relief that seeks to alter this state, known as a mandatory injunction, is "particularly disfavored" and requires a higher showing of a likelihood of success on the merits. *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 (8th Cir. 2008).

In this case, the government's status quo includes its statutory authority to transfer detainees and manage facilities such as Whipple according to its established operational needs. Plaintiffs are requesting that the Court mandate affirmative acts, such as allowing physical contact between visitors and detainees. Thus, such relief is mandatory because it forces the government to change its existing protocols.

Under the heightened mandatory-injunction standard, Plaintiffs must show not just a fair chance of success, but a substantial likelihood or a heavy and compelling weight of evidence. *Id.; see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Further, a mandatory injunction is deemed such an extraordinary remedy that it is only appropriate where the alleged harm is truly irreparable and imminent. *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). Thus, Plaintiffs must demonstrate that the threat to their interests is actual and non-theoretical, and of such imminence that there is a clear

and present need for the Court to intervene. *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).

Where, as here, the requested relief would upend the long-standing operational status quo of a federal facility, the failure to show certain and immediate injury is fatal to the request. *Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir. 1980). Further, when a mandatory injunction interferes with a government agency's core functions, the balance of equities weighs more heavily against the movant. *Nken v. Holder,* 556 U.S. 418, 435 (2009). In the context of federal detention operations, courts must accord wide-ranging deference to the agency's execution of policies designed to maintain order and security. *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). Here, because Plaintiffs' requested relief would force ICE to overhaul the operational and security protocols of Whipple, the public interest in efficient and secure law enforcement outweighs Plaintiffs' distant claims of harm. *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005).

In this detention-related litigation arising from Operation Metro Surge, the legal standard governing the religious rights at issue is derived from well-settled caselaw such as *Fowler v. Crawford*, 534 F.3d 931,937 (8th Cir. 2008), in which the Eighth Circuit recognized that RFRA[4] should not be construed "to elevate accommodation of religious practice over an institution's need to maintain order and safety." (citing *Cutter*, 544 U.S.

---

[4] *Fowler* arose under the Religious Land Use and Institutionalized Persons Act (RLUIPA), but expressly recognized that the substantive standard as between the two cousin statutes is "identical" in the context of confinement. 534 F.3d at 937 (citing *Murphy v. Missouri Dep't Corr.*, 372 F.3d 979, 987 (8th Cir. 2004)).

at 717; *see also Holt v. Hobbs*, 574 U.S. 352, 362 (2015) (noting "compelling interest in prison safety and security"). Under that controlling line of cases, courts construing RFRA consistently "accord due deference to the experience and expertise of prison and jail administrators." *Cutter*, 544 U.S. at 717; *id.* at 722-23 (noting the "urgency of discipline, order, safety, and security in penal institutions" and the need for "consideration of costs and limited resources") (quoted in *Fowler*, 534 F.3d at 937); *see also Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (noting that in "sensitive and weighty" contexts like immigration, government is not required to wait until a threat has actually materialized before acting to address that threat).[5]

**B. The *Dataphase* Factors**

A preliminary injunction is an "extraordinary remedy," and the burden of proof rests entirely on the movant to show a "fair chance of prevailing" on the merits.

**1. No Likelihood of Succeed on the Merits**

**a. Mootness**

As an initial matter, Plaintiffs' alleged inability to visit detainees at Whipple because of a complete ban have been superseded by events now that Operation Metro Surge has ended and the facility is being run as in the past. Rich Decl. ¶¶ 12-16. Plaintiffs have

---

[5] This Court has repeatedly found civil immigration detention to be "indistinguishable from criminal confinement." *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 903 (D. Minn. 2020); *Abdirizak Mohamed A. v. Brott*, 2020 WL 1062913, at *4 (D. Minn. Mar. 5, 2020) (same); *Abshir H.A. v. Barr*, 2019 WL 3719414, at *2 (D. Minn. Aug. 7, 2019) (same); *see also Khan v. Whiddon*, 2016 WL 4666513, at *6 (M.D. Fla. Sept. 7, 2016) ("civil immigration detention does not appear to be meaningfully different from criminal detention in a penal institution").

been asked about any attempted visits since February 23 but have not responded; they were also expressly invited to come visit the detainee holding space just last week, after Defendants made representations to the Court to the effect that the situation has changed significantly since Plaintiffs' alleged failed attempts. At the very least, additional fact development is needed in this case.

More significantly, because much of the relief Plaintiffs seek from the Court has been granted to them by Defendants, this case is at least partially moot. As the Eighth Circuit explains, "[a] case becomes moot if it can be said with assurance that there is no reasonable expectation that the violation will recur or if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Doe v. Nixon*, 716 F.3d 1041, 1051 (8th Cir. 2013) (citations and internal quotation marks omitted); *see also Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000) ("When, during the course of litigation, the issues presented in a case lose their life because of the passage of time or a change in circumstances and a federal court can no longer grant effective relief, the case is considered moot." (citations, alterations, and internal quotation marks omitted)). When a case becomes moot, the federal district court hearing that case loses subject matter jurisdiction. *See Davis v. Anthony, Inc.*, 886 F.3d 674, 677 (8th Cir. 2018).

The end of Operation Metro Surge—and more specifically, the end of visiting restrictions at Whipple—means that Plaintiffs already have most of the relief they want this Court to order. Plaintiffs explicitly tie their claims in this case to Operation Metro Surge. *See* Compl. ¶ 28 ("*Throughout Operation Metro Surge*, Defendants have repeatedly infringed on Minnesotans' rights to freely exercise their religion through acts of force and

intimidation.”), ¶ 54 (“Plaintiffs’ ministers have made several attempts to provide pastoral care to detainees at Whipple *since the inception of Operation Metro Surge*.”). Yet the restrictions giving rise to those claims are no longer in place. Since March 5, 2026, practices and procedures have reverted to those in place before the operation. Rich Decl. ¶ 15. Clergy members have been able to visit detainees at Whipple for the last two weeks, and only one (not necessary a Plaintiff in this case) has tried to do so. Rich Decl. ¶ 16. That clergy member decided to leave because there were no detainees present at Whipple at the time, although the clergy member would have been allowed to visit any detainees who had expressed a desire to meet. *Id.* In other words, the situation has returned to the pre-operation conditions that Plaintiffs seem to want in their Complaint. *See, e.g.*, Compl. ¶¶ 17-19.

On the record before the Court, there is no basis for applying the “capable of repetition yet evading review” exception to mootness. Federal courts apply the doctrine “only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.” *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (citations, alterations, and internal quotation marks omitted). Plaintiffs cannot dispute that Operation Metro Surge was a unique circumstance that led to unique restrictions at Whipple. But that operation has ended, and the resulting restrictions have subsided. Rich Decl. ¶¶ 12-16. There is no allegation in the Complaint, much less any evidence, that Defendants will undertake a similar operation in the future or re-institute visitation restrictions of the type necessitated

by Operation Metro Surge. The "capable of repetition yet evading review" exception therefore does not apply here.

**b. Plaintiffs' Requested Injunctive Relief**

To the extent this Court concludes it has jurisdiction, Plaintiffs are not likely to succeed on the merits, and a preliminary injunction is not appropriate. Here, the Defendants have legitimate interests stemming from their need to manage the facility in which detainees are processed at Whipple. Indeed, the restrictions and practices in place were reasonable responses by Whipple officials to legitimate security and operational concerns stemming from the significant influx of detainees associated with Operation Metro Surge, and in any event, were of only limited duration.

Ultimately, for Plaintiffs to obtain a mandatory preliminary injunction, they must show more than a "fair chance" of success; they must demonstrate a substantial likelihood of prevailing on the merits through a "heavy and compelling weight of evidence." *Planned Parenthood Minn., N.D., S.D.,* 530 F.3d at 732. Plaintiffs fail to meet this heightened burden because they cannot show that the current operational constraint at Whipple violates either the First Amendment or RFRA.

**i. Free Exercise Clause**

First, with respect to Free Exercise, Plaintiffs allege only that they were temporarily restricted from visiting the Whipple facility. And—importantly—they do not allege that they (as religious practitioners) were treated less favorably than any other prospective visitor. That does not state a Free Exercise claim.

In assessing whether a given restriction violates the Free Exercise clause, courts must first decide whether the law is either "neutral and of general applicability" (in which case, rational basis review applies) or whether, instead, the law *lacks* neutrality, either because it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature (in which case, strict scrutiny applies). *Employment Division v. Smith*, 494 U.S. 872 (1990) ("The right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)"); *Fulton v. City of Philadelphia, Pennsylvania,* 141 S. Ct. 1868, 1877 (2021) (declining to overrule *Smith*); *O'Lone v. Shabazz*, 482 U.S. 342, 349 (Free Exercise case applying rational basis review); *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053-54 (8th Cir. 2020) (applying *O'Lone*).

In this case, plaintiffs' visitation requests following the launch of Operation Metro Surge were denied, like *many* requests for visitation were denied. The complaint alleges nothing beyond that. Because Whipple's temporary visitation restrictions were neutral and of general applicability, they are now subject to rational-basis review, requiring only that they were rationally related to a legitimate governmental purpose. *Mbonyunkiza*, 956 F.3d at 1053-54; *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006). And importantly, on rational basis review, the visitation restrictions carry a *presumption* of validity. *Lyng v. Automobile Workers*, 485 U.S. 360, 370, (1988). Plaintiffs bear the burden of negating "every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973) (cleaned up).

It is not hard to come up with a "conceivable basis" supporting the temporary visitation restrictions at Whipple between December and February. Anyone who watched the evening news or spent any time on social media during that time would appreciate the intense operational demands facing the staff at Whipple. The building was both a hub of heightened ICE operations and the symbolic epicenter of community unrest. Rich Decl. ¶ 13 (noting staff having to be sent home for safety reasons, the throwing of rocks and bricks, and attempts by protestors with batons and shields to enter Whipple during this time period). In short, Whipple staff was not, at that time, in a good position to facilitate visitation (which requires screening of visitors, provision of dedicated private space, and assignment of personnel to monitor the visitation). Because plaintiffs have failed to allege that the visitation restrictions they faced at that time were irrational, there is simply no cognizable Free Exercise claim. There can be no preliminary injunction, and the claim should be dismissed.

**ii. RFRA**

A person claiming that a governmental policy or action violates his right to exercise his religion freely "must establish that the action substantially burdens his sincerely held religious belief." *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997). While Plaintiffs argue that limited access to detainees at a processing center constitutes a substantial burden on their religious practice, their claims ignore the fundamental principle, discussed above, of "due deference to the experience and expertise of prison and jail administrators," given the "urgency of discipline, order, safety, and security in penal institutions," and the need for "consideration of costs and limited resources." *Cutter*, 544 U.S. at 717, 722-23 (quoted in

*Fowler*, 534 F.3d at 937). With this context in mind, the recent procedures at Whipple, which involved the rapid processing of a high volume of detainees during Operation Metro Surge, were tailored to the facility's core function as a short-term processing hub rather than a long-term detention center.

As for Plaintiffs' contention that a categorial ban on in-person visits with detainees substantially burdens their right to religious practice, that temporary ban—as discussed above—is no longer in place and, while it was, furthered the compelling government interests of operational safety and security during greatly heightened processing and transport activities occasioned by the Surge. Again, because no blanket prohibition on such visits currently exists, injunctive relief is not warranted as to this issue.

When it comes to Plaintiffs' demand that they themselves (rather than facility staff) must be the ones to personally announce their presence and invite any willing detainees to come meet with them, they have failed to show how doing so is important to their respective faith traditions. Nowhere in the declarations of Plaintiffs or amici is there anything about feeling compelled to be the one to announce one's own presence during a visit to minister to a detained immigrant, rather than having one's presence announced by someone else. Plaintiffs' speculation that their visits will not be less fruitful if they are not allowed to announce themselves is utterly without foundation.[6] This highlights an interesting feature of this lawsuit, in which no detainee is a party, and Plaintiffs do not even

[6] One could just as easily surmise that a frightened detainee would be all the *more* reluctant to visit with a faith leader if that detainee was not *directly informed by ICE personnel* that the visitor is present and available—since then the detainee may worry that the visit is not officially authorized and could lead to retaliation.

purport to speak on behalf of any particular detainee. In any event, nothing in the record establishes this "announcement" concern as rising to the level of requiring the Court to issue mandatory injunctive relief.

Concerning physical contact, Defendants do not question the sincerity of Plaintiffs' beliefs about the importance of communion, imposition of ashes, and the laying on of hands as a general matter. What they have not shown, however, is why it is critical that such practices be specifically included in ministry visits to Whipple. Plaintiffs' demands to be allowed to engage in physical contact with detainees does not warrant the Court's intervention because the government's safety and security concerns override any substantial burden placed on Plaintiffs' religious practice by the prohibition. The governmental interest is straightforward and narrowly tailored – keeping visitors out of the secure holding area where detainees are temporarily housed at Whipple for processing and eventual transport to another, longer-term facility ensures the personal safety of visitors, staff, and other detainees. Rich Decl. ¶¶ 18-19. Plaintiffs have not suggested a way their demands might be met, short of an outright change to the policy of keeping detainees and visitors physically separate. Nor are Defendants able to think of any compromise solution on this issue.

Plaintiffs' demand for a preliminary injunction in terms of operational infrastructure would require the Government to overhaul the security and logistical protocols of a high-security federal building. However, judicial deference should be at its highest when considering matters of institutional security and resource allocation. *Fowler*, 534 F.3d at 937. Because the Surge-related limitations were driven by the physical constraints of

Whipple and the need for orderly processing during that time, they were legitimate operational considerations that did not rise to the level of a legal violation.

Defendants do not dispute that both the Free Exercise Clause and RFRA protect Plaintiffs' interest in visiting and ministering to detained immigrants in accordance with the dictates of their respective faith traditions. However, that does not guarantee an unfettered right to a specific *manner* of access or visitation. *Fowler*, 534 F.3d at 943 (rejecting inmate's demand for sweat lodge that "would expend significant prison resources, undoubtedly diverting limited resources from other areas of the prison"); *id.* at 941 (warning against construing least restrictive means test in a way that "would render federal judges the primary arbiters of what constitutes the best solution to every religious accommodation problem"); *id.* at 939 ("A prison's interest in order and security is always compelling.").

Defendants fully acknowledge the importance of being able to visit and minister to broken and hurting people. But that is very different from insisting on the right to do so whenever and wherever one pleases. Because Plaintiffs cannot show that the government has completely foreclosed all avenues of ministry—as opposed to prioritizing secure processing over Plaintiffs' preferred visitation schedule—they cannot demonstrate a violation. *See Shockley v. Adams*, 155 F.4th 985, 988 (8th Cir. 2025) (denying stay of execution where inmate insisted, for religious reasons, on having daughters present in execution room rather than visitation room behind glass).

As the Supreme Court cautioned, courts must accord "due deference to the experience and expertise of prison and jail administrators" when applying the substantial-

burden and least-restrictive-means tests in the religious freedom context. *Cutter*, 544 U.S. at 717. While it is not disputed that Plaintiffs have a right to visit detainees, they do not have a right to *specific methods of access* that overrides Defendants' operational needs. Because the challenged policies are narrowly tailored and necessary to advance the government's compelling interest in the secure and efficient administration of federal immigration law, Plaintiffs are unlikely to prevail on the merits.

Therefore, taking the extraordinary step of entering a preliminary injunction now that matches the equitable relief Plaintiffs seek at the conclusion of the case is not warranted.

**2. No Irreparable Harm**

Plaintiffs do not face a genuinely imminent threat of any irreparable injury that would support entering the broad injunction they seek. Whatever chance of success Plaintiffs have on the merits, the Court cannot enter an injunction absent a showing that irreparable harm will likely occur without the injunction. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (original emphasis) (citations omitted)).

Plaintiffs have consistently declined Defendants' invitations to provide more current information about attempts to visit Whipple, or to come visit now that the Surge

has ended. Their alleged experiences from months past, when operations at the building were very different, have become stale. For this reason alone, they fail to satisfy the "irreparable injury" factor under *Dataphase*.

### 3. The Balance of Harms and Public Interest

The remaining *Dataphase* factors—the balance of equities and the public interest—merge because Plaintiffs seek an injunction against government activity. *See Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022). These factors do not weigh in favor of any injunction at all, let alone the broad relief Plaintiffs seek.

Because plaintiffs cannot establish that they are likely to succeed on the merits, the court need not address "irreparable harm" and "public interest." For the sake of completeness, however, defendant notes that plaintiffs' argument on both of those elements presumes that ICE's December-through-February visitation restrictions are meant to be permanent. But as discussed above, those restrictions were operationally necessary in connection with Operation Metro Surge. Plaintiffs *speculate* that they will be denied visitation access on an ongoing basis, and they ask the Court to intervene on the basis of that same speculation. But the Court should not "anticipate a question of constitutional law in advance of the necessity of deciding it." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936). At the very least, the Court should allow the facts to develop such that they are properly framed for the Court's consideration before it resorts to the extraordinary remedy of a preliminary injunction.

### C. Plaintiffs should be ordered to post security in connection with any injunctive relief, and the Court should stay any relief.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025).

In addition, to the extent the Court issues injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of 48 hours to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## IV. CONCLUSION

For all these reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: March 16, 2026

DANIEL N. ROSEN
United States Attorney

s/ David W. Fuller

By: DAVID W. FULLER
Assistant U.S. Attorney
Attorney ID Number 390922
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: 612-664-5600
Email: David.Fuller@usdoj.gov

Attorneys for Defendants