



# National Detention Standards

Revised 2025



U.S. Immigration and Customs Enforcement

GOVERNMENT
EXHIBIT

2

*Foreword*

## INTRODUCTION

U.S. Immigration and Customs Enforcement (ICE) is a federal agency charged with enforcing the nation's immigration laws in a fair and effective manner. ICE identifies, apprehends, detains, and removes individuals who are amenable to removal from the United States. ICE uses its immigration detention authority to effectuate this mission by securing individuals in custody while they await the outcome of their immigration proceedings and/or removal from the United States. ICE has important obligations under the U.S. Constitution and other federal and state law when it keeps an individual in custody. ICE detention standards ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled.

National Detention Standards (NDS) reflects the agency's ongoing commitment to working with its state and local partners to enforce immigration laws and improve public safety and national security. These standards have been updated to better reflect the strong relationship ICE has with its law enforcement partners, including where detention facilities successfully manage their own populations and are willing to assist ICE with housing immigration detainees.

## BACKGROUND

The original NDS were issued in 2000 by the U.S. Department of Justice (DOJ) Immigration and Naturalization Service (INS), ICE's predecessor agency. The NDS established consistent conditions of confinement, program operations, and management expectations within the agency's detention system. Over the past 25 years, much has changed in immigration enforcement, including the growth of a network of dedicated immigration detention facilities, which are now largely covered by a separate set of standards – the Performance Based National Detention Standards (PBNDS). However, due to the scope of immigration enforcement and the importance of collaboration with local law enforcement agencies, ICE continues to rely on state and local facilities to house its detainees.

In 2019, ICE released a revised version of NDS (NDS 2019) to streamline and condense certain requirements, eliminate redundant standards, and reduce the burden on ICE's local law enforcement partners. NDS 2019 added three standards: Searches of Detainees; Sexual Abuse and Assault Prevention and Intervention; and Disability Identification, Assessment, and Accommodation.

### Specific Areas of Change

In 2025, ICE is again revising NDS to align with the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to The Federal Government" issued on January 20, 2025. Accordingly, references to gender have been replaced with sex throughout the standards; specifically in the following: Custody Classification System; Hold Rooms in Detention Facilities; Searches of Detainees; Special Management Units; Sexual Abuse and Assault Prevention and Intervention; Personal Hygiene; Significant Self-Harm and Suicide

Prevention and Intervention. Appendix A: List of Required Staff Training and Appendix D: Definitions have similarly been revised. Minor edits have also been made to sections referencing language access and other technical edits have been made to align with current ICE organizational structure, the Performance Based National Detention Standards 2016, and with ICE's Non-Dedicated Intergovernmental Service Agreement Standards (issued March 26, 2025).

*Language Access*

Pursuant to Title VI of the Civil Rights Act of 1964, facilities are required to identify detainees with limited English proficiency (LEP) (i.e., detainees who do not speak English as their primary language and who have limited ability to read, speak, write, or understand English) and provide them with access to facility programs and activities through language interpretation and translation services. The facilities' obligation to provide access to LEP detainees extends to all aspects of detention, including but not limited to intake, disciplinary proceedings, placement in segregation, sexual abuse and assault prevention and intervention, staff-detainee communication, mental health, and medical care. Access may be accomplished through professional in-person or telephonic interpretation and translation services or bilingual personnel. Except in emergencies, other detainees should not be used as interpreters or translators.

Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate.

Areas where language access is particularly important have been included with specific provisions throughout the updated NDS. Where necessary (e.g., a facility's contracted language assistance services cannot fulfill a particular language), ICE can assist the facilities with language services (by providing contact and other necessary information) so that the facility can secure the needed interpretation services at no additional cost. ICE will also supply the facility with Spanish and other available translations of frequently used ICE forms.

# Table of Contents

## SECTION 1: SAFETY

STANDARD 1.1 ENVIRONMENTAL HEALTH AND SAFETY...................................................... 1

STANDARD 1.2 TRANSPORTATION BY LAND...... 9

## SECTION 2: SECURITY

STANDARD 2.1 ADMISSION AND RELEASE ....... 18

STANDARD 2.2 CUSTODY CLASSIFICATION SYSTEM ....................................................... 21

STANDARD 2.3 FACILITY SECURITY AND CONTROL.................................................... 24

STANDARD 2.4 FUNDS AND PERSONAL PROPERTY ................................................... 28

STANDARD 2.5 HOLD ROOMS IN DETENTION FACILITIES................................................. 31

STANDARD 2.6 POST ORDERS............................... 34

STANDARD 2.7 SEARCHES OF DETAINEES ........ 36

STANDARD 2.8 USE OF FORCE AND RESTRAINTS .................................................... 44

STANDARD 2.9 SPECIAL MANAGEMENT UNITS 53

STANDARD 2.10 STAFF-DETAINEE COMMUNICATION ...................................... 66

STANDARD 2.11 SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION ..................... 69

## SECTION 3: ORDER .................................................. 90

STANDARD 3.1 DISCIPLINARY SYSTEM ............. 91

## SECTION 4: CARE

STANDARD 4.1 FOOD SERVICE............................. 97

STANDARD 4.2 HUNGER STRIKES ..................... 108

STANDARD 4.3 MEDICAL CARE........................... 112

STANDARD 4.4 PERSONAL HYGIENE ................ 127

STANDARD 4.5 SIGNIFICANT SELF-HARM AND SUICIDE PREVENTION AND INTERVENTION... 130

STANDARD 4.6 TERMINAL ILLNESS AND DEATH ............................................................... 135

STANDARD 4.7 DISABILITY IDENTIFICATION, ASSESSMENT, AND ACCOMMODATION ............ 137

## SECTION 5: ACTIVITIES

STANDARD 5.1 CORRESPONDENCE AND OTHER MAIL........................................................... 147

STANDARD 5.2 RECREATION .............................. 152

STANDARD 5.3 RELIGIOUS PRACTICES ............ 155

STANDARD 5.4 TELEPHONE ACCESS ................ 158

STANDARD 5.5 VISITATION................................. 163

STANDARD 5.6 VOLUNTARY WORK PROGRAM ............................................................... 176

## SECTION 6: JUSTICE

STANDARD 6.1 DETAINEE HANDBOOK ............ 180

STANDARD 6.2 GRIEVANCE SYSTEM................ 182

STANDARD 6.3 LAW LIBRARIES AND LEGAL MATERIALS ................................................. 185

STANDARD 6.4 LEGAL RIGHTS GROUP PRESENTATIONS ....................................... 191

## SECTION 7: ADMINISTRATION AND MANAGEMENT

STANDARD 7.1 DETENTION FILES ..................... 195

STANDARD 7.2 DETAINEE TRANSFERS ............ 198

**APPENDIX A LIST OF REQUIRED STAFF TRAINING 203**

**APPENDIX B ICE REPORTING REQUIREMENTS ....... 206**

**APPENDIX C CONTENTS OF THE LOCAL SUPPLEMENT ...................................................... 212**

**APPENDIX D DEFINITIONS............................................... 214**

# Acronyms and Abbreviations

AFOD: Assistant Field Office Director

BIA: Board of Immigration Appeals, Executive Office for Immigration Review, U.S. Department of Justice

CBP: U.S. Customs and Border Protection

CDC: Centers for Disease Control and Prevention, U.S. Department of Health and Human Services

CMA: Clinical Medical Authority

COR: Contracting Officer's Representative

CRCL: Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security

DHS: U.S. Department of Homeland Security

DOJ: U.S. Department of Justice

DRIL: ICE ERO Detention Reporting and Information Line

DSCU: ICE ERO Detention Standards Compliance Unit

EOIR: DOJ Executive Office for Immigration Review

E/R: Expedited Removal

ERO: ICE Enforcement and Removal Operations

FOD: Field Office Director

FSA: Food Service Administrator

HSA: Health Services Administrator

IAO: ICE Air Operations

ICC: Integrity Coordination Center

IDP: Institution Disciplinary Panel

IGSA: Intergovernmental Service Agreement

IHSC: ICE Health Service Corps

LEP: Limited English Proficiency (or Proficient)

LOP: Legal Orientation Program

LPR: Lawful Permanent Resident

MOU: Memorandum of Understanding

NCCHC: National Commission on Correctional Health Care

NCIC: National Crime Information Center, Federal Bureau of Investigation

NFPA: National Fire Protection Association

NTA: Notice to Appear

OIG: DHS Office of the Inspector General

OPLA: ICE Office of the Principal Legal Advisor

OPR: ICE Office of Professional Responsibility

ORR: Office of Refugee Resettlement, U.S. Department of Health and Human Services

OSHA: Occupational Safety and Health Administration, U.S. Department of Labor

PBNDS: Performance-Based National Detention Standards

PII: Personally Identifiable Information

PREA: Prison Rape Elimination Act of 2003, Pub. L. 108-79 (Sept. 4, 2003), codified at 42 U.S.C. § 15601 *et seq.*

RSC: Religious Services Coordinator

SAFE: Sexual Assault Forensic Examiner

SANE: Sexual Assault Nurse Examiner

SART: Sexual Assault Response Team

SDS: Safety Data Sheet

SIR: Significant Incident Report

SMI: Serious Mental Illness

SMU: Special Management Unit

SRT: Special Response Team

# Section 1: SAFETY



## STANDARD 1.1

### ENVIRONMENTAL HEALTH AND SAFETY

I. **POLICY**

This detention standard protects detainees, staff, volunteers, and contractors from injury and illness by maintaining high facility standards of cleanliness and sanitation, safe work practices, and control of hazardous substances and equipment. The facility will operate in accordance with all applicable regulations and codes, such as those of the Occupational Safety and Health Administration (OSHA), the National Fire Protection Association (NFPA), the Food and Drug Administration (FDA), the Centers for Disease Control and Prevention (CDC), and the Environmental Protection Agency (EPA).

II. **STANDARDS AND PROCEDURES**

A. **Hazardous Substances**

In accordance with OSHA 29 CFR 1910.1200, *Hazard Communication,* each facility utilizing hazardous chemicals shall create a written hazardous communication program that outlines proper chemical labeling, providing Safety Data Sheets (SDS), and training for employees.

The facility will establish a system for storing, issuing, and maintaining inventories of, and accountability for, hazardous materials.

Every area will have a perpetual inventory of the hazardous (flammable, toxic, or caustic) substances used and stored in that area. Inventory records will be maintained for each substance.

1. **Safety Data Sheets (SDSs); Files**

In accordance with OSHA requirements, every area using hazardous substances will maintain a file of the corresponding Safety Data Sheets (SDSs). The SDSs provide vital information on individual hazardous substances, including instructions on safe handling, storage, and disposal, prohibited interactions, etc. Staff and detainees will have ready and continuous access to SDSs for the substances with which they are working while in the work area.

Staff must review SDS files, and the Maintenance Supervisor will review the records as necessary.

2. **Master Index**

The Maintenance Supervisor or facility designee will compile a master index of all hazardous substances in the facility, including their locations, along with a master file of SDSs. Documentation of reviews will be maintained in the SDS master file.

The master index will also include a comprehensive, up-to-date list of emergency phone numbers (fire department, poison control center, etc.).

3. **Personal Responsibility**

Every individual using a hazardous substance in the facility must be familiar with and follow all prescribed precautions, wear personal protective equipment (PPE) when necessary, and report hazards or spills to the designated authority.

Staff supervising detainees must be familiar with and follow all prescribed precautions, ensuring detainees are provided with and are properly utilizing PPE. Supervisors will promptly report hazards and incidents to the designated authority.

4. **General Guidelines**

   a. Flammable, caustic, and toxic substances (hazardous substances) will be issued (i.e., drawn from supply points to canisters or dispensed) only under the supervision of the designated officer.

   b. Hazardous substances will be issued in the amount needed as deemed necessary by the facility administrator.

   c. Inventory records for a hazardous substance must be kept current before, during, and after each use.

   d. Any liquid or aerosol labeled "Flammable" or "Combustible" must be stored and used as prescribed on the label, in accordance with the Federal Hazardous Substances Labeling Act, to protect both life and property.

   e. The SDS will govern use of a particular flammable or combustible liquid. Staff will follow SDS directions in disposing of excess flammable or combustible liquids and chemical spills.

5. **Toxic and Caustic Substances**

   a. All toxic and caustic materials must be stored in secure areas, in their original containers, with the manufacturer's label intact on each container.

   b. Only authorized staff will draw/dispense these substances, in accordance with the applicable SDS(s).

6. **Labeling of Chemicals, Solvents, and Other Hazardous Materials**

   a. The facility will require use of properly labeled containers for hazardous materials, including any and all miscellaneous containers into which employees might transfer the material.

   b. Staff and detainees who work with hazardous materials will have appropriate training, including the classification code and safe handling procedures for each material.

B. **Emergency Response**

The facility will develop written plans and procedures for handling emergency situations reasonably likely to occur. Plans will include procedures for detainees with disabilities to ensure their safety and security during the facility response. All staff will be trained in the emergency plans, which will be reviewed and updated as appropriate on an annual basis.

C. **Significant Event Notification Requirements**

1. The facility shall immediately notify ICE/ERO of any and all of the following incidents or circumstances:

   a. Disturbances: Activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests), escape or escape attempts, weapons discharge, full or partial lock down of the detention facility, bomb threats, detention facility evacuations;

   b. Acts of God: Fires, significant environmental problems that impact the detention facility operations, adverse weather (e.g., hurricanes, floods, ice/snowstorms, heat waves, tornadoes);

   c. Adverse Findings: Citations or denied licensures related to federal, state and local health, life, safety, and fire codes; adverse incidents that attract unusual interest or significant publicity;

   d. Noncompliance: The facility is required to provide a notice per the Public Notification Rule (40 C.F.R. Part 141). This requires a facility to notify its water consumers its water supply violates a national primary drinking water regulation or has a situation that may pose a risk to public health. These consumer notices are required to be provided to persons served (not just billing customers), including detainees.

      1. If potable water is provided by a public water utility, the facility must immediately notify detainees and ICE/ERO if the facility receives a public notification from its water supplier in accordance with the Public Notification Rule.

2. If the facility is its own public water system, it must notify its customers, including detainees and ICE/ERO, when its water violates federal or state drinking water regulations (including monitoring requirements), or when they provide drinking water that may pose a risk to consumer's health.

e. Accidents/Facility Operation Issues: Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage; fence damage; power outages; interruption in water service; HVAC system failure impacting detainee living areas; sewage backup; roof leaks in detainee living areas;

f. Assaults or Misconduct:

    i. Detainee-on-Detainee Assault (any serious physical assault on an ICE detainee by another detainee or inmate);

    ii. Staff-on-Detainee Assaults (any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation); and

    iii. Staff Misconduct (any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE).

## D. **Fire Prevention and Control**

The facility will comply with standards and regulations issued by the National Fire Protection Association (NFPA), Environmental Protection Agency (EPA) and OSHA, national, state, and local fire safety codes, and the applicable standards of the American Society for Testing and Materials, American National Standards Institute, and Underwriters' Laboratories or Factory Mutual Engineering Corporation. Such topics will include, but are not limited to, fire safety codes; regular fire and safety inspections; a fire prevention, control and evacuation plan and fire drills.

New construction, alterations, and renovations will comply with the latest revision or update of the National Building Code of the Building Officials and Code Administrators International; the Uniform Building Code; or the Standard Building Code, in accordance with 40 USC 619 and local law.

In addition, the construction will comply with the latest edition of the National Fire Protection Association (NFPA) *NFPA 101, Life Safety Code*, and *NFPA 1, Fire Code*.

## E. **Pests and Vermin**

Pests and vermin will be controlled and eliminated. Conditions which provide food, shelter, a medium for breeding, or harborage will be controlled and eliminated. The facility shall immediately notify ICE/ERO in the event of insect or rodent infestation.

**F.  Certification of Facility Water Supply**

Potable water shall be available throughout the facility. If the facility is not on a certified community water source, a state laboratory will test samples of drinking and wastewater to ensure compliance with applicable standards. The facility shall immediately notify ICE/ERO in the event a report or notification is received showing the water supply violates health-based standards that may lead to water-related illnesses.

**G.  Emergency Electrical Power Generator**

Power generators will be tested according to the manufacturer's instructions. Other emergency equipment and systems will undergo quarterly testing, with follow-up repairs or replacement as necessary. Testing documentation will be retained for review.

**H.  Guidelines for Specific Areas of the Facility:**

**1.  Barber Operations**

Sanitation of barber operations is of the utmost concern due to the possible transfer of diseases through direct contact or by the tools, implements, and supplies including the towels, combs, and clippers. Towels must not be reused after use on one person.

a.  The operation will be located in an easily cleanable area with sufficient lighting of at least 50-foot candles.

b.  At least one lavatory/sink with hot and cold running water, or waterless hand sanitizer, will be available.

c.  Barber operations will be provided with all equipment and facilities necessary for maintaining sanitary procedures of hair care, including containers for waste, disinfectants, disposable headrest covers, laundered towels, and haircloths.

d.  All hair care tools which come in contact with detainees will be cleaned and disinfected prior to each use.

e.  No person will be served when infested with head lice but will be reported to the medical authority for appropriate care and treatment.

**2.  Medical Operations**

An established uniform procedure will be provided for the safe handling and disposal of used needles and other potentially sharp objects to prevent both mechanical injury and the percutaneous transmission of infectious disease organisms, especially the hepatitis B virus (HBV) and the human immunodeficiency virus (HIV).

"Sharps" are all disposable or discarded items derived from detainee care that could potentially transmit disease via direct subdermal inoculation. The following procedures will be observed when handling and disposing of needles and other hazardous sharp items:

a.  <u>Inventory</u>

A perpetual/running inventory will be kept of those items that pose a security risk, such as sharp instruments, syringes, needles, and scissors. This inventory will be reconciled weekly by an individual designated by the medical facility Health Service Administrator (HSA) or equivalent.

b.  <u>Handling</u>

Without removing the needles or replacing the needle covers, staff will place used (disposable) syringes in commercially available, biohazardous-waste sharps containers approved by the National Institute for Occupational Safety and Health.

1)  Disposal

The container will be labeled with the words "infectious waste," or with the universal biohazard symbol, and placed in the proper area for removal and disposal. Sharps will be considered infectious waste and final disposal of the container and contents will be through a commercial contractor that handles disposal of infectious waste in accordance with all local and federal regulations.

The facility will make arrangements for disposal with an approved contractor. The facility is responsible for validating that the contractor's disposal methods comply with all infectious and hazardous waste disposal laws and regulations.

c.  <u>Accidental Needle Sticks</u>

A written exposure-control plan will be followed in the event of a needle stick.

## I.  **General Environmental Health Guidelines**

Environmental health conditions will be maintained at a level that meets recognized standards of hygiene. Recognized standards include those from the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association (including the Life Safety Code (NFPA 101), and the Centers for Disease Control and Prevention (CDC).

The facility, in consultation with the HSA and the Environmental Health and Safety officer or equivalent, shall establish a housekeeping plan to ensure a high level of environmental sanitation. and shall consult with the HSA or equivalent in designing this program.

1. **Facility Conditions**

   The facility shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards.

   Under emergency circumstances, and only with ICE/ERO written approval, the facility may utilize emergency capacity/temporary bed space, to include triple bunks, on an as needed basis for an initial period not to exceed 90 days, with incremental 30-day extensions possible only with prior ICE/ERO authorization. Before using emergency capacity, the facility must certify to ICE/ERO that required medical, mental health, and security staffing are available to properly support the additional detainee population. The facility must stay within overall emergency capacity limits and ensure all local fire safety requirements are met.

2. **Housekeeping**

   General: Facility cleanliness and sanitation shall be maintained. All surfaces, fixtures, and equipment shall be kept clean and in good repair.

   Suitable and sufficient cleaning equipment and supplies shall be available throughout the facility.

   Medical Areas: The medical facility will be kept clean and in working order. The HSA or equivalent, or designee, will make a daily visual inspection of the medical facility noting the condition of floors, walls, windows, horizontal surfaces, equipment, and furnishings.

3. **Blood and Body Fluid Clean-up**

   Spills of blood and body fluids will be cleaned up and the surface decontaminated in such a manner as to minimize the possibility of workers becoming exposed to infectious organisms. A suitable cleanup kit will be maintained for use in cases of spills of blood and body fluids. Cleanup kits may be obtained from commercial sources.

4. **Hazardous and Infectious Waste Disposal**

   Infectious and hazardous waste generated at a medical facility will be stored and disposed of safely and in accordance with all applicable federal and state regulations.

5. **Universal Precautions**

   Staff will routinely take precautions to prevent contact with blood and other bodily fluids in accordance with the facility's policies and procedures, which should comply with CDC Universal Precautions. (See Standard 4.3 "Medical Care.")

**6. Garbage and Refuse**

Garbage and refuse will be collected, stored, and removed from common areas at least daily and as often as necessary to maintain sanitary conditions and to avoid creating health hazards. Refuse inside and outside of the facility must be handled and disposed of in a sanitary and safe manner that complies with applicable laws and regulations.

## STANDARD 1.2

### TRANSPORTATION BY LAND

## I. POLICY

The facility will take all reasonable precautions to protect the lives, safety, and welfare of detainees, officers, other personnel, and the general public during ground transportation.

Detainees in transit from one facility to another institution or jurisdiction will be transported in a safe and humane manner under the supervision of trained and experienced personnel. Accommodations shall be made for detainees with disabilities in accordance with the standard on "Identification, Assessment, and Accommodation of Detainees with Disabilities." Accommodations shall be made for detainees with other special needs in accordance with security and safety needs and all applicable laws and regulations.

## II. STANDARDS AND PROCEDURES

### A. Transportation Planning

The facility administrator (or designee) has overall responsibility for all aspects of vehicle operations and is responsible for setting schedules and monitoring vehicular maintenance, making logistical arrangements to transport detainees, supervising and instructing personnel, and protecting detainee security. Before departure, plans shall be revised as necessary, based on weather and road conditions and any other relevant considerations.

Detainees should not be transported to/from any facility, including ICE/ERO detention facilities, unless a Form G-391, I-216, or I-203, or equivalent, is furnished to authorize the transportation. These forms must be properly signed and shall clearly indicate the name of the detainee(s), the place or places to be escorted, the purpose of the trip and other information necessary to carry out the detail efficiently.

When coordinating the transfer of detainees, originating facility staff shall electronically transmit a copy of Form I-216 or I-203, along with the following information about each detainee, to the receiving facility:

1.  Name, date of birth, and sex;

2.  Nationality;

3.  A-number;

4.  Health and general condition;

5.  Special handling required, if any (violent, escape risk, medical, etc.);

6.      Name and title of point(s) of contact at originating office; and

7.      Property and baggage.

The receiving facility staff should confirm receipt of the documentation.

The following documents must accompany the transferee:

1.      I-862, "Notice to Appear," if applicable;

2.      I-203, "Order to Detain or Release Alien," if required by receiving facility;

3.      I-216, "Record of Persons and Property Transferred," with G-589 and I-77 attached (see also Standard 2.1 "Admission and Release");

4.      I-205, "Warrant of Deportation," original copy, if applicable;

5.      I-385, "Booking Card," with photo attached;

6.      Classification Sheet; and

7.      Medical Transfer Summary.

Standard 7.2 "Detainee Transfers" requires a Medical Transfer Summary accompany the detainee. If official health records accompany the detainee, they are to be placed in a sealed envelope or other container labeled with the detainee's name and A-number and marked "Confidential Medical Records." Transportation staff may not transport a detainee without the documents required by Standard 7.2 "Detainee Transfers." Staff is responsible for delivering all required documents and the transfer summary to personnel at the receiving facility.

If the above paperwork is incomplete at the time of departure, the facility must notify ICE/ERO to take corrective action.

**B.  <u>Transporting Officer Responsibilities</u>**

Transporting officers shall comply with all state and federal (including U.S. Department of Transportation (DOT), National Surface Transportation Board, and Environmental Protection Agency) motor vehicle regulations including, but not limited to, the following:

1.      Wearing a seat belt when the vehicle is moving;

2.      Holding a valid Commercial Driver's License (CDL), if applicable, from the state where employed;

3. Transporting detainees in a safe and humane manner that accommodates detainees with disabilities;

4. Verifying individual identities and checking documentation when transferring or receiving detainees; and

5. Driving defensively, taking care to protect the vehicle and occupants; obeying traffic laws; and reporting damage or accidents immediately.

Driving under the influence of drugs or alcohol is prohibited.

## C. **Vehicle Safety**

The officers shall secure the vehicle before leaving it unattended.

## D. **Vehicle Operation**

The driver must have the appropriate driver's license issued by the state in which he or she is employed.

The driver shall operate the vehicle in accordance with state and federal law, including all limitations on hours and maximum driving times.

DOT regulations apply to all vehicles on U.S. highways, including those used to transport detainees.

## E. **Pre-Departure Security Check**

The vehicle crew must be present to ensure a complete and thorough search of the vehicle and each detainee. The crew may take certain precautionary measures with a detainee identified as a special-handling case (such as those who pose security, medical, or mental health concerns) while searches are in progress. (See Standard 4.7 "Disability Identification, Assessment, and Accommodation.")

## F. **Movement to Vehicles**

The escorting officer/assistant driver will instruct detainees about rules of conduct during the trip.

## G. **Vehicle Occupancy Requirement**

The number of detainees transported shall not exceed the occupancy level for which the vehicle is rated.

**H. Detainee Count and Identification**

Officers will confirm the identities of the detainees they are transporting.

**I. Seating of Detainees**

The facility will develop written policy and implementing procedures governing the seating of detainees in transportation vehicles.

1. Officers will seat each detainee with particular attention to detainees with disabilities, and to those who may need to be afforded closer observation for their own safety. (See Standard 4.7 "Disability Identification, Assessment, and Accommodation.")

2. The facility will establish separate procedures for transporting detainees whose physical or mental health conditions preclude prolonged travel.

3. In accordance with Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention," when seating detainees, the facility shall assess all detainees to identify those likely to be sexual aggressors or sexual abuse victims and shall seat detainees in a manner designed to prevent sexual abuse, taking necessary steps to mitigate any such danger.

**J. Departure Scheduling and Security**

Before transferring detainees from one facility to another, a designated officer will contact the next receiving office or facility with the following information:

1. The estimated time of departure/arrival (ETD/ETA);

2. The number of detainees in each of the following categories: new arrivals (remaining at the facility); drop-offs; and overnighters;

3. The total number of detainees;

4. Special-handling cases, detailing medications, accommodations, restraints, and other relevant details for each; and

5. Notification of any actual or estimated delays in departure, and the accordingly revised ETA(s).

**K. Responsibilities En Route**

The receiving office serves as the contact point and is responsible for monitoring the vehicle's schedule.

Upon making contact with the arriving vehicle, the receiving officers will certify they are taking custody of each detainee by signing the accompanying Form I-216.

Each office will develop and post written guidelines for locating an overdue vehicle. If the vehicle does not arrive within a specified time period of the ETA, the contact point will set the tracing procedures in motion.

**L. <u>Stops</u>**

During stops, when the detainees disembark, the transport officers will keep them under constant observation to prevent external contact(s) and/or contraband smuggling. At least one officer will remain in the vehicle when one or more detainees are present.

**M. <u>Meals</u>**

Water, meals, and snacks shall be provided during any trip that exceeds six hours in duration. Consideration shall be given as to when detainees last ate before serving meals and snacks.

Meals must satisfy the nutritional requirements of the sending facility. Special dietary needs should be identified before departure so suitable meals can be arranged.

**N. <u>Vehicle Supervision</u>**

The officers must maintain a clear view of the entire vehicle compartment and remain alert for behavior that could jeopardize safety and security.

**O. <u>Vehicle Communication</u>**

The vehicle shall have sufficient equipment to allow for continuous communication during transport.

**P. <u>Vehicle Sanitation</u>**

Vehicles must be kept clean and sanitary at all times. The facility will establish the procedures and schedule for sanitizing facility vehicles.

**Q. <u>Officer Conduct</u>**

Officers will comply with all rules and procedures governing use of government vehicles. They shall not transport any personal items other than those needed to carry out their assigned duties during the trip. Alcoholic beverages and illegal drugs are strictly prohibited.

**R.  Transfer of Funds, Valuables, and Property**

The personal property of a detainee transferring from one facility to another will be inspected and inventoried upon release and arrival by respective facility personnel. The lead driver will check the manifest against the number of packages by detainee name and A-number before signing the I-216 or placing the baggage on the bus.

The following procedures apply to transferring detainees:

1. At the originating facility, staff will ask whether the detainee has in his or her possession all funds, valuables, and other property listed on the I-216.

   a. If the detainee answers "yes," he or she may board the vehicle.

   b. If the detainee claims missing property, including funds and valuables, he or she will remain at the facility until completion of the required paperwork (the SF-95 and I-387 or comparable forms). Photocopies of the completed forms are documentation sufficient for the delayed transfer to proceed.

2. The I-77 number(s) in the "checked baggage" section of the I-216 will identify the baggage to be verified by the receiving officer.

**S.  Officer Uniform and Equipment**

All officers transporting detainees shall wear the prescribed uniforms or other attire authorized by the facility.

**T.  Firearms Storage**

Firearms and weapons will be appropriately handled and stored.

**U.  Use of Restraints**

Officers shall use authorized techniques and sound correctional judgment when applying restraints. (See Standard 2.8 "Use of Force and Restraints.") To ensure safe and humane treatment, the officers will check the fit of restraining devices immediately after application, at every relay point, and any time the detainee complains. Properly fitting restraints do not restrict breathing or blood circulation.

The officers will double-lock the restraining device(s). Under no circumstances will officers attach a restraining device to an immovable object, including, but not limited to, security bars, seats, steering wheel, or any other part of a vehicle. Officers carrying firearms shall exercise caution if close contact with a detainee becomes necessary.

The use of restraints for minors may be modified, as appropriate (e.g., restrained with hands in front instead of in back, use of no restraints).

A pregnant woman or woman in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary, as documented by a supervisor and directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints should not be considered as an option for pregnant women, except under the following extraordinary circumstances:

    a. A medical officer has directed the use of restraints for medical reasons;

    b. Credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff, or others; or

    c. Reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, handcuffing in the front should be used whenever possible to enable a pregnant detainee to break her fall, and no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's detention and medical file.

## V. <u>Emergency Situations</u>

The facility shall establish written procedures for transportation officers to follow in an emergency occurring during transport. The written procedures shall cover scenarios including attacks, escapes, hostages, illness, death, fire, traffic accidents, vehicle failures, and natural disasters.

If an emergency occurs within a reasonable distance of an ICE/ERO office, the transportation officers will make every effort to reach that office before taking extraordinary measures. However, if moving seems ill-advised or impossible, they will

contact the office, stating their location and the nature of the problem so the office can provide/secure assistance as quickly as possible.

If the situation is life-threatening and the vehicle crew cannot afford to wait for help from an ICE/ERO office, immediate action shall be taken.

## W. **Non-Medical Emergency Escorted Trips**

Facilities shall refer any request for a non-medical emergency escorted trip to ICE/ERO for consideration and approval.

## X. **Transporting Minors, Females, and Opposite Sex Transports**

Minors shall be separated from unrelated adults at all times during transport and seated in an area of the vehicle near officers and under their close supervision.

Assigned transportation staff shall search a detainee of the opposite sex only in extraordinary circumstances and only when an officer of the same sex is not available.

The facility administrator shall develop procedures for vehicle crews transporting females. Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite sex. In the case of individual transports, when transporting detainees of the opposite sex, assigned transportation staff shall call in their time of departure and odometer reading, and then do so again upon arrival, to account for their time.

# Section 2:
# SECURITY



## STANDARD 2.1

### ADMISSION AND RELEASE

I. **POLICY**

The procedures a facility follows in admitting and releasing detainees protect the health, safety, and welfare of each person. During the admissions process, detainees undergo screening for medical, sexual abuse prevention, and suicide risk evaluation purposes; have their files reviewed for classification purposes; submit to a standard body search; and personally observe and certify the examination, categorization, inventorying, and safeguarding of all personal belongings.

During the release process, detainees return clothing, bedding, and other facility-issued items; participate in identity-verification procedures; and complete documents in accordance with facility procedures, including certifying receipt of all inventoried personal property, including funds and valuables.

II. **STANDARDS AND PROCEDURES**

A. **New Arrivals**

Every new arrival shall undergo custody and medical screening interviews, which will include a determination as to whether the detainee is a victim of or at risk for sexual abuse or assault and a suicide risk screening; complete questionnaires and other forms; attend any site-specific orientation program; and comply with other facility admission procedures (issuance of clothing, towels, bedding, etc.).

1. Newly arrived detainees shall receive a language access and disability screening to identify any necessary accommodations. The facility shall comply with federal laws to ensure access to facility programs, services, and activities for detainees with limited English proficiency, and provide accommodations for detainees with disabilities to ensure equal access to facility programs, services, and activities.

2. Staff will open a detainee detention file as part of the admissions process. This file will contain documentation generated during the detainee's stay at the facility, though additional documentation may be recorded and maintained electronically.

3. Detainee medical screenings shall occur as required by Standard 4.3 "Medical Care."

B. **Search of Detainee and Property**

Each new arrival will be searched in accordance with Standard 2.7 "Searches of Detainees." Searches should be conducted in an intake area that affords as much privacy as possible. All items discovered during the search will be identified as funds, valuables,

or other personal property, to be kept in the detainee's possession or inventoried, receipted, and stored, or, if appropriate, classified as contraband. (See Standard 2.4 "Funds and Personal Property" and Standard 2.3 "Facility Security and Control.")

During intake, detainees shall be given the opportunity to shower, where possible, and be issued clean institutional clothing, bedding, towels, and personal hygiene items.

## C. **Funds, Valuables, and Other Personal Property**

Each facility shall institute procedures for inventory and receipt of detainee funds, valuables, and personal property in accordance with Standard 2.4 "Funds and Personal Property."

Identity documents, such as passports, birth certificates, etc., will be copied for the detention file, and the original forwarded to ICE/ERO. Detainees will receive a receipt for confiscated identity documents. Upon request, staff will provide the detainee with a copy of the document.

## D. **Clothing and Bedding Issued to New Arrivals**

Facility staff shall issue detainees clothing and bedding in quantities, sizes, and weights appropriate for the facility environment and local weather conditions.
(See Standard 4.4 "Personal Hygiene.")

## E. **Personal Hygiene Items**

Staff shall provide detainees with articles necessary for maintaining proper hygiene. The facility will replenish all hygiene supplies as needed at no cost to the detainee.

## F. **Admissions Documentation**

Official documentation from ICE/ERO (e.g. Form I-203, I-203a, or I-216) shall accompany each newly arriving detainee. Staff shall prepare specific documents in conjunction with each new arrival to facilitate timely processing, classification, medical screening, accounting of personal effects, and reporting of statistical data.

## G. **Missing Detainee Property**

The facility shall complete a Form I-387, "Report of Detainee's Missing Property," or equivalent, when any newly arrived detainee claims his or her property has been lost or left behind at a previous location. Facilities shall forward the completed forms to ICE/ERO.

## H. **Orientation**

All facilities shall provide detainees an orientation to the facility as soon as practicable, in a language or manner detainees can understand. The orientation must include facility

operations, programs and services, grievance process information, and other rules and requirements.

The facility orientation shall also include the following information:

1. Procedures for the detainee to contact the ERO officer handling his/her case; and

2. How to use the telephone system to make telephone calls.

If ICE/ERO provides an orientation video, all reasonable efforts should be made to show it within 72 hours of a detainee's admission.

**I.** **Detainee Handbook**

Upon admission, every detainee will receive an ICE/ERO National Detainee Handbook and a facility handbook. The facility handbook will fully describe all policies, procedures, and rules in effect at the facility, in accordance with Standard 6.1 "Detainee Handbook." The ICE/ERO National Detainee Handbook is available in several languages. These translated versions may be requested from ICE/ERO as necessary and are available on ice.gov.

**J.** **Releases**

Staff must complete certain procedures before any detainee's release, removal, or transfer from the facility. Necessary steps include completing and processing forms, closing files, fingerprinting, returning personal property, and reclaiming facility-issued clothing, bedding, etc.

The time, point, and manner of release shall be consistent with safety considerations and shall take into account special vulnerabilities. As appropriate and necessary, facilities shall transport detainees to local public transportation stations at a time when such public transportation is running. If public transportation is within walking distance of the facility, detainees shall be provided with an information sheet that gives directions to and describes the types of transportation services available. All releases must be coordinated with ICE/ERO.

Prior to release, the detainee shall be provided an opportunity to make a free phone call to facilitate release arrangements.

## STANDARD 2.2

### CUSTODY CLASSIFICATION SYSTEM

I.  **POLICY**

In accordance with the requirements and guidelines of this standard, each facility is required to have in place a formal detainee classification system that begins at admission and is based on interviews and verifiable and documented information. This process will assist in the management and separation of detainees to ensure safety and security.

II.  **STANDARDS AND PROCEDURES**

A.  **Standards**

The facility shall develop and implement a system for classifying detainees in accordance with the guidelines set forth in this Standard.

The classification system shall ensure:

1.  All detainees are classified upon arrival, before being admitted into the general population.

2.  All officers assigned to classification duties shall be trained in the facility's classification process. The initial classification process and initial housing assignment should be completed within 12 hours of admission to the facility.

3.  If a detainee cannot be classified without certain information that is missing at the time of processing (e.g., results of criminal-record check), the detainee will be kept apart from the general population pending arrival of that information.

4.  A supervisor will review each detainee's classification.

5.  A detainee's classification level will determine his or her housing assignment, voluntary work assignment, and how his or her recreational activities, meals, and religious services are managed.

6.  Each facility shall establish a system that readily identifies a detainee's classification level, for example, color-coded uniforms.

7.  Detainees with special vulnerabilities will be identified and the appropriate accommodations provided.

**B. Classification Review**

A supervisor will review the intake/processing officer's classification file for each detainee for accuracy and completeness. Among other things, the reviewing officer shall ensure each detainee has been assigned to the appropriate housing unit.

**C. Classification Information**

Staff shall use the most reliable, objective information available during the classification process. "Objective" information refers to documented or discernible facts, such as most recent and/or prior criminal offense(s), escapes, institutional disciplinary history, violent episodes/incidents, sex, potential victimization or abusiveness based on the criteria in 6 C.F.R. § 115.41 mental health and/or medical status, and age. ICE/ERO offices will provide the facility with any information available to ICE to assist the facility in classifying detainees.

**D. Classification Levels and Housing Assignments**

All facilities shall ensure detainees are housed according to their classification level.

The classification system shall assign detainees to the least restrictive housing consistent with facility safety and security.

**E. Special Vulnerabilities**

Special consideration shall be given to any factor that would raise a detainee's vulnerability, or risk of vulnerability, victimization, or assault in detention. Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those with risk(s) of victimization or abusiveness identified in 6 C.F.R. § 115.41, and those who have been victims of sexual assault, torture, trafficking, or abuse.

Consistent with Standard 4.7, "Disability Identification, Assessment, and Accommodation," the facility shall use any information about identified disabilities in making classification and housing decisions. Detainees with disabilities shall be housed in the least restrictive and most integrated setting possible consistent with facility safety and security and provided an equal opportunity to participate in or benefit from the facility's programs and activities.

When making classification and housing decisions, staff shall ensure the assessment risk factors in 6 C.F.R. § 115.41 are considered in the assignment of detainee to housing, recreation and other activities and voluntary work, making individualized determinations to ensure the safety of each detainee.

**F.  Reclassification**

All facility classification systems shall ensure that a detainee is reassessed and/or reclassified at regular intervals and upon the occurrence of relevant events. Reclassification assessments shall consider, among other factors, the detainee's risk of victimization or abusiveness.  Subsequent reclassification assessments shall be completed any other time when warranted based upon the receipt of additional, relevant information, or following an incident of abuse or victimization.  A detainee may request reclassification at any time.

If it is documented, suspected, or reported that a detainee has been physically or sexually abused or assaulted, the victim's perception of his or her own safety and well-being shall be among the factors considered.

**G.  Classification Appeal**

All facility classification systems shall include procedures by which new arrivals can appeal their classification levels. The facility shall respond to all appeals in a timely manner.

**H.  Notice to Detainees**

The facility shall include a classification section in its detainee handbook which will include the following:

1.  An explanation of the classification levels, with the conditions and restrictions applicable to each.

2.  The procedures by which a detainee may appeal his or her classification.

## STANDARD 2.3

### FACILITY SECURITY AND CONTROL

I. **POLICY**

This standard protects communities, staff, contractors, volunteers, and detainees from harm by ensuring that facility security is maintained and that events which may pose a risk of harm are prevented. Facilities will have policy and procedures for conducting security inspections; the prevention, identification, and disposition of contraband; key and lock control; and population counts; as well as a comprehensive policy for tool control.

II. **STANDARDS AND PROCEDURES**

A. **Facility Policy**

The facility shall establish a comprehensive security policy, including procedures for the control and prevention of contraband inside the facility, complemented by policy and procedures regarding tool control, population counts, and key control.

Each facility shall ensure it maintains sufficient supervision of detainees, including through appropriate staffing levels and, where applicable, video monitoring, to protect detainees against sexual abuse and assault and other forms of violence or harassment, and to prevent significant self-harm and suicide. Security staffing shall be sufficient to maintain facility security and prevent or minimize events that pose a risk of harm to persons and property.

The facility shall develop and document comprehensive detainee supervision guidelines, as well as a comprehensive staffing analysis and staffing plan, to determine and meet the facility's detainee supervision needs; these shall be reviewed and updated at least annually. Essential posts and positions shall be filled with qualified personnel.

In determining adequate levels of detainee supervision and the need for video monitoring, the facility shall consider generally accepted detention and correctional practices, any judicial findings of inadequacy, the physical layout of the facility, the composition of the detainee population, the prevalence of substantiated and unsubstantiated incidents of sexual abuse as well as other incidents reflecting on facility security and detainee safety, the findings and recommendations of sexual abuse incident review reports or other findings reflecting on facility security and detainee safety, the length of time detainees spend in facility custody, and any other relevant factors.

B. **Security Inspections**

Security inspections are necessary to control contraband, ensure facility safety, security and good order, prevent escapes, maintain sanitary standards, and eliminate fire and safety hazards.

Each facility shall establish a comprehensive security inspection system that addresses every area of the facility, including the perimeter fence line and other areas noted below in this standard.

Frequent unannounced security inspections shall be conducted on both day and night shifts to control contraband; identify and deter sexual abuse of detainees; ensure facility safety, security and good order; prevent escapes; maintain sanitary standards; and eliminate fire and safety hazards. Each facility shall prohibit staff from alerting others that these security inspections are occurring, unless such announcement is related to the legitimate operational functions of the facility.

1. **Search Log**

   Each housing unit, including the Special Management Unit (SMU), will document cell and area searches including the date, time, and findings, including location(s) where contraband is found, type(s) of contraband, and the searching officers' names.

2. **Searches**

   Every facility will establish written policy and procedures for housing unit and personal area searches.

C. **Perimeter Security**

The facility's front entrance shall be a controlled access point. Entrance into the secure perimeter shall be controlled by a sally port (or equivalent with electronic interlocking doors or grilles) to prevent unauthorized entry or exit.

1. **Identification**

   The officer assigned to this post shall check the identification documents of every visitor, employee, and other person entering or leaving the facility. (See Standard 5.5 "Visitation.")

2. **Record**

   a. The post officer will maintain the visitor logbook. Logbook entries of persons visiting detainees will be completed in accordance with Standard 5.5 "Visitation."

   b. Every entry in the logbook will identify the person visiting; the person or department visited; date and time of visitor's arrival; purpose of visit; and time of departure.

**D. Key and Lock Control**

Every facility shall establish procedures for key and lock control in compliance with OSHA and National Fire Protection Association requirements. The facility shall develop and implement site-specific procedures for controlling gun-locker access.

**E. Population Counts**

Every facility shall implement an effective system for counting detainees. Formal and informal counts will be conducted as necessary to ensure around-the-clock accountability for all detainees.

**F. Tool Control**

Every facility will establish a tool-control policy with which all employees shall comply. The facility administrator shall designate the person responsible for developing and implementing tool-control procedures, along with an inventory and an inspection system to ensure accountability. These inventories shall be kept current and readily available.

**G. Private/Contract Repair and Maintenance Workers**

All visitors who are not ICE/ERO officials or facility employees, including repair and maintenance workers, shall submit to an inspection and inventory of all tools, toolboxes, and equipment that could be used as weapons before entering and leaving the facility.

**H. Contraband**

Staff will handle and properly dispose of contraband in accordance with the standard operating procedures of the facility. "Contraband" refers to all items that pose a threat to the security of people or property. Any facility-approved auxiliary aids, services, or other disability-related items used by a detainee with a disability shall not be considered contraband.

A contraband item is either "hard" contraband or "soft" contraband. Hard contraband includes any item that is inherently dangerous as a weapon or tool of violence, e.g., a knife, explosives, a "zip-gun," brass knuckles, etc. Because hard contraband presents an immediate physical threat in or to the facility, a detainee found in possession of hard contraband could face disciplinary action or criminal prosecution.

Soft contraband, on the other hand, comprises "nuisance" items that do not pose a direct and immediate threat to individual safety. Nonetheless, soft contraband has the potential to create dangerous or unsanitary conditions in the facility. Examples include excess papers that create a fire hazard, and food items that are spoiled or retained beyond the point of safe consumption. The facility administrator shall ordinarily consult a religious authority before confiscating a religious item that is deemed "soft" contraband.

1. The facility shall establish a procedure for the disposal and/or destruction of contraband items.

2. Every facility will establish written policy and procedures to secure the SMU from contraband.

Newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and should not automatically be considered contraband.

## I. **Canine Units**

Canine units may be used for contraband detection, but the use of dogs for force, control, or intimidation of detainees is prohibited, in accordance with Standard 2.8 "Use of Force and Restraints."

Any facility that has a canine unit shall establish a clear and detailed written policy and procedures governing the circumstances in which canine units may be used in searches. Canines shall not be used in the presence of detainees.

## J. **Notice to Detainees**

The facility handbook shall notify detainees in a language or manner they understand of the facility's rules and procedures governing pertinent security issues, e.g., counts and contraband.

## STANDARD 2.4

### FUNDS AND PERSONAL PROPERTY

### I. POLICY

All facilities will provide for the control and safeguarding of detainees' personal property. This will include the secure storage of funds, valuables, baggage, and other personal property; a procedure for documentation and receipting of surrendered property; and the initial and regularly scheduled inventories of all funds, valuables, and other property.

### II. STANDARDS AND PROCEDURES

#### A. General

The facility shall provide a secure area, accessible only by designated supervisors and/or property officers, to hold detainee property, valuables, and foreign currency. Detainees lacking baggage or luggage in which to store their property shall have their property placed in baggage or property bins owned by the facility and stored in the secured baggage area at no cost to the detainee. Staff shall inventory, and maintain a record of, detainee personal property being shipped from the facility. The record shall be maintained in the detention file or in a retrievable electronic format, and a copy of the record shall be provided to the detainee.

Any unauthorized personal property is contraband and will be surrendered to staff for securing and inventorying. (See Standard 2.3 "Facility Security and Control.")

The facility may make shipping arrangements for the excess personal property of detainees requiring such assistance. If the detainee refuses to cooperate by providing an appropriate mailing address or is financially able but unwilling to pay the postage, or is unable to pay for shipping, the facility will notify ICE/ERO for instructions for mailing or disposing of the property. In all cases, detainees shall be provided written notice prior to the destruction of their property.

#### B. Limitations on Possession of Detainee Personal Property

1. Detainees may keep a reasonable amount of personal property in their possession, provided the property poses no threat to facility security. Detainees shall have the opportunity to store excess property with a third party or, as applicable, in the facility's personal property storage area.

2. Identity documents, such as passports, birth certificates, etc., shall be copied for the detention file, and the original forwarded to ICE/ERO. Upon request, facility staff will provide the detainee with a copy of the document.

3.  Each housing area will designate an area for storing detainees' personal property.

**C.  <u>Admission</u>**

All detention facilities shall have policies and procedures to account for and safeguard detainee property at time of admission. Medical staff will determine the disposition of all medicine accompanying an arriving detainee.

1.  Standard operating procedures will include obtaining a forwarding address from every detainee who has personal property.

2.  Each facility shall have a written standard procedure for inventory and receipt of detainee funds and valuables. Each detainee shall be given a receipt for all property held until release.

**D.  <u>Inventory and Audit</u>**

Each facility shall have a written procedure for inventory and audit of detainee funds, valuables, and personal property.

An inventory of detainee baggage and other non-valuable property will be conducted by the facility administrator or designee at least once each quarter.

The facility's logs will indicate the date, time, and name of the officer(s) conducting the inventory. Any discrepancies will be reported immediately to the facility administrator.

**E.  <u>Release or Transfer</u>**

Each facility shall have a written procedure for returning funds, valuables, and personal property to a detainee being transferred or released. U.S. and foreign currency will be returned to the detainee as cash, when possible.

After a property check, the detainee will then sign a receipt for the property, indicating his or her receipt of all funds and personal property due him or her. Detainees who are limited English proficient shall be provided with language services (written translation or oral interpretation) and, consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," detainees with disabilities shall be provided with appropriate accommodations, auxiliary aids or services, and modifications, as necessary, to ensure the detainee understands the information in the receipt. The property log and inventory sheets will reflect the transaction.

**F.  <u>Lost/Damaged Property</u>**

Each facility shall have a written policy and procedure for detainee property reported missing or damaged.

1. All procedures for investigating and reporting property loss or damage will be implemented in a timely fashion;

2. Supervisory staff will conduct the investigation;

3. The facility will promptly reimburse detainees for all validated property losses caused by facility negligence; and

4. The facility will immediately notify ICE/ERO of all claims and outcomes.

**G. <u>Abandoned Property</u>**

Facilities shall report and surrender to ICE/ERO all detainee property that is abandoned or unclaimed.

**H. <u>Notice to Detainees</u>**

The facility handbook shall notify detainees of facility policies and procedures concerning personal property, including:

1. Which items they may retain in their possession;

2. That, upon request, they will be provided a copy of any identity document (passport, birth certificate, etc.) placed in their A-files or detention files;

3. The rules for storing or mailing property not allowed in their possession;

4. The procedures for claiming property upon release, transfer, or removal; and

5. The procedures for filing a claim for lost or damaged property.

## STANDARD 2.5

### HOLD ROOMS IN DETENTION FACILITIES

---

### I. POLICY

Hold rooms may be used for the temporary detention of individuals awaiting removal, transfer, Executive Office of Immigration Review (EOIR) immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of the facility.

### II. STANDARDS AND PROCEDURES

#### A. Physical Conditions

1. Hold rooms will be located within the secure perimeter.

2. Single occupant hold rooms shall contain a minimum of 37 square feet (seven unencumbered square feet for the detainee, five square feet for a combination lavatory/toilet fixture, and 25 square feet for wheelchair turnaround). Multiple-occupant hold rooms shall provide an additional seven square feet of unencumbered space for each additional detainee.

3. Hold rooms shall be well ventilated, well lit, and allow for convenient visual checks.

4. Hold rooms will contain sufficient seating for the maximum room capacity, which shall be posted outside the hold room.

5. Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms. Exceptions shall be made for detainees who are ill, and for minors and pregnant women.

6. All hold rooms shall be equipped to provide handwashing and potable water. Hold rooms with toilets shall allow for an appropriate amount of privacy. If the hold room is not equipped with a toilet, the shift supervisor shall at all times position an officer within sight or earshot of the hold room to provide detainees with regular access to toilet facilities. Detainees using the restroom shall be appropriately monitored.

7. Facilities will be in compliance with the applicable federal and state accessibility standards.

#### B. Time Limits and Restrictions

A detainee may not be held in a hold room for more than 12 hours. The following procedures shall be adhered to:

1. Unaccompanied minors (under 18 years), persons over the age of 70 years, females with children, and family groups will not be placed in hold rooms, unless they have shown or threatened violent behavior, have criminal convictions involving violence, or have given staff articulable grounds to expect an escape attempt.

2. As soon as it is determined that a minor in ICE custody is unaccompanied, facilities must coordinate immediately with ICE/ERO. ICE/ERO will arrange with its Juvenile Family and Residential Management Unit (JFRMU) to move the minor within 72 hours to an approved facility designated for the placement of unaccompanied minors by U.S. Department of Health and Human Services Office of Refugee Resettlement (ORR).

3. While in ICE custody, juveniles shall be detained in the least restrictive setting appropriate to the juvenile's age and special needs, provided such a setting is consistent with the need to protect the juvenile's well-being and that of others, as well as with any other laws, regulations, or legal requirements.

4. Persons exempt from placement in hold rooms due to obvious illness; special medical, physical, and or psychological needs; or other documented reasons shall be seated in a designated area outside the hold room, under direct supervision and control, barring an emergency. If the physical layout of the facility precludes holding these individuals outside the hold room, they may be held in separate rooms, if available.

5. Adult males shall be segregated from adult females at all times (even if married).

6. Minors (under 18 years) will be held apart from adults, minimizing sight, sound, and physical contact, unless the adult is an immediate relative or recognized guardian, and no other adult detainees are present in the hold room and there are no safety or security concerns with the arrangement.

7. Detainees shall be provided with basic personal hygiene items, e.g., potable water, disposable cups, soap, toilet paper, feminine hygiene items, diapers, and sanitary wipes.

## C. Detainee Search

Every detainee shall undergo a pat-down search for weapons or contraband before being placed in a hold room. Sharp objects, including pens, pencils, knives, nail files, and other objects that could be used as weapons, shall be removed from the detainee's possession.

Opposite sex pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, male staff is not available at the time the pat-down search is required, or in exigent circumstances. Opposite sex pat-down searches of female detainees shall not be conducted unless in exigent circumstances. All opposite sex pat-down searches shall be documented. If the pat-down search indicates the need for a more thorough search, a strip search shall be conducted. This must be performed by an officer of the same sex as the detainee, or in the presence of another officer of the same sex (see Standard 2.7 "Searches of Detainees" for more detailed information).

**D. <u>Basic Operational Procedures</u>**

1. An officer will visually assess every individual before placing them in the hold room, checking for any open, obvious, or apparent disabilities, mental health concerns, or other special needs.

2. Each facility shall maintain a log which records custodial information about all detainees placed in and removed from hold rooms.

3. Officers shall provide a meal to any adult in the hold room for more than six hours. Juveniles will receive meal service regardless of time in custody. Juveniles, babies, pregnant women, and others for whom it is medically necessary shall have regular access to snacks, milk, juice, etc. Staff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels. Juveniles, pregnant women, and others with evident medical needs shall have access to temperature-appropriate clothing and blankets. The facility will record when food is provided.

4. Officers shall closely supervise the hold rooms through direct supervision, which involves irregular visual monitoring not to exceed 15 minutes between checks (each time recording the time and officer's name or identifier in the detention log). Staff shall conduct constant surveillance of any detainee exhibiting signs of hostility, depression, or similar behaviors. In such cases, the officer shall notify a supervisor.

5. Staff shall immediately notify the emergency medical provider or services when a detainee appears to be need of emergency medical treatment.

6. When the last detainee has been removed from the hold room, the room shall be given a thorough cleaning and safety inspection.

## STANDARD 2.6

### POST ORDERS

---

## I.   POLICY

Each officer will have written post orders that specifically govern his or her current duties. The post orders will specify the duties of the post, along with instructions on how to perform those duties. The step-by-step procedures will include enough detail to guide an officer newly assigned to the post. The facility will also develop post orders for non-permanent assignments (details, temporary housing units, emergency changes, etc.). If events preclude advance planning, the facility will issue a post order as soon as possible after the need arises.

## II.   STANDARDS AND PROCEDURES

### A.   Post Orders

Written orders shall specify the duties of each post, along with the procedures to be followed in carrying out those duties. A master file which contains all post orders shall be available to all employees.

### B.   Reading and Understanding of Post Orders

All facilities shall have written procedures to ensure that all officers read applicable post orders. The facility administrator or designee shall review and sign housing-unit orders.

All officers and supervisors shall use the post orders to familiarize themselves with the duties for which they are responsible, and to stay abreast of changes that occur in the operation and duties of the post. Supervisors shall ensure that officers understand the post orders of each post they are assigned, regardless of whether the assignment is temporary, permanent, or due to an emergency.

Prior to assuming a post, officers will sign and date the post order to indicate having read and understood its provisions.

### C.   Maintenance of Post Orders

Post orders will be kept current at all times. Post orders will be reviewed and updated at least annually.

### D.   Armed and Perimeter-Access Post Assignments

Post orders for armed and perimeter-access post assignments will, among other things, describe and explain:

1. The proper care and safe handling of firearms; and

2. Circumstances and conditions when use of firearms is authorized.

Post orders for armed posts, and for posts that control access to the institution perimeter, shall clearly state that any staff member who is taken hostage is considered to be under duress. Any order/directive issued by such a person, regardless of his or her position of authority, is to be disregarded.

Specific instructions for escape attempts shall be included in the post orders for armed posts.

## STANDARD 2.7

### SEARCHES OF DETAINEES

I. **POLICY**

This detention standard protects detainees and staff and enhances facility security and good order by detecting, controlling, and properly disposing of contraband.

Various terms used in this standard are defined in the Definitions Appendix.

II. **STANDARDS AND PROCEDURES**

A. **Written Policy and Procedures**

The facility shall have written policy and procedures for the following:

1. Body searches, including pat searches ("pat downs"), strip searches, body cavity searches, and x-rays;

2. Close observation in "dry cells" to detect contraband;

3. Employing the least intrusive method of search practicable, as indicated by the type of suspected contraband and the method of suspected introduction or concealment;

4. Avoiding unnecessary force during searches and preserving the dignity of the detainee being searched;

5. Handling of contraband; and

6. Preservation of evidence.

B. **Staff Training**

All staff who conduct searches of housing, work areas, or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty and shall receive annual, updated training in authorized and effective techniques thereafter.

## C. **Body Searches of Detainees**

### 1. **Pat Search**

    a.  <u>Description</u>

A pat search (or "pat down") is a sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

All pat searches shall be conducted in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs including consideration of officer safety.

Security staff shall be trained in proper procedures for conducting pat searches, including opposite sex pat searches.

    b.  <u>Sex of Officer Conducting Pat Searches</u>

Opposite sex pat-down searches of male detainees shall not be conducted unless, after reasonable diligence, male staff is not available at the time the pat-down search is required, or in exigent circumstances. Opposite sex pat-down searches of female detainees shall not be conducted unless in exigent circumstances.

All opposite sex pat-down searches shall be documented.

### 2. **Strip Search**

    a.  <u>Description</u>

A strip search is a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia. Staff shall not routinely require a detainee to remove clothing or require a detainee to expose private parts of his or her body to search for contraband. To the extent reasonably possible, the inspector shall refrain from touching the skin surface of the detainee; however, the inspector may request that the detainee move parts of the body to permit visual inspection. A strip search is more intrusive than a pat search and shall be conducted in a manner designed to ensure as much privacy to the detainee as practicable.

If items are discovered that protrude from a body cavity, the removal of those items is governed by the procedures applicable to body-cavity searches, addressed below.

The facility shall not search or physically examine a detainee for the sole purpose of determining the detainee's genital characteristics. If the detainee's sex is unknown, it may be determined during conversations with the detainee, by

reviewing medical records, or, if necessary, learning that information as part of a standard medical examination that all detainees must undergo as part of intake or other processing procedure conducted in private, by a medical practitioner.

b.  <u>Same Sex Strip Searches</u>

An officer of the same sex as the detainee shall perform a strip search.

In the case of an emergency, a staff member of the same sex as the detainee shall be present to observe a strip search performed by an officer of the opposite sex.

When an officer of the opposite sex conducts a strip search which is observed by a staff member of the same sex as the detainee, staff shall document the reasons for the opposite-sex search in any logs used to record searches and in either the detainee's detention file or a retrievable electronic format.

c.  <u>Guidelines</u>

Facilities may perform a strip search when an articulable and reasonable suspicion exists that contraband is concealed on the detainee's person. Facilities may also conduct strip searches as a matter of course when a detainee is entering or re-entering the facility or in accordance with the facility's contact visitation procedures as outlined in Standard 5.5 "Visitation." All strip searches will be documented. Where a strip search is based on reasonable suspicion, the articulable facts supporting that conclusion will also be documented.

d.  <u>Reasonable Suspicion</u>

"Reasonable suspicion" is based on the existence of specific and articulable facts that would lead a reasonable officer to believe that a specific detainee is in possession of contraband. It must be based on specific and articulable facts, along with reasonable inferences that may be drawn from those facts.

The lack of identity documents alone does not ordinarily constitute reasonable suspicion.

**3.  Body Cavity Searches**

A body cavity search is an inspection for contraband or any other foreign item, in a body cavity of a detainee, by use of fingers or simple instruments, such as an otoscope, tongue blade, short nasal speculum, and simple forceps. A body cavity search is the most intrusive type of search. A body cavity search must be performed by a medical professional and take place in an area that affords privacy from other detainees and from facility staff who are not involved in the search.

a.  A body cavity search may only be conducted by authorized medical personnel, upon approval of the facility administrator or acting facility administrator, and only if there is reasonable suspicion that contraband may be concealed in or on the detainee's person.

b.  The articulable facts supporting the conclusion that reasonable suspicion exists shall be documented.

c.  The detainee's health and welfare shall be considered prior to performance of any digital or simple instrument search.

d.  Although a detainee's written consent should be obtained prior to conducting a digital or simple instrument search, such written consent is not required.

e.  If located, the contraband or foreign item may be removed immediately by medical staff, if such removal can easily be affected by use of fingers or simple medical instruments.

f.  IHSC staff is not authorized to collect or participate in the collection of specimens or other information that will be used for forensic purposes, including for toxicology studies, rape kits, and DNA testing.

Staff shall document all body cavity, digital, and simple instrument searches, the authorizations, and the reasons for the searches, in any logs used to record searches and in the detainee's detention file or retrievable electronic format.

## D.  Close Observation in a "Dry Cell"

### 1.  Description and Authorization

When an officer has reasonable suspicion to believe that a detainee may have ingested contraband or concealed contraband in a body cavity, and the methods of search specified above are inappropriate or likely to result in physical injury to the detainee, the facility administrator or designee may authorize that the detainee be placed in a room or cell to be closely observed by staff until the detainee has voided or passed the contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband.

### 2.  Requirements for "Dry Cells"

One or more rooms or cells may be identified as dry cells; such rooms must meet the following requirements:

a. The room shall be free of hiding places and be equipped with only a bed.

b. Doors shall have proper observation panels to protect staff and to allow unobstructed observation.

c. If the designated area is equipped with a toilet and/or sink, the water to the cell shall be shut off for the duration of the dry cell process.

d. Prior to a detainee's placement in dry cell status, the room to be used shall be completely searched and determined to be free of contraband.

### 3. Advising the Detainee

The supervisor responsible for initiating the dry cell placement shall advise the detainee of the conditions and what is expected and shall document the notification on an Administrative Segregation Order. The detainee shall be advised of the reasons he or she is being placed in a dry cell, the purpose of this placement, the conditions he or she can expect, and the means by which he or she can request items and services including, but not limited to, food and water, medical care, hygiene products, and bedpans. This information shall be communicated in a language or manner that the detainee understands.

### 4. Conditions of "Dry Cell" Status

a. For the detainee's safety, he or she shall be required to provide a urine sample within two hours of placement under close observation. A second urine sample shall be required prior to releasing the detainee from close observation.

b. The detainee shall have regular access to potable water.

c. The detainee may be provided telephone access.

d. The detainee may not be allowed to come in contact with other detainees.

e. Personal hygiene items shall be provided as necessary and controlled by staff.

f. The detainee shall not be permitted to leave the cell or room, except in case of extreme emergency.

g. The detainee shall be served the same meals as the general population, unless medically advice dictates otherwise. All meals are to be inspected for contraband prior to delivery to the detainee, and any food remaining after the meal, as well as the utensils and tray, are to be thoroughly inspected before their return to food service.

h.   Only medications prescribed and administered directly to the detainee by medical personnel may be given to the detainee.

i.   When the detainee needs to urinate and/or defecate, he or she shall be furnished an empty hospital bedpan, which shall afterward be closely inspected to ascertain whether any contraband is present.

j.   Since the detainee is in administrative segregation status even if not actually housed in the Special Management Unit (SMU), the requirements for medical and supervisory and staff visits in Standard 2.9 "Special Management Units" apply.

k.   Dry cells must be cleaned in accordance with Standard 1.1 "Environmental Health and Safety."

## 5.  Post Orders

The facility shall have post orders for closely observing a detainee in dry cell status. A video camera shall be used whenever possible and as appropriate.

## 6.  Requirements for Close Observation

The detainee shall be constantly observed and supervised by a staff member of the same sex. Opposite sex observation shall only occur in in exigent circumstances, the occurrence of which must be documented.

It is the observer's responsibility to ensure the detainee does not dispose of any concealed item, and to prevent activity which would allow the detainee access to the concealed item, thereby jeopardizing the security and good order of the facility, staff, and detainees. Any questions, emergency, or other situation that arises shall immediately be brought to the attention of the shift supervisor.

a.   Detainees in dry cells shall be monitored by medical staff for changes in medical and mental health status.

b.   A daily log and SMU record shall be maintained on each detainee in dry cell status.

c.   The shift supervisor shall provide periodic staff relief to the observer and at any other time the observer must leave the area. The detainee must not be left unattended.

d.   Trash may not be allowed to accumulate, and each item shall be thoroughly searched before final disposal.

e.   Periodic searches shall be conducted as follows:

1) A strip search of the detainee when he or she is placed in the dry cell, after which the detainee shall be issued a jump suit (or other suitable loose-fitting clothing);

2) A strip search of the detainee at least once each shift, if necessary; and

3) A search of the dry cell at least once each shift.

f. Staff shall notify the shift supervisor when contraband is found, secure the contraband in a properly documented evidence bag, and maintain the chain of custody for the evidence.

### 7. Length of Observation

The length of close-observation status must be determined on an individual basis. The facility administrator or designee, in consultation with qualified health personnel, shall determine when termination is appropriate.

a. The status of a detainee under close observation for as long as three days must be reviewed by the facility administrator or designee and medical staff in accordance with Standard 2.9 "Special Management Units."

b. Since the objective of dry cell status is likely to be achieved within seven days, maintaining a detainee under close observation beyond seven days requires prior approval of the facility administrator and medical staff.

## E. <u>X-Ray</u>

### 1. Medical

The facility physician may authorize use of an x-ray for medical reasons and only with the consent of the detainee.

### 2. Security

Only the facility administrator, upon approval by ICE/ERO, may authorize the facility physician to order a non-repetitive x-ray examination for the purpose of determining whether contraband is concealed in or on the detainee (e.g., in a cast or body cavity).

Such approval and authorization shall be based on the facility administrator and physician's determination that:

a. An x-ray examination is necessary for security, safety, good order, or health of the detainee;

b. No reasonable alternative exists; and

c.  The examination is not likely to result in serious or lasting medical injury or harm to the detainee, based on the determination of qualified medical staff.

Staff shall place documentation of the examination, the authorizations, and the reasons for the examination in the detainee's detention file or other retrievable electronic format, as well as in the medical file.

An x-ray examination may not be performed on a detainee without the detainee's consent. Staff shall solicit the detainee's consent and cooperation prior to the x-ray examination. Force may not be used to gain consent and cooperation. If the detainee does not provide consent and fails to cooperate, an x-ray examination shall not be performed.

**F.  Major Instrument, Fluoroscope, or Surgical Intrusion**

Only a physician may authorize use of a fluoroscope, major instrument (including an anoscope or vaginal speculum), or surgical intrusion. Such use must be for medical reasons only, and only with the detainee's consent.

## STANDARD 2.8

### USE OF FORCE AND RESTRAINTS

---

I. **POLICY**

For the purpose of these standards, force is defined as the physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee. The use of force is authorized only after all reasonable efforts to resolve a situation have failed. Officers shall use only the force necessary to gain control of the detainee; to protect and ensure the safety of detainees, staff, and others; to prevent serious property damage; and to ensure the security and orderly operation of the facility. Physical restraints shall be used to gain control of an apparently dangerous detainee only under specified conditions.

II. **STANDARDS AND PROCEDURES**

A. **Principles Governing the Use of Force and Application of Restraints**

1. Under no circumstances shall force be used to punish a detainee.

2. Staff shall attempt to gain the detainee's willing cooperation, in a language or manner that the detainee understands, before using force.

3. Staff shall use only that amount of force necessary to gain control of the detainee.

4. Immediate use of restraints is warranted to prevent the detainee from harming self or others, or from causing serious property damage. If, after the detainee is under control, the continued use of restraints appears necessary, facility administrator approval is required.

5. Additional restraints may be applied to a detainee who continues to resist after staff achieves physical control. If a restrained detainee refuses or cannot move because of the restraints, staff may lift and carry the detainee to the appropriate destination. Restraints shall not be used for lifting or carrying a detainee.

6. The following uses of restraint equipment or devices (e.g., handcuffs) are prohibited:

   a. On a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways (mouth, nose, neck, esophagus);

   b. To cause physical pain or extreme discomfort.

7. Staff will monitor all detainees placed in restraints.

8. Medication shall not be used to subdue an uncooperative detainee for staff convenience. Medication must be prescribed and administered by licensed medical personnel, for medical purposes only.

**B. <u>Types of Force</u>**

When a detainee acts violently or appears on the verge of violent action(s), staff may use reasonable force and/or restraints to prevent him or her from harming self, others, and/or causing damage to property. ICE requires that all of use of force incidents be documented, and the documentation forwarded to ICE/ERO for review.

**1. Immediate Use of Force**

An "immediate-use-of-force" situation is created when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility. In that situation, staff may respond without a supervisor's direction or presence.

**2. Calculated Use of Force**

If a detainee is in an isolated location (e.g., a locked cell) where there is no immediate threat to the detainee or others, staff shall take the time to assess the possibility of resolving the situation without resorting to force. The calculated use of force is feasible in most cases.

a. <u>Confrontation Avoidance</u>

Before authorizing the calculated use of force, a supervisory detention official, a designated health professional, and others, as appropriate, shall assess the situation. This assessment shall take into account the detainee's history and the circumstances of the immediate situation to determine the appropriateness of using force.

The conferring officials may consider, in their assessment, the detainee's medical/mental history; recent incident reports involving the detainee, if any; and shocks or traumas that may be contributing to the detainee's state of mind (e.g., a pending criminal prosecution or sentencing, a recent removal order, divorce, illness, death, etc.). Interviews with staff members familiar with the detainee might yield insight into the detainee's current agitation, even pinpointing the immediate cause.

b. <u>Use-of-Force Team Technique</u>

When a detainee must be forcibly moved and/or restrained during a calculated use of force, the use-of-force team technique shall apply.

1) Calculated-use-of-force video recording will include the following:

a) Introduction by Team Leader, stating facility name, location, time, date, etc.; describing the incident that led to the calculated use of force; naming each team member and showing his or her face briefly, as well as naming the video camera operator, and other staff present.

b) Faces of all team members briefly appear (helmets removed, heads uncovered).

c) Team Leader offering detainee last chance to cooperate before team action in a language or manner the detainee understands, outlining use-of-force procedures, engaging in confrontation avoidance, and issuing use-of-force order.

d) Entire Use-of-Force Team operation, unedited, until detainee is in restraints.

e) Close-ups of detainee's body during medical exam, focusing on the presence/absence of injuries; staff injuries, if any, described but not shown.

2) Use-of-force recordings shall be available for ICE/ERO incident reviews. They may also be used for training, e.g., after-action review training.

## C. Prohibited Use-of-Force Acts and Techniques

Facility staff shall only use force, restraints, and non-lethal weapons that are approved by facility policy in a manner consistent with policy, procedure, and training requirements.

The following acts and techniques are prohibited when using non-deadly force:

1. Canines shall not be used for force, control, or intimidation of detainees;

2. Choke holds, using a baton to apply choke or "come-along" holds to the neck area, and other neck restraints;

3. Intentional baton strikes to the head, face, groin, solar plexus, neck, kidneys, or spinal column;

4. Striking a detainee for failing to obey an order;

5. Striking a detainee, when grasping or pushing him or her would achieve the desired result; and

6. Using force against a detainee offering no resistance.

**D. Use-of-Force Safeguards**

1. Compliance with the Use-of-Force procedures can prevent injury and exposure to communicable disease.

2. Use-of-Force Team members and others participating in a calculated use of force shall wear appropriate protective gear.

3. Whenever possible, staff shall use protective devices when entering a cell or area where blood or other body fluids could be present.

4. The shift supervisor shall inspect areas of blood or other body-fluid spillage after an incident. Unless he or she determines that the spillage must be preserved as evidence, staff shall immediately sanitize those areas. Articles of clothing and use-of-force equipment contaminated with body fluids will be immediately disinfected or destroyed, as appropriate. The medical department shall provide guidance on appropriate cleaning solutions and usage.

**E. Progressive and Ambulatory Restraints**

Whenever possible, staff shall apply ambulatory restraints. If the detainee's behavior makes use of more restrictive or secure restraints necessary, the facility administrator shall decide on the appropriate restraint method. Such methods might include hard restraints with/without waist chain or belt; four-point soft restraints, with hard restraints securing the detainee to his or her bed; four-point hard restraints; etc.

In situations involving highly assaultive and aggressive detainees, progressive restraints may be used as an intermediate measure while placing the detainee into, or removing a detainee from, four-point restraints.

**F. Use of Four- or Five-Point Restraints**

Staff shall follow the specified procedures:

1. Provide the detainee with temperature-appropriate clothing and a bed, mattress, sheet and/or blanket.

2. Under no circumstance shall a detainee remain naked or without cover (sheet or blanket) unless determined necessary by qualified health personnel.

3. Check and record the detainee's condition at least every 15 minutes to ensure that the restraints are not hampering circulation and to monitor the general welfare of the detainee. If the detainee is confined by bed restraints, staff shall periodically rotate the detainee's position to prevent soreness or stiffness.

4. A health professional shall test the detainee's breathing, other vital signs, and physical and verbal responses and, if the detainee is bed-restrained, determine how he or she should be placed. Qualified health personnel ordinarily visit the detainee at least twice per eight-hour shift. When qualified health personnel are not immediately available, staff shall place the detainee in a "face-up" position until the medical evaluation.

5. Use of four-point restraints beyond eight hours requires medical supervision.

6. The shift supervisor shall review a detainee in four-point restraints every two hours. If the restraints have had a calming effect, they may be removed and, if appropriate, replaced by a less restrictive device. At every two-hour review, the detainee will be afforded the opportunity to use the toilet, unless the detainee actively resists or becomes combative when released from restraints for this purpose.

7. The facility must inform ICE/ERO when a detainee has been in restraints for more than eight hours. The facility will provide updates every eight hours until the restraints are removed.

### G. Medical Attention in Use-of-Force and Application-of-Restraints Incidents

1. In immediate use-of-force situations, staff shall seek the assistance of mental health or other medical personnel immediately upon gaining physical control of the detainee.

2. In all calculated uses of force, the use-of-force team leader shall seek the guidance of qualified health personnel (based on a review of the detainee's medical record) to identify physical or mental health concerns. If the medical or mental health professional determines that the detainee requires continuing care, he or she shall make the necessary arrangements. Continuing care may involve such measures as admission to a hospital.

3. After any use of force or application of restraints, medical personnel shall examine the detainee, immediately treating any injuries. The medical services provided shall be documented.

4. Medical staff shall immediately examine any staff member involved in a use-of-force incident who reports an injury and, if necessary, provide initial emergency treatment.

### H. Use of Non-Lethal Weapons

The facility may authorize the use of non-lethal weapons if a detainee:

1. Is armed and/or barricaded; or

2. Cannot be approached without danger to self or others; and

3. A delay in controlling the situation would seriously endanger the detainee or others or would result in a major disturbance or serious property damage.

Staff shall consult medical staff before using oleoresin capsicum (OC) spray or other non-lethal weapon(s) unless escalating tension make such action unavoidable. When possible, medical staff will review the detainee's medical file for any disease or condition that a non-lethal weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure.

## I. Use of Force in Special Circumstances

Occasionally, after the failure or impracticability of confrontation-avoidance techniques, staff must make a judgment call as to whether to use force. In such cases, if the incident involves a detainee at high risk for injury to self or others, such as a pregnant detainee or an aggressive detainee with open cuts, sores, or lesions, staff shall consult with the on-site medical authority before deciding the situation is grave enough to warrant the use of physical force.

### 1. Special Needs

If a situation arises involving a detainee with special needs, the appropriate medical or mental health staff shall be consulted prior to the calculated use of force. A detainee with "special needs" is a detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drugs or alcohol.

Pregnant and Post-Delivery Detainees

A pregnant woman or a woman in post-delivery recuperation shall not be restrained absent truly extraordinary circumstances that render restraints absolutely necessary, as documented by a supervisor and directed by the on-site medical authority. This general prohibition on restraints applies to all pregnant women in the custody of ICE, whether during transport, in a detention facility, or at an outside medical facility. Restraints are never permitted on women who are in active labor or delivery.

Restraints should not be considered as an option for these populations, except under the following extraordinary circumstances:

a. A medical officer has directed the use of restraints for medical reasons;

b. Credible, reasonable grounds exist to believe the detainee presents an immediate and serious threat of hurting herself, staff, or others; or

c.  Reasonable grounds exist to believe the detainee presents an immediate and credible risk of escape that cannot be reasonably minimized through any other method.

In the rare event that one of the above situations applies, medical staff shall determine the safest method and duration for the use of restraints and the least restrictive restraints necessary shall be used.

Even in the extraordinary circumstance when restraints are deemed necessary, handcuffing in front should be used whenever possible to enable a pregnant detainee to break her fall, and no detainee known to be pregnant shall be restrained in a face-down position with four-point restraints, on her back, or in a restraint belt that constricts the area of the pregnancy. All attempts will be made to ensure that the detainee is placed on her left side if she is immobilized.

The use of restraints requires documented approval and guidance from the on-site medical authority. Record-keeping and reporting requirements regarding the medical approval to use restraints shall be consistent with other provisions within these standards, including documentation in the detainee's detention and medical file.

## 2. Detainees with Wounds or Cuts

Staff shall wear protective gear when restraining aggressive detainees with open cuts or wounds. If use of force is deemed necessary, this gear will include a full-body shield.

## J. <u>Documentation of Use of Force and Application of Restraints Incidents</u>

ICE/ERO requires that all use of force incidents involving detainees be documented and the documentation forwarded to ICE/ERO for review. Facility staff shall likewise document the use of restraints on a detainee who becomes violent or displays signs of imminent violence. A copy of the report shall be placed in the detainee's detention file or be maintained in and retrievable electronic format. A report is not necessary for the general unresisted use of restraints (for example, the routine movement or transfer of detainees).

All personnel who either use force or observe the use of force shall document their actions and observations in a written report before leaving shift. Supervisors who are present during a force incident shall document in a written report their observations and any orders given directing the use of force.

## 1. Report of Incident

Facility staff shall prepare a use of force report for each use of force incident. Each staff member who witnesses the use of force shall complete a memorandum for the record, to be attached to the use of force report. The facility administrator or designee will review all completed reports and memoranda for sufficiency and corrective action as necessary.

2. **4- or 5-Point Restraints Report**

Facilities shall document all 15-minute checks of detainees in four- or five-point restraints and report to ICE/ERO any detainee restrained for over eight hours, with additional reports every eight hours thereafter.

3. **Recordings of Use-of-Force Incidents**

Staff shall immediately obtain and record with a video camera any use-of-force incident, unless such a delay in bringing the situation under control would constitute a serious hazard to the detainee, staff, or others, or would result in a major disturbance or serious property damage. Calculated use of force shall be video recorded as specified in part B.2.b. of this standard, "Use-of-Force Team Technique." Release of use-of-force audiovisual recordings to the news media may occur only if authorized by the Director of Enforcement and Removal Operations, in accordance with ICE/ERO procedures and rules of accountability.

4. **Record Keeping**

Facilities shall maintain all written use-of-force documentation for a minimum of six years.

Video, audio, and other recordings shall be catalogued and preserved until no longer needed, but for no less than 30 months after their last documented use. In the event of litigation, the facility will retain the recording for a minimum of six months after the conclusion/resolution of the litigation.

5. **Report Completion**

The facility review team shall complete and submit its report to the facility administrator within five working days of the incident or the detainee's release from restraints. The facility administrator shall review and sign the report, acknowledging its finding that the use of force was appropriate or inappropriate.

The review team shall determine whether the incident requires further investigation or referral to law enforcement. The facility shall forward a copy of the After-Action Report to the local ICE/ERO Field Office Director within seven days of completion.

**K. <u>After-Action Review of Use of Force and Application of Restraints Incidents</u>**

Written procedures shall govern the mandatory after-action review for use-of-force incidents (whether calculated or immediate), and for the application of restraints. The purpose of the review is, among other things, to assess the reasonableness of the actions taken (i.e., the proportionality of the force used to the detainee's actions).

No officer involved in the use of force shall be part of the review team.

1. The After-Action Review shall examine all relevant materials for facility staff's compliance with facility policy and these standards. For calculated use of force incidents, and incidents where video is available, recordings will be reviewed to examine, among other things:

   a. Application of only as much force as necessary to subdue the detainee. This includes responding appropriately to a subdued or cooperative detainee, i.e., one who discontinues his or her violent behavior;

   b. Protective gear worn inside cell/area until end of operation;

   c. Appropriate use of chemical agents, Oleoresin Capsicum (OC) spray, mace, etc., in accordance with written procedures;

   d. A medical professional promptly examines the detainee, with the findings reported on the recording;

   e. Continuous coverage from the time the camera starts recording until the incident is over. The review will investigate any breaks or sequences apparently missing from the recording.

## L.  **Training**

Staff shall be trained in approved methods of self-defense, crisis intervention, conflict de-escalation, use of force techniques, recognizing signs and symptoms of mental illness, and reporting requirements. Staff will be made aware of prohibited use-of-force acts and techniques.

Specialized training shall be required for certain non-lethal equipment, e.g., OC spray and electronic devices. Training in the use of chemical agents shall include treatment of individuals exposed to them. Each officer must have been specifically certified to use a given device.

## STANDARD 2.9

### SPECIAL MANAGEMENT UNITS

---

**I.  POLICY**

This detention standard protects detainees, staff, contractors, volunteers, and the community from harm by segregating certain detainees from the general population in Special Management Units (SMUs) through Administrative Segregation for detainees segregated for administrative reasons and Disciplinary Segregation for detainees segregated for disciplinary reasons.

**II.  STANDARDS AND PROCEDURES**

**A. Placement in Administrative Segregation**

Administrative Segregation status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility. For matters of safety and security, staff may have to take immediate action to control a detainee, including placement in administrative segregation.

Each facility shall develop and follow written procedures, consistent with this standard, governing the management of its administrative segregation unit. These procedures must include documenting detailed reasons for placement of an individual in administrative segregation.

Prior to the detainee's placement in administrative segregation, the facility administrator or designee shall review the case to determine whether administrative segregation is in fact warranted.

**1. Reasons for Placement in Administrative Segregation**

A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for medical reasons; or under other circumstances as set forth below.

A detainee's age, disability, sex, sexual orientation, race, color, national origin, or religion may never provide the sole basis for a decision to place the detainee in involuntary segregation. An individualized assessment must be made in each case.

Some examples of reasons for a detainee's assignment to administrative segregation include, but are not limited to, the following:

a. A detainee is awaiting an investigation or a hearing for a violation of facility rules. Generally, a detainee should not remain in administrative segregation for a longer period of time than the maximum term of disciplinary segregation permitted for the most serious offense charged.

b. A detainee poses a threat to the security of the facility.

c. A detainee requires protection. Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to regularly review continued placement in protective custody as well as provisions for release from protective custody when appropriate.

Use of administrative segregation to protect detainees with special vulnerabilities, including detainees vulnerable to sexual abuse or assault, shall be limited to those instances where reasonable efforts have been made to provide appropriate housing; where the placement is for the least amount of time practicable; and where no other viable housing options exist, and as a last resort.

Detainees who have been placed in administrative segregation for protective custody shall have access to programs, services, visitation, counsel, and other services available to the general population to the maximum extent possible.

d. A detainee is scheduled for release, removal, or transfer within 24 hours. Such segregation may be ordered for security reasons or for the orderly operation of the facility.

e. The facility's Institutional Disciplinary Panel (IDP), or its equivalent, may recommend a detainee be placed in administrative segregation following disciplinary segregation if it determines that releasing the detainee into the general population would pose a threat to the detainee or to the security and orderly operation of the facility. However, a subsequent placement in administrative segregation requires an administrative segregation order justifying the placement after the completion of the term served in disciplinary segregation.

A detainee transferred from disciplinary segregation to administrative segregation shall enjoy the same privileges as all other detainees in administrative segregation, provided receipt of such privileges poses no threat to the safety, security, or orderly operation of the facility.

f. A medical professional who orders a detainee removed from the general population shall complete and sign an administrative segregation order (see below) unless the detainee is to stay in the medical department's isolation ward.

2. **Administrative Segregation Order**

A written order shall be completed and approved by the facility administrator or designee before a detainee is placed in administrative segregation, except when exigent circumstances make such documentation impracticable. In such cases, an order shall be prepared as soon as possible.

a. The administrative segregation order shall be provided to the detainee within 24 hours of placement in administrative segregation, and its contents communicated to him or her in a language or manner the detainee can understand.

b. A copy of the administrative segregation order shall be immediately provided to ICE/ERO.

c. When the detainee is released from administrative segregation, the releasing officer shall indicate the date and time of release on the administrative segregation order. The completed order shall then be included in the detainee's detention file or maintained in a retrievable electronic format.

3. **Review of Detainee Status in Administrative Segregation**

All facilities shall implement written procedures for the regular placement review of all detainees held in administrative segregation, consistent with the procedures specified below.

a. A supervisor shall conduct a review within 72 hours of the detainee's placement in administrative segregation to determine whether segregation is still warranted.

   1) The review shall include an interview with the detainee.

   2) A written record shall be made of the decision and the justification.

   3) If the detainee has been segregated for his or her own protection, but not at the detainee's request, the signature of the facility administrator or assistant facility administrator is required to authorize the detainee's continued placement in administrative segregation.

b. A supervisor shall conduct an identical review after the detainee has spent seven days in administrative segregation, and every week thereafter for the first 30 days, and every 10 days thereafter, at a minimum.

c. A copy of the decision and justification in each review shall be given to the detainee unless, in exceptional circumstances, this provision would jeopardize the facility's safety, security, or orderly operations. The detainee shall also be given an opportunity to appeal a review decision to the facility administrator.

d. After seven consecutive days in administrative segregation, the detainee may exercise the right to appeal the conclusions and recommendations of any review conducted to the facility administrator. The detainee may use any standard form of written communication, to include a detainee request, to file the appeal.

e. If a detainee has been in administrative segregation for more than 30 days and objects to that status, the facility administrator shall review the case to determine whether that status should continue. This review shall take into account the detainee's views and shall result in a written record of the decision and its justification. A similar review shall take place each 30 days thereafter.

## B. Placement in Disciplinary Segregation

To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in disciplinary segregation, apart from the general population. A detainee may be placed in disciplinary segregation only by order of the Institutional Disciplinary Panel (IDP), or its equivalent, after a hearing in which the detainee has been found to have committed a prohibited act and only when alternative dispositions would inadequately regulate the detainee's behavior.

### 1. Duration

The maximum sanction is 30 days in disciplinary segregation per incident, except in extraordinary circumstances. After the first 30 days, and each 30 days thereafter, the facility administrator shall send a written justification for the continued segregation to ICE/ERO.

Time served in pre-disciplinary hearing detention shall be deducted from any time ordered by the IDP.

### 2. Disciplinary Segregation Order

A written order shall be completed and signed by the chair of the IDP (or disciplinary hearing officer) before a detainee is placed into disciplinary segregation.

a. Prior to a detainee's actual placement in disciplinary segregation, the IDP shall complete the disciplinary segregation order detailing the reasons for placing the detainee in disciplinary segregation. All relevant documentation must be attached to the order.

b. The completed disciplinary segregation order shall be immediately provided to the detainee and its contents communicated to him or her in a language or manner the detainee can understand, unless delivery would jeopardize the safe, secure, or orderly operation of the facility.

c.  When the detainee is released from disciplinary segregation, the releasing officer shall indicate the date and time of release on the disciplinary segregation order. The completed order shall then be included in the detainee's detention file or maintained in a retrievable electronic format.

**3.  Review of Detainee Status in Disciplinary Segregation**

All facilities shall implement written procedures for the regular review of all disciplinary segregation cases, consistent with the following procedures:

a.  A security supervisor, or equivalent, shall interview the detainee and review his or her status in disciplinary segregation every seven days. The review will confirm the detainee is being provided showers, meals, recreation, and other basic necessities, as required by this detention standard.

1)  The supervisor may shorten, but not extend, the original sanction.

2)  All review documents shall be placed in the detainee's detention file or maintained in a retrievable electronic format.

3)  After each formal review, the detainee shall be given a written copy of the reviewing officer's decision and the basis for his or her finding, unless such a copy may result in a compromise of institutional security. If a written copy cannot be delivered, the detainee shall be advised of the decision orally, and the detention file, or retrievable electronic record, shall so note, identifying the reasons why the notice was not provided in writing. The review decision shall be communicated to detainees in a language or manner that they understand.

b.  The facility administrator shall review the status of a detainee in disciplinary segregation after the first 30 days of segregation, and each 30 days thereafter, to determine whether continued detention in disciplinary segregation is warranted.

**C.  Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review**

**1.  Extended Segregation Placements**

The facility administrator must notify ICE/ERO in writing whenever a detainee has been held continuously in any form of segregation for:

a.  14 days, or 14 days out of any 21-day period;

b.  30 days; and

c.  At every 30-day interval thereafter.

2. **Immediate Notifications**

The facility administrator must notify ICE/ERO in writing as soon as possible, but no later than 72 hours, after the initial placement of a detainee in segregation if:

a.  The detainee has been placed in administrative segregation on the basis of a disability, medical or mental illness, or other special vulnerability, or because the detainee is an alleged victim of a sexual assault, is an identified suicide risk, or is on a hunger strike; or

b.  A detainee placed in segregation for any reason has a mental illness, a serious medical illness, a serious physical disability, or is pregnant or recently had a miscarriage.

c.  For the purposes of this standard, detainees with special vulnerabilities include those:

   i.  Who are known to be suffering from mental illness or serious medical illness;

   ii.  Who have a disability or are elderly, pregnant, or nursing;

   iii.  Who would be susceptible to sexual abuse or assault in the general population;

   iv.  Who would be susceptible to harm in the general population due in part to risk(s) of sexual victimization in 6 C.F.R. § 115.41; or

   v.  Who have been victims – in or out of ICE/ERO custody – of sexual assault, torture, trafficking, or abuse.

3. **Updates to Segregation Status**

The facility administrator must also notify ICE/ERO in writing whenever a detainee who has been the subject of a prior notification pursuant to this section is subsequently released from segregation.

4. **Coordination with ICE/ERO in Reviewing Segregation Placements**

The facility administrator shall provide all information and supporting documentation regarding segregation placements as requested by ICE/ERO. The facility administrator shall also coordinate with ICE/ERO in:

a.  considering whether a less restrictive housing or custodial option is appropriate and available, including return to the general population or options to limit isolation while housed in the SMU, such as additional out of cell time and the ability to participate in group activities; and

b.  recommending whether transfer may be appropriate to a hospital or to another facility where the detainee can be housed in the general population or in an environment better suited to the needs of the detainee, such as a facility that has dedicated medical beds in its clinic, a medical observation unit, a facility that has a dedicated protective custody unit, or a facility that has a Special Management Unit with enhanced privileges.

## D.  **Logs and Records**

### 1.  **Permanent SMU Log**

A permanent log shall be maintained in the SMU to record all activities concerning SMU detainees (e.g., meals served, recreational time, visitors, etc.).

The SMU log shall record the detainee's name, A-number, housing location, date admitted, reasons for admission, status review dates, tentative release date (for detainees in disciplinary segregation), the authorizing official, and date released. These logs shall also be used by supervisory staff and other officials to record their visits to the unit.

### 2.  **Special Management Housing Unit Record**

The Special Management Housing Unit Record or comparable form shall be prepared immediately upon the detainee's placement in the SMU.

a.  The special housing unit officer shall immediately record:

1)  Whether the detainee ate, showered, recreated and took any medication; and

2)  Any additional information, such as whether the detainee has a medical condition, or has expressed or exhibited suicidal/assaultive ideation, intent, or behavior.

3)  The officer that conducts the activity shall print his or her name and sign the record.

b.  The facility medical staff shall sign each individual's record when the medical staff member visits a detainee in the SMU. The housing officer shall initial the record after the medical visits are completed, but no later than the end of the shift.

c.  Upon a detainee's release from the SMU, the releasing officer shall attach that detainee's entire housing unit record to either the administrative segregation order or the disciplinary segregation order and ensure the record's inclusion in the detainee's detention file or retrievable electronic record.

### E. **Basic Requirements for All Special Management Units**

Conditions of confinement are based on the amount of supervision required to control a detainee and to safeguard the detainee, other detainees and facility staff.

In every instance, any exceptions to these requirements shall be:

1. Made only for the purpose of ensuring detainee and facility staff safety and security;

2. Approved by a supervisor (or higher official);

3. On a temporary and situational basis, continued only for as long as it is justified by threat to the safety or security of the facility, its staff, or detainee population; and

4. Documented in the Permanent SMU log and, under circumstances specified later in this detention standard, documented and placed in the detainee's detention file or retrievable electronic record.

When a detainee in an SMU is deprived of any usually authorized items or activity, a report shall be included in the detainee's detention file or retrievable electronic record.

Placement in an SMU does not constitute a valid basis for the use of restraints while in the SMU or during movement around the facility. Consistent with Standard 2.8 "Use of Force and Restraints," restraints should only be used, when necessary, as a precaution against escape during transfer, for medical reasons (when directed by the medical officer), or to prevent self-injury, injury to others, or serious property damage.

### F. **Translation/Interpretation Services**

Detainees shall be provided translation and/or interpretation services and any necessary communication assistance while in the SMU, to assist with their understanding of the reasons for and conditions of their confinement as well as their rights and responsibilities while in confinement.

### G. **Special Needs**

Detainees in the SMU shall be provided appropriate accommodations and professional assistance for disabilities and/or other special needs (e.g., medical, therapeutic, or mental health treatment), on an equal basis as those in the general population.

### H. **Cell Condition**

Cells and rooms used for purposes of segregation must be well ventilated, adequately lit, appropriately heated/cooled, and maintained in a sanitary condition at all times, consistent with safety and security.

Ordinarily, the number of detainees confined to each cell or room may not exceed the capacity for which it was designed. Under exigent circumstances, before approving any additional cell occupancy on a temporary basis, the facility administrator shall consult with ICE/ERO, who shall consult with ICE/ERO legal counsel. If a decision is made to approve such additional cell occupancy, a report of the action shall be filed with the facility and with the ICE/ERO Field Office Director.

**I. Personal Property**

Each facility shall issue guidelines in accordance with this standard concerning the property detainees may retain in each type of segregation. Generally, detainees in administrative segregation shall be subject to less stringent personal property restrictions and control than those in disciplinary segregation.

**J. Privileges**

Each facility shall issue guidelines in accordance with this standard concerning the privileges detainees may have in each type of segregation.

**1. Administrative Segregation**

Generally, these detainees shall receive the same privileges available to detainees in the general population, consistent with any safety and security considerations for detainees and facility staff.

When space and resources are available, detainees in administrative segregation may be provided opportunities to spend time outside their cells (in addition to the required recreation periods) for such activities as socializing, watching TV and playing board games, and may be assigned to voluntary work details (e.g., as orderlies in the SMU).

**2. Disciplinary Segregation**

Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control.

**K. Close Supervision**

SMU staff shall observe and log observations at least every 30 minutes on an irregular schedule. For cases that warrant increased observation, the SMU staff shall observe detainees accordingly.

**L. Specialized Training**

Security staff assigned to SMU shall receive training in relevant topics, such as:
1. Identifying signs of mental health decompensation;

2. Techniques for appropriate interactions with mentally ill detainees;

3. The impact of isolation; and

4. De-escalation techniques.

## M. Health Care

Detainees must be evaluated by a health care professional prior to placement in an SMU (or when that is infeasible, as soon as possible and no later than within 24 hours of placement). The assessment should include a review of whether the detainee has a suspected or diagnosed mental illness, prior suicide attempts or self-harm, or any other special needs.

Health care personnel shall conduct face-to-face medical assessments at least once daily for detainees in an SMU. Where reason for concern exists, assessments shall be followed up with a complete evaluation by a qualified health care or mental health provider, and a treatment plan developed.

Health care visits shall be recorded on the SMU housing record or comparable form. The facility shall provide out-of-cell, confidential assessments and visits for detainees whenever possible, to ensure patient privacy and to eliminate barriers to treatment.

At a minimum of every 30 days, a qualified mental health care provider shall conduct a face-to-face psychological evaluation and record the review.

Detainees with a medical or mental illness or identified as being a suicide risk or on a hunger strike, shall be removed from segregation if IHSC or facility medical staff determine that the segregation placement has resulted in deterioration of the detainee's medical or mental health, and an appropriate alternative is available.

### 1. Detainees with Serious Mental Illnesses (SMI)

Detainees with a serious mental illness (SMI), as defined in Standard 4.3 "Medical Care," should not be automatically placed in an SMU on the basis of such mental illness. Every effort shall be made to place detainees with an SMI in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an SMU.

The facility shall coordinate with ICE/ERO in seeking alternatives to SMU housing for detainees with an SMI, potentially including transfer to a hospital or to another facility.

For any detainee with an SMI placed in restrictive housing:

a. Mental health staff shall conduct a mental health consultation within 72 hours of the detainee's placement in restrictive housing;

b. A multi-disciplinary committee of facility staff, including facility leadership, medical and mental health professionals, and security staff, shall meet weekly to review all detainees with SMI who are in restrictive housing;

c. At least weekly, a qualified mental health provider shall conduct face-to-face clinical contact with the detainee to monitor the detainee's mental health status, identify signs of deterioration, and recommend additional treatment as appropriate.

The facility shall seek to develop enhanced opportunities for in-cell and out-of-cell therapeutic activities and additional unstructured out-of-cell time for detainees with an SMI, to the extent such activities can be conducted while ensuring the safety of the detainee, staff, and other detainees.

**2. Pregnant Detainees**

Women who are pregnant, who are post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy should as a general matter not be placed in an SMU. In very rare situations, a woman who is pregnant, is postpartum, recently had a miscarriage, or recently had a terminated pregnancy may be placed in an SMU as a response to behavior that poses a serious and immediate risk of physical harm to self or others, or if the detainee has requested to be placed in protective custody administrative segregation and there are no more appropriate alternatives available. Even in such cases, this decision must be approved by a representative of the detention facility administration, in consultation with a medical professional, and must be reviewed every 48 hours.

**N. <u>Meals</u>**

Detainees in SMU shall be provided three nutritionally adequate meals per day, according to the general population meal schedule and ordinarily from the same menu.

**O. <u>Clothing and Personal Hygiene</u>**

Detainees in SMU may shave and shower at least three times weekly and receive other basic services—such as laundry, clothing, bedding, and linen—equivalent to general population detainees and consistent with safety and security of the facility.

A detainee may be denied such items as clothing, mattress, bedding, or linens for medical or mental health reasons if his or her possession of such items raises concerns for detainee safety and/or facility security. All denials of such items shall be documented and justified.

**P. <u>Correspondence</u>**

Detainees in an SMU may write, send, and receive letters and other correspondence in a manner similar to those housed in the facility's general population.

**Q. <u>Visitation</u>**

Detainees in an SMU ordinarily retain visiting privileges.

Segregated detainees may ordinarily use the visiting room during normal visiting hours. However, the facility may restrict or disallow visits for a detainee who violates visitation rules or whose behavior otherwise indicates the detainee poses a threat to the security or the good order of the visiting room.

**R. <u>Legal Visits</u>**

Detainees in SMU may not be denied legal visitation. However, the facility administrator or designee may implement security precautions to protect the detainee and visitors and maintain good order. In such cases, staff shall advise legal service providers and assistants of any security concerns.

**S. <u>Religious Guidance</u>**

Detainees in an SMU shall be permitted to participate in religious practices, consistent with the safety, security, and orderly operation of the facility.

**T. <u>Legal Materials</u>**

Detainees in SMU shall have access to legal materials in accordance with Standard 6.3 "Law Libraries and Legal Materials."

Detainees may retain all personal legal material upon placement in an SMU, provided such material does not create a safety, security, or sanitation hazard.

Detainees with a large amount of personal legal material may be required to place a portion with their stored personal property, with access permitted during scheduled hours. Requests for access to such legal material shall be accommodated as soon as possible, but in no case more than 24 hours after receipt of the initial detainee request to retrieve documents, except in the event of documented security reasons.

**U. <u>Law Library and Legal Rights Group Presentations Access</u>**

Detainees housed in administrative segregation or disciplinary segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.
The facility administrator shall notify ICE/ERO every time access to legal materials is denied, with documentation of the denial and the justification placed in the detention file or retrievable electronic record.

## V. **Recreation**

Facilities are encouraged to maximize opportunities for group participation during recreation and other activities, consistent with safety and security considerations. Recreation for certain individuals may occur separate from other detainees when necessary or advisable to prevent assaults and to reduce management problems.

Detainees in the SMU shall be offered at least one hour of recreation per day, outside their cells and scheduled at a reasonable time, at least five days per week.

1. When recreation privileges are suspended, the institutional disciplinary panel or facility administrator shall provide the detainee written notification, including the reason(s) for the suspension, any conditions that must be met before restoration of privileges, and the anticipated duration of the suspension (provided the requisite conditions are met for restoration of privileges).

2. Denial of recreation privileges for more than seven days requires the concurrence of the facility administrator and a health care professional. It is expected that such denials shall rarely occur, and only in extreme circumstances.

3. The facility shall notify ICE/ERO in writing when a detainee is denied recreation privileges in excess of seven days.

## W. **Telephone Access**

Detainees in SMU shall have access to telephones in a manner that is consistent with the special safety and security requirements of SMU placement. In general, any detainee in an SMU may be reasonably restricted from using or having access to a phone if that access has been or is likely to be used for criminal purposes, or would endanger any person, or if the detainee damages the equipment provided. In such instances, staff must clearly document why such restrictions are necessary to preserve the safety, security, and good order of the facility. Such documentation shall be placed in the detainee's detention file or be maintained in a retrievable electronic format.

Detainees in disciplinary segregation may be restricted, as part of the disciplinary process, from using telephones to make general calls. However, even in disciplinary segregation, detainees shall have telephone access for family or personal emergencies, and for calls to attorneys, other legal representatives, courts, and government offices as described below.

All detainees, including those in disciplinary segregation, shall be permitted to place calls to attorneys, other legal representatives, courts, and government offices (including the DHS Office of the Inspector General, DHS Office for Civil Rights and Civil Liberties, ICE/OPR Joint Intake Center, and embassies or consulates), according to the facility schedule.

## STANDARD 2.10

### STAFF-DETAINEE COMMUNICATION

I. **POLICY**

Procedures must be in place to allow for formal and informal contact between detainees, ICE staff, and facility staff. Procedures shall permit detainees to make written requests to ICE staff and receive an answer in an acceptable time frame. Detainees may make marriage requests that will be reviewed on a case-by-case basis.

II. **STANDARDS AND PROCEDURES**

A. **Facility Staff and Detainee Contact**

Detainees shall have frequent opportunities for formal and informal contact with facility staff, including managerial and supervisory staff. Facility staff will address detainees in a professional and respectful manner. The facility shall also allow detainees to file grievances and communicate directly with ICE/ERO. Facility staff shall immediately refer any questions related to a detainee's immigration removal processes to ICE/ERO.

B. **ICE/ERO Access and Detainee Contact**

1. **Unannounced Contacts with Detainees**

ICE/ERO shall have access to conduct regular unannounced (not scheduled) visits to the facility's living and activity areas to encourage informal communication with detainees and informally observe conditions.

2. **Scheduled Visits**

The facility shall accommodate ICE and DHS components' access to the facility and its detainee population upon request from ICE.

3. **ICE/ERO Staff Presence**

ICE/ERO may place dedicated ICE staff at the facility. Such ICE staff shall have unimpeded access to all areas of the facility 24 hours a day, 7 days a week as well as access to any records associated with detainees.

4. **Documenting ICE visits**

Each facility shall develop a method to document ICE visits.

**C. Requests to ICE/ERO from Detainees**

All detainees shall have the opportunity to submit written questions, requests, or concerns to ICE/ERO staff. The facility must ensure that adequate supplies of detainee request forms and writing implements are available.

The facility shall have written procedures to route detainee requests to the appropriate ICE/ERO official(s).

Detainee request forms shall be delivered to ICE/ERO staff without reading, altering, or delaying such requests. The detainee may, if he or she chooses, seal the request in an envelope and clearly mark the envelope with the name, title or office to which the request is to be forwarded.

A detainee may obtain assistance from another detainee, housing officer, or other facility staff in preparing a request form. The facility shall ensure that procedures enable detainees with special needs, including detainees with disabilities, illiterate detainees, and limited English proficient detainees, to complete and submit request forms on an equal basis to detainees without special needs. The facility will accommodate the special assistance needs of such detainees in making a request.

**1. Response Times**

Detainee requests shall be forwarded to ICE/ERO within 72 hours. The facility will provide ICE/ERO's returned response to the detainee within 24 hours.

**2. Record Keeping and File Maintenance**

The date the request was forwarded to ICE/ERO and the date it was returned shall be recorded.

All completed detainee request documents will be retained in the detainee's detention file or a retrievable electronic archive.

**3. ICE/ERO Informational Posters**

The facility administrator shall ensure that all ICE/ERO posters or other information are provided in every housing unit and in appropriate common areas (e.g., recreation areas, dining areas, processing areas).

**4. Additional Facility Responsibilities**

The facility shall provide contact information for ICE/ERO and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility. Contact information shall be updated quarterly or more frequently as necessary to reflect changes in ICE/ERO personnel.

ICE/ERO may provide a secure drop box for detainees to correspond directly with ICE/ERO management. Only ICE/ERO personnel shall have access to the drop-box. If ICE/ERO does not collect information from the drop box for more than five days, the facility will notify ICE/ERO.

**D. <u>Marriage Requests</u>**

ICE/ERO will review and approve detainee marriage requests on a case-by-case basis.

When a request is approved, the detainee, legal representative, or other individual(s) acting on his or her behalf must make all arrangements for the marriage. Arrangements may include, but are not limited to, taking a blood test, obtaining a marriage license, and retaining an official to perform the marriage ceremony.

The marriage may take place inside the facility, or ICE/ERO may take temporary custody for marriage arrangements.

## STANDARD 2.11

### SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION

### I.  POLICY

This detention standard requires that facilities that house detainees act affirmatively to prevent sexual abuse and assaults on detainees; provide prompt and effective intervention and treatment for victims of sexual abuse and assault; and control, discipline and prosecute the perpetrators of sexual abuse and assault.

### II.  STANDARDS AND PROCEDURES

#### A.  Written Policy and Procedures Required

The facility's policy and procedures shall reflect the unique characteristics of the facility, including factors such as the availability of specialized community-based services, including rape crisis/trauma units in local medical centers, clinics, and hospitals.

The facility shall have written policy and procedures for a Sexual Abuse and Assault Prevention and Intervention Program. This policy must mandate zero tolerance toward all forms of sexual abuse and assault, outline the facility's approach to preventing, detecting, and responding to such conduct, and include, at a minimum:

1.  Procedures on preventing sexual abuse and assault, including:

    a.  Procedures for assessing all detainees for their risk of sexual abusiveness or victimization;

    b.  Procedures for housing detainees in accordance with their classification assessment;

    c.  Training of all employees, contractors, and volunteers on the agency's and facility's zero tolerance policies and their responsibilities under those policies; and

    d.  Notification to detainees of the facility's Sexual Abuse and Assault Prevention and Intervention Program.

2.  Procedures for immediate reporting of sexual abuse and assault allegations, including:

    a.  Procedures for immediate reporting of sexual abuse and assault allegations through the facility's chain of command, from the reporting official to the highest facility official, including also procedures for notifying ICE/ERO (this notification must be

sent directly to the FOD) and a method by which staff can report outside the chain of command;

b. Responsibility of all staff to report allegations or suspicions of sexual abuse and assault;

c. Referrals to law enforcement agencies;

d. Written documentation requirements to ensure that each allegation or suspicion is properly reported and addressed; and

e. A method to receive third-party reports of sexual abuse and assault in its facility, with information made available to the public regarding how to report sexual abuse and assault on behalf of a detainee.

3. Procedures for prompt and effective intervention to address the safety and treatment needs of detainee victims if an allegation is made or an assault occurs, including:

a. Procedures for offering immediate protection, including prevention of retaliation and medical and mental health referrals;

b. Plan to coordinate actions taken by staff first responders, medical and mental health practitioners, investigators, and facility leadership in response to an incident of sexual abuse and assault; and

c. Methods for addressing the alleged victim's future safety, medical, and mental health needs;

4. Procedures to include victim advocate services in sexual abuse and assault prevention and intervention programs, if such resources are available;

5. Procedures for investigation and discipline of assailants, including:

a. Coordinating with ICE/ERO and other appropriate investigative agencies to ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and assault;

b. Following a uniform evidence protocol, including access to a forensic medical exam, which maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions;

c. Procedures for coordination of internal administrative investigations with the assigned criminal investigative entity to ensure non-interference with criminal investigations, as well as coordination with the ICE Office of Professional Responsibility; and

    d.  Disciplinary sanctions for staff, up to and including termination, when there is a substantiated allegation of sexual abuse and assault, or when staff has violated agency sexual abuse and assault policies.

6.  Procedures for data collection and reporting; and

7.  the facility's requirement to cooperate with all ICE/ERO audits and monitoring of facility compliance with sexual abuse and assault policies and standards.

The facility's written policy and procedures must be reviewed and approved by ICE/ERO.

The facility administrator shall ensure that, within 90 days of the adoption of this detention standard, written policy and procedures are in place and that the facility is in full compliance with its requirements and guidelines. The facility must meet all other requirements in this standard which do not require written policy or procedure on the date the standard is adopted.

Each facility shall also post its protocols on its website, if it has one, or otherwise make the protocols available to the public.

## B. Acts of Sexual Abuse and Assault

For the purposes of this standard, the following definitions apply:

### 1. Detainee-on-detainee Sexual Abuse and Assault

Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

    a.  Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

    b.  Contact between the mouth and the penis, vulva or anus;

    c.  Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

    d.  Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

    e.  Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

2. **Staff-on-detainee Sexual Abuse and Assault**

Sexual abuse and assault of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

a. Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

b. Contact between the mouth and the penis, vulva or anus;

c. Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

d. Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

e. Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications aimed at coercing or pressuring a detainee to engage in a sexual act;

f. Repeated verbal statements or comments of a sexual nature to a detainee;

g. Any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, or,

h. Voyeurism, which is defined as the inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

C. **Compliance Manager**

The facility administrator shall designate a Prevention of Sexual Assault (PSA) Compliance Manager who shall serve as the facility point of contact for the ICE/ERO PSA Coordinator and who has sufficient time and authority to oversee facility efforts to comply with facility sexual abuse and assault prevention and intervention policies and procedures. The PSA Compliance Manager shall:

1. Assist with the development of written policies and procedures for the Sexual Abuse and Assault Prevention and Intervention Program, as specified above in this standard, and with keeping them current;

2. Assist with the development of initial and ongoing training protocols;

3. Serve as a liaison with other agencies;

4. Coordinate the gathering of statistics and reports on incidents of sexual abuse or assault, as detailed in "O. Data Collection" in this standard;

5. Review the results of every investigation of sexual abuse and assault and assist in conducting an annual review of all investigations in compliance with the Privacy Act to assess and improve prevention and response efforts;

6. Review facility practices to ensure required levels of confidentiality are maintained; and

7. Be notified of every allegation.

**D. <u>Sexual Conduct Between Detainees Prohibited</u>**

In addition to the forms of sexual abuse and assault defined above, all other sexual conduct – including consensual sexual conduct – between detainees is prohibited and subject to disciplinary sanctions. However, staff should be sensitive to the possibility that seemingly consensual behavior may have involved coercion by either person involved.

Consensual sexual conduct between detainees and staff, volunteers, or contract personnel is included within the definition of staff-on-detainee sexual abuse and/or assault above.

**E. <u>Staff Training</u>**

Training on the facility's Sexual Abuse and Assault Prevention and Intervention Program shall be included in training for all employees and shall also be included in biannual refresher training thereafter.

Employee training shall ensure facility staff are able to fulfill their responsibilities under this standard and shall include:

1. The facility's zero-tolerance policies for all forms of sexual abuse and assault;

2. Definitions and examples of prohibited and illegal sexual behavior;

3. The right of detainees and staff to be free from sexual abuse and assault, and from retaliation for reporting sexual abuse and assault;

4. Instruction that sexual abuse and assault is never an acceptable consequence of detention;

5. Recognition of situations where sexual abuse and assault may occur;

6. How to avoid inappropriate relationships with detainees;

7. Working with vulnerable populations and addressing their potential vulnerability in the general population;

8. Recognition of the physical, behavioral and emotional signs of sexual abuse and assault and ways to prevent and respond to such occurrences;

9. The requirement to limit reporting of sexual abuse and assault to personnel with a need to know in order to make decisions concerning the detainee-victim's welfare, and for law enforcement/investigative purposes;

10. The investigation process and how to ensure that evidence is not destroyed;

11. Prevention, recognition and appropriate response to allegations or suspicions of sexual abuse and assault involving detainees with mental or physical disabilities;

12. How to communicate effectively and professionally with detainees;

13. Instruction on reporting knowledge or suspicion of sexual abuse and assault; and

14. Instruction on documentation and referral procedures for all allegations or suspicions of sexual abuse and assault.

The facility shall ensure that all volunteers and other contractors who have contact with detainees have been trained on their responsibilities under the facility's sexual abuse and assault prevention, detection, intervention and response policies and procedures. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's zero-tolerance policy and informed how to report such incidents. In this paragraph "other contractor" means a person who provides services on a non-recurring basis to the facility pursuant to a contractual agreement with the agency or facility.

The facility must maintain written documentation verifying employee, volunteer, and contractor training. In addition to the general training provided to all facility employees, the facility shall provide specialized training on sexual abuse and assault and effective cross-agency coordination to facility investigators who conduct investigations into allegations of sexual abuse and assault. This training must cover, at a minimum,

interviewing sexual abuse and assault victims, sexual abuse and assault evidence collection in confinement settings, the criteria and evidence required for administrative action or prosecutorial referral, and information about effective cross-agency coordination in the investigation process. The facility must maintain written documentation verifying specialized training provided to investigators pursuant to this paragraph.

Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse in facilities where medical staff may be assigned these activities. This training shall be subject to the review and approval of ICE/ERO.

## F.  **Detainee Notification, Orientation and Instruction**

The facility administrator shall ensure that the orientation program, required by Standard 2.1 "Admission and Release" notifies and informs detainees about the agency and f a c i l i t y ' s  zero tolerance policies for all forms of sexual abuse and assault.

Following the intake process, the facility shall provide instruction to detainees on the facility's Sexual Abuse and Assault Prevention and Intervention Program and ensure that such instruction includes (at a minimum):

1.  The facility's zero-tolerance policy for all forms of sexual abuse and assault;

2.  Prevention and intervention strategies;

3.  Definitions and examples of detainee-on-detainee sexual abuse and assault, staff-on-detainee sexual abuse and assault and coercive sexual activity;

4.  Explanation of methods for reporting sexual abuse and assault, including one or more staff members other than an immediate point-of-contact line officer, the ICE Detention and Reporting Information Line (DRIL), the DHS Office of Inspector General and the ICE Office of Professional Responsibility;

5.  Information about self-protection and indicators of sexual abuse and assault;

6.  Prohibition against retaliation, including an explanation that reporting sexual abuse and assault shall not negatively impact the detainee's immigration proceedings; and

7.  Right of a detainee who has been subjected to sexual abuse and assault to receive treatment and counseling.

Detainee notification, orientation, and instruction must be provided in a language or manner that the detainee understands, including for those who are limited English proficient, deaf, visually impaired, or who otherwise have a communication impairment, as well as to detainees who have limited reading skills or are illiterate. The facility shall maintain documentation of detainee participation in the instruction session.

The facility shall develop policies and procedures to ensure that detainees have multiple ways to privately report sexual abuse and assault, retaliation for reporting sexual abuse and assault, or staff neglect or violations of responsibilities that may have contributed to such incidents:

1. Each facility's Sexual Abuse and Assault Prevention and Intervention program shall provide detainees who are victims of sexual abuse and assault the option to report the incident or situation to a designated staff member other than an immediate point-of-contact line officer (e.g., the program coordinator or a mental health specialist). The facility shall provide detainees with the name of the program coordinator or designated staff member and information on how to contact him or her. Detainees will also be informed that they can report any incident or situation regarding sexual abuse and assault, or intimidation, to any staff member (as outlined above), the DHS Office of Inspector General, and the DHS Joint Intake Center.

2. The facility shall provide instructions on how detainees may contact their consular official, the DHS Office of Inspector General, or as appropriate, another designated office, to confidentially and, if desired, anonymously report these incidents.

3. The facility shall inform the detainees of at least one way for detainees to report sexual abuse and assault to a public or private entity or office that is not part of the facility, and that is able to receive and immediately forward detainee reports of sexual abuse and assault to facility officials, allowing the detainee to remain anonymous upon request. ICE/ERO will provide a sexual abuse and assault awareness notice to be posted on all housing-unit bulletin boards, as well as a "Sexual Assault Awareness Information" pamphlet to be distributed. The facility shall post with this notice the name of the facility PSA Compliance Manager and information about local organizations that can assist detainees who have been victims of sexual abuse and assault, including mailing addresses and telephone numbers (including toll-free hotline numbers where available). If no such local organizations exist, the facility shall make available the same information about national organizations. This information will be provided in English and Spanish, and to other segments of the detainee population with limited English proficiency through translations or oral interpretation.

## G. Accommodating Detainees with Disabilities or Limited English Proficiency (LEP)

Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall take appropriate steps to ensure detainees with disabilities (including, for example, detainees who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) have an equal opportunity to participate in or benefit from all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse and assault. Such steps shall include, when necessary to ensure effective communication with detainees who are deaf or hard of hearing, or detainees who have intellectual, psychiatric, or speech disabilities, limited reading skills, or who are blind or have low vision.

1.  Providing access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

2.  Providing access to written materials related to sexual abuse and assault in formats or through methods that ensure effective communication.

The facility shall take steps to ensure access to all aspects of the facility's efforts to prevent, detect, and respond to sexual abuse and assault for detainees who are LEP, including steps to provide in-person or telephonic interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.

In matters relating to allegations of sexual abuse and assault, the facility shall employ effective expressive and receptive verbal communication techniques while communicating with detainees with disabilities in accordance with professionally accepted standards of care. The facility shall provide detainees with disabilities and detainees with limited English proficiency with in-person or telephonic interpretation services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary. Interpretation services shall be provided by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation and the facility determines that such interpretation is appropriate and consistent with DHS policy. The provision of interpretation services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse and assault.

Where practicable, provisions for written translation of materials related to sexual abuse and assault shall be made for significant segments of the population with limited English proficiency other than Spanish speakers. Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated or who is illiterate.

## H. **Victim Advocate Services**

The facility shall utilize available community resources and services to provide valuable expertise and support in the areas of crisis intervention, counseling, investigation and the prosecution of sexual abuse perpetrators to most appropriately address victims' needs. The facility administrator shall establish procedures to make available, to the full extent possible, outside victim services following incidents of sexual abuse and assault. The facility shall also attempt to make available such victim services for any detainees identified as having experienced sexual victimization prior to entering DHS custody.

The facility administrator shall maintain or attempt to enter into memoranda of understanding (MOU) or other agreements with community service providers or, if local

providers are not available, with national organizations that provide legal advocacy and confidential emotional support services for immigrant victims of crime. The facility shall enable reasonable communication between detainees and these organizations and agencies, in as confidential a manner as possible. The facility shall also inform detainees, prior to giving them access to outside resources, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

## I.  <u>Prevention</u>

All staff and detainees are responsible for being alert to signs of potential situations in which sexual abuse and assaults might occur, and for making reports and intervention referrals as appropriate. If a staff member has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual abuse and assault, he or she shall take immediate action to protect the detainee.

### 1.  Classification and Screening

In accordance with Standards 2.1 "Admission and Release" and 2.2 "Custody Classification System," the facility shall assess all detainees on intake to identify those likely to be sexual aggressors or sexual abuse and assault victims and shall house detainees to prevent sexual abuse and assault, taking necessary steps to mitigate any such danger. The facility shall also use the assessment to inform assignment of detainees to recreation and other activities, and voluntary work.

Each new arrival shall be kept separate from the general population until he or she is classified and housed accordingly.

The facility shall consider, to the extent that the information is available, the criteria in 6 C.F.R. § 115.41(c) to assess detainees for risk of sexual victimization.

The initial screening shall consider prior acts of sexual abuse and assault, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse and assault, as known to the facility, in assessing detainees for risk of being sexually abusive.

Detainees shall not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to items a, g, h, or i above. The facility shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this screening in order to ensure that sensitive information is not exploited to the detainee's detriment by staff or other detainees or inmates. Detainees who are considered at risk shall be placed in the least restrictive housing that is available and appropriate. Such detainees should be assigned to administrative segregation for protective custody only until an alternative means of separation from likely abusers can be arranged, and such an assignment shall not

ordinarily exceed a period of 30 days.

### 2. Transportation

Detainees identified as being "at risk" for sexual victimization shall be transported in accordance with that special safety concern. The section on "Seating of Detainees," found in Standard 1.2 "Transportation by Land," requires that transportation staff seat each detainee in accordance with written procedures from the facility administrator, with particular attention to detainees who may need to be afforded closer observation for their own safety.

### 3. Upgrades to Facilities and Technologies

When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the facility shall consider the effect of the design, acquisition, expansion, or modification upon its ability to protect detainees from sexual abuse and assault.

When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology in a facility, the facility shall consider how such technology may enhance its ability to protect detainees from sexual abuse and assault.

## J. <u>Prompt and Effective Intervention</u>

Staff sensitivity toward detainees who are victims of sexual abuse and assault is critical.

Staff shall take seriously all statements from detainees claiming to be victims of sexual abuse and assaults and shall respond supportively and non-judgmentally. Any detainee who alleges that he or she has been sexually abused and assaulted shall be offered immediate protection and separation from the assailant and shall be referred for a medical examination and/or clinical assessment for potential negative symptoms. Staff members who become aware of an alleged assault shall immediately follow the reporting requirements set forth in the written policies and procedures.

If a victim is transferred between detention facilities, the sending facility shall, as permitted by law, inform the receiving facility of the incident and the victim's potential need for medical or social services (unless, in the case of transfer to a non-ICE facility, the victim requests otherwise). If the receiving facility is unknown to the sending facility, the sending facility shall notify ICE/ERO, so that he or she can notify the receiving facility.

Facilities should use a coordinated, multidisciplinary team approach to responding to sexual abuse and assault, such as a sexual abuse and assault response team (SART), which, in accordance with community practices, includes a medical practitioner, a mental health practitioner, a security staff member and an investigator from the assigned investigative entity, as well as representatives from outside entities that provide relevant services and expertise. The facility shall attempt to make available to the victim a victim advocate from a rape crisis center. If a rape crisis center is not available to provide victim advocate services, ICE/ERO will provide these services by making available a qualified staff member from a community-based organization, or a qualified agency staff member. A qualified agency staff member or a qualified community-based staff member means an individual who has received education concerning sexual assault and forensic examination issues in general. The outside or internal victim advocate shall provide emotional support, crisis intervention, information, and referrals.

Care shall be taken to place the detainee in a supportive environment that represents the least restrictive housing option possible (e.g., in a different housing unit, transfer to another facility, medical housing, or protective custody), and that takes into account any ongoing medical and mental health needs of the alleged victim.

Victims shall not be held for longer than five days in any type of administrative segregation, except in highly unusual circumstances or at the request of the detainee. A detainee victim who is in protective custody after having been subjected to sexual abuse shall not be returned to the general population until completion of a proper re-assessment, taking into consideration any increased vulnerability of the detainee as a result of the sexual abuse.

Where an alleged victim of sexual abuse and assault that occurred elsewhere in ICE/ERO custody is subsequently transferred to the facility, the facility shall comply with all applicable response and intervention requirements in this standard, as appropriate based on the nature and status of the case.

**K.  Protection Against Retaliation**

Staff, contractors, volunteers, and detainees shall not retaliate against any person, including a detainee, who reports, complains about, or participates in an investigation into an allegation of sexual abuse and assault, or for participating in sexual abuse and assault as a result of force, coercion, threats, or fear of force.

The facility shall employ multiple protection measures, such as housing changes, removal of alleged staff or detainee abusers from contact with victims, and emotional support services for detainees or staff who fear retaliation for reporting sexual abuse and assault or for cooperating with investigations.

For at least 90 days following a report of sexual abuse and assault, the facility shall monitor to see if there are facts that may suggest possible retaliation by detainees or staff and shall act promptly to remedy any such retaliation. Items the facility should monitor include any detainee disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff. The facility shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

**L.  Reporting, Notifications and Confidentiality**

The facility shall require all staff to report immediately any knowledge, suspicion, or information regarding an incident of sexual abuse and assault that occurred in a facility; retaliation against detainees or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

Staff members who become aware of alleged sexual abuse and assault shall immediately follow the reporting requirements set forth in the facility's written policies and procedures.

Apart from such reporting, staff shall not reveal any information related to a sexual abuse and assault report to anyone other than to the extent necessary to help protect the safety of the victim or prevent further victimization of other detainees or staff in the facility, or to make medical treatment, investigation, law enforcement, or other security and management decisions.

If the alleged victim is under the age of 18 or considered a vulnerable adult under a state or local vulnerable persons statute, the facility shall report that information to ICE/ERO so that the agency can report the allegation to the designated state or local services agency under applicable mandatory reporting laws.

Staff shall accept reports made verbally, in writing, anonymously, and from third parties, and promptly document any verbal reports.

The facility shall establish a method to receive third-party reports of sexual abuse and assault in its facility and shall make available to the public information on how to report sexual abuse and assault on behalf of a detainee.

1. **Alleged Detainee Perpetrator**

   When a detainee(s) is alleged to be the perpetrator, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO (this notification must go directly to the FOD), which shall report it to the OPR Intake Center.

2. **Alleged Staff Perpetrator**

   When an employee, contractor or volunteer is alleged to be the perpetrator of detainee sexual abuse and assault, it is the facility administrator's responsibility to ensure that the incident is promptly referred to the appropriate law enforcement agency having jurisdiction for investigation (if the incident is potentially criminal) and reported to ICE/ERO, which shall report it to the OPR Intake Center. The local government entity or contractor that owns or operates the facility shall also be notified.

Staff, contractors, and volunteers suspected of perpetrating sexual abuse and assault shall be removed from all duties requiring detainee contact pending the outcome of an investigation.

Upon receiving an allegation that a detainee was sexually abused and assaulted while confined at another facility, the facility whose staff received the allegation shall notify ICE/ERO and the appropriate administrator of the facility where the alleged abuse occurred. The notification provided in this section shall be provided as soon as possible, but no later than 72 hours after receiving the allegation. The facility shall document that it has provided such notification. The facility where the alleged abuse occurred shall then ensure the allegation is referred for investigation and reported to ICE/ERO (this notification must go directly to the FOD) in accordance with this standard.

## M. <u>Investigation, Discipline and Incident Reviews</u>

If a detainee alleges sexual abuse and assault, a sensitive and coordinated response is necessary. The facility shall coordinate with ICE/ERO and other appropriate investigative agencies to ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and assault.

All investigations of alleged sexual abuse and assault must be prompt, thorough, objective, and fair and conducted by specially trained, qualified investigators.

Where an alleged victim of sexual abuse and assault that occurred elsewhere is subsequently transferred to the detention facility, the facility shall cooperate with any administrative or criminal investigative efforts arising from the incident.

1. **Preservation of Evidence**

   The first security staff member to respond to a report of sexual abuse and assault, or his or her supervisor, shall preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence. If the abuse occurred within a time period that still allows for the collection of physical evidence, the responder shall request the alleged victim not to take any actions, and shall ensure that the alleged abuser does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating. If the first staff responder is not a security staff member, the responder shall be required to request that the alleged victim not take any actions that could destroy physical evidence and then notify security staff.

2. **Forensic Examinations**

   Where evidentiarily or medically appropriate, at no cost to the detainee, and only with the detainee's consent, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

   As requested by a victim, the presence of his or her outside or internal victim advocate, including any available victim advocacy services offered by a hospital conducting a forensic exam, shall be allowed for support during a forensic exam and investigatory interviews.

   The results of the physical examination and all collected physical evidence are to be provided to the investigative entity. Part of the investigative process may also include an examination and collection of physical evidence from the suspected assailant(s).

   In the event the investigation is being conducted by a non-federal investigating agency, the facility shall request that the investigating agency follow the applicable requirements of this standard, including subsections 1 and 2 of this section.

3. **Procedures for Administrative Investigations**

   Upon conclusion of a criminal investigation where the allegation was substantiated, or in instances where no criminal investigation has been completed, an administrative investigation shall be conducted. Upon conclusion of a criminal investigation where the allegation was unsubstantiated, the facility shall review any available completed

criminal investigation reports to determine whether an administrative investigation is necessary or appropriate. Substantiated allegation means an allegation that was investigated and determined to have occurred. Unsubstantiated allegation means an allegation that was investigated, and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred. Unfounded allegation means an allegation that was investigated and determined not to have occurred.

Administrative investigations shall be conducted after consultation with the appropriate investigative office within DHS and the assigned criminal investigative entity. The ICE Office of Professional Responsibility will typically be the appropriate investigative office within DHS, as well as the DHS OIG in cases where the DHS OIG is conducting an investigation.

The facility shall develop written procedures for administrative investigations, including provisions requiring:

a. Preservation of direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data;

b. Interviewing alleged victims, suspected perpetrators, and witnesses;

c. Reviewing prior complaints and reports of sexual abuse and assault involving the suspected perpetrator;

d. Assessment of the credibility of an alleged victim, suspect, or witness, without regard to the individual's status as detainee, staff, or employee, and without requiring any detainee who alleges sexual abuse and assault to submit to a polygraph;

e. An effort to determine whether actions or failures to act at the facility contributed to the abuse;

f. Documentation of each investigation by written report, which shall include a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings; and

g. Retention of such reports for as long as the alleged abuser is detained or employed by the agency or facility, plus five years.

Such procedures shall govern the coordination and sequencing of administrative and criminal investigations, in accordance with the first paragraph of this section, to ensure that the criminal investigation is not compromised by an internal administrative investigation.

When an administrative investigation is undertaken, the facility shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse and assault are substantiated.

The departure of the alleged abuser or victim from the employment or control of the facility shall not provide a basis for terminating an investigation.

When outside agencies investigate sexual abuse and assault, the facility shall cooperate with outside investigators and shall endeavor to remain informed about the progress of the investigation.

Following an investigation conducted by the facility into a detainee's allegation of sexual abuse and assault, the facility shall notify ICE/ERO of the results of the investigation and any responsive actions taken so that the information can be reported to ICE/ERO headquarters and to the detainee.

**4. Discipline**

a. Disciplinary sanctions for staff

Staff shall be subject to disciplinary or adverse action up to and including removal from their position for substantiated allegations of sexual abuse and assault or for violating agency or facility sexual abuse rules, policies or standards. Removal from their position is the presumptive disciplinary sanction for staff who have engaged in or attempted or threatened to engage in those acts of sexual abuse and assault defined in paragraphs a-d and g-h of "Staff on Detainee Sexual Abuse and/or Assault" in "B. Acts of Sexual Abuse and/or Assault" in this standard.

The facility shall report all incidents of substantiated sexual abuse and assault by staff, and all removals of staff, or resignations in lieu of removal, for violations of agency or facility sexual abuse and assault policies, to appropriate law enforcement agencies unless the activity was clearly not criminal.

The facility shall also report all such incidents of substantiated abuse, removals, or resignations in lieu of removal to ICE/ERO, regardless of whether the activity was criminal, and shall make reasonable efforts to report such information to any relevant licensing bodies, to the extent known.

b. Corrective action for contractors and volunteers

Any contractor or volunteer who has engaged in sexual abuse and assault shall be prohibited from contact with detainees. The facility shall take appropriate remedial measures and shall consider whether to prohibit further contact with detainees by contractors or volunteers who have not engaged in sexual abuse but have violated other provisions within these standards.

Incidents of substantiated sexual abuse and assault by a contractor or volunteer shall be reported to law enforcement agencies, unless the activity was clearly not criminal. The facility shall also report such incidents to ICE/ERO regardless of whether the activity was criminal and shall make reasonable efforts to report such incidents to any relevant licensing bodies, to the extent known.

c. Disciplinary sanctions for detainees

Detainees shall be subjected to disciplinary sanctions pursuant to a formal disciplinary process following an administrative or criminal finding that the detainee engaged in sexual abuse and assault, consistent with the requirements of Standard 3.1 "Disciplinary System." The facility shall not discipline a detainee for sexual contact with staff unless there is a finding that the staff member did not consent to such contact. For the purpose of disciplinary action, a report of sexual abuse and assault made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.

## 5. Sexual Abuse Incident Reviews

The facility shall conduct a sexual abuse and assault incident review at the conclusion of every investigation of sexual abuse and assault within 30 days. If an allegation was determined to be substantiated or unsubstantiated, the facility must prepare a written report within 30 days of the conclusion of the investigation recommending whether the allegation or investigation indicates that a change in policy or practice could better prevent, detect, or respond to sexual abuse and assault. The facility shall implement the recommendations for improvement or shall document its reasons for not doing so in a written response. Both the report and response shall be forwarded to ICE/ERO for transmission to the ICE/ERO PSA Coordinator. The facility shall also provide any further information regarding such incident reviews as requested by the ICE/ERO PSA Coordinator.

The review team shall consider the criteria in 6 CFR §115.86 (b).

The facility shall conduct an annual review of all sexual abuse and assault investigations and resulting incident reviews to assess and improve sexual abuse and assault intervention, prevention, and response efforts. If the facility has not had any reports of sexual abuse and assault during the annual reporting period, then the facility shall prepare a negative report. The results and findings of the annual review shall be provided to the facility administrator and ICE/ERO for transmission to the ICE PSA Coordinator (this notification must be sent directly to the FOD).

**N. <u>Medical and Mental Health Care</u>**

Detainee victims of sexual abuse and assault shall be provided emergency medical and mental health services and ongoing care. All treatment services, both emergency and ongoing, shall be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident.

**1. Access to emergency medical and mental health services**

    a. Detainee victims of sexual abuse and assault shall have timely, unimpeded access to emergency medical treatment and crisis intervention services, including emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.

    b. Where evidentiarily or medically appropriate, the facility administrator shall arrange for an alleged victim to undergo a forensic medical examination, in accordance with the requirements of "M. Investigation, Discipline and Incident Reviews" of this standard.

    c. Transportation of an alleged victim for emergency care or other services provided off-site shall be arranged in a manner that takes into account the special needs of victimized detainees.

**2. Ongoing medical and mental health care for sexual abuse and assault victims and abusers**

    a. The facility shall offer medical and mental health evaluation and, as appropriate, treatment to all detainees who have been victimized by sexual abuse and assault while in immigration detention.

    b. The evaluation and treatment of such victims shall include, as appropriate, follow-up services, treatment plans, and, when necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

    c. The facility shall provide such victims with medical and mental health services consistent with the community level of care.

    d. Detainee victims of sexually abusive vaginal penetration by a male abuser while incarcerated shall be offered pregnancy tests. If pregnancy results from an instance of sexual abuse and assault, the victim shall receive timely and comprehensive information about lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services.

e.  Detainee victims of sexual abuse and assault while detained shall be offered tests for sexually transmitted infections as medically appropriate.

f.  The facility shall attempt to conduct a mental health evaluation of all known detainee-on-detainee abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

## O.  **Data Collection**

The facility shall maintain, in a secure area, all case records associated with claims of sexual abuse and assault, including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release treatment, if necessary, and/or counseling shall be maintained in appropriate files in accordance with these detention standards and applicable policies, and retained in accordance with established schedules.

Particularly applicable to the storage, confidentiality and release of case records are the requirements of the "Confidentiality and Release of Medical Records" section of Standard 4.3 "Medical Care" and the requirements of Standard 7.1 "Detention Files," especially in regard to the Privacy Act of 1974. Because of the very sensitive nature of information about victims and their medical condition, including infectious disease testing, staff must be particularly vigilant about maintaining confidentiality and releasing information only for legitimate need-to-know reasons.

Monitoring and evaluation are essential for assessing both the rate of occurrence of sexual abuse and assault and agency effectiveness in reducing sexually abusive behavior. Accordingly, the facility administrator must maintain two types of files of sexual abuse and assault incidents which include the following minimum information:

1.  General files include:

    a.  The victim(s) and perpetrator(s) of a sexual abuse and assault;

    b.   The date, time, location, and nature of the incident;

    c.  The demographic background of the victim and perpetrator (including citizenship, age, sex, and other factors as described in 6 C.F.R. § 115.87.);

    d.  Detailed reporting timeline, including the names of the individuals who reported the incident and received the report of sexual assault, date and time the report was received, and steps taken to communicate the report up the chain of command;

    e.  Any injuries sustained by the victim;

    f.   All formal and/or informal action taken, including all post-report follow up response taken by the facility (e.g., housing placement/custody classification, medical examination, mental health counseling, etc.);

    g.   All reports;

    h.   Medical forms or other relevant medical information;

    i.   Supporting memos and videotapes, if any;

    j.   Any sanctions imposed on the perpetrator; and

    k.   Any other evidentiary materials pertaining to the allegation.

The facility administrator shall maintain these files chronologically in a secure location.

In addition, the facility administrator shall maintain a listing of the names of sexual abuse and assault victims and assailants, along with the dates and locations of all sexual abuse and assault incidents occurring within the facility, on his or her computerized incident reporting system. Such information shall be maintained on a need-to-know basis in accordance with the Standards 4.3 "Medical Care" and 7.1 "Detention Files," which includes protection of electronic files from unauthorized access. At no time may law enforcement sensitive documents or evidence be stored at the facility. Access to this designation shall be limited to those staff involved in the treatment of the victim or the investigation of the incident. The authorized designation shall allow appropriate staff to track the detainee victim or assailant of sexual abuse and assault across the system.

On an ongoing basis, the facility PSA Compliance Manager and facility administrator must work with ICE/ERO and the ICE/ERO PSA Coordinator to share data regarding sexual abuse and assault incidents and response.

## P.  **Facility Audits**

Facilities shall cooperate with all DHS audits of the facility's compliance with this standard, including by making available relevant documents, records, and other information as requested (including available videotapes and other electronically available data). Upon request, facilities shall also provide to DHS the results of any audits conducted of the facility against the DOJ "National Standards to Prevent, Detect, and Respond to Prison Rape," 28 C.F.R. Part 115.

Facilities shall permit auditors access to all areas of the facility and shall make available space suitable for interviews of detainees and staff. Detainees shall be permitted to have private interviews with auditors, and to send confidential information or correspondence to the auditor.

# Section 3: ORDER



## STANDARD 3.1

### DISCIPLINARY SYSTEM

I. **POLICY**

The facility shall promote a safe and orderly living environment for detainees by establishing a fair and equitable disciplinary system, requiring detainees to comply with facility rules and regulations, and imposing disciplinary sanctions on those who do not comply.

II. **STANDARDS AND PROCEDURES**

A. **Guidelines**

1. Facilities holding detainees will have a detainee disciplinary system with progressive levels of reviews, appeals, procedures, and documentation. Disciplinary policy and procedures shall clearly define detainee rights and responsibilities.

2. Disciplinary action may not be capricious or retaliatory.

3. Staff may not impose or allow imposition of the following sanctions: corporal punishment; deviations from food services or availability of water; deprivation of clothing, bedding, or items of personal hygiene; deprivation of correspondence privileges; deprivation of legal visitation, legal mail, access to the law library, and the removal of legal papers; or deprivation of physical exercise unless such activity creates an unsafe condition.

4. The facility shall not hold a detainee accountable for his or her conduct if a medical authority finds him or her mentally incompetent.

5. When a detainee has a suspected or diagnosed mental illness or cognitive impairment, a mental health professional shall be consulted to provide input as to the detainee's competence to participate in the disciplinary hearing and any impact the detainee's mental illness may have had on his or her responsibility for the charged behavior.

6. The disciplinary process shall consider whether a detainee's cognitive impairment, disability, or mental illness contributed to his or her behavior when determining what type of sanction, if any, should be imposed.

7. At all steps in the disciplinary process, any sanctions imposed shall be commensurate with the severity of the committed prohibited act and intended to encourage the detainee to conform with rules and regulations in the future.

**B.  Incident Reports**

Officers who witness a prohibited act, or have reason to suspect one has been committed, shall promptly report the incident per facility policy and identify the officer(s), the detainee(s), and all witness(es) to the incident.

Minor transgressions involving detainees may be settled informally and by mutual consent whenever possible.

**C.  Investigations**

The facility shall have procedures in place to ensure that all alleged rule violations are reviewed within 24 hours of the time the violation is reported. The investigation shall be completed within 72 hours of receipt of the Incident Report, barring exceptional circumstances.

The investigating officer shall have had no prior involvement in the incident, either as witness or officer at the scene.

**D.  Unit Disciplinary Committee (UDC)**

Facilities may establish an intermediate level of adjudication for low or moderate infractions known as the UDC. Before hearing a case, the UDC shall ensure that the detainee is afforded all the rights listed under "Notice of Rights," below.

The UDC will have authority to consider written reports, statements, and physical evidence, hear pleadings on the part of the detainee, make findings that a detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence, and impose minor sanctions.

The UDC shall not include the reporting officer, the investigating officer, or an officer who witnessed or was directly involved in the incident, except in the unlikely event that every available officer witnessed or was directly involved in the incident.

The UDC shall:

1.  Refer to the Institutional Disciplinary Panel (IDP) any incident involving a serious violation, with or without a UDC hearing, as appropriate.

2.  Serve the detainee with:

    a.  A copy of the UDC decision and sanctions imposed; or

    b.  Written notification of charges and hearing before the IDP.

3. If the detainee's case is being referred to the IDP, advise the detainee, in writing, of the right to:

  a. Call witnesses and present evidence before the IDP; and

  b. A staff representative before the IDP.

The detainee notifications listed above shall be communicated in a language or manner that the detainee understands.

## E. <u>Institutional Disciplinary Panel (IDP)</u>

The facility shall have an IDP to adjudicate detainee incident reports. Only the IDP can place a detainee in disciplinary segregation. It shall be the responsibility of the IDP to ensure that the detainee does not have documentation in his or her medical record of suspected or diagnosed mental illness or cognitive impairment prior to placing the detainee in disciplinary segregation.

Barring extraordinary circumstances, the panel shall not include the reporting officer, the investigating officer, any member of the referring UDC, or anyone who witnessed or was directly involved in the incident.

The IDP shall have authority to:

1. Conduct hearings on all charges and allegations.

2. Call witnesses to testify.

3. Consider written reports, statements, physical evidence, and oral testimony.

4. Hear pleadings by detainee and staff representative.

5. Make findings that the detainee did or did not commit the rule violation(s) or prohibited act(s) as charged, based on the preponderance of evidence.

6. Impose sanctions as listed and authorized in each category.

## F. <u>Notice of Rights</u>

The UDC or IDP will advise the detainee in a language or manner the detainee understands before the hearing of his or her right to:

1. Remain silent at any stage of the disciplinary process.

2. Due process, including a UDC hearing (or IDP hearing if the facility does not have a UDC) within 24 hours of the end of the investigation. If there is a UDC hearing, then the IDP hearing must be held within 48 hours after the conclusion of the UDC hearing.

3. Attend the entire hearing (excluding committee deliberations). If security considerations prevent the detainee's attendance, the committee must document the security considerations.

4. Present statements and evidence in his or her own behalf.

5. Have language services to be able to participate meaningfully in the hearing.

6. Appeal the committee's determination through the detainee appeal process or waive the right to appeal.

**G. Detainee Assistance**

A detainee may be provided staff assistance in preparing his or her defense. This assistance will automatically be offered for detainees who are illiterate, have limited English proficiency, have disabilities that prevent them from having equal access to the facility's discipline process, and/or are unable to collect or present evidence (including detainees in segregation).

**H. Postponement of Disciplinary Proceedings**

The facility shall permit hearing postponements or continuances. Postponements beyond 72 hours from the time of referral to the IDP will be documented.

**I. Duration of Sanctions**

The duration of punishment shall be within established limits. Neither the panel recommending sanctions nor the facility administrator making the final decision shall impose sanctions arbitrarily or outside these limits.

1. Time in segregation or the withholding of privileges after a hearing shall generally not exceed 30 days per incident, except in extraordinary circumstances.

2. Time served in segregation pending the outcome of the proceedings should be credited towards disciplinary segregation time.

3. The disciplinary report and accompanying documents shall not be placed in the file of a detainee who is found not guilty. However, the facility may retain the material in its own files for institutional uses such as statistical or historical recordkeeping, etc.

**J.  Disciplinary Severity Scale and Prohibited Acts**

The facility shall have graduated scales of offenses and disciplinary consequences, as provided in this section.

**K.  Documents**

All documents relevant to the incident, subsequent investigation, hearing(s), etc., will be completed and distributed in accordance with facility procedures.

**L.  Confidential Information**

When a decision relies on information from a confidential informant, the UDC or IDP shall include in the hearing record the factual basis for finding the information reliable.

**M.  Notice to Detainees**

The facility handbook shall provide notice of the facility's rules of conduct, and of the sanctions imposed for violations of the rules. Among other things, the handbook shall advise detainees of the following, and the contents shall be communicated to detainees in a language or manner that they understand:

1.  The right to protection from personal abuse, corporal punishment, unnecessary or excessive use of force, personal injury, disease, property damage, and harassment;

2.  The right to freedom from discrimination based on race, religion, national origin, color, sex, age, sexual orientation, disability, or political beliefs; and

3.  The right to due process, including the prompt resolution of a disciplinary matter in accordance with the rules, procedures, and sanctions and procedures for appealing disciplinary findings provided in the handbook.

# Section 4: CARE



## STANDARD 4.1

### FOOD SERVICE

I. **POLICY**

The facility shall provide detainees with nutritious, attractively presented meals, prepared and served in a sanitary and hygienic food service operation.

II. **STANDARDS AND PROCEDURES**

A. **Administration**

1. **Food Service Administrator (FSA) or Equivalent**

The food service program shall be under the direct supervision of a professional food service administrator (FSA). The FSA is responsible for planning, controlling, directing, and evaluating food service; training staff and detainees; managing budget resources; establishing standards of sanitation, safety, and security; developing nutritionally adequate menus and evaluating detainee acceptance; developing specifications for the procurement of food, equipment, and supplies; and ensuring a quality food service program.

B. **General Policy**

1. **Custody and Security**

The facility's custody and security policy and procedures shall address the buildings or portions of buildings housing the food service department; all types of detainee traffic in and out of the department; detainee behavior; control of utensils with a custodial hazard potential (knives, cleavers, saws, tableware, etc.); official counts and/or census; and any other matters having a direct or indirect bearing on custody and security.

The facility will devise and provide appropriate training to all food service personnel in detainee custodial issues.

2. **Knife Control**

Knives must be physically secured to workstations or used only under direct staff supervision.

3. **Controlled Food Items/Hot Items**

All facilities shall have procedures for the storage and handling of food items that pose a security threat, including, but not limited to, yeast, mace, nutmeg, cloves, and alcohol-based flavorings.

4. **Detainee Clothing**

Detainees assigned to the food service department shall have a neat and clean appearance. Detainees will be issued appropriate safety and sanitation garments and protective coverings, for example, for freezers or garbage duty.

5. **Detainee Job Descriptions**

The FSA shall review detainee job descriptions annually to ensure they are accurate and up to date. Before starting work in the department, the detainee will sign for receipt of the applicable job description.

6. **Detainee Orientation and Training**

To ensure a quality food service program and instill good work habits, each FSA or designee shall instruct newly assigned detainee workers in the rules, safety measures, and procedures of the food service department.

C. **Food Service Dining Room/Satellite Feeding Operations**

1. **General Policy**

Ordinarily detainees shall be served three meals every day, at least two of which shall be hot meals; however, the facility administrator may approve variations in the food service schedule during religious and civic holidays, provided that basic nutritional goals are met. The dining room schedule must allow no more than 14 hours between the evening meal and breakfast.

Clean, potable drinking water must be available.

Meals shall always be prepared, delivered, and served under staff (or contractor) supervision.

2. **Display and Service**

The following procedures apply to the display, service, and transportation of food to mainline and satellite food service areas:

a. Food is fit for consumption and appropriately presented;

b.  Sanitary guidelines are observed, with hot foods maintained at a temperature of at least 135 degrees F and foods that require refrigeration maintained at 41 degrees F or below.

c.  Every open food item and beverage shall be protected from contaminants by clean sneeze-guards, cabinets, display cases, or other such equipment.

d.  Servers must wear plastic gloves whenever direct contact with a food, ice, or beverage is possible. They must use tongs, forks, spoons, ladles, or other such utensils to serve any food or beverage.

e.  Utensils shall be sanitized as often as necessary to prevent cross-contamination and other food-handling hazards during food preparation and service.

f.  If the facility cannot maintain the minimum or maximum temperature required for food safety, the affected items (e.g., salad bar staples such as lettuce, meat, eggs, cheese) must be discarded after two hours at room temperature.

g.  Food will be delivered from one place to another in covered containers. If the food carts do not have locking devices, they must be supervised by facility staff.

h.  All food safety provisions (sanitation, safe-handling, storage, etc.) apply without exception to food in transit.

i.  Soiled equipment and utensils must be transported to the appropriate receptacles in closed containers.

j.  A member of the food service staff will oversee the loading of satellite-feeding carts. Staff shall inspect and secure all food carts before allowing their removal from the food service area.

**D.  Menu Planning**

**1.  General Policy**

The FSA shall base menu selections on a nutritional program meeting or exceeding minimum U.S. recommended daily allowances. The FSA shall consider the ethnic and religious diversity of the facility's detainee population when developing menu cycles.

**2.  Nutritional Analysis**

A registered dietitian shall conduct an annual complete nutritional analysis of every master-cycle menu planned by the FSA. Menus must be certified by the dietitian before implementation. If necessary, the FSA shall modify the menu in light of the nutritional analysis, to ensure nutritional adequacy.

## E. **Food Preparation**

### 1. **General Policy**

The FSA is responsible for ensuring that all items on the master-cycle menu are prepared and presented according to approved recipes. The FSA or designee has the authority to change menu items when necessary. Every such change/substitution must be documented and forwarded to the FSA. The FSA or designee shall exercise this menu-changing authority as infrequently as possible.

### 2. **Preparation Guidelines**

Food shall be prepared and served in compliance with the most recent version of the FDA food code and/or applicable local standards. Food shall be prepared with minimal manual contact. Food service workers shall thoroughly wash fruits and vegetables with fresh water before cooking or serving raw.

The FSA or designee shall use thermometers to ensure the attainment and maintenance of proper internal cooking, holding, or refrigeration temperatures of all potentially hazardous foods.

### 3. **Food Protection - General Requirements**

Food and ice will be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage, and other sources of contamination. Protection will be continuous, whether the food is in storage, in preparation/on display, or in transit.

All food storage units must be equipped with accurate easy-to-read thermometers. Refrigeration equipment shall be designed and operated to maintain temperature of 41 degrees F or below.

### 4. **Leftovers**

Prepared and properly maintained food items which have not been placed on the serving line may be retained for no more than 24 hours. Leftovers offered for service a second time shall not be retained but discarded immediately after offering. All saved prepared food shall be labeled to identify the product, preparation date, and time.

## F. **Religious/Special Diets**

### 1. **General Policy**

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the security and orderly operations of the facility. While each request

for religious diet accommodation is to be determined on a case-by-case basis, ICE/ERO anticipates that facilities will grant these requests unless an articulable reason exists to disqualify someone for religious accommodation or the detainee's practice poses a significant threat to the secure and orderly operation of the facility.

To initiate or end a religious diet program, the detainee will provide a written statement articulating the religious motivation for participation in or termination of the religious diet program, as appropriate. Oral interpretation or written assistance shall be provided to illiterate or limited English proficient detainees as necessary in completing this statement. Auxiliary aids and services, accommodations, and/or staff assistance shall be provided to detainees with disabilities as needed in completing this statement to ensure their equal access to the facility's religious diet program. A copy of the request and decision granting or denying it should be kept in the detainee's detention file or in a retrievable electronic format.

When considering denying a request by a detainee to participate in the religious diet program, or removal of a detainee from the religious diet program, the facility administrator, or his or her designee, shall consult with ICE/ERO prior to denying the request or prior to removing a detainee from the program.

## 2. Common-Fare Menu

Facilities must make available a "common fare" menu, which serves as the foundation to which modifications may be made to accommodate the religious diets of various faiths (e.g., for the inclusion of halal flesh-food options). Common fare represents a no-flesh protein option, offering vegetables, starches, and other foods that are not seasoned with flesh, and must be provided whenever an entrée containing flesh is offered as part of a meal.

In addition, hot entrées should be available to accommodate detainee's religious dietary needs and should be purchased, prepared, and served in a manner that does not violate the religious requirements of any faith group.

Common fare is a no-flesh protein option intended to accommodate detainees whose religious dietary needs cannot be met on the main line. The common-fare menu is based on a 14-day cycle, with special menus for the 10 Federal holidays. The menus must be certified as exceeding minimum daily nutritional requirements, meeting or exceeding U.S. recommended daily allowances (RDAs).

## 3. Changes to the Standard Common-Fare Menu

Modifications of the standard common-fare menu may be made at the local level for various reasons, such as to meet the requirements of faith groups (e.g., for the inclusion of kosher and/or halal flesh-food options).

**4. Hot Entree Availability**

To the extent practicable, a hot entree shall be available to accommodate detainees' religious dietary needs, e.g., kosher and/or halal products. Hot entrees shall be offered five times a week and shall be purchased precooked, heated in their sealed containers, and served hot.

**5. Religious Requirements**

With the exception of fresh fruits and vegetables, the facility's kosher and/or halal food purchases shall be fully prepared, ready-to-use, and bearing the symbol of a recognized kosher and/or halal certification agency.

**6. Plates and Utensils**

Common-fare meals shall be served with disposable plates and utensils, except when a supply of reusable plates and utensils has been set aside for common-fare service only. Separate cutting boards, knives, food scoops, food inserts, and other such tools, appliances, and utensils shall be used to prepare common-fare foods and shall be identified accordingly. Meat and dairy food items and the service utensils used with each group shall be stored in areas separate from each other.

**7. Ceremonial Meals, Religious Fasts, and Seasonal Observances**

The chaplain, in consultation with local religious leaders, if necessary, shall develop the ceremonial-meal schedule for the subsequent calendar year, providing it to the facility administrator. This schedule shall include the date, religious group, estimated number of participants, and special foods required. Ceremonial and commemorative meals shall be prepared in the food service facility unless otherwise approved by the facility administrator.

The common-fare program shall accommodate detainees abstaining from particular foods or fasting for religious purposes at prescribed times of the year.

**G. <u>Medical Diets</u>**

**1. Therapeutic Diets**

Detainees with certain conditions – chronic or temporary; medical, dental, and/or psychological – shall be prescribed special (therapeutic) diets, supplemental meals, or snacks as appropriate by authorized medical staff. If a prescribed medical diet conflicts with a common-fare diet, the medical diet takes precedence.

Pregnant detainees may also have additional nutritional and caloric requirements. (See Standard 4.3 Medical Care.)

## H. **Specialized Food Service Programs**

### 1. **Satellite Feeding**

Food transported to housing units or other locations shall be transported in thermal containers that maintain cold items at temperatures below 41 degrees F and hot items at temperatures above 135 degrees F, excluding items served within the two-hour window for food safety.

### 2. **Segregation Food Rations**

Food rations shall not be reduced or changed or used as a disciplinary tool.

### 3. **Sack Meals**

Sack meals shall meet nutritional minimums and be provided for detainees being transported from the facility and detainees arriving/departing between scheduled meal hours. Detainee volunteers assigned to the food service department shall not be involved in preparing meals for transportation but may prepare sack meals for on-site consumption.

## I. **Safety and Sanitation**

### 1. **General Policy**

All food service employees are responsible for maintaining a high level of sanitation in the food service department in accordance with the most recent edition of the U.S. Food and Drug Administration (FDA) Food Code and/or applicable local standards.

### 2. **Personal Hygiene of Staff and Detainees**

a.  All food service personnel shall wear clean garments, maintain a high level of personal cleanliness, and practice good hygiene while on duty. They shall wash hands thoroughly with soap or detergent before starting work, and as often as necessary during the shift to remove soil or other contaminants.

b.  Staff and detainees shall not resume work after visiting the toilet facility without first washing their hands with soap or detergent.

c.  All staff and detainees working in the food preparation and service area(s) shall use effective hair restraints. Personnel with hair that cannot be adequately restrained shall be prohibited from food service operations.

d.  Staff and detainees who prepare or serve food shall not clean latrines, garbage cans, sewers, drains, grease traps, or for other duties during the period of food preparation.

e.  Rubber soled safety shoes shall be provided and used by all detainees working in food service.

**3. Medical Examination**

All food service personnel (both staff and detainee) shall receive a documented pre-employment medical examination. Detainees who have been absent from work for any length of time for reasons of communicable illness (including diarrhea) shall be referred to Health Services for a determination as to fitness for duty prior to resuming work.

**4. Daily Health Checks**

Food Service staff will inspect all detainee food service workers daily at the start of each work period. Detainees who exhibit signs of illness, skin disease, diarrhea (admitted or suspected), or infected cuts or boils shall be removed from the work assignment and immediately referred to Health Services for determination of duty fitness. The detainees shall return to work only after the FSA has received written clearance from Health Services staff.

**5. Environmental Sanitation and Safety**

All facilities shall meet the following environmental standards:

a.  Clean, well-lit, and orderly work and storage areas.

b.  Overhead pipes removed or covered, to eliminate the food-safety hazard posed by leaking or dusty pipes.

c.  Routinely cleaned walls, floors, and ceilings in all areas.

d.  Ventilation hoods, to prevent grease buildup and wall/ceiling condensation that can drip into food or onto food-contact surfaces. Filters or other grease- extracting equipment shall be readily removable for cleaning and replacement.

e.  Eighteen-inch clearance (minimum) underneath sprinkler deflectors.

f.  Hazard-free storage areas:

    1)  Bags, containers, bundles, etc., stored in tiers; stacked, blocked, interlocked, and limited in height for stability/security against sliding or collapsing.

    2)  No flammable material; no loose cords, debris, or other obvious accident-causers (stumbling, tripping, falling, etc.); no pest-harborage.

g.  Aisles and passageways shall be kept clear and in good repair, with no obstruction that could create a hazard or hamper egress.

h.  To prevent cross-contamination, kitchenware and food-contact surfaces should be washed, rinsed, and sanitized after each use and after any interruption of operations during which contamination could occur.

i.  A ready supply of hot water (105-120 degrees F).

j.  Garbage and other trash shall be collected and removed as often as possible. The garbage/refuse containers shall have sufficient capacity for the volume, and shall be kept covered, cleaned frequently, and insect and rodent proof. The facility shall comply with all applicable regulations (local, state, and federal) on refuse-handling and disposal.

**6.  Equipment Sanitation**

Information about the operation, cleaning, and care of equipment will be obtained from manufacturers or local distributors. The FSA shall develop a schedule for the routine cleaning of equipment. The facility will adhere to the health and safety standards of the FDA and/or state or local authorities with oversight of food service operations.

a.  Manual Cleaning and Sanitizing

The FSA shall develop a cleaning schedule for each food service area and post it for easy reference. All areas (walls, windows, vent hoods, etc.) and equipment (chairs, tables, fryers, ovens, etc.) will be grouped by frequency of cleaning, e.g., After Every Use, Daily, Weekly, Monthly, Semi-annually, or Annually.

b.  Mechanical Cleaning and Sanitizing

Spray- or immersion-dishwashers or devices, including automatic dispensers for detergents, wetting agents, and liquid sanitizer, shall be maintained in good repair.

**7.  Lavatories**

Toilet facilities shall be provided for all food service staff and detainee workers. Toilet facilities, including rooms and fixtures, shall be kept clean and in good repair. Signs shall be prominently displayed directing all personnel to wash hands after using the toilet.

Soap or detergent and paper towels or a hand-drying device providing heated air shall be available at all times in each lavatory.

8. **Pest Control**

Good sanitation practices are essential to an effective pest control program. The facility is responsible for pest control in the food service department.

9. **Hazardous Materials**

a. Only those toxic and caustic materials required for sanitary maintenance of the facility, equipment, and utensils shall be used in the food service department.

b. All staff members shall know where and how much toxic, flammable, or caustic material is on hand, and be aware that their use must be controlled and accounted for daily.

c. All containers of toxic, flammable, or caustic materials shall be prominently and distinctively labeled for easy content identification.

d. All toxic, flammable, and caustic materials shall be segregated from food products and stored in a locked and labeled cabinet or room.

10. **General Safety Guidelines**

Machines shall be guarded in compliance with OSHA standards.

a. Light fixtures, vent covers, wall-mounted fans, decorative materials, and similar equipment and materials attached to walls or ceilings shall be maintained in good repair.

b. Lights in food-production areas, utensil- and equipment-washing areas, and other areas displaying or storing food, equipment, or utensils shall be equipped with protective shielding.

c. An approved, fixed, fire-suppression system shall be installed in ventilation hoods over all grills, deep fryers, and open flame devices. A qualified contractor shall inspect the system every six months. The fire-suppression system shall be equipped with a locally audible alarm and connected to the control room's annunciator panel.

d. Hood systems shall be cleaned after each use to prevent grease build-ups, which constitute fire risks. All deep-fryers and grills shall be equipped with automatic fuel or energy shut-off controls.

11. **Mandatory Inspections**

a. The facility shall implement written procedures for the administrative or food service, personnel conducting the weekly inspections of all food service areas, including dining, storage, equipment, and food-preparation areas and an annual

independent inspection ensuring that all governmental health and safety codes are being met. Staff shall check refrigerator and water temperatures daily, recording the results.

b.  Daily checks of equipment temperatures shall follow this schedule:

   1)  Dishwashers: every meal;

   2)  Pot and pan-washers: daily, if water in the third compartment of a three-compartment sink is used for sanitation the required minimum temperature shall be maintained in accordance with the applicable local food code;

   3)  Refrigeration/freezer equipment (walk-in units): site-specific schedule, established by the FSA.

   All temperature-check documentation shall be filed and accessible.

## J.  Food Storage, Receiving and Inventory

### 1.  General Policy

Since control and location of subsistence supplies are site-specific, each FSA shall establish procedures for storing, receiving, and inventorying food.

### 2.  Food Receipt and Storage

The following procedures apply when receiving or storing food:

a.  Inspect the incoming shipment for damage, contamination, and pest infestation. Rats, mice, or insects may be hiding in the middle of a pallet.

b.  Do not store food in locker rooms, toilet rooms, dressing rooms, garbage rooms, mechanical rooms, or under sewer lines, potentially leaking water lines, open stairwells, or other sources of contamination.

### 3.  Inventory

The FSA shall base inventory levels on facility needs; however, each facility will at all times stock a 3-day-minimum food supply. Inventory levels shall be established, monitored, and periodically adjusted to correct excesses or shortages.

| STANDARD 4.2 |
| :---: |

**HUNGER STRIKES**

I.  **POLICY**

This detention standard protects detainees' health and well-being by monitoring, counseling, and providing appropriate treatment to any detainee who is on a hunger strike.

Nothing in this detention standard is intended to limit or override the exercise of sound medical judgment by the clinical medical authority (CMA) responsible for a detainee's medical care. Each case must be evaluated on its own merits and specific circumstances, and treatment shall be given in accordance with accepted medical practice.

II. **STANDARDS AND PROCEDURES**

A.  **Staff Training**

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike.

B.  **Initial Referral**

Procedures for identifying and referring a detainee suspected or announced to be on a hunger strike to medical staff shall include obtaining from qualified medical personnel an assessment of whether the detainee's action is reasoned and deliberate, or the manifestation of a mental illness.

Facilities shall immediately notify ICE/ERO when a detainee begins a hunger strike.

1. Staff shall consider any detainee observed to have not eaten for 72 hours to be on a hunger strike and shall refer him or her to the CMA for evaluation and management.

2. Medical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours. Medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs. If measuring food and liquid intake/output becomes necessary, medical personnel shall make a decision about appropriate housing placement.

C.  **Initial Medical Evaluation and Management**

Medical staff shall monitor the health of a detainee on a hunger strike. If a detainee engaging in a hunger strike has been previously diagnosed with a mental condition or is

incapable of giving informed consent due to age or illness, appropriate medical and/or administrative action shall be taken in the best interest of the detainee.

1. During the initial evaluation of a detainee on a hunger strike, medical staff shall:

   a. Measure and record height and weight;

   b. Measure and record vital signs;

   c. Perform urinalysis;

   d. Conduct psychological/psychiatric evaluation;

   e. Examine general physical condition; and

   f. If clinically indicated, proceed with other necessary studies.

2. Medical staff shall measure and record weight and vital signs at least once every 24 hours during the hunger strike and repeat other procedures as medically indicated.

3. Qualified medical personnel may modify or augment standard treatment protocols when medically indicated.

4. Medical staff shall record all examination results in the detainee's medical file.

5. If the detainee refuses the initial medical evaluation or any treatment or other medical procedures, medical staff must attempt to secure the detainee's signature on a "Refusal of Treatment" form. If the detainee will not cooperate by signing, staff shall note this on the "Refusal of Treatment" form.

6. Any detainee refusing medical treatment shall be monitored by medical staff to evaluate whether the hunger strike poses a risk to the detainee's life or permanent health. See "E. Refusal to Accept Treatment" below in this standard.

7. If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.

8. After the hunger strike, medical staff shall continue to provide appropriate medical and mental health follow-up.

9. Records shall be kept of all interactions with the striking detainee, the provision of food, attempted and successfully administered medical treatment, and communications between the CMA, facility administrator, and ICE/ERO regarding the striking detainee.

**D.  <u>Food and Liquid Intake and Output</u>**

After consultation with the CMA, the facility administrator may require staff to measure and record food and water intake and output as follows:

1.  Record intake and output in the medical record using an IHSC "Hunger Strike Form" or equivalent;

2.  Deliver three meals per day to the detainee's room unless otherwise directed by the CMA—staff shall physically deliver each meal regardless of the detainee's response to an offered meal;

3.  Provide an adequate supply of drinking water or other beverages; and

4.  Remove from the detainee's room all food items not authorized by the CMA. During the hunger strike, the detainee may not purchase commissary/vending machine food.

**E.  <u>Refusal to Accept Treatment</u>**

An individual has a right to refuse medical treatment. Before involuntary medical treatment is administered, staff shall make reasonable efforts to educate and encourage the detainee to accept treatment voluntarily. Involuntary medical treatment shall be administered in accordance with established guidelines and applicable laws and only after the CMA determines the detainee's life or health is at risk.

1.  Medical staff shall explain to the detainee the medical risks associated with refusal of treatment and shall document treatment efforts in the detainee's medical record.

2.  The physician may recommend involuntary treatment when clinical assessment and laboratory results indicate the detainee's weakening condition threatens the life or long-term health of the detainee.

    a.  The facility administrator shall notify ICE/ERO if a detainee is refusing treatment, and the health services administrator shall notify ICE/ERO in writing of any proposed plan to involuntarily feed the detainee if the hunger strike continues. Under no circumstances may a facility administer involuntary medical treatment or sustenance without authorization from ICE/ERO.

    b.  ICE/ERO, in consultation with the CMA, shall then contact the ICE Office of the Principal Legal Advisor and the U.S. Attorney's Office with jurisdiction. After discussing the case, the attorneys shall recommend whether or not to pursue a court order. ICE/ERO policy is to seek a court order to obtain authorization for involuntary medical treatment or sustenance. If a court determines that it does not have jurisdiction to issue such an order, or a hospital refuses to administer involuntary medical treatment or sustenance pursuant to a court order, ICE/ERO may consider other action if the hunger strike continues.

3. Medical staff shall:

    a. Document all treatment efforts and each treatment refusal in the detainee's medical record;

    b. Continue clinical and laboratory monitoring as necessary until the detainee's life or health is out of danger; and

    c. Continue medical and mental health follow-up as necessary.

**F.  <u>Release from Treatment</u>**

Only a physician may order the termination of hunger strike treatment. The order shall be documented in the detainee's medical record. A notation shall be made in the detention file or retrievable electronic record when the detainee has ended the hunger strike.

## STANDARD 4.3

### MEDICAL CARE

I. **POLICY**

All detainees shall have access to appropriate medical, dental, and mental health care, including emergency services. Each medical facility will strive for accreditation with National Commission on Correctional Health Care.

II. **STANDARDS AND PROCEDURES**

A. **General**

Every facility shall directly or contractually provide its detainee population with the following:

1. Initial medical, mental health and dental screening;

2. Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services at no cost to the detainee;

3. Comprehensive, routine and preventive health care, as medically indicated;

4. Emergency care;

5. Specialty health care;

6. Timely responses to medical complaints;

7. Hospitalization as needed within the local community; and

8. Staff or professional language services necessary to allow for access for detainees with limited English proficiency (LEP), and effective communication for detainees with disabilities, during any medical or mental health appointment, sick call, treatment, or consultation.

The health care program and the medical facilities will be under the direction of a Health Services Administrator (HSA) and/or Clinical Medical Authority (CMA). When the HSA is not a physician, final clinical judgment shall rest with the facility's designated CMA.

Facilities will employ sufficient medical staff to perform basic exams and treatments for all detainees. The HSA will negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not available within the

facility. These arrangements will include appropriate custodial officers to transport and remain with the detainee for the duration of any off-site treatment or hospital admission.

## B. **Facilities**

Adequate space and equipment will be furnished so that all detainees are provided basic health examination, treatment, and communication in private. Medical records will be kept separately from detainee records and stored in a securely locked area. All pharmaceuticals will be stored in a secure area and temperature controlled to ensure no alteration in potency.

## C. **Health Care Staff**

Health care staff shall have a valid professional licensure and/or certification for the jurisdiction in which they practice and will perform duties within the scope of their clinical license. The following terms apply to health care staff referred to throughout this standard.

1. Health Care Practitioner: Defined as an individual who is licensed, certified, or credentialed by a state, territory, or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

2. Mental Health Provider: Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker, or any other mental health professional who, by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients.

## D. **Medical Screening (New Arrivals)**

As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care practitioner or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute, emergent, or pertinent past or chronic medical conditions, including history of mental illness, particularly prior suicide attempts or current suicidal/homicidal ideation or intent, and any disabilities or impairments affecting major life activities. Any detainee responding in the affirmative shall be sent for evaluation to a qualified, licensed health care practitioner as quickly as possible, but no later than two working days. Detainees who appear upon arrival to raise urgent medical or mental health concerns shall receive priority in the intake screening process. For intra-system transfers, a health care practitioner will review each incoming detainee's health record or health summary within 12 hours of arrival, to ensure continuity of care.

Facilities shall have policies and procedures to ensure documentation of the initial health screening and assessment.

1. **Tuberculosis**

   All new arrivals shall receive tuberculosis (TB) screening in accordance with the most current Centers for Disease Control and Prevention (CDC) guidelines, including, but not limited to, CDC Guidelines for Correctional Facilities, prior to being placed in general population. For detainees who have been in continuous law enforcement custody, symptom screening plus documented TB screening within one year of arrival may be accepted for intake screening purposes.

   Detainees with symptoms suggestive of pulmonary TB disease and/or with suspected or confirmed TB disease based on historical, clinical and/or laboratory findings will be housed in an airborne infection isolation room with negative pressure ventilation and promptly evaluated for TB disease. Detainees with suspected pulmonary TB disease will remain in airborne infection isolation until determined by a health care practitioner to be noncontagious in accordance with CDC guidelines. All detainees with suspected or confirmed TB disease shall be evaluated for human immunodeficiency virus (HIV), and all detainees with HIV shall be evaluated for TB disease, which includes a chest x-ray. The CMA will consult with the local or state TB program on all aspects of health and public health care for detainees with suspected or confirmed TB disease, including testing, treatment, release from isolation, placement in general population, and public health actions.

2. **Infectious and Communicable Diseases**

   The facility will have written plans that address the management of infectious and communicable diseases, including, but not limited to, testing, isolation, prevention, and education. This also includes reporting and collaboration with local or state health departments in accordance with state and local laws and recommendations.

E. **Comprehensive Health Assessment**

The facility will conduct and document a comprehensive health assessment, including a physical examination and mental health screening, on each detainee within 14 days of the detainee's arrival at the facility. Health assessments shall be performed by a physician, physician assistant, nurse practitioner, registered nurse (RN) (with documented initial and annual training provided by a physician), or other health care practitioner, as permitted by law. When a physical examination is not conducted by a provider, it must be reviewed by a provider. If there is documented evidence of a comprehensive health assessment within the previous 90 days, the health care practitioner may determine that a new assessment is not required.

F. **Substance Dependence and Detoxification**

During the initial screening, all detainees shall be evaluated for their use of or dependence on mood and mind-altering substances including alcohol, opiates, hypnotics, and sedatives.

Detainees reporting the use of such substances shall be evaluated for their degree of reliance and potential for withdrawal. The CMA shall establish guidelines for evaluation and treatment of new arrivals who require detoxification. If females are housed at the facility, guidelines will specifically address the treatment of pregnant women who are chemically dependent. Treatment and supportive measures shall be provided to permit withdrawal with minimal discomfort.

Where a detainee requires hospitalization, a physician's order will be obtained and ICE/ERO shall be notified. Detainees experiencing severe or life-threatening alcohol or drug withdrawal shall be immediately transferred to an emergency department for evaluation. Once evaluated, the detainee will be treated on-site if the facility is qualified to provide treatment and monitoring for withdrawal or transferred to an appropriate facility.

**G.** **Translation, Interpretation, and Language Access for Detainees with Limited English Proficiency**

Facilities shall provide appropriate interpretation and other language services for LEP detainees related to medical and mental health care. When appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service. Interpretation and translation services by other detainees shall only be used in an emergency medical situation.

**H.** **Dental Treatment**

An initial dental screening exam shall be performed within 14 days of the detainee's arrival. If no on-site dentist is available, the initial dental screening may be performed by a physician, physician assistant, nurse practitioner, or registered nurse. Such non-dental clinicians shall be trained annually on how to conduct the exam by a dentist.

Detainees shall be afforded only authorized dental treatment, defined as follows:

1. Emergency dental treatment shall be provided for immediate relief of pain, trauma, and acute oral infection.

2. Routine dental treatment may be provided to detainees for whom dental treatment is inaccessible for prolonged periods because of detention for over six months. Routine dental treatment includes amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the repair and adjustment of prosthetic appliances, and other procedures required to maintain the detainee's health.

**I.** **Sick Call**

The facility will have regularly scheduled times, in accordance with facility policy, when medical personnel are available to see detainees who have requested medical services, commonly known as sick call.

The facility will have a mechanism that allows detainees the opportunity to privately request health care services (including mental health and dental services) provided by a physician or other health care practitioner in a clinical setting. If necessary, detainees shall be provided assistance in filling out the request, especially detainees with a disability, or who are illiterate or LEP.

The facility shall have procedures to ensure that all request slips are received and triaged by the medical staff within 24 hours of receipt of the request. Request slips shall be provided in English and Spanish, at a minimum.

A health care practitioner will review the request and determine when the detainee will be seen based on the acuity of the problem and within a reasonable period of time.

All detainees, including those in Special Management Units, regardless of classification, will have access to sick call.

## J. 24-Hour Emergency Medical and Mental Health Treatment

The facility will have a written plan for the delivery of 24-hour emergency medical and mental health care when no medical personnel are on duty at the facility, or when immediate outside medical attention is otherwise required.

## K. First Aid and Medical Emergencies

The CMA will determine the availability and placement of first aid kits.

Detention staff and health care staff will be trained to respond to health-related emergencies within a 4-minute response time. This training will be provided by a responsible medical authority in cooperation with the facility and will include the following:

a.  The recognition of signs of potential health emergencies and the required response;

b.  The administration of first aid and cardiopulmonary resuscitation (CPR);

c.  The recognition of signs and symptoms of mental illness; and

d.  The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

If a detainee requires emergency medical care, the first responding officer will immediately take steps to contact a health care practitioner through established procedures.

**L.  Delivery of Medication**

Medication will be distributed according to the specific instructions and procedures established by the health care provider. Health care providers and officers shall keep written records of all medication given to (or refused by) detainees.

Medication will not be delivered or administered by detainees. In facilities that are medically staffed 24 hours a day, a health care practitioner will distribute medication. In facilities that are not medically staffed 24 hours a day, medication may be distributed, consistent with state law and/or regulations, by detention officers who have received proper training, but only when medication must be delivered at a specific time when medical staff is not on duty. Distribution of medication by non-medical staff will be according to the specific instructions and procedures established by the CMA.

**M.  Special Needs**

The facility will notify ICE/ERO of any detainee who requires close medical supervision, including chronic and convalescent care. The facility shall develop a written treatment plan, including access to health care and other treatment, and coordination with non-medical personnel as necessary.

**N.  Bloodborne Pathogens**

See also Standard 1.1 "Environmental Health and Safety" for additional information.

Information regarding infectious diseases shall be communicated on a regular basis to non-medical and medical staff, as well as detainees. Detainees exposed to potentially infectious bodily fluids (e.g., through needle sticks or bites) shall be afforded immediate medical assistance, and the incident shall be reported as soon as possible to the clinical director or designee and documented in the detainee's medical file. All detainees shall be assumed to be infectious for bloodborne pathogens, and standard precautions are to be used at all times when caring for all detainees.

The facility shall establish a written plan to address exposure to bloodborne pathogens and post-exposure intervention, including prophylactic administration of medication, as appropriate and according to facility policies; the management of hepatitis A, B, and C; and the management of HIV infection, including reporting.

**1.  Hepatitis**

A detainee may request hepatitis testing at any time.

2. **HIV**

A detainee may request HIV testing at any time. Facilities shall develop a written plan to ensure the highest degree of confidentiality regarding HIV status. Staff training shall emphasize the need for confidentiality, and procedures shall be established to limit access to health records to only authorized individuals and only when necessary.

The accurate diagnosis and medical management of HIV infection among detainees is important. An HIV diagnosis may be made only by a qualified health care practitioner, based on a medical history, current clinical evaluation of signs and symptoms, and laboratory studies.

3. **Clinical Evaluation and Management**

Medical personnel shall provide all detainees diagnosed with HIV or acquired immunodeficiency syndrome (AIDS) appropriate medical care consistent with national recommendations and guidelines disseminated through the U.S. Department of Health and Human Services agencies, including the CDC, and the Infectious Diseases Society of America. Medical and pharmacy personnel shall ensure that all Food and Drug Administration (FDA) approved medications currently approved for the treatment of HIV/AIDS are accessible. Medical and pharmacy personnel shall develop and implement distribution procedures to ensure timely and confidential access to medications.

Any detainee with confirmed or suspected TB disease shall also be evaluated for possible HIV infection, and any detainee with HIV shall be evaluated for TB disease.

Medical and pharmacy personnel shall ensure the facility maintains access to adequate supplies of FDA-approved medications for the treatment of HIV/AIDS to ensure that newly admitted detainees are able to continue with their treatment without interruption. Upon release, detainees currently receiving anti-HIV therapy and other drugs shall receive up to a 30-day supply of their medications as medically appropriate.

When current symptoms suggest HIV infection, the following procedures shall be implemented.

a. Clinical evaluation shall determine the medical need for isolation, but HIV infection cannot be the sole reason for isolation. Segregation of HIV-positive detainees is not necessary for public health purposes. Detainees with HIV shall not be separated from the general population, either pending a test result or after a test report, unless clinical evaluation reveals a medical need for isolation.

b. Following a clinical evaluation, if a detainee manifests symptoms requiring treatment beyond the facility's capability, a qualified health care practitioner shall recommend the detainee's transfer to a local hospital or other appropriate facility

for further medical testing, final diagnosis, and acute treatment, as needed, and consistent with local and national standards.

c. New HIV-positive diagnoses must be reported to government bodies according to state and local laws and requirements; the HSA is responsible for ensuring that all applicable state requirements are met.

## O. <u>Informed Consent</u>

The facility health care practitioner will obtain specific signed and dated consent forms from all detainees before any medical examination or treatment, except in emergency circumstances. Prior to the administration of psychotropic medications, a separate documented informed consent, that includes a description of the medications side effects, shall be obtained.

As a rule, medical treatment shall not be administered against the detainee's will. If a detainee refuses treatment, ICE/ERO will be consulted in determining whether forced treatment will be administered, unless the situation is an emergency. In emergency situations or those that place other detainees or staff at risk of exposure to infectious agents, the facility shall take appropriate emergency measures and notify ICE/ERO as soon as possible.

If the detainee refuses to consent to treatment, medical staff will explain the medical risks to the detainee of declining treatment and make reasonable efforts to convince the detainee to voluntarily accept treatment in a language or manner that the detainee understands. Medical staff will document their treatment efforts and the refusal of treatment in the detainee's medical record. A detainee refusing examination or treatment may be segregated from the general population when recommended by the medical staff. Forced treatment is prohibited unless there is a valid court order authorizing involuntary medical treatment.

## P. <u>Confidentiality and Release of Medical Records</u>

All medical personnel, and in particular those who have access to medical records, shall protect the privacy of detainees' medical information to the maximum extent possible while permitting the exchange of health information required to fulfill program responsibilities and to provide for the well-being of detainees.

Detainees and their representatives shall be allowed to request and receive medical records pursuant to facility policy, which shall be communicated to the detainee in the facility handbook. Detainees and their representatives may also request medical records through the detainee's designated ICE officer, or the ICE Freedom of Information Act (FOIA) process as described in the ICE/ERO National Detainee Handbook.

Detainees who indicate that they wish to obtain copies of their medical records shall be provided with any appropriate forms. The facility will provide the detainee with assistance

in making the written request (if needed) and will assist in transmitting the request to the appropriate office or person.

Following the release of health information, the written authorization shall be retained in the health record, and a copy placed in the detainee's detention file or maintained in a retrievable electronic format.

### Q. **Transfer and Release of Detainees**

1. **Medical/Psychiatric Alert**

   When a health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility, or requires medical escort during removal or transfer, the facility shall notify ICE/ERO in writing.

2. **Notification of Transfers, Releases, and Removals**

   Medical personnel will be given advance notice prior to the release, transfer, or removal of a detainee, so that they may provide for any medical needs associated with the transfer or release.

3. **Transfer of Medical Information**

   a. When a detainee is transferred to another detention facility, the sending facility shall ensure that a medical transfer summary accompanies the detainee. Upon request of the receiving facility, the sending facility shall transmit a copy of the full medical record within five business days or sooner if determined by the receiving facility to be a medically urgent matter.

   b. Upon removal or release from ICE/ERO custody, the detainee shall be provided medication (in quantities specified below), referrals to community-based providers as medically appropriate, and a detailed medical care summary. This summary should include instructions that the detainee can understand and health history that would be meaningful to future medical providers. The summary shall include, at a minimum, the following items:

      1) Patient identification;

      2) Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

      3) Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

4)  Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5)  Any past hospitalizations or major surgical procedures;

6)  Recent test results, as appropriate;

7)  Known allergies;

8)  Any pending medical or mental health evaluations, tests, procedures, or treatments for a serious medical condition scheduled for the detainee at the sending facility. In the case of patients with communicable disease and/or other serious medical needs, detainees being released from ICE/ERO custody are given a list of community resources, at a minimum;

9)  Copies of any relevant documents as appropriate;

10) Printed instructions on how to obtain the complete medical record; and

11) The name and contact information of the transferring medical official.

### 4.  Medications

The facility shall ensure that, at a minimum, a seven-day supply of medication (or, in the case of TB medications, 15 days; and in the case of HIV/AIDS medications, 30 days) accompanies the detainee upon transfer from the facility, as ordered by the prescribing authority.

Upon removal or release from ICE custody, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a medical care summary. If a detainee is on prescribed narcotics, the clinical health authority shall make a determination regarding continuation, based on assessment of the detainee.

### R.  **Medical Experimentation and Research**

Detainees shall not be used in any medical, pharmaceutical, or cosmetic experiments or research.

This will not preclude an individual detainee from receiving a medical treatment or procedure not generally available, but determined medically necessary by the CMA, such as medications and clinical trials. The administration of such investigational therapies shall follow relevant FDA or other national protocols and will be administered only with written consent from the detainee, which should be retained in the detainee's medical record. The facility shall notify ICE/ERO of all such situations.

S.  **Mental Health Program**

1. **Details**

    The facility shall have a mental health program, approved by the appropriate medical authority, that provides:

    a.  Assistance with intake screening for mental health concerns;

    b.  Referral as needed for evaluation, diagnosis, treatment and monitoring of mental illness by a qualified mental health care provider;

    c.  Sufficient capacity to provide crisis intervention and management of acute mental health episodes;

    d.  Transfer to licensed mental health facilities of detainees whose mental health needs exceed the capabilities of the facility; and

    e.  Professional consultation for and assistance with the suicide prevention program.

2. **Referrals and Treatment**

    Based on the intake screening, the comprehensive health assessment, medical documentation, or subsequent observations by detention staff or medical personnel, a detainee may be referred for mental health treatment or evaluation. Any detainee referred for mental health treatment shall be triaged for any emergency needs and receive an evaluation by a qualified mental health provider no later than seven days after the referral. The provider shall develop an overall treatment/management plan. If the detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility, a referral for an outside mental health facility shall be initiated and the facility shall notify ICE/ERO in a timely manner. Any detainee prescribed psychiatric medications must be regularly evaluated by a duly licensed and appropriate medical professional to ensure proper treatment and dosage.

3. **Involuntary Administration of Psychotropic Medication**

    Involuntary administration of psychotropic medication to detainees shall comply with established guidelines and applicable laws, and shall be performed only pursuant to the specific, written, and detailed authorization of a physician. Absent a declared medical emergency, before psychotropic medication is involuntarily administered, the HSA shall contact ICE/ERO to facilitate a request for a court order.

4. **Serious Mental Illness**

    The following non-exhaustive categories of conditions should be considered to constitute a serious mental illness:

a. conditions that a qualified medical provider has determined to meet the criteria for a "serious mental disorder or condition" pursuant to applicable ICE policies, including:

1) A mental disorder that is causing serious limitations in communication, memory, or general mental and/or intellectual functioning (e.g., communicating, conducting activities of daily life, social skills); or a severe medical condition(s) (e.g., traumatic brain injury or dementia) that is significantly impairing mental function; or

2) One or more of the following active psychiatric symptoms and/or behaviors: severe disorganization, active hallucinations or delusions, mania, catatonia, severe depressive symptoms, suicidal ideation and/or behavior, marked anxiety or impulsivity; or

3) Significant symptoms of one of the following:

   i.   Psychosis or Psychotic Disorder;

   ii.  Bipolar Disorder;

   iii. Schizophrenia or Schizoaffective Disorder;

   iv.  Major Depressive Disorder with Psychotic Features;

   v.   Dementia and/or a Neurocognitive Disorder; or

   vi.  Intellectual Development Disorder (moderate, severe, or profound);

4) Any ongoing or recurrent conditions that have required a recent or prolonged hospitalization, typically for greater than 14 days, or a recent and prolonged stay in the medical clinic of a detention or correctional facility, typically for greater than 30 days;

5) Any condition that would preclude the detainee from being housed, typically for greater than 30 days, in a non-restrictive setting (such as a general population housing unit, as opposed to a special management unit or a medical clinic); and

6) Any other mental illness determined to be serious by IHSC.

## T. Referrals for Sexual Abuse Victims or Abusers

If any security or medical intake screening or classification assessment indicates that a detainee has experienced prior sexual victimization or perpetrated sexual abuse, staff shall, as appropriate, ensure that the detainee is immediately referred to a qualified medical

practitioner or mental health provider for a medical and/or mental health evaluation and follow-up as appropriate.

When a referral for medical follow-up is initiated, the detainee shall receive a health evaluation no later than two working days from the date of assessment. When a referral for mental health follow-up is initiated, the detainee shall receive a mental health evaluation no later than 72 hours after the referral.

For the purposes of this section, a "qualified medical practitioner" or "qualified mental health practitioner" means a health or mental health professional, respectively, who in addition to being qualified to evaluate and care for patients within the scope of his or her professional practice, has successfully completed specialized training for treating sexual abuse victims.

## U. **Women's Medical Care**

Female detainees shall receive routine, age appropriate gynecological and obstetrical health care, consistent with recognized community and clinical guidelines for women's health services.

### 1. **Initial Assessment**

All initial health assessments of female detainees shall be conducted by a qualified health care practitioner. In addition to the criteria listed on the health assessment form, the evaluation shall inquire about and perform the following:

a. Pregnancy test for detainees aged 18-56 and deliver to the detainee and document the results;

b. If the detainee is currently nursing (breastfeeding);

c. Use of contraception;

d. Reproductive history (number of pregnancies, number of live births, number of spontaneous/elective abortions, pregnancy complications, etc.);

e. Menstrual cycle;

f. History of breast and gynecological problems;

g. Family history of breast and gynecological problems; and

h. Any history of physical or sexual victimization and when the incident occurred.

A pelvic and breast examination, pap test, baseline mammography and sexually transmitted disease (STD) testing shall be offered and provided as deemed appropriate or necessary by a health care practitioner.

## 2. Preventive Services

Upon request, appropriately trained medical personnel within their scope of practice shall provide detainees with non-directive (impartial) advice and consultation about family planning and contraception, and where medically appropriate, prescribe and dispense medical contraception.

## 3. Pregnancy

Upon confirmation by health care practitioner that a detainee is pregnant, the detainee shall be provided close medical supervision. Pregnant detainees shall have access to prenatal and specialized care, and comprehensive counseling on topics including, but not limited to, nutrition, exercise, complications of pregnancy, prenatal vitamins, labor and delivery, postpartum care, lactation, family planning, abortion services and parenting skills.

The facility administrator shall ensure that ICE/ERO is notified as soon as practicable of any pregnant detainee, but no later than 72 hours after such determination.

A health care practitioner will identify any special needs (e.g., diet, housing, and other accommodations such as the provision of additional pillows) and inform all necessary security staff and facility authorities. If a pregnant detainee has been identified as high risk, the detainee shall be referred to a physician specializing in high-risk pregnancies.

All chemically dependent pregnant detainees (e.g., detainees dependent on substances including alcohol, sedatives/hypnotics, anxiolytics, and opioids) are considered high risk and referred to qualified physician capable of addressing their needs immediately.

a. <u>Abortion Access</u>

In the event continued detention is necessary and appropriate, and consistent with the practice of ICE/ERO's federal partners, if the life of the mother would be endangered by carrying a fetus to term, or in the case of rape or incest, ICE/ERO will assume the costs associated with a female detainee's decision to terminate a pregnancy.

1) In this instance, or in a situation where a female detainee opts to fund the termination of her pregnancy, ICE/ERO will arrange for transportation at no cost to the detainee for the medical appointment and, if requested by the detainee, for access to religious counseling, and non-directive (impartial)

medical resources and social counseling, to include outside social services or women's community resources groups.

2) If a detainee requests to terminate her pregnancy, it will be documented in the detainee's medical records. The detainee's statement should be signed personally by the detainee and include clear language of the detainee's intent.

## STANDARD 4.4

### PERSONAL HYGIENE

### I.  POLICY

Good hygiene is essential to the well-being of detainees in the custody of ICE/ERO. ICE/ERO requires that all facilities provide detainees with regular exchanges of suitable and clean clothing, linens, blankets, and towels for as long as they remain in detention.

### II.  STANDARDS AND PROCEDURES

#### A.  Clothing, Bedding, Linen, Blanket and Towel Supply

The facility shall have a policy and procedure for the regular issuance and exchange of clothing, bedding, linens, and towels. The facility shall keep a supply of these items that exceeds the minimum amount required for the number of detainees to prevent delay in replacing the items.

#### B.  Issuance of Clothing

At no cost to the detainee, all new detainees shall be issued clean, indoor/outdoor, temperature-appropriate, presentable clothing during in-processing. Damaged or unusable shoes or clothing shall be replaced at no cost to the detainee.

The standard issue of clothing for detainees should be consistent with facility policy but should include not less than one uniform shirt and one pair of uniform pants or one jumpsuit; one pair of socks; one pair of underwear; two brassieres, as appropriate; and one pair of footwear. Additional clothing shall be issued as necessary for changing weather conditions or as seasonally appropriate.

#### C.  Issuance of Bedding, Linen and Towels

All new detainees shall be issued clean bedding, linens, and a towel(s). Detainees shall be held accountable for these items.

#### D.  Special Uniforms and Protective Equipment for Detainees

Detainees assigned to special work areas shall be clothed in accordance with the requirements of the job and, when appropriate, provided with protective clothing and equipment in accordance with safety and security considerations.

### E.  Exchange Requirements

Detainees shall be provided with clean clothing, linens, and towels on a regular basis to ensure proper hygiene. Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly.

More frequent exchanges of outer garments may be appropriate, especially in hot and humid climates. Individual facilities may institute their own clothing, linen, and towel exchange policy and procedures, provided the standards in this policy are met.

### F.  Personal Hygiene Items

Distribution of hygiene items shall not be used as reward or punishment.

Each detainee shall receive, at a minimum, the following items:

1.  One bar of bath soap, or equivalent;

2.  One comb or equivalent;

3.  One tube of toothpaste;

4.  One toothbrush;

5.  One bottle of shampoo, or equivalent; and

6.  One container of skin lotion.

The facility administrator may modify this list as needed (e.g., to accommodate the use of bulk liquid soap and shampoo dispensers).

The distribution of razors shall be strictly controlled.

Female detainees shall be issued and may retain sufficient feminine hygiene items, including sanitary pads or tampons, for use during the menstrual cycle, and may be permitted brushes to replace combs.

The facility shall replenish personal hygiene items at no cost to the detainee on an as-needed basis, in accordance with written facility procedures.

### G.  Bathing and Toilet Facilities

Detainees shall be provided with a reasonably private bathing and toileting environment in accordance with safety and security needs. Detainees shall be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite sex, except in exigent circumstances or when such viewing is incidental to routine cell checks

or is otherwise appropriate in connection with a medical examination or monitored bowel movement.

Staff of the opposite sex shall announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing.

When operationally feasible, detainees with risk(s) of sexual victimization set forth in 6 C.F.R. § 115.41 shall be given the opportunity to shower separately from other detainees.

Detainees with disabilities shall be provided the facilities and support needed for self-care and personal hygiene in a reasonably private environment in which the individual can maintain dignity. When necessary, assistance to detainees with disabilities who cannot perform basic life functions shall be provided by individuals who are trained and qualified to assist persons with physical and/or mental impairments. Such training may be provided by the health services authority and may involve the expertise of relevant community organizations and government agencies. Discrimination on the basis of disability is prohibited.

## STANDARD 4.5

**SIGNIFICANT SELF-HARM AND SUICIDE PREVENTION AND INTERVENTION**

---

I.    **POLICY**

The facility shall have a written suicide prevention and intervention program that includes procedures to address suicidal detainees and detainees at risk of self-harm. Staff shall be trained to recognize signs, symptoms, and situations which indicate the potential for self-harm and/or suicide risk. Staff shall act to prevent suicides with appropriate sensitivity, supervision, and referrals. Any suicidal detainee shall receive preventive supervision and treatment.

II.    **STANDARDS AND PROCEDURES**

A.  **General**

The facility shall have policy and procedures for a comprehensive suicide prevention and intervention program.

B.  **Training**

All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter.

All of the following topics shall be covered:

1.  Potential stressors related to incarceration and how detention facilities can be conducive to suicidal behavior;

2.  Standard first aid training, cardiopulmonary resuscitation (CPR) training, and training in the use of emergency equipment (that may be located in each housing area of the detention facility);

3.  Liability issues associated with detainee suicide;

4.  Recognizing verbal and behavioral cues that indicate potential suicide;

5.  Demographic, cultural, and precipitating factors of suicidal behavior;

6.  How to respond to suicidal and depressed detainees;

7.  Effective communication between correctional and health care personnel;

8.  Necessary referral procedures;

9.  Suicide precautions, including constant observation and close observation;

10. Follow-up monitoring of detainees who have already attempted suicide; and

11. Reporting and written documentation procedures.

## C.  **Identification**

All detainees shall receive an initial mental health screening within 12 hours of admission by a health care practitioner or a specially trained detention officer. Information regarding a history of suicidal behavior and current suicidal ideation shall be obtained. The results of the screening shall be documented on an intake screening form.

Detainees may be identified as being at risk for self-harm or suicide at any time. This identification may be the result of a self-referral, observation, or interaction with medical, mental health, or correctional staff.

If a detainee is observed to display or express any intent, threat, or gesture of self-harm, any custody official may place the detainee on suicide precautions. Only a mental health provider or a physician may remove the detainee from suicide precautions.

## D.  **Referral and Evaluation**

Detainees identified as at risk for suicide or self-harm shall be immediately referred to a mental health provider. An evaluation shall take place within 24 hours. Until this evaluation takes place, security staff shall place the detainee in a secure environment on constant (one-to-one) visual observation.

The mental health provider's evaluation shall be documented in the medical record and must include the following information:

1.  Relevant history;
2.  Environmental factors;
3.  Lethality of suicide plan;
4.  Psychological factors;
5.  Diagnoses;
6.  A determination of seriousness of suicide risk;
7.  Level of supervision needed;
8.  Referral/transfer for inpatient care (if needed);
9.  Instructions to medical staff for care; and
10. A treatment plan, including reassessment time frames.

Detainees placed on suicide precautions shall be reevaluated by a mental health provider (or a health care practitioner) on a daily basis to assess any changes that indicate a need for

change in the level of supervision (i.e., constant watch, close observation, or removal from suicide precautions). Each re-evaluation must be documented in the detainee's medical record.

**E. Treatment**

For a detainee who has been identified at risk for self-harm or suicide, a mental health provider will develop a treatment plan. This plan will be documented and placed in the detainee's medical record.

This treatment plan shall include strategies and interventions to be followed by staff and the detainee if suicidal ideation or intent reoccurs, and a plan for follow-up care. The timing of follow up appointments should be based on the level of acuity.

**F. Housing and Monitoring**

A mental health provider may place a detainee in a suicide-resistant cell with constant monitoring (one-to-one). A suicide-resistant cell must be free of objects and structural elements that could facilitate a suicide attempt and must be approved by a health care practitioner. The monitoring must be documented every 15 minutes or more frequently if necessary. Clinical staff will perform welfare checks every 8 hours.

Only a mental health provider may remove a detainee from constant monitoring (one-to-one). A mental health provider may immediately move or later place the detainee under close observation status. A detainee on close observation may be housed in general population or other medical or suicide-resistant housing, as appropriate. A detainee on close observation shall be regularly monitored. The monitoring shall consist of staggered checks at intervals not to exceed 15 minutes (e.g., every 5, 10, 7 minutes) and be documented. Clinical staff will perform welfare checks every 8 hours.

The facility administrator shall promptly report to ICE/ERO any detainee who is placed on constant observation or close observation status (suicide precautions).

**G. Hospitalization**

If a detainee faces an imminent risk of injury or death, appropriate staff will make a recommendation for hospitalization.

If the detainee refuses, it may be necessary to petition the appropriate court to intervene against the detainee's will for hospitalization and treatment. At a minimum, refusal of hospitalization should prompt immediate placement of the detainee in a suicide-resistant cell under one-to-one observation.

**H. <u>No Excessive Deprivations</u>**

Deprivations and restrictions placed on suicidal detainees must be kept at a minimum. Suicidal detainees may be discouraged from expressing their intentions if the consequences of reporting those intentions result in punitive treatment. Placing suicidal detainees in conditions of confinement that are worse than those experienced by detainees in the general population may result in the detainee not discussing his or her suicidal intentions and falsely showing an appearance of a swift recovery.

**I. <u>Clothing, Hygiene, and Privacy</u>**

The facility may allow suicidal detainees under constant (one-to-one) monitoring to wear the standard issue clothing, as long as extraneous items that could aid in self-harm are removed, such as shoelaces or belts.

A mental health provider shall assess the detainee to determine whether a suicide smock is necessary, and if so, whether to provide underwear. Under no circumstances shall detainees be held without clothing.

Suicidal detainees shall be allowed to shower, perform bodily functions, and change clothing with as much privacy as possible under the continuous observation of staff, and without nonmedical staff of the opposite sex viewing their breasts, buttocks, or genitalia, except in exigent circumstances. Although staff of the opposite sex may be assigned to suicide precautions, including constant observation, the facility must have procedures in place that enable a detainee on suicide precautions to avoid exposing himself or herself to nonmedical staff of the opposite sex. This may be accomplished, for example, by substituting medical staff or security staff of the same sex to observe the periods of time when a detainee is showering, performing bodily functions, or changing clothes. It may also be accomplished by providing a shower with a partial curtain or other privacy shields. The privacy standards apply whether the viewing occurs in a cell or elsewhere.

However, any privacy accommodations must be implemented in a way that does not pose a safety risk for the individual on suicide precautions. Safety is paramount when conducting suicide precautions, and if an immediate safety concern or detainee conduct makes it impractical to provide same sex coverage during a period in which the inmate is undressed, the detainee should continue to be observed, and any such incident should be documented.

**J. <u>Intervention</u>**

Following a suicide attempt, security staff shall initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. Arriving medical personnel shall perform appropriate medical evaluation and intervention. The CMA or designee shall be notified when a detainee requires transfer to a local hospital or emergency room.

**K. <u>Notification and Reporting</u>**

In the event of a suicide or suicide attempt, placement of a detainee on suicide precautions, or transfer of a detainee to a local hospital or emergency room, the facility shall immediately notify ICE/ERO and appropriate outside authorities.

Medical staff shall complete a preliminary Incident Report within 24 hours of any suicide or suicide attempt, and all staff who came into contact with the detainee immediately before the suicide attempt or death shall submit a statement describing their knowledge of the detainee and the incident.

The preliminary Incident Report must include detainee name, alien number, relevant medical history/diagnosis, reason for suicide placement (if applicable), date of death, and name and title of person providing information.

**L. <u>Review</u>**

The facility will cooperate with ICE/ERO on any mortality review process triggered by a death resulting from suicide.

**M. <u>Debriefing</u>**

Facilities are encouraged to offer a critical incident debriefing following a suicide or serious suicide attempt for all affected staff and detainees within 24 to 72 hours after the critical incident.

**N. <u>Detainee Mental Health Follow-up</u>**

Following a suicide or serious suicide attempt, the facility should offer appropriate mental health services to other detainees who may have been affected.

## STANDARD 4.6

### TERMINAL ILLNESS AND DEATH

I.    **POLICY**

All facilities shall have policies and procedures addressing the issues of terminal illness, serious injury, advance directives, and detainee death, including prompt notification of ICE/ERO in all cases.

II.    **STANDARDS AND PROCEDURES**

A.    **Terminal Illness**

The facility's Clinical Medical Authority (CMA), assisted by the Health Services Administrator (HSA), shall arrange the transfer of chronically, critically, or terminally ill detainees to appropriate off-site medical facilities. The facility shall notify ICE/ERO as soon as practicable of the need for such transfer, ideally before the detainee leaves the facility.

When a detainee's medical condition becomes life-threatening, the following standards and procedures apply:

1.    A seriously ill or dying detainee's care shall be consistent with Standard 4.3 "Medical Care."

2.    A detainee in a community hospital remains in ICE/ERO custody. ICE/ERO retains the authority to make administrative decisions affecting the detainee (e.g., visitors, movement, authorizing/limiting services, etc.). The hospital assumes medical decision-making authority (e.g., drug regimen, lab tests, x-rays, treatments, etc.).

3.    The facility and ICE/ERO will defer to the hospital's standard rules and procedures concerning the seriously ill, injured, and dying, including the hospital's procedures for determining and contacting next-of-kin.

B.    **Death Occurring in ICE/ERO Custody**

The facility shall immediately notify ICE/ERO of any detainee death, and where appropriate, the chaplain may provide advice about religious considerations that could influence the decision about the disposition of remains.

1.    **Notification of Family**

Written procedures will provide for the facility's direct coordination with ICE/ERO in communicating news of the serious illness or death of a detainee. The chaplain or

designee may coordinate requested religious rituals at the time of a detainee's serious illness, injury, or death.

**2. Disposition of Property**

The facility shall collect and return a deceased detainee's property and funds to ICE/ERO for processing and disposition.

**3. Disposition of Remains**

The detainee's family shall have the opportunity to claim the remains within seven calendar days of the date they received notification (in writing or in person) of the death. If the family chooses to claim the body, the family shall assume responsibility for making the necessary arrangements and paying all associated costs (transportation of body, burial, etc.).

ICE/ERO will coordinate the logistical details involved in returning the detainee's remains to the family.

If family members cannot be located or decline, orally or in writing, to claim the remains, ICE/ERO will notify the consulate of the detainee's country of nationality in writing. The consulate shall have seven calendar days in which to claim the remains.

In the event that neither family nor consulate claims the remains, the facility shall coordinate with ICE/ERO.

The facility shall not independently authorize cremation or donation of the remains for medical research.

**4. Death Certificate**

The facility shall coordinate with ICE/ERO on proper distribution of the death certificate.

**5. Authority to Order Autopsies**

The facility shall make autopsy arrangements in coordination with ICE/ERO.

## STANDARD 4.7

### DISABILITY IDENTIFICATION, ASSESSMENT, AND ACCOMMODATION

### I. POLICY

Facilities are required by federal law, including Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), to ensure that detainees with a disability have an equal opportunity to participate in, access, and enjoy the benefits of the facility's programs, services, and activities. Such participation will be accomplished in the least restrictive and most integrated setting possible, through the provision of reasonable accommodations, modifications, and/or auxiliary aids and services, as necessary, and in a facility that is physically accessible.

### II. STANDARDS AND PROCEDURES

#### A. Definitions

##### 1. Disability

For purposes of these detention standards, the term "disability" means either of the below:

a. A physical or mental impairment that substantially limits one or more of an individual's major life activities; or

b. A record of such a physical or mental impairment.

"Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

##### 2. Communication Impairments

Detainees with "communication impairments" include detainees with physical, hearing, vision, and speech impairments (e.g., detainees who have hearing loss or are deaf or blind, who have visual impairments, or who are nonverbal).

3. **Mobility Impairments**

Detainees with "mobility impairments" include detainees with physical impairments who require a wheelchair, crutches, prosthesis, cane, or other mobility device, or other assistance.

4. **Programs, Services, or Activities**

For purposes of these standards, the "programs," "services," "benefits," and/or "activities" of a detention facility include all aspects of the facility's operations that involve detainees. These include, but are not limited to, housing placements, medical care, safety and security protocols, food services, correspondence, visitation, grievance systems, transfers, and detainee programming and scheduled activities such as law and leisure libraries, religious services, educational or vocational classes, work programs, and recreation.

5. **Auxiliary Aids or Services**

"Auxiliary aids or services" are services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include sign language interpreters, written materials, note-takers, video remote interpreting and/or video relay services, videophones, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

6. **Reasonable Accommodations**

For purposes of these standards, "reasonable accommodation" means any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene.

When considering requests for reasonable accommodations or modifications, the facility shall engage in an interactive and individualized process as outlined in section F below.

For the purposes of this standard, and particularly section F below, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

## B. Reasonable Accommodation Process and Compliance Coordinator

### 1. Reasonable Accommodation Process

The facility shall develop a process, which includes reasonable timelines, for reviewing detainees' requests for accommodations related to a disability and for providing accommodations (including interim accommodations), modifications, and reassessments.

### 2. Disability Compliance Coordinator

The facility or public entity shall designate a Disability Compliance Coordinator to assist facility personnel in ensuring compliance with this standard and all applicable federal, state, and local laws related to accommodation of detainees with disabilities. The Disability Compliance Coordinator may be a member of the medical staff, or anyone with relevant knowledge, education, and/or experience; this role may be filled by the county, locality, or agency's existing ADA coordinator.

## C. Identification

A detainee may identify him- or herself as having a disability and/or request a reasonable accommodation at any point during detention. Detainees may submit a formal or informal (i.e., verbal or written) request for accommodations or assistance. Requests should be reviewed in context, and do not need to include the words "disability" or "accommodation" to be considered a request for accommodations. The facility shall also consider information submitted by a third party, such as an attorney, family member, or other detainee identifying a detainee with a disability or a detainee's need for an accommodation.

Further, it is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent. Identification of detainees with potential disabilities (i.e., impairments that are open, obvious, and apparent) may occur through medical or intake screenings, or through direct observation. Staff should be particularly vigilant for impairments that affect a detainee's mobility or ability to communicate. Upon identifying a detainee with a potential disability, the facility shall review the need for any necessary accommodations pursuant to Section F below.

The processes described in this standard apply to any detainee who has requested an accommodation or auxiliary aid or service, or who has otherwise been identified as potentially needing an accommodation.

**D. <u>Physical Accessibility and Most Integrated Setting Possible</u>**

**1. Physical Accessibility**

The facility shall comply with all applicable federal, state, and local laws and regulations related to the accessibility of safe and appropriate housing for detainees with disabilities.

The facility will ensure that detainees with disabilities are able to physically access its programs, services, and activities. This includes, for example, ensuring detainees with disabilities can access telephones, as well as toileting and bathing facilities.

**2. Most Integrated Setting**

Every detainee with a disability will be housed in a space that affords him or her safe, appropriate living conditions. Detainees with disabilities should be provided access to the facility's programs and services in the least restrictive setting possible and the most integrated setting appropriate to the needs of the detainee with a disability.

Detainees with disabilities shall generally be permitted to keep assistive devices (including such aids as canes and crutches) with them at all times, including in general population. Placement apart from the general population due to security concerns related to the use of any such item must be based on individualized review, and the justification for the placement must be documented, whether the detainee is placed in an SMU, medical clinic, or elsewhere. The justification shall set forth the individualized assessment of the safety or security concern created by the assistive device that could not be eliminated or mitigated by modification of policies or procedures.

A detainee's disability or need for accommodations may not provide the sole basis for a decision to place the detainee in an SMU. An individualized assessment must be made in each case, and the justification for the placement documented.

**E. <u>Effective Communication</u>**

Throughout the facility's programs and activities, including at all stages of the reasonable accommodation process, the facility must take appropriate steps to allow for effective communication with detainees with disabilities to afford them an equal opportunity to participate in, and enjoy the benefits of, the facility's programs and activities. Steps to ensure effective communication may include the provision and use of auxiliary aids or services for detainees with vision, hearing, sensory, speech, and manual impairments, as needed. The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual detainee, the nature, length, and complexity of the communication involved, and the context in which the communication is taking place. In determining what types of auxiliary aids or services

are necessary, the facility shall give primary consideration to the request of the detainee with a disability.

Use of other detainees to interpret or facilitate communication with a detainee with a disability may only occur in emergencies.

## F. Reasonable Accommodations Process

The facility's process to appropriately accommodate a detainee with a disability will differ depending on the nature of the impairment or disability being addressed.

### 1. Immediate Accommodations

The facility shall provide detainees with disabilities with necessary accommodations in an expeditious manner. In many situations, the facility will be able to immediately grant a detainee's request for an accommodation.

### 2. Medical and Mental Health Treatment

Many detainees with disabilities will receive medical and/or mental health treatment from the facility's clinical medical authority. Where a detainee with a disability is fully able to access the facility's programs and activities through the provision of appropriate medical or mental health treatment, further interactive process may not be necessary. However, where the provision of accommodations depends on medical expenditures requiring ICE/ERO authorization, the facility shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending ICE/ERO authorization (for example, providing a wheelchair as an interim accommodation to allow for mobility while a prosthesis is repaired), and shall provide to the detainee any such interim accommodations it identifies.

### 3. Interactive Process

Requests or referrals that require an interactive process include (1) detainees with mobility impairments; (2) detainees with communication impairments; (3) detainees whose initial requests for accommodations or assistance have been denied; (4) detainees who have filed grievances about the accommodation of their disabilities or impairments; (5) detainees whose requests are complex or best addressed by staff from more than one discipline (e.g., security, programming, medical, or mental health, etc.); and (6) detainees whose cases are otherwise determined by facility staff to be appropriate for review.

The interactive process will likely include participation from a healthcare professional and any additional facility staff with requisite knowledge of and/or responsibility for compliance with the facility's obligation to accommodate detainees with disabilities. When appropriate, the facility shall consult with ICE/ERO to obtain guidance, information, and/or resources for providing accommodations.

a. <u>Interaction with the Detainee</u>

Given the importance of considering information from the detainee, the interactive process shall include a good faith attempt to interview the detainee and determine the nature of the detainee's disability, any difficulties the detainee experiences in accessing the facility or its programs or services, and the detainee's specific requests or needs for accommodation, if any. The facility will respect any detainee's decision to decline to participate in the accommodation process. If a detainee declines such an invitation, the facility will document this declination.

b. <u>Determinations</u>

The facility will determine whether the detainee has a disability, whether the detainee requires an accommodation to meaningfully access the facility's programs and activities, and whether to grant or recommend denying the requested accommodation (if any) or propose an alternate, equally effective accommodation. The facility will issue a written decision within a reasonable time of the request or referral.

If there is a delay in determining whether to approve an accommodation request or in providing the detainee with an approved accommodation, the facility shall consider whether there are any interim accommodations that would afford the detainee access to its programs and activities pending the final disposition of the request or the provision of approved accommodations. The facility shall provide to the detainee any such interim accommodations it identifies.

Where the facility approves a request for an accommodation, but the recommended accommodation requires approval from ICE/ERO (i.e., expenditures on medical treatment, medication, and durable medical equipment that require IHSC authorization), the facility will inform the detainee of the decision and the status of the request with ICE/ERO and shall consider whether to provide an interim accommodation. The facility shall provide to the detainee any such interim accommodations it identifies.

Where the facility approves a request for accommodations, and can immediately provide the necessary accommodation, the facility will follow the notification procedures outlined below and implement the approved accommodations as quickly as possible.

c. <u>Final Review of Any Denial by Facility Administrator or Assistant Facility Administrator</u>

Any denial of a request for accommodation related to a disability must be approved by the facility administrator or assistant facility administrator. Such denials include all cases in which the facility determines that accommodations, including all

requested accommodations, should be denied; or that alternate, unrequested accommodation(s) should be provided.

d.   Detainee Notification

The facility will provide the detainee with written notification of the facility's final decision on his or her request for accommodation, regardless of whether an accommodation was granted or denied, and regardless of whether the accommodation requires further approval by ICE/ERO. Notification of a denied accommodation, or provision of an alternate, unrequested accommodation will include a justification for the denial. Notification shall be provided in a language or manner the detainee can understand.

e.   Staff Notification

Where an accommodation is granted, all relevant facility staff, including facility security staff, receive timely notification and as needed, instructions for successful implementation of the accommodation. The provision of this information will also account for any applicable privacy and confidentiality considerations.

## G.  **Denial of an Accommodation**

Permissible reasons for the facility to deny an accommodation to a detainee who has been determined to have a disability include: (1) the detainee is not denied access to the facility's programs or activities because of a disability; (2) there is not a nexus between the disability and the requested accommodation; (3) the requested accommodation would fundamentally alter the nature of the program, service, or activity; (4) the requested accommodation would result in an undue financial and administrative burden; or (5) the detainee poses a direct threat to staff or other detainees.

Both "fundamental alteration" and "undue financial and administrative burden" are generally high standards that are difficult to meet. Further, if a particular accommodation would result in an undue financial and administrative burden or fundamental alteration, the facility must take any other action that would not result in such an undue burden or fundamental alteration but would nevertheless ensure that, to the maximum extent possible, detainees with a disability receive the benefits and services of the program or activity. Similarly, determinations that individuals pose a "direct threat" are generally very rare, and require a careful, individualized assessment as described below.

### 1.  **Fundamental Alteration**

A "fundamental alteration" to a facility's programs, services, or activities is a change that is so significant that it alters the essential nature of the program, service, or activity offered. Whether a change constitutes a fundamental alteration is a determination that must be made on a case-by-case basis, and that must consider the unique characteristics of each facility and each detainee with a disability.

2. **Undue Financial and Administrative Burden**

   An "undue financial and administrative burden" is a significant difficulty or expense related to a facility's operations, programs, or activities. In evaluating whether a particular accommodation would result in an undue burden, the facility must consider all resources available for use in the funding and operation of the conducted program or activity *as a whole*.

3. **Direct Threat**

   The facility may justify the denial of an accommodation to a detainee with a disability on the basis of the detainee posing a direct threat to staff or other detainees only if providing the accommodation would unavoidably exacerbate the threat. The determination that a detainee with a disability poses such a direct threat to staff or other detainees must be reached through an individualized assessment. The assessment must rely on reasonable judgment and current medical evidence, or the best available objective evidence, to determine the nature, duration, and severity of the risk, and whether any modifications of policies, practices, or procedures can mitigate or eliminate the risk. Detainees who are found to pose a direct threat are nevertheless entitled to auxiliary aids or services to allow for effective communication.

## H. <u>External Notifications</u>

1. **Notification of a Detainee with a Communication or Mobility Impairment**

   The facility shall notify ICE/ERO as soon as practicable, but no later than 72 hours, after the facility has completed its interactive process to assess the needs of any detainee with a communication or mobility impairment. This notification must include, at a minimum,

   a. The nature of the detainee's disability or impairment;

   b. The accommodation requested by the detainee or required; and

   c. The facility's plan to accommodate the detainee.

2. **Notification of Facility Denials and Provision of Alternative Accommodations**

   The facility shall notify ICE/ERO in writing within 72 hours of any denial of any accommodation's requests. This notification must include, at a minimum,

   a. The nature of the detainee's disability;

   b. The accommodation requested by the detainee;

   c. The reason for denial; and

d.  Any steps the facility has taken to address the detainee's needs.

ICE/ERO may review the facility's denial of a request for an accommodation. The facility shall provide additional information as needed to further ICE/ERO's review and shall cooperate with ICE/ERO on any additional steps that may be necessary.

## I.  **Detainee Orientation**

The facility orientation program shall notify and inform detainees about the facility's disability accommodations policy, including their right to request reasonable accommodations and how to make such a request, in a language and/or manner they can understand. The facility will post other documents for detainee awareness in detainee living areas and in the medical unit, as requested by ICE/ERO.

# Section 5:
# ACTIVITIES



## STANDARD 5.1

### CORRESPONDENCE AND OTHER MAIL

I.  **POLICY**

All facilities will ensure that detainees can send and receive correspondence in a timely manner, subject to limitations required for the safety, security, and orderly operation of the facility. Other mail will be permitted, subject to the same limitations. Each facility will make available its guidelines concerning correspondence and other mail.

II.  **STANDARDS AND PROCEDURES**

A.  **General**

The quantity of correspondence a detainee may receive or send at his or her own expense will not be limited. However, for reasons of safety, security, and the orderly operation of the facility, non-correspondence mail (such as packages and publications) may be subject to certain restrictions.

B.  **Detainee Notification**

The facility shall notify detainees in a language or manner that they understand of its policy on correspondence and other mail and shall include information on sending and receiving correspondence in the facility handbook.

At a minimum, the notification shall specify:

1.  That a detainee may receive mail, the mailing address of the facility, and instructions on how envelopes should be addressed;

2.  That a detainee may send mail, the procedure for sending mail, and instructions on how outgoing mail must be addressed;

3.  The process for inspecting general correspondence;

4.  That special correspondence may only be opened in the detainee's presence, and may be inspected for contraband, but not read;

5.  The definition of special correspondence, including instructions on the proper labeling for special correspondence;

6.  Facility policy on packages;

7. A description of mail which may be rejected by the facility and which the detainee will not be permitted to keep in his or her possession;

8. How to obtain writing implements, paper, and envelopes; and

9. The procedure for purchasing postage (if any), and the rules for providing indigent and certain other detainees free postage.

**C. <u>Processing</u>**

Detainee correspondence and other mail shall be delivered to the detainee and to the postal service on regular schedules.

Barring extraordinary circumstances, incoming correspondence shall be distributed to detainees within 24 hours of receipt by the facility. Outgoing correspondence shall be delivered to the postal service no later than the day after it is received by facility staff or placed by the detainee in a designated mail depository, excluding weekends and holidays. An exception may be made for correspondence or other mail that requires special handling for security purposes. For example, in exceptional circumstances, special correspondence may be held for 48 hours, to verify the addressee or sender.

**D. <u>Packages</u>**

Each facility shall implement policies and procedures concerning detainee packages.

**E. <u>Inspection of Incoming and Outgoing Correspondence and Other Mail</u>**

**1. General Correspondence and Other Mail**

All facilities shall implement procedures for the inspection of all incoming general correspondence and other mail (including packages and publications) for contraband.

Outgoing general correspondence and other mail may be inspected and/or read if the addressee is another detainee or if there is reason to believe the item might present a threat to the facility's secure or orderly operation, endanger the recipient or the public, or facilitate criminal activity.

**2. Special Correspondence**

"Special correspondence" is the term for detainees' written communications to or from private attorneys and other legal representatives; government attorneys; judges; courts; embassies and consulates; the president and vice president of the United States, members of Congress, the Department of Justice (including the immigration courts); the Department of Homeland Security (including ICE/ERO, IHSC, the DHS Office for

Civil Rights and Civil Liberties, and the DHS Office of the Inspector General); administrators of grievance systems; and representatives of the news media. Correspondence will only be treated as special correspondence if the title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, clearly indicating that the correspondence is special.

All facilities shall implement procedures for inspecting incoming special correspondence for contraband. Any such inspection shall be in the presence of the detainee.

Outgoing special correspondence will not be opened, inspected, or read, consistent with facility policy. If a need exists, any inspection shall be undertaken in the presence of the detainee.

Staff shall neither read nor copy incoming or outgoing special correspondence. The inspection shall be limited to the purposes of detecting physical contraband and confirming that any enclosures qualify as special correspondence

## F.  Rejection of Incoming and Outgoing Mail

All facilities shall implement policies and procedures addressing the issue of acceptable and non-acceptable mail. Procedures shall cover the rejection of incoming and outgoing mail for reasons of facility order and security. Incoming and outgoing general correspondence and other mail may be rejected by the facility to protect the security, good order, or discipline of the institution; to protect the public; or to deter criminal activity.

The affected detainees shall be notified when incoming or outgoing mail is confiscated or withheld (in whole or in part). The detainee shall receive a receipt for the confiscated or withheld item(s).

## G.  Contraband Recording and Handling

When an officer finds an item that must be removed from a detainee's mail, he or she shall make a written record.

Prohibited items discovered in the mail will be handled in accordance with Standard 2.3, "Facility Security and Control." However, at the discretion of the facility, soft contraband may be returned to the sender.

Newspaper articles that depict or describe violence in a detainee's country of origin may be relevant to a detainee's legal case and should not automatically be considered contraband.

Identity documents (passports, birth certificates, etc.) shall be turned over to ICE/ERO. A copy shall be provided to the detainee, and a copy shall be placed in the detainee's file.

**H.  Postage Allowance**

The facility shall not limit the amount of correspondence detainees may send at their own expense, except to protect public safety or facility security and order.

The facility shall provide a postage allowance at government expense for indigent detainees. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. A facility shall make a timely effort to determine indigence.

The facility shall establish procedures to provide indigent detainees the ability to mail a reasonable amount of mail each week at government expense, including the following:

1.  At least three pieces of general correspondence;

2.  At least five pieces of special correspondence or legal mail; and

3.  Packages containing personal property, when the facility determines that storage space is limited and that mailing the property is in ICE/ERO's best interest.

Free postage is generally limited to letters weighing one ounce or less, with exceptions allowed for special correspondence. In compelling circumstances, the facility may grant exceptions for general correspondence and other mail.

**I.  Writing Implements, Paper, and Envelopes**

The facility shall provide writing paper, writing implements and envelopes at no cost to detainees.

**J.  Detainees in Special Management Units**

Detainees in administrative or disciplinary segregation shall have the same correspondence privileges as detainees in the general population.

**K.  Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters**

If a detainee without legal representation requests certain services in connection with a legal matter (notary public, certified mail, etc.) and has no family member, friend, or community organization to provide assistance, the facility shall assist the detainee.

If it is unclear whether the requested service is necessary in pursuit of a legal matter, the facility should consult with ICE/ERO.

| STANDARD 5.2 |
|---|

**RECREATION**

I. **POLICY**

The facility shall provide detainees with access to recreational programs and activities, within the constraints of the safety and security of the facility.

II. **STANDARDS AND PROCEDURES**

A. **Requirements for Recreation**

1. If outdoor recreation is available at the facility, it shall be offered at a reasonable time of day. Weather permitting, each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week.

2. If only indoor recreation is available, detainees shall have access for at least one hour each day and shall have access to natural light.

3. All facilities shall provide equal access to recreational opportunities for detainees with disabilities.

4. Under no circumstances will the facility require detainees to forgo basic law library privileges for recreation privileges.

B. **Recreation Specialist**

All facilities shall have an individual responsible for the development and oversight of the recreation program.

C. **Program Content**

1. Exercise areas shall offer a variety of fixed and movable equipment.

2. Cardiovascular exercise shall be available to detainees for whom outdoor recreation is unavailable.

3. Recreational activities shall be based on the facility's size and location, and may include limited-contact sports, such as soccer, basketball, volleyball, table games, and may extend to competitions between units.

4. Dayrooms in general-population housing units will offer board games, television, leisure reading materials, and other sedentary activities.

5. All detainees participating in outdoor recreation shall have access to drinking water and toilet facilities.

6. Programs and activities are subject to the facility's security and operational guidelines and may be restricted.

7. Recreation areas shall be under continuous supervision by staff.

8. Where television or other broadcast programming is available to detainees, facilities are encouraged to provide these in Spanish and languages spoken by significant portions of the detainee population.

**D. Recreation for Special Management Unit (SMU)**

Recreation for detainees housed in the SMU shall occur separately from recreation for the general population.

Facilities are encouraged to maximize opportunities for group participation in recreation and other activities, consistent with safety and security considerations. Recreation for certain detainees may occur separate from other detainees when necessary or advisable to prevent assaults and reduce management problems.

Detainees in the SMU shall be offered at least one hour of recreation per day, scheduled at a reasonable time, at least five days per week. This privilege shall be waived only if the detainee's recreational activity would unreasonably endanger safety or security, as follows:

1. A detainee may be denied recreation privileges only with the facility administrator's written authorization.

2. The facility shall provide the detainee with written notification of the suspension of recreation privileges, the reason for the suspension, any conditions that must be met before restoration of privileges, and the duration of the suspension (assuming the requisite conditions are met).

3. Denial of recreation privileges for more than 15 days requires the concurrence of the facility administrator and a health care professional. The facility shall notify ICE/ERO when a detainee is denied recreation privileges in excess of 15 days.

**E.** **<u>Volunteer Program Involvement</u>**

A volunteer group may provide special recreational or educational programs consistent with security considerations, availability of detention personnel to supervise participating detainees, and sufficient advance notification to the facility.

## STANDARD 5.3

### RELIGIOUS PRACTICES

---

## I.  POLICY

This detention standard ensures that detainees of different religious beliefs are provided reasonable and equitable opportunities to participate in the practices of their respective faiths, limited only by a documented threat to safety, security and the orderly operation of the facility.

## II.  STANDARDS AND PROCEDURES

### A.  General

Detainees shall have the opportunity to engage in practices of their religious faith, limited only by a documented threat to safety, security, and the orderly operation of the facility.

Religious activities shall be open to the entire detainee population, without discrimination based on a detainee's race, ethnicity, religion, national origin, color, sex, sexual orientation, age, or disability.

Language services shall be provided to detainees who have limited English proficiency to provide them with access to religious activities. As needed, and consistent with Standard 4.7 "Disability Identification, Assessment, and Accommodation," accommodations will be provided to detainees with disabilities to provide them with equal access to religious services.

No one may disparage the religious beliefs of a detainee, nor coerce or harass a detainee to change religious affiliation. Attendance at all religious activities is voluntary and, unless otherwise specified by the facility, open to all.

### B.  Religious Opportunities and Limitations

When necessary for the security or good order of the facility, the facility administrator may discontinue a religious activity or practice or limit participation to a reasonable number of detainees or to members of a particular religious group after consulting with the chaplain or religious services coordinator (RSC). Facility records shall reflect the limitation or discontinuance of a religious practice, as well as the reason for such limitation or discontinuance.

C. **Religious Preferences**

ICE/ERO does not require a detainee to profess a religious belief. The facility shall record any or no religious preference during in-processing. By notifying the chaplain or other RSC, in writing, a detainee may request to change this designation at any time, and the change will be affected in a timely fashion.

D. **Chaplain/ Religious Services Coordinator**

The chaplain or individual designated as the facility religious services coordinator is responsible for managing religious activities in the facility and providing information to detainees about how to request a religious practice accommodation.

E. **Schedules and Facilities**

All facilities shall designate adequate space for religious activities that can equitably meet the needs of the detainee population. Religious service areas shall be maintained in a neutral fashion suitable for use by various faith groups. The chaplain or religious services coordinator shall schedule and direct the facility's religious activities. Current program schedules shall be posted in living units, or otherwise made available to detainees.

F. **Community Involvement (Volunteers, Contractors)**

All facilities shall have resources available for community groups that provide religious services not provided by the chaplain or facility.

G. **Introduction of New and Unfamiliar Religious Components**

Detainees may request the introduction of new or unfamiliar religious components to the facility's religious services program. In those instances when information is required regarding a specific practice, the chaplain may ask the detainee or local or national offices of the relevant religion to provide additional information to inform the decision to include or exclude the practice from the religious services program.

H. **Religious Group Assemblies**

Detainees will have the opportunity to engage in group religious activities, limited only by a documented threat to the safety, security, and orderly operation of the facility.

I. **Religious Holy Days**

A policy consistent with maintaining safety, security and the orderly operation of the facility shall be in place to facilitate the observance of important religious holy days. The facility shall facilitate the observance of important religious holy days that involve special

fasts, dietary regulations, worship, or work proscription. The chaplain or RSC will work with requesting detainees to accommodate a proper observance of the holy day.

**J.**  **Pastoral Visits**

Detainees who belong to a religious faith different from the chaplain's will, if they prefer, have access to pastoral care and counseling from external clergy and religious service providers. The facility may request documentation of the person's religious credentials, as well as a criminal background check.

**K.**  **Religious Property**

Detainees shall have access to personal religious property, consistent with facility security. Any denial of access to personal religious property and the reason for it shall be documented and placed in the detention file or maintained in a retrievable electronic format. Limited only by a documented threat to safety, security, and orderly operation of the facility, the facility administrator shall ordinarily allow a detainee to wear or use personal religious items during religious services, ceremonies, and meetings in the chapel, and may, upon request of a detainee, allow a detainee to wear or use certain religious items throughout the facility. Religious literature should be permitted in accordance with the procedures governing incoming publications.

**L.**  **Dietary Requirements**

ICE/ERO requires all facilities to provide detainees requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of the secure and orderly running of the facility. See Standard 4.1 "Food Service."

**M.**  **Detainees in Special Management Units**

Detainees in the Special Management Units (administrative, disciplinary, protective custody, or medical housing) shall be permitted to participate in religious practices, limited only by a documented threat to safety, security, and orderly operation of the facility. The chaplain or RSC shall have physical access to all areas of the facility to serve detainees.

## STANDARD 5.4

### TELEPHONE ACCESS

**I.**   **POLICY**

Facilities shall provide detainees with reasonable and equitable access to telephones.

**II.**   **STANDARDS AND PROCEDURES**

**A.**  **Detainee Access to Telephones**

The facility shall provide detainees with reasonable and equitable access to telephones during established facility waking hours, limited only by the restrictions below.

Each facility shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with all applicable state and federal regulations and be based on rates and surcharges comparable to those charged to the general public.

**B.**  **Detainee Notification**

The facility shall provide telephone access rules in the facility handbook and shall post these rules where detainees may easily see them.

**C.**  **Number of Telephones**

To ensure sufficient access, the facility shall provide at least one operable telephone for every 25 detainees.

**D.**  **Telephone Maintenance**

The facility shall maintain detainee telephones in proper working order. Appropriate facility staff shall inspect the telephones daily, promptly report out-of-order telephones to the repair service, and ensure required repairs are completed quickly.

**E.**  **Direct Calls and Free Calls**

Even if telephone service is limited to collect calls, the facility shall permit detainees to make direct, free calls to the local immigration court and the Board of Immigration Appeals; federal and state courts where the detainee is or may become involved in a legal proceeding; consular officials; legal service providers, in pursuit of legal representation or to engage in consultation concerning his or her expedited removal case; legal service providers or organizations listed on the ICE/ERO free legal service provider list; government offices, to obtain documents relevant to his or her immigration case; DHS

OIG; ICE/OPR Joint Intake Center (JIC); the ICE/ERO DRIL; UNHCR; family or friends to address a personal or family emergency, or when the detainee can otherwise demonstrate a compelling need (to be interpreted liberally). If the limitations of its existing phone system will initially preclude the facility from meeting these requirements, the facility must report this to ICE/ERO. ICE/ERO will respond by providing some means of access, e.g., cell phones into which facility staff can pre-program authorized numbers (in the above categories) with all other numbers blocked. These phones will be maintained by ICE/ERO liaison officers or local officials and calls must be provided in an environment where the detainee's conversation may not be readily overheard.

ICE/ERO headquarters shall maintain and provide Field Offices a list of telephone numbers for current free legal service providers, consulates and embassies, and the Department of Homeland Security's (DHS) Office of the Inspector General (OIG), and the ICE/ERO DRIL. All Field Offices are responsible for ensuring facilities which house ICE detainees under their jurisdiction are provided with current pro bono legal service information.

ICE/ERO can also provide access to its detainee telephone service provider which enables detainees to make free calls to all numbers on the official pro bono legal services providers list, consulates and embassies, courts, DHS hotlines, and other entities.

Staff will allow detainees to make direct, free calls as described above as soon as possible after the request, factoring in the urgency expressed by the detainee. Generally, access will be granted within eight (facility-established) waking hours of the detainee's request, excluding the hours between lights-out and morning resumption of scheduled activities. The detainee shall always be granted access within 24 hours of his or her request.

Incidents of delays extending beyond eight (waking) hours must be documented and reported to ICE/ERO.

Indigent detainees may request a call to immediate family or others in personal or family emergencies or on an as-needed basis. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten days. The facility shall make a timely effort to determine indigence.

The facility shall enable all detainees to make calls to the ICE/ERO-provided list of pro bono legal service providers and consulates at no charge to the detainee or the receiving party. If the facility requires detainees to complete a request form to make direct or free calls, assistance must be provided for illiterate or limited English proficient detainees, and to detainees with disabilities.

Facilities will make efforts where necessary to allow detainees to make legal calls and to navigate decision trees and/or leave messages when those calls are answered by an automated system.

**F.**  **Telephone Usage Restrictions**

The facility shall not restrict the number of calls a detainee places to his or her legal representatives or to obtain representation. Similarly, the facility shall not limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. If time limits are necessary for such calls, they shall be no shorter than 20 minutes, and the detainee shall be allowed to continue the call, if desired, at the first available opportunity.

The facility may place reasonable restrictions on the hours, frequency, and duration of the other direct and/or free calls listed above.

**G.**  **Telephone Privileges in Special Management Unit**

Staff shall permit detainees in the Special Management Unit for disciplinary reasons to make direct and/or free calls as described above, except under compelling security conditions. These conditions shall be documented.

Staff shall permit detainees in the Special Management Unit for administrative reasons (e.g., protective custody, suicide risk) to have telephone access similar to detainees in the general population, but in a manner consistent with the special security and safety requirements of detainees in these units.

**H.**  **Inter-facility Telephone Calls**

Upon a detainee's request, the facility shall make special arrangements permitting the detainee to speak by telephone with an immediate family member detained in another facility. Immediate family members include the detainee's spouse, co-parent, mother, father, stepparents, foster parents, brothers and sisters, and children. Reasonable limitations may be placed on the frequency and duration of such calls.

The facility shall liberally grant requests for inter-facility family calls to discuss legal matters. For such calls, the detainee's conversations shall be afforded privacy to the extent possible, while maintaining adequate security.

**I.**  **Incoming Calls**

The facility shall take and deliver telephone messages to detainees as promptly as possible. When facility staff receives an emergency telephone call for a detainee, the caller's name and telephone number will be obtained and given to the detainee as soon as possible. The detainee shall be permitted to return the emergency call as soon as reasonably possible within the constraints of security and safety—normally within eight waking hours of the incoming call, as described above. The facility shall enable indigent detainees to make a free return emergency call.

**J.** **Privacy for Telephone Calls on Legal Matters**

The facility shall ensure privacy for detainees' telephone calls regarding legal matters. For this purpose, the facility shall provide a reasonable number of telephones on which detainees can make such calls without being overheard by officers, other staff, or other detainees.

Facility staff shall not electronically monitor detainee telephone calls related to legal matters, absent a court order.

The facility shall inform detainees to contact a facility staff member if they have difficulty making a confidential call relating to a legal matter. If notified of such a difficulty, facility staff shall take measures to ensure that the call can be made confidentially. Privacy may be provided in a number of ways, including:

1. Telephones with privacy panels;

2. Placing telephones where conversations may not be readily overheard by other detainees or facility staff; or

3. Allowing detainees to use an office telephone to make confidential calls regarding their legal proceedings.

**K.** **Monitoring of Detainee Telephone Calls**

The facility shall have a written policy on the monitoring of detainee telephone calls. If telephone calls are monitored, the facility shall notify detainees of this in a language or manner that they understand and in the facility handbook provided upon admission. The facility shall also place a notice at each monitored telephone stating:

1. That detainee calls are subject to monitoring; and

2. The procedure for obtaining an unmonitored call to a court, legal representative, or for the purposes of obtaining legal representation.

A detainee's call to a court, a legal representative, or for the purposes of obtaining legal representation will not be aurally monitored absent a court order. The facility retains the discretion to monitor other calls for security purposes.

**L.** **Telephone Access for Detainees with Disabilities**

Consistent with Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall provide equal access to telephone services for individuals with disabilities. Such telephone services may include TTY devices, Accessible Telephones (telephones equipped with volume control and telephones that are hearing-aid

compatible for detainees who are deaf or hard of hearing), or videophones and video relay service or video remote interpretation service. Detainees with disabilities shall be provided access to accessible telephone services on the same terms as detainees without disabilities are provided access to telephones. Except to the extent that there are time limitations, detainees using accessible telephone services shall be granted additional time, consistent with safety and security concerns.

If accessible telephone services are not available in the same location as telephones used by detainees without disabilities, detainees with disabilities shall be allotted additional time to walk to and from the accessible telephone services location. Consistent with the order and safety of the facility, the facility shall ensure that the privacy of telephone calls by detainees using accessible telephone services is the same as other detainees using telephones.

## STANDARD 5.5

### VISITATION

I. **POLICY**

Facilities holding detainees shall permit authorized persons to visit detainees within security and operational constraints. To maintain detainee morale and family relationships, ICE/ERO encourages visits from family and friends.

Facilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants, and also with their consular officials.

In coordination with ICE/ERO, to better inform the public about ICE/ERO detention operations, facilities may permit authorized representatives of the news media and non-governmental organizations access to public information about facility operations; and with appropriate notice, to tour facilities; and, with permission from ICE/ERO and the detainee, to interview individual detainees.

Guidance regarding congressional visits to facilities can be found on ICE's public website: www.ice.gov.

II. **STANDARDS AND PROCEDURES**

A. **General**

The facility shall establish written visiting procedures, including a schedule and hours of visitation, taking into account the visitation requirements of family (including minors), friends, legal representatives, and consular officials.

The facility may temporarily restrict visiting when necessary to ensure the security and good order of the facility. Contact visits are encouraged but subject to the facility's detainee population and its physical conditions.

B. **Notification**

The facility handbook shall include visitation rules and hours. The facility shall also post the rules and hours where detainees can easily see them, including in the housing units.

Each facility shall make the schedule and procedures available to the public, both in written form on the facility's website (if available) and posted in the visitors' waiting area, and telephonically. A live voice or recording shall provide telephone callers the rules and hours for all categories of visitation. The same information will be available in the public visitation room.

**C. <u>Visitor Log</u>**

The facility shall maintain a log of all general visitors, and a separate log of legal visitors as described below. The visitation logs shall comply with local policy and procedures.

**D. <u>Incoming Property and Money for Detainees</u>**

The facility shall have written procedures regarding incoming property and money for detainees. The facility shall allow a visitor to leave money for deposit in a detainee's account. The visitor will receive a receipt for all money or property left at the facility unless it is allowed to be given directly to the detainee.

Facilities are encouraged to allow visiting family members to bring detainees items such as legal documents and papers, prescription glasses, religious items and reading materials, and wedding rings.

**E. <u>Sanctions for Violation of Visitation Rules</u>**

Any violation of the visitation rules may result in disciplinary action against the detainee, including loss of visitation privileges, through the formal disciplinary process.

Contraband introduction or violations may lead to criminal prosecution of the visitor, detainee, or both.

**F. <u>Visits by Family and Friends</u>**

**1. Hours and Time Limits**

The facility shall establish a visiting schedule based on the detainee population and the demand for visits. Visits shall be permitted during set hours on Saturdays, Sundays, and holidays. To the extent practicable, the facility shall accommodate the scheduling needs of visitors for whom weekends and holidays pose a hardship. The facility may, for example, authorize special visits for family visitors unable to visit during regular hours.

Detainees will be allowed visits on at least one weekend day. However, to the extent practicable, ICE/ERO encourages the facility to establish visiting hours for each detainee on both days of the weekend, and to try to accommodate visitors who can only visit on a specific weekend day.

The facility's written rules shall specify time limits for visits: 30 minutes minimum, under normal conditions. ICE/ERO encourages more generous limits, when possible, especially for family members traveling significant distances to visit. In unforeseen

circumstances, such as the number of visitors exceeding visiting room capacity, the facility may modify visiting periods.

Immediate family members detained at the same facility may visit with each other during normal visiting hours regardless of sex when practicable.

At facilities where there is no provision for contact visits by minors, upon request, ICE/ERO shall arrange for a contact visit by a detainee's children, stepchildren, and foster children within the first 30 days. After that time, upon request, ICE/ERO shall consider a request for transfer, when possible, to a facility that will allow such visitation. Upon request, ICE/ERO shall continue monthly visits, if transfer is not approved, or until an approved transfer can be affected.

## 2. Visitor Identification and Search

Staff shall verify each visitor's identity (through driver's license, photo identification, etc.) before admitting him or her to the facility. Photo identification must be a valid state or government-issued photo identification. No adult visitor shall be admitted without positive identification.

The facility may require a pat search as well as a visual inspection of purses, briefcases, packages and other containers. Any cancellation of visitation shall conform to facility policy and be documented.

## 3. Contact Visits

Written procedures shall detail the limits and conditions of contact visits in facilities permitting them.

A facility may only adopt a policy permitting strip searches after all contact visits in the absence of reasonable suspicion if detainees have the right to choose non-contact visitation instead. Detainees must be fully informed of that option and the policy generally in a language or manner they understand. The facility must document all strip searches that are performed based on such policy.

## 4. Visits for Administrative and Disciplinary Segregation Detainees

A detainee shall ordinarily retain visiting privileges while in administrative or disciplinary segregation. In a facility that allows contact visits, segregated detainees may use the visiting room during normal visiting hours.

Under no circumstances are detainees to participate in general visitation while in restraints. If the detainee's behavior warrants restraints, the visit will not be granted.

**G. Visits by Legal Representatives and Legal Assistants**

**1. General**

During legal visitation, each detainee may meet privately with current or prospective legal representatives and their legal assistants.

**2. Hours**

The facility shall permit legal visitation seven days a week, including holidays. It shall permit legal visits for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays.

The facility shall provide notification of the rules and hours for legal visitation and post the rules prominently in the visiting room. On regular business days, legal visitations may proceed through a scheduled meal period. In such cases, the detainee shall receive a tray or sack meal after the visit.

**3. Persons Allowed to Visit**

Subject to the restrictions stated below, individuals in the following categories may visit detainees to discuss legal matters:

a. Attorneys and Other Legal Representatives

An attorney is any person who is a member in good standing of the bar of the highest court of any state, possession, territory, commonwealth or the District of Columbia, and is not under an order of any court suspending, enjoining, restraining, disbarring or otherwise restricting him or her in the practice of law.

A legal representative is an attorney or other person representing another in a matter of law, including law students or law graduates not yet admitted to the bar under certain conditions; Executive Office for Immigration Review accredited representatives; and accredited officials and attorneys licensed outside the United States. *See* 8 C.F.R. § 292.1 for more detailed definitions of these terms.

b. Legal Assistants

Upon presentation of a letter of authorization from the legal representative under whose supervision he or she is working, an unaccompanied legal assistant may meet with a detainee during legal visitation hours. The letter shall state that the named legal assistant is working on behalf of the supervising legal representative for purposes of meeting with the detainee(s).

    c.  <u>Translators and Interpreters</u>

The facility shall permit translators and interpreters to accompany legal representatives and legal assistants on legal visits. Translators and interpreters shall undergo the regular security clearance process.

    d.  <u>Messengers</u>

The facility shall permit messengers (who are not legal representatives or legal assistants) to deliver documents to and from the facility, but not to visit detainees.

## 4.  Identification of Legal Representatives and Assistants

Prior to each visit, all legal representatives and assistants shall be required to provide appropriate identification, such as a bar card from any state, a document demonstrating partial or full accreditation from the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR), or a letter of authorization from the legal representative or attorney under whose supervision the individual is working as detailed above.

If such documentation is not readily available to attorneys licensed in a particular state, they will be required to indicate where they are licensed as an attorney and how that fact may be verified.

Legal representatives and legal assistants shall not be asked to state the legal subject matter of the meeting.

A legal representative or legal assistant shall be subject to a search of his or her person and belongings for the purpose of ascertaining the presence of contraband at any time.

## 5.  Identification of Detainee to Be Visited

The facility shall not require legal service providers to submit a detainee's A-number as a condition of visiting. The facility shall make a good-faith effort to locate a detainee if provided with other information about the detainee.

## 6.  Call-Ahead Inquiries

Each facility shall establish a written procedure to allow legal service providers and legal assistants to telephone the facility in advance of a visit to determine whether a particular individual is detained in that facility.

7. **Pre-Representational and Other Legal Meetings**

During the regular hours for legal visitation, the facility shall permit detainees to meet with prospective and current legal representatives and legal assistants.

Legal service providers need not complete a Form G-28 (stating that they are the legal representatives of the detainee) to meet with a detainee.

8. **Private Meeting Room and Interruption for Head Counts**

Visits between legal service providers (or legal assistants) and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

Facility staff may terminate attorney visits to maintain security. Routine official counts shall not terminate attorney visits.

Facility staff shall not be present in the confidential area during the attorney-detainee meeting unless the attorney requests the presence of an officer. However, staff may observe such meetings visually through a window or camera to the extent necessary to maintain security, as long as the staff member cannot overhear the conversation.

On occasion, a situation may arise where private conference rooms are in use and the attorney wishes to meet in a regular or alternate visiting room. Such requests should be accommodated to the extent practicable, and such meetings should be afforded the greatest degree of privacy possible under the circumstances.

9. **Materials Provided to Detainees by Legal Representatives**

The facility's written legal visitation procedures must provide for the exchange of documents between detainee and legal representative (or legal assistant) even when contact visitation rooms are unavailable.

Documents or other written material provided to a detainee during a visit with a legal representative shall be inspected, but not read. Detainees are entitled to retain legal material received for their personal use. Quantities of blank forms or self-help legal material in excess of that required for personal use may be held for the detainee in their property. The detainee will be permitted access to these documents utilizing the established avenues of communication.

10. **Detainee Search**

Generally, unless there is specific and articulable suspicion that contraband has been transferred to a detainee, detainees shall not be subjected to a strip search after a visit

by a consular representative, an attorney, a legal assistant working under the supervision of an attorney, or an accredited representative.

However, if standard operating procedures require strip searches after every contact visit with a legal representative, the facility must provide an option for non-contact visits with legal representatives in an environment that allows confidentiality. In that case, the facility will establish a mechanism for the detainee and his or her representative to exchange documents.

### 11. Legal Visitation for Detainees in Administrative and Disciplinary Segregation

Detainees in either administrative or disciplinary segregation shall be allowed legal visitation. If the facility administrator considers special security measures necessary, he or she will notify legal service providers of the security concerns prior to the meeting.

### 12. Group Legal Meetings

Upon the request of a legal service provider (or assistant), the facility may permit a confidential meeting (with no officer present) involving the requester and two or more detainees. This may be for various purposes: pre-representational, representational, removal-related, etc. The facility should grant such requests to the greatest extent practicable, i.e., if it has the physical capacity; if the meeting would not unduly interfere with security and good order, etc.

See also Standard 6.4 "Legal Rights Group Presentations."

### 13. Pro Bono List and Detainee Sign-Up

ICE/ERO shall provide the facility with the official list of pro bono legal services providers on a regular basis. The facility shall post the current list in detainee housing units and other appropriate areas. Any legal organization or individual on the current list may write the facility to request the posting and/or general circulation of a sign-up sheet. The facility will then notify detainees of the sign-up sheet's availability in a language or manner that they understand and, according to established procedures, ensure coordination with the pro bono organization.

### 14. Legal Visitation Log

A separate log shall record all legal visitors, including those denied access to the detainee. The log shall include the reason(s) for denying access.

### 15. Availability of Legal Visitation Policy

The facility's written legal visitation policy shall be available upon request.

## H. **Consultation Visits for Detainees Subject to Expedited Removal**

### 1. General

A detainee subject to expedited removal who has been referred to an Asylum Officer is entitled by statute and regulation to consult with any persons of the detainee's choosing, both prior to the interview and while the Asylum Officer's decision is under review.

Because expedited removal procedures occur within short timeframes, each facility shall develop procedures that liberally allow the opportunity for consultation visitation in accordance with this standard.

### 2. Method of Consultation

The facility shall facilitate consultation visitation, both by telephone and face-to-face.

### 3. Persons Allowed to Visit for Consultation Purposes

Detainees subject to expedited removal may consult whomever they choose, in person or by phone, at any time, during the first 48 hours at the facility. Consultants might include, but are not limited to, attorneys and other legal representatives, prospective legal representatives, legal assistants, staff members of non-governmental organizations (NGOs), and friends and family.

All consultation visitors are subject to the same identification and security screening procedures as general visitors. If documented security concerns preclude an in-person visit with a particular individual, the facility shall arrange for consultation by telephone. If security reasons also preclude consultation by telephone, the facility shall immediately inform ICE/ERO.

### 4. Privacy

Consultation visits, in person or by telephone, receive the same privacy as communications between legal representatives and detainees.

### 5. Hours

Consultation visitation shall be allowed during legal visitation hours and during general visitation hours. However, the facility may ensure confidentiality during legal visitation hours only.

If necessary to meet demand, the facility will increase consultation visiting hours.

6. **Duration of Consultation Period**

As stated above, the consultation visitation period begins before any interview with an Asylum Officer and continues while the Asylum Officer's determination undergoes review by the Supervisory Asylum Officer or Immigration Judge.

The consultation visitation period ends with the issuance of a Notice to Appear, and the detainee's placement in removal proceedings before an Immigration Judge. However, the detainee retains legal and other visitation privileges, in accordance with this detention standard.

7. **Admittance for Asylum Officer Interview**

Detainees subject to Expedited Removal may bring and consult advisors during the Asylum Officer interview. The presence of persons to consult is also allowed during the Immigration Judge's review of a negative credible fear determination, at the judge's discretion.

8. **Log**

The legal visitation log shall record consultation visits.

9. **Form G-28**

Visitors are not required to file a Form G-28 as a condition of participating in a consultation visit or providing consultation during an Asylum Officer interview or Immigration Judge review of a negative credible fear determination. This applies even if the visitor is an attorney or legal representative.

## I. <u>Consular Protection</u>

In accordance with the Vienna Convention on Consular Relations of 1963 and 8 C.F.R. § 236.1(e), detainees must be advised of their right to consular access, and the ICE/ERO must facilitate this access. ICE/ERO policy and practice require that detention facilities provide all detained individuals with notice of their rights to contact their consular representative(s) and receive visits from their consular officer(s). Additional information about consular notification and access is available online at http://travel.state.gov/CNA.

The facility shall ensure that all detainees are notified of and afforded the right to contact and receive visits from their consular officers. Such notifications shall be provided in a language or manner the detainees understand. The same hours, privacy, and other conditions that govern legal visitation apply to consular visitation. Consular visits may be permitted at additional times outside normal visitation hours with the facility's prior authorization. To conduct such visits, consular officers must present identification issued by the U.S. Department of State.

**J.  Non-Government Organization Visitation with Detainees and Tours of Facilities**

All requests by NGOs and other organizations for tours and/or visits must be submitted in writing to ICE/ERO. The request will state the exact reason for the visit and issues to be discussed. When deciding whether to approve or deny the request, ICE/ERO will take into consideration facility safety and security, and the availability of personnel to staff the tour, visitation, or tour with visitation. Access will not be denied based on the political or editorial viewpoint of the requestor.

If approved by ICE/ERO, the facility should accommodate requests in a timely manner. Tours will be scheduled at the convenience of the facility so as not to disrupt normal operations and will comply with facility security requirements.

All participants in tours or detainee visitation must provide personal information to facilitate a mandatory background check, allowing sufficient time for completion prior to entry to the facility.

**K.  Visits from Representatives of Community Service Organizations**

The facility, in coordination with ICE/ERO, may approve visits to one or more detainees by representatives of community service organizations, including civic, religious, cultural, therapeutic, and other groups. Visiting procedures shall conform with the facility's visitor policy.

**L.  News Media Interviews of Detainees**

**1.  General**

ICE/ERO supports public access to non-classified and non-confidential information about its operations in the interest of an informed public and an accountable government.

Visits must be coordinated with ICE/ERO. Interviews by reporters, academics conducting research, and others not included in other visitation categories must be approved by ICE/ERO.

**2.  Detention Facility Visits/Tours**

Media representatives may tour facilities that house detainees for the purpose of preparing reports about the facilities. Facility tours shall be approved by ICE/ERO and the facility. When deciding whether to approve or deny the request, ICE/ERO will take into consideration safety and security, and the availability of personnel to staff the tour or provide security for the interview. ICE/ERO and the facility will coordinate on final approvals. Access will not be denied based on the political or editorial viewpoint of the requestor.

Following ICE/ERO approval, media representatives shall make advance appointments with the facility for visits/tours.

News organizations interested in detainee issues shall abide by the policies and procedures of the facility being visited or toured.

The facility shall advise both media representatives and detainees that use of any detainee's name, identifiable photo, or recorded voice requires his or her prior permission. Such notice to detainees shall be provided in a language or manner that they understand. Media representatives shall obtain a signed release from the detainee before photographing or recording his or her voice and the facility shall retain the signed release(s) in the detainee's detention file or retrievable electronic record.

Detainees have the right not to be photographed (still, movie, or video), and not to have their voices recorded by the media. If the presence of video, film, or audio equipment or personnel would likely cause a disruption within the facility, the facility may limit or prohibit such equipment or personnel. For example, ICE/ERO might limit the equipment to hand-held cameras or recorders.

### 3. Personal Interviews

A media representative planning to conduct a personal interview at a facility shall submit a written request to ICE/ERO, preferably 48 hours and no less than 24 hours prior to the time slot requested. ICE/ERO may waive the 24-hour rule if convinced of the need for urgency.

ICE/ERO will inform the detainee of the interview request; the detainee must indicate his or her willingness to be interviewed by signing a consent form before ICE/ERO begins to consider the request. The signed consent form shall be retained in the detainee's detention file or retrievable electronic record.

Interviews will take place during normal business hours in a location determined by the facility. The facility will provide a location conducive to the interviewing activity, consistent with security and good order. ICE/ERO may limit the number of interviews with a particular detainee to a reasonable number per month. Further, if interviews are imposing a serious strain on staff or facility resources, ICE/ERO may restrict the time allotted to interviews.

ICE/ERO reserves the right to monitor and/or supervise, but not participate in, detainee interviews.

A media representative interested in touring the facility and photographing or recording other detainees in conjunction with an individual interview must follow all applicable facility procedures.

4. **Press Pools**

When ICE/ERO and the facility determine the volume of interview requests warrants such action, a press pool may be established. All material generated from such a press pool shall be available to all news media, without right of first publication or broadcast.

The facility will notify all media representatives with pending interviews, tours/visits, or requests that, effective immediately and until further notice, all media representatives must comply with the press pool guidelines established by ICE/ERO.

ICE/ERO will, upon request, provide the media information about a detainee provided it is a matter of public record and not protected by privacy laws or ICE/ERO policy. Security and safety concerns for staff and detainee(s) require that removal-related data remain confidential.

5. **Special Conditions**

The media representative shall certify that he or she is familiar with, and accepts, the rules and regulations governing media conduct during facility interviews and visits.

Media representatives must comply with the facility's rules and regulations. The routine processing of detainees shall take precedence over media interviews. A media request shall not delay or otherwise interfere with the in-processing or departure of any detainee.

## M. **Other Special Visits**

1. **Law Enforcement Officials' Visits**

Facility visitation procedures shall address law enforcement officials requesting interviews with detainees.

2. **Visitation by Former Detainees or Aliens in Proceedings**

Former ICE/ERO detainees, individuals with criminal records, and individuals in removal proceedings shall not be automatically excluded from visiting. Individuals in any of these categories must notify the facility before registering for visitation privileges. The facility shall weigh the nature and extent of an individual's criminal record and/or prior conduct against the benefits of visitation in determining visitation privileges.

3. **Business Visitors**

A detainee shall not actively engage in business or professional interests or activities. A detainee engaged in a business or profession prior to detention should assign

authority for its daily operation to a person in the community. However, in the event that a detainee must make a decision that will substantially affect the assets or prospects of a business, the facility may permit a special visit.

## 4.  Examinations by Independent Medical Service Providers and Experts

A medical and/or psychological examination by a practitioner or expert not associated with ICE/ERO or the facility can provide a detainee with information useful in legal or administrative proceedings. Therefore, ICE/ERO will generally approve examinations for such purposes, if the requested examination would not present an unreasonable security risk.

If a detainee seeks an independent medical or physical examination, he or she (or the legal representative) shall submit a written request to ICE/ERO. The request must provide the reason(s) for requesting such an examination.

The facility shall provide a location for an independent examination approved by ICE/ERO but will not provide medical equipment or supplies. Neither ICE/ERO nor the facility shall assume the costs of the examination, which shall be at the detainee's expense. The examination will be arranged and conducted in a manner consistent with security and good order. ICE/ERO will advise the requester, in writing, of any reasons for denying a request.

## STANDARD 5.6

### VOLUNTARY WORK PROGRAM

---

**I.     POLICY**

Where allowed by the facility, detainees may participate in a work program to earn money. While working, detainees shall have basic Occupational Safety and Health Administration (OSHA) protections.

**II.     STANDARDS AND PROCEDURES**

**A.   Voluntary Work Program**

Where available, detainees may participate voluntarily in any facility work program.

The detainee's classification level will determine the type of work assignment for which he or she is eligible.

**B.   Voluntary Special Details**

Detainees may volunteer for temporary work details that occasionally arise. The work, which generally lasts from several hours to several days, can involve digging trenches, removing topsoil, and other labor-intensive work. High custody detainees will not, under any circumstances, work outside the secure outer perimeter.

**C.   Detainee Selection**

The facility shall develop site-specific rules for selecting work detail volunteers.

**D.   Discrimination in Hiring Detainee Workers**

Detainees shall not be denied voluntary work opportunities on the basis of such factors as a detainee's race, religion, national origin, color, sex, sexual orientation, age, or disability.

**E.   Detainees with Disabilities**

The facility shall allow, where possible, detainees with disabilities to participate in the voluntary work program in appropriate work assignments. Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall provide reasonable accommodations and modifications to its policies, practices, and/or procedures to ensure that detainees with disabilities have an equal opportunity to access, participate in, and benefit from the voluntary work programs.

**F. <u>Hours of Work</u>**

Detainees participating in the voluntary work program are required to work according to a fixed schedule of no more than 8 hours daily and 40 hours weekly.

**G. <u>Work Restrictions</u>**

The facility may restrict the number of work details permitted a detainee during one day.

**H. <u>Compensation</u>**

Detainees shall receive monetary compensation of not less than $1.00 per day for work completed in accordance with the facility's standard policy. Detainees will be paid owed wages prior to transfer or release.

**I. <u>Removal of Detainee from Work Detail</u>**

A detainee may be removed from a work detail for cause. Upon removing a detainee from a work detail, the facility shall place a written justification in the detainee's detention file or in a retrievable electronic record.

**J. <u>Detainee Responsibility</u>**

The facility will establish procedures for informing detainee volunteers about on-the-job responsibilities and reporting procedures.

Detainees will use safety equipment and other precautions in accordance with the work supervisor's instructions.

**K. <u>Detainee Training and Safety</u>**

All detention facilities shall comply with all applicable health and safety regulations and standards.

The facility shall ensure that all department heads develop appropriate training for all detainee workers.

1. Upon the detainee's assignment to a job or detail, the supervisor shall provide thorough instructions regarding safe work methods and, if relevant, hazardous materials. The detainee shall undertake no assignment before signing a voluntary work program agreement. Among other things, by signing the agreement the detainee confirms he or she has received and understood training about the assigned job from the supervisor. This agreement will be placed in the detainee's detention file or retrievable electronic record.

2. Medical staff will ensure detainees are medically screened and certified before undertaking a food service assignment.

3. The facility will provide detainees with safety equipment that meets OSHA and other standards associated with the task performed.

**L. <u>Detainee Injury and Reporting Procedures</u>**

The facility shall implement procedures for immediately and appropriately responding to on-the-job injuries, including immediate notification of ICE/ERO.

# Section 6: JUSTICE



## STANDARD 6.1

### DETAINEE HANDBOOK

I. **POLICY**

Each facility will develop a site-specific handbook to serve as an overview of, and guide to, the rules and procedures in effect at the facility. The handbook will also describe the services, programs, and opportunities available through various sources, including the facility. Every detainee will receive a copy of this handbook upon admission to the facility along with a copy of the ICE/ERO National Detainee Handbook.

Detainees are expected to behave in accordance with the rules articulated in the handbook and will be held accountable for violations. Therefore, the facility staff will advise every detainee to become familiar with the material in the handbook and ensure the information is provided in a language or manner the detainee can understand.

II. **STANDARDS AND PROCEDURES**

A. The facility will have a local handbook known as the "facility handbook."

B. The facility handbook will specify in detail the rules, regulations, policies, and procedures with which every detainee must comply and include information about available services such as: personal hygiene rules, recreation, correspondence and other mail, visitation, library/legal access, telephone use, sexual abuse and assault prevention and intervention program, disability accommodations, restricted areas, contraband, housekeeping, disciplinary rules and sanctions, grievance and appeal procedures, health care access, religious services, canteen and commissary, property, and so forth.

C. The handbook will be written in English and translated into Spanish and other prevalent language(s) among the facility's detainee population, as appropriate. Oral interpretation or assistance shall be provided to any detainee who speaks another language into which written material has not been translated or who is illiterate. Consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," the facility shall also provide auxiliary aids and services (e.g., qualified sign language interpreters) or other accommodations to ensure the effective communication of the content of the handbook to detainees with disabilities.

D. The facility will provide a copy of the handbook to every staff member who has contact with detainees. These staff members will also receive training focused on its contents.

E. The facility will review the handbook annually.

F.  The facility will document and maintain a detainee acknowledgement of receipt of the ICE/ERO National Detainee Handbook and facility handbook.

## STANDARD 6.2

### GRIEVANCE SYSTEM

## I. POLICY

Every facility will develop and implement policy and procedures that address detainee grievances. Among other things, each facility must establish a process to review formal complaints and a reasonable time limit for processing, investigating, and responding to grievances and providing written responses to detainees who filed formal grievances, including the basis for the decision. The facility must also prescribe procedures applicable to emergency grievances. All grievances shall receive supervisory review. Facility policies must include guarantees against reprisal.

## II. STANDARDS AND PROCEDURES

### A. Grievance Procedure

#### 1. Informal/Oral Grievance

The facility shall make every effort to resolve a detainee's complaint or grievance at the lowest level possible, in an orderly and timely manner. Each facility will institute procedures for informal resolution of oral grievances.

The detainee is always free to bypass or terminate the informal grievance process and proceed directly to the formal grievance stage.

Facilities shall ensure that detainees with disabilities have equal opportunity to access and participate in the grievance system, including by allowing for effective communication, which can include the provision of auxiliary aids and services, throughout the process.

Facilities shall ensure access to the oral grievance process for LEP detainees who are filing oral grievances, including through the provision of interpretation and translation services.

#### 2. Formal/Written Grievance

The facility must allow the detainee to submit a formal, written grievance to the facility's grievance committee. The detainee may take this step because he or she is not satisfied with the outcome of the informal process, or because he or she decides to forgo the informal procedures. The detainee has the responsibility to use this process in good faith and in an honest and straightforward manner. The facility shall not impose a time

limit on when a detainee may submit a formal grievance regarding an allegation of sexual abuse.

The detainee shall be given the opportunity to obtain assistance from another detainee, the housing officer or facility staff, family members, or legal representatives in preparing a grievance. Staff shall take reasonable steps to expedite requests for assistance from these other parties.

a. Barring extraordinary circumstances, grievances shall be addressed within five business days.

b. Medical grievances shall be promptly referred to and answered by the medical department.

c. The facility shall provide accommodations and/or assistance with filling out a grievance for detainees with a disability, who are illiterate, or who are limited English proficient.

No one against whom a grievance is made shall be responsible for adjudicating the grievance.

**B. <u>Emergency Grievances</u>**

Each facility shall implement procedures for identifying and handling an emergency grievance. An emergency grievance involves an immediate threat to a detainee's health, safety, or welfare. When a staff member determines that a detainee is raising an issue requiring urgent attention, the facility's emergency grievance procedures apply.

**C. <u>Appeal</u>**

If the detainee does not accept the grievance decision, he or she may appeal it. All facilities shall implement procedures for addressing detainee appeals.

Facilities must allow any detainee dissatisfied with the facility's response to his or her grievance to communicate directly with ICE/ERO.

**D. <u>Retaliation</u>**

Staff will not harass, discipline, punish, disclose sensitive information about, or otherwise retaliate against a detainee lodging a complaint. However, if an individual establishes a pattern of filing nuisance complaints or otherwise abusing the grievance system, staff may refuse to process subsequent complaints but will notify ICE/ERO of any detainee determined to be filing nuisance grievances.

**E. Recordkeeping and File Maintenance**

Each facility will devise a method for documenting detainee grievances. At a minimum, the facility will maintain a Detainee Grievance Log.

A copy of the grievance will remain in the detainee's detention file, or in a retrievable electronic archive, where appropriate, for at least three years.

**F. Allegations of Officer Misconduct**

The facility must forward all detainee grievances containing allegations of staff misconduct to ICE/ERO.

**G. Allegations of Sexual Abuse**

If a detainee files a grievance related to a sexual abuse claim, the facility shall issue a decision on the grievance within five days of receipt and shall respond to an appeal of the grievance decision within 30 days. (A report of all such grievances must be sent directly to the ICE/ERO FOD.)

Facilities shall not impose a time limitation for detainees to file a sexual abuse and assault grievance.

**H. Detainee Handbook**

The grievance section of the facility handbook will provide notice of the following:

1. The opportunity to file a grievance, both informal and formal.

2. The procedures for filing a grievance and appeal, including the availability of assistance in preparing a grievance.

3. The procedures for resolving a grievance or appeal, including the right to have the grievance referred to higher levels if the detainee is not satisfied that the grievance has been adequately resolved.

4. Notice that staff may not harass, discipline, punish, or otherwise retaliate against any detainee for filing a grievance.

## STANDARD 6.3

### LAW LIBRARIES AND LEGAL MATERIALS

I. **POLICY**

Facilities shall permit detainees access to a law library, and provide legal materials, facilities, equipment, printing and copying privileges, and the opportunity to prepare legal documents.

II. **STANDARDS AND PROCEDURES**

A. **Law Library**

The facility shall provide a law library in a designated room, or if facility design prevents a specific room for a designated law library, a suitable area will be identified. The area or room will have sufficient space and resources to facilitate detainees' legal research and writing.

B. **Equipment**

The law library shall provide the following to enable detainees to prepare documents and conduct research for legal proceedings:

1. An adequate number of computers for electronic legal research;

2. A printer or the ability to print.

3. A copier or the ability to make copies;

4. Writing implements and paper

The facility shall designate an employee with responsibility to inspect the equipment at least weekly and ensure that it is in good working order, and to stock sufficient supplies.

C. **Holdings**

ICE/ERO shall provide each facility an electronic version of required ICE/ERO law library reference materials. The facility shall post a list of its holdings in the law library and/or make a list of holding available electronically.

**D.  Materials from Outside Persons or Organizations**

Outside persons and organizations may submit published or unpublished legal material for inclusion in a facility's law library. If the material is in a language other than English, an English translation must be provided.

If the facility receives published and/or unpublished immigration-related material for inclusion in the law library, it must immediately forward the material to ICE/ERO for review and approval.

ICE/ERO, in coordination with the ICE Office of the Principal Legal Advisor, shall review materials and issue an approval or denial generally within 45 days. The submitter will be notified of denials.

**E.  Updating/Replacing Legal Materials**

ICE/ERO will provide updated electronic materials to facilities on a regular basis.

The facility shall designate an employee with responsibility for updating legal materials, inspecting them weekly, maintaining them in good condition, and replacing them promptly as needed. The facility shall notify the designated contact person at ICE/ERO if anticipated updates are not received. The facility shall update electronic media when it receives new materials.

Damaged materials shall be promptly replaced. The facility may obtain replacements by contacting the designated coordinator at ICE/ERO.

If materials submitted by outside organizations need to be replaced, the facility will contact ICE/ERO to obtain replacements from the submitting organization.

**F.  Hours of Access**

The facility shall devise a flexible schedule to permit all detainees, regardless of housing or classification, to use the law library on a regular basis. Each detainee shall be permitted to use the designated law library for a minimum of five (5) hours per week during a reasonable time of day. Detainees may not be forced to forgo their minimal recreation time, as provided in Standard 5.2 "Recreation," to use the law library. Detainee requests for additional time in the law library shall be accommodated to the extent possible, consistent with the orderly and secure operation of the facility. Special priority should be given to requests for additional library time when a detainee is facing an imminent court deadline.

**G.  Requests for Additional Legal Material**

Detainees who require additional legal material not available in the law library may request additional information. The facility shall inform ICE/ERO of the request as quickly as possible.

Requests from detainees who are facing imminent deadlines will receive priority. Requests for copies of court decisions will normally be met within three business days, with reasonable timeframes for other requests.

**H.  Photocopying and Printing Legal Documents**

The facility shall ensure that detainees can obtain copies of legal material when such copies are reasonable and necessary for a legal proceeding involving the detainee. This may be accomplished by providing detainees with access to a copier or printer, or by making copies upon request. Detainees may not be charged for copying or printing a reasonable amount of legal material.

The number of copies of documents to be filed with a particular court, combined with the number required for ICE/ERO records and at least one copy for the detainee's personal use will determine the number of photocopies required. Requests for photocopies of legal material may be denied only if:

1.  The document(s) might pose a risk to the security and orderly operation of the detention facility;

2.  There are other legitimate security reasons;

3.  Copying would constitute a violation of any law or regulation; or

4.  The request is clearly abusive or excessive.

Staff may not read a document that on its face is clearly related to a legal proceeding involving the detainee.

**I.  Assistance from Facility Staff and Other Detainees**

**1.  Assistance from Facility Staff**

Facility staff shall provide assistance to detainees in accessing legal materials where needed (e.g., orientation to written or electronic media and materials; assistance in accessing related programs, forms and materials).

**2.  Assistance from Other Detainees and Volunteers**

The facility shall permit detainees to assist other detainees in researching and preparing legal documents upon request, except when such assistance poses a security risk. Such assistance is voluntary, and no detainee shall be allowed to charge a fee or accept anything of value for assistance.

Facilities may allow outside volunteers and programs to assist or help detainees access legal materials.

**J.   Assistance to Detainees with Disabilities, Limited English Proficient (LEP) Detainees, and Illiterate Detainees**

Detainees with disabilities, LEP detainees, and illiterate detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who request assistance or otherwise indicate difficulty accessing or comprehending the legal materials, must be provided assistance beyond access to a set of English-language law books.

The facility shall assist detainees who are illiterate, LEP, or have disabilities in using the law library. Facilities shall establish procedures to meet this requirement, such as:

1.  Having the facility's law librarian assist the detainee with legal research;

2.  Permitting the detainee to receive assistance from other detainees in using the law library;

3.  Assisting the detainee in contacting pro bono legal-assistance organizations from the ICE/ERO-provided list; and

4.  In securing interpretation or translation services for an LEP detainee;

5.  in the case of detainees with disabilities, consistent with the procedures outlined in Standard 4.7 "Disability Identification, Assessment, and Accommodation," providing reasonable accommodations and/or auxiliary aids and services identified through the facility's reasonable accommodation process.

If such attempts are unsuccessful in providing the detainee sufficient assistance, the facility shall contact ICE/ERO to determine appropriate further action.

**K.   Personal Legal Materials**

The facility shall permit detainees to retain all personal legal material upon admittance to the general population or segregation, unless such material creates a safety, security, and/or sanitation hazard. The facility may require detainees with a large amount of personal legal material to place some of the material in a personal property storage area, with access permitted during designated hours. The facility shall grant requests for access to such stored legal material as soon as possible, but not later than 24 hours after receipt of the detainee request, unless documented security concerns preclude action within this time frame.

**L.   Law Library Access for Detainees in Special Management Units**

Detainees housed in Administrative Segregation or Disciplinary Segregation units shall have the same law library access as the general population, unless compelling security concerns require limitations.

Facilities may supervise the library use by a detainee housed in a special management unit as warranted by the individual's behavior and attitude. Detainees segregated for protection may be required to use the law library separately or, if feasible, have legal material brought to them. Violent or uncooperative detainees may be temporarily denied access to the law library if necessary to maintain security, until such time as their behavior and attitude warrants resumed access. In some circumstances, legal material may be brought to individuals in disciplinary segregation.

Denial of access to the law library must be supported by compelling security concerns, must be for the shortest period required by security, and must be fully documented in the special management housing logbook. A detainee shall not be denied access to law libraries and legal materials as a disciplinary measure, reprisal, retaliation, or penalty. ICE/ERO must be notified every time access is denied.

**M. <u>Envelopes and Stamps for Legal Documents</u>**

The facility will provide indigent detainees with free envelopes and stamps for mail related to a legal matter, including correspondence to a legal representative, potential legal representative, or any court. Indigent detainees will be permitted to mail a reasonable amount of mail each week, including at least five pieces of special correspondence and three pieces of general correspondence.

**N. <u>Notaries, Certified Mail, and Miscellaneous Needs Associated with Legal Matters</u>**

The facility shall provide assistance to any detainee who requests a notary public, certified mail, or other such services to pursue a legal matter, and if the detainee is unable to meet the need through a family member, friend, or community organization.

**O. <u>Retaliation Prohibited</u>**

Detainees may not be subjected to reprisals, retaliation, or penalties because of a decision to seek judicial relief on any matter, including:

1. The legality of their confinement;

2. The legality of conditions or treatment while under detention;

3. An issue relating to their immigration proceedings; or
4. Any allegation that the Government is denying rights protected by law.

**P. <u>Notice to Detainees</u>**

The facility shall provide detainees with the rules and procedures governing access to legal materials, communicating their content in a language or manner the detainees understand. Such rules and procedures shall include the following information:

1. The scheduled hours of access to the law library;

2. The procedure for requesting access to the law library;

3. The procedure for requesting additional time in the law library (beyond the five hours per week minimum);

4. The procedure for requesting legal reference materials not maintained in the law library; and

5. The procedure for notifying the facility about concerns with legal access.

## STANDARD 6.4

### LEGAL RIGHTS GROUP PRESENTATIONS

---

## I.    POLICY

Facilities shall permit authorized persons to make presentations to groups of detainees for the purpose of informing them of U.S. immigration law and procedures, consistent with the security and orderly operation of each facility. ICE/ERO encourages such presentations, which instruct detainees about the immigration system and their rights and options within it.

## II.    STANDARDS AND PROCEDURES

### A.    Requests to Make Group Presentations on Legal Rights

Attorneys and legal representatives (including EOIR accredited representatives) interested in making a group presentation on legal rights must submit a written request to ICE/ERO.

Legal assistants/paralegals may conduct a group presentation on legal rights, if the supervising attorney/legal representative is present or he/she prepares a letter identifying the presenter(s) and affirming that the supervisory relationship directly relates to the presentation. The authorizing letter must be presented to ICE/ERO before the presentation can take place.

### B.    Scheduling Presentations

ICE/ERO will notify the facility upon approving a group presentation. The facility will contact the designated party to arrange a mutually acceptable date and time for the presentation. Presentations will be scheduled during normal legal visiting hours, excluding weekends and holidays. If feasible, group presentations may be conducted daily, immediately before detainees' first Immigration Court appearance.

The facility is not required to arrange presentations for detainees; however, facilities are required to coordinate ICE/ERO approved presentations

### C.    Detainee Notification and Attendance

At least 48 hours before a scheduled presentation, informational posters shall be prominently displayed in detainee housing units, and each housing unit officer will maintain a sign-up sheet. Detainees planning to attend may register on the sign-up sheet kept by a designated employee.

Presentations are open to all detainees, regardless of the presenter's intended audience, except when a particular detainee's attendance would pose a security risk. If a detainee in segregation cannot attend for this reason, either the detainee or the presenter(s) may request alternative arrangements.

The facility may limit the number of detainees at a single session. Therefore, the presenter must be prepared to conduct several presentations, depending on the number of interested detainees or the need to separate groups of detainees for safety and security. The presenter may contact the facility the day before the presentation to determine the number of sessions required.

### D. <u>Entering the Facility</u>

The facility shall require all persons seeking entry to present identification in accordance with local policy.

The facility shall admit interpreters to assist attorneys and other legal representatives. ICE/ERO will not be responsible for providing interpreters for presenters.

### E. <u>Presentation Guidelines</u>

The facility shall select and provide an environment conducive to the presentation, consistent with security. Once detainees have assembled, the presenters will have a minimum of one hour to make the presentation and to conduct a question-and-answer session.

The facility may require presenters to abide by all rules and regulations for visitors to the facility. Presentations will be conducted in a manner consistent with the security and orderly operation of the facility. Presenters shall not charge a fee nor solicit business during any presentation.

### F. <u>Written Materials</u>

Presenters may distribute brief written materials to detainees and to ICE/ERO and/or facility staff at the same time. These materials must have been approved in advance by ICE/ERO. Distribution of unapproved materials will constitute grounds for discontinuation of presentation privileges.

The volume of materials to be distributed must be kept to a minimum. If the facility determines that the written materials are too voluminous for distribution at the presentation, the materials shall be made available to detainees in the facility's law library.

**G. Individual Counseling Following a Group Presentation**

The facility shall permit presenters to meet with small groups of detainees to discuss their cases following a group presentation, consistent with security and the orderly operation of the facility. ICE/ERO and facility staff shall not be present during these meetings. Standard 5.5 "Visitation" sets forth the rules and procedures governing one-on-one counseling.

**H. Suspension or Termination**

The facility may discontinue or temporarily suspend group presentations by any or all presenters, if:

1. They pose an unreasonable security risk;

2. They interfere substantially with the facility's orderly operation;

3. They deviate from approved material, procedures or presenters; or

4. The facility is operating under emergency conditions.

The facility shall notify the affected presenters, in writing, of the reasons for termination or suspension, and send a copy of the notice to ICE/ERO. The presenters may appeal this decision.

**I. Video Presentations**

The facility shall play ICE/ERO-approved video presentations on legal rights at the request of ICE/ERO. If technical difficulties arise, the facility shall contact ICE/ERO for equipment options.

The facility shall provide regular opportunities for detainees in the general population to view such videos. The facility shall provide at least one opportunity to view the video for detainees in administrative or disciplinary segregation, unless precluded by security concerns regarding a particular detainee.

# Section 7:
# ADMINISTRATION AND MANAGEMENT



## STANDARD 7.1

**DETENTION FILES**

I.  **POLICY**

Facilities will create a detention file for each detainee booked into the facility for more than 24 hours. The detention file will contain copies and, in some cases, the originals of documents including but not limited to the classification sheet, initial medical screening, property inventory sheet, and disciplinary records. The detention file may be comprised of hard copy documents, retrievable electronic records, or a combination of both.

II.  **STANDARDS AND PROCEDURES**

A.  **Policy**

The creation of a detention file is essential to maintaining a complete record of a detainee's time in facility custody. The file will contain the classification level and any copies of receipts for items issued to/surrendered by the detainee. It will also document adverse behavior, special requests and complaints, and other information considered appropriate for the record by facility officials.

B.  **Creation of a Detainee Detention File**

When a detainee whose stay will exceed 24 hours is admitted into a facility, staff will create a detainee detention file as part of in-processing (admissions) procedures, including the date of file initiation.

C.  **Required Contents of File**

1.  The detention file will contain either originals or copies of forms and other documents generated during the admissions process. If necessary, the detention file may include copies of material contained in the detainee's A-File.

2.  The detention file will generally include the following information unless the information is maintained in a retrievable electronic format:

    a.  Booking Record, with one or more original photograph(s) attached;

    b.  Classification Work Sheet;

    c.  Health Screening Form;

d. Personal Property Inventory Sheet;

e. Housing Identification Card;

f. Property Receipt;

g. Baggage Check(s);

h. Acknowledgment form, documenting receipt of handbook, orientation, etc.;

i. Work assignment sheet;

j. Identifying marks form; and

k. Any other documents, as appropriate.

3. The detention file shall also contain documents generated during the detainee's time in the facility. ICE/ERO may direct that certain documents be added to the detention file.

### D. __Additions to File__

1. During the course of the detainee's stay at the facility, staff will maintain documents associated with normal operations in either the detainee's detention file or in a retrievable electronic format. Examples of documents typically maintained in the detention file include the following:

a. Special requests;

b. Any property or baggage form closed-out during the detainee's stay;

c. Disciplinary forms;

d. Grievances, complaints, and the disposition(s) of same;

e. All forms associated with disciplinary and/or administrative segregation;

f. Staff reports about the detainee's behavior, attitude, etc.;

g. Strip search documentation; and

h. Any privacy waivers, including release-of-information consent forms.

### E. __Location of File__

Detention files will be located and maintained in a secured area.

### F. **Active/Archived File**

1. The detention file will remain active during the detainee's stay. Upon the detainee's release from the facility, staff will add any final documents not available in a retrievable electronic format to the file before closing and archiving.

2. The officer closing the detention file will document the date the file was closed.

3. The closed detention file shall not be transferred to another facility with the detainee. However, staff may forward copies of documents in the file at the request of supervisory personnel at the receiving facility/office.

4. When forwarding documents, staff will accordingly notate the request in the archived file or electronic record.

5. The archived files may be purged after six years, with the material either shredded or, if possible, burned.

### G. **Access to File**

1. The facility shall have procedures addressing the circumstances under which a detention file may be requested and accessed by both facility staff and outside officials, and the recording of the file's removal from storage in a logbook or retrievable electronic record.

2. Unless release of information is required by statute or regulation, a detainee must sign a release-of-information consent form prior to the release of information in his or her detention file. A copy of the form shall be maintained in the detainee's detention file. The content of the form shall be explained to the detainee in a language or manner he or she understands.

3. Upon request by the detainee, the detention file shall be provided to the detainee or his or her designated attorney of record. Prior to release of the detention file, ICE/ERO should be notified to confirm that there are no security or sensitivity concerns.

## STANDARD 7.2

### DETAINEE TRANSFERS

I. **POLICY**

U.S. Immigration and Customs Enforcement (ICE) often transfers detainees from one facility to another for a variety of reasons. This standard prescribes the procedures and notification requirements to be followed when transferring a detainee.

ICE/ERO will make all necessary notifications when a detainee(s) is transferred. Transfers will not be retaliatory. In deciding whether to transfer a detainee, ICE/ERO will take into account whether the detainee is represented before the immigration court. In such cases, ICE/ERO will consider alternatives to transfer, especially where the attorney is located within reasonable driving distance of the detention facility and where immigration court proceedings are ongoing.

II. **STANDARDS AND PROCEDURES**

A. **Notification Procedure**

1. **Detainee**

For security purposes, specific plans and time schedules shall never be discussed with the detainee involved. The detainee shall not be notified of the transfer until immediately prior to leaving the facility. At that time, the detainee shall be notified that he or she is being moved to a new facility within the United States, and not being deported. This information shall be communicated to the detainee in a language or manner he or she understands. Following transfer notification, the detainee shall normally not be permitted to make or receive any telephone calls or have contact with other detainees in the general population until the detainee reaches the destination facility. At the time of the transfer, ICE/ERO will provide the detainee, in writing, with the name, address and telephone number of the facility he or she is being transferred to and contact the attorney of record.

2. **Medical Procedures and Information Required for Transfer**

a. Notification of Transfers, Releases, and Removals

The facility health care provider will be given advance notice prior to the release, transfer, or removal of a detainee, so that medical staff may determine and provide for any medical needs in accordance with Standard 4.3, "Medical Care," associated with the transfer or release of a detainee.

b.  Transfer of Health Records

The facility will send the detainee with full medical records or a detailed medical transfer summary.

c.  Transfer Summary

The sending facility's medical staff shall prepare a Medical Transfer Summary that must accompany the detainee and shall include, at a minimum:

1.  Patient identification;

2.  Tuberculosis (TB) screening results (including results date) and current TB status if TB disease is suspected or confirmed;

3.  Current mental, dental, and physical health status, including all significant health issues, and highlighting any potential unstable issues or conditions which require urgent follow-up;

4.  Current medications, with instructions for dose, frequency, etc., with specific instructions for medications that must be administered en route;

5.  Any past hospitalizations or major surgical procedures;

6.  Known allergies; and

7.  The name and contact information of the transferring medical official.

The transfer summary sheet is essential for detainee safety while in transit and must be in the escorting officer's possession during that time. The detainee cannot be moved without the required information from the releasing institution. The transferring officer will review the information for completeness and to ensure he or she has the supplies required to provide care as indicated during the transfer process.

Any officer who reviews the transfer summary shall protect the privacy of the detainee's medical information. Such information shall not be shared with other detainees and shall not be shared with other officers unless appropriate to fulfill responsibilities. See Standard 4.3 "Medical Care," part J. "Confidentiality and Release of Medical Records." The transferring officer is responsible for delivering the transfer summary materials to medical personnel at the receiving facility.

d.  Medical/Psychiatric Alert

When the medical staff determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer,

or requires medical escort during deportation or transfer, ICE/ERO will be notified in writing.

e.  Medications

Prior to transfer, medical personnel will provide the transporting officers with instructions and, if applicable, medication(s) for the detainee's care in transit in accordance with Standard 4.3 "Medical Care." Medications will be placed in a property envelope with the detainee's name and A-number on it. Medications will accompany the transfer and be turned over to an officer at the receiving field office.

## 3. Other Transfer Paperwork

A properly executed I-203/I-203A and I-216 by ICE/ERO will accompany the transfer.

## B. Property

### 1. Checkout of Funds and Small Valuables

The following items shall always accompany a detainee to the receiving facility: cash, all legal material, and small valuables such as jewelry, address books, phone lists, correspondence, dentures, prescription glasses, small religious items, pictures, etc.

The detainee should ordinarily have these items in his or her possession during transport. Items that might present a security risk or that are particularly bulky shall be separated from the detainee during transport.

Before the detainee is transferred, the sending facility shall return all funds and small valuables to the detainee. All funds and valuable receipts shall be closed in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new funds and valuables receipt during in processing according to procedures established in Standard 2.4 "Funds and Personal Property."

### 2. Large Valuables, Excess Luggage, and Other Bulky Items

All items stored at the sending facility will accompany the transferee. If the receiving facility will not accept detainees' excess, oversized, or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility will retain them, arrange to store them elsewhere, or may follow the procedures for disposing of excess property.

If the detainee refuses to cooperate by providing an appropriate mailing address or is financially able but unwilling to pay for shipping, the facility will coordinate with ICE/ERO to dispose of the property after providing the detainee with written notice. If, however, the detainee's failure to specify a shipping address is because an appropriate mailing address does not exist, the facility will coordinate with ICE/ERO for disposition of the property.

### 3. Checkout of Luggage, Large Valuables, and Other Bulky Items

If the property accompanies the detainee, the sending facility shall close out the existing G-589, or local funds and valuable receipts, in accordance with Standard 2.4 "Funds and Personal Property." The receiving facility shall create a new I-77 or local funds and valuable receipts during in processing.

### C. **Food During Transfer**

During transfers, food shall be provided to detainees in accordance with the "Meals" section of Standard 1.2 "Transportation by Land."

# APPENDICES:

Appendix A: List of Required Staff Training ………………..………203

Appendix B: ICE Reporting Requirements …………….……………206

Appendix C: Contents of the Local Supplement ……………..…….212

Appendix D: Definitions ...…………………………………...……214

## APPENDIX A

### LIST OF REQUIRED STAFF TRAINING

Detention facility staff, contractors, and volunteers shall receive sufficient initial and recurrent training to be competent in their job duties.

The following list includes general training in these standards where ICE has a specific requirement related to content, duration, or frequency.

Note: See the respective standards for additional, specific requirements for trainings.

### 2.7 Searches of Detainees

1. All staff who conduct searches of housing, work areas or of a detainee's body shall receive initial training regarding search procedures prior to entering on duty and shall receive annual training in authorized and effective techniques thereafter. (See Standard 2.7 "Searches of Detainees," B. Staff Training)

2. Security staff shall be trained in proper procedures for conducting pat searches, including opposite sex pat searches. (See Standard 2.7 "Searches of Detainees," C. Body Searches of Detainees)

### 2.8 Use of Force and Restraints

1. All detention personnel shall be trained in approved methods of self-defense, crisis intervention and conflict de-escalation techniques, recognizing signs and symptoms of mental illness, reporting requirements, and the use of force to control detainees. Staff will be made aware of prohibited use-of-force acts and techniques.

2. Training in the use of chemical agents shall include treatment of individuals exposed to them. Training should also cover use of force in special situations. (See Standard 2.8 "Use of Force," N. Training)

### 2.9 Special Management Units

Security staff assigned to SMU shall receive specialized training in relevant topics, such as:

    a. Identifying signs of mental health decompensation;
    b. Techniques for appropriate interactions with mentally ill detainees;
    c. The impact of isolation; and
    d. De-escalation techniques.

(See Standard 2.9 "Special Management Units," L. Specialized Training)

**2.11 Sexual Abuse and Assault Prevention and Intervention**

1. Training on the facility's Sexual Abuse or Assault Prevention and Intervention Program shall be included in training for all employees and shall also be included in biannual refresher training thereafter. Specific additional requirements are listed in the standards.

2. All volunteers and contractors who have contact with detainees must be trained on their responsibilities under the facility's sexual abuse prevention, detection, intervention and response policies and procedures. The level and type of training for volunteers and contractors will be based on the services they provide and their level of contact with detainees; however, all volunteers and contractors who have any contact with detainees must be notified of the facility's zero-tolerance policy and informed how to report such incidents.

3. Facility investigators must receive training on sexual abuse and effective cross-agency coordination.

4. Facility medical staff shall be trained in procedures for examining and treating victims of sexual abuse, in facilities where medical staff may be assigned these activities. (See Standard 2.11 "Sexual Abuse and Assault Prevention and Intervention," E. Staff Training)

**4.2 Hunger Strikes**

All staff shall be trained initially and annually thereafter to recognize the signs of a hunger strike, and to implement the procedures for referral for medical assessment and for management of a detainee on a hunger strike. (See Standard 4.2 "Hunger Strikes," A. Staff Training)

**4.3 Medical Care**

1. Registered Nurses who perform health assessments must have documented initial and annual training provided by a physician. (See Standard 4.3 "Medical Care," E. Comprehensive Health Assessment)

2. Registered Nurses who perform initial dental screenings must be trained how to conduct the exam by a dentist annually. (See Standard 4.3 "Medical Care," H. Dental Treatment)

3. Detention staff will be trained to respond to health-related emergencies within a 4-minute response time, and will include:

   a. The recognition of signs of potential health emergencies and the required response;
   b. The administration of first aid and cardiopulmonary resuscitation (CPR);
   c. The recognition of signs and symptoms of mental illness (including suicide risk), and chemical dependency; and
   d. The facility's established plan and procedures for providing emergency medical care including, when required, the safe and secure transfer of detainees for appropriate hospital or other medical services.

(See Standard 4.3 "Medical Care," K. First Aid and Medical Emergencies)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

1. All facility staff members who interact with and/or are responsible for detainees shall receive comprehensive suicide prevention training during orientation and refresher training at least annually thereafter. Subjects are listed in the standards. (See Standard 4.5 "Significant Self-Harm and Suicide Prevention and Intervention," B. Training)

2. If an officer evaluates a detainee for suicide potential and history of suicide risk as part of his or her initial health screening, that officer must have received special training to do so. (See Standard 4.5 "Significant Self-Harm and Suicide Prevention and Intervention," C. Identification)

**6.1 Detainee Handbook**

The facility will provide a copy of the handbook to every staff member who has contact with detainees. These staff members will also receive training focused on its contents. (See Standard 6.1 "Detainee Handbook," II. Standards and Procedures)

## APPENDIX B

### ICE REPORTING REQUIREMENTS

The facility shall immediately notify ICE/ERO of any and all of the incidents or circumstances listed below.

The local ICE/ERO Field Office may provide additional reporting instructions.

### Significant Events

(These notifications are not otherwise listed in the standards.)

1. Activation of disturbance control team(s);

2. Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, workplace violence, civil disturbances/protests);

3. Fires;

4. Citations or denied licensures related to federal, state and local health, life, safety, and fire codes;

5. Significant environmental problems that impact detention facility operations;

6. Full or partial lock down of the detention facility;

7. Escape(s) or escape attempts;

8. Weapons discharge;

9. Adverse incidents that attract unusual interest or significant publicity;

10. Adverse weather (e.g., hurricanes, floods, ice/snowstorms, heat waves, tornadoes);

11. Fence damage;

12. Power outages;

13. Bomb threats;

14. Transportation (e.g., airlift, bus) accidents resulting in ICE detainee injuries, death, or detention facility property damage;

15. Detention facility evacuations;

16. Detainee (or Inmate)-on-Detainee Assault (i.e., any serious physical assault on an ICE detainee by another detainee or inmate);

17. Staff-on-Detainee Assaults (i.e., any incident or allegation of a physical assault on an ICE detainee perpetrated by staff, including the facility investigation); and

18. Staff Misconduct (i.e., any incident or allegation of staff misconduct if that misconduct relates to treatment of ICE detainees, to the security or safety of the facility, or to compliance with detention standards or the provisions of the facility's contract with ICE).

**Standards Notifications**

(The following notifications are listed in the standards.)

**1.2 Transportation by Land**

If a detainee's paperwork is incomplete prior to transfer. (See 1.2 Transportation by Land, A. Transportation Planning)

**2.1 Admission and Release:**

Any detainee claims of lost or damaged property and the outcomes of such claims. (See 2.1 Admission and Release, H. Missing Detainee Property, and 2.4 Funds and Personal Property, G. Lost/Damaged Property)

**2.8 Use of Force and Restraints:**

1. All uses of force involving detainees;

2. Uses of restraints; and

3. Detainees restrained using 4- or 5-point restraints for over eight hours, and every eight hours thereafter.

(These reports must be sent directly to the ICE/ERO Field Office Director (FOD).)

(See 2.8 Use of Force and Restraints, J. Documentation of Use of Force and Application of Restraints Incidents)

**2.9 Special Management Units**

1. When a detainee is placed in a Special Management Unit (SMU) for an administrative purpose, the administrative segregation order shall be immediately provided to ICE/ERO.

2. When a detainee housed in a Special Management Unit (SMU) meets the following criteria, ICE/ERO shall be notified:

   a. Extended Segregation Placements: Housed in an SMU for 14 days, or 14 days out of any 21-day period; housed in an SMU for 30 days; and at every 30-day interval thereafter.

   b. Special Vulnerability Notifications: No later than 72 hours after the initial placement for any detainee who:

      i. Has been placed in administrative segregation **on the basis of** a disability, medical or mental illness, or other special vulnerability, or because the detainee is an alleged victim of a sexual assault (this report must be sent directly to the FOD), is an identified suicide risk, or is on a hunger strike; or

      ii. has been placed in segregation **for any reason** who has a mental illness, a serious medical illness, a serious physical disability, or is pregnant or recently had a miscarriage.

   (See 2.9 Special Management Units, C. Notifying ICE/ERO of Segregation Placements and Facilitating ICE/ERO Review)

3. Any denial of access to legal materials for a detainee housed in the SMU. (See 2.9 Special Management Units, U. Law Library and Legal Rights Group Presentations)

4. The denial of recreation privileges in excess of seven days. (See 2.9 Special Management Units, V. Recreation)

## 2.10 Staff-Detainee Communication

If there is a secure ICE/ERO drop box at a facility, and ICE/ERO has not collected detainee correspondence from the drop box for more than five days. (See 2.10 Staff-Detainee Communication, B. Requests to ICE/ERO Staff from ICE/ERO Detainees, 4. Additional Facility Responsibilities)

## 2.11 Sexual Abuse and Assault Prevention and Intervention

1. Any allegation that a detainee was sexually abused or assaulted at the current facility or elsewhere while in custody. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications, and Confidentiality)

2. The final results of any facility sexual assault investigation. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 3. Procedures for Administrative Investigations)

3. The completed incident review for any allegation determined to be substantiated or unsubstantiated. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

4. An annual review of all sexual abuse investigations to assess and improve sexual abuse and assault intervention, prevention and response efforts, or if there have been no reports, a negative report. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, M. Investigation, Discipline, and Incident Reviews, 5. Sexual Abuse Incident Reviews)

5. Any allegation involving a victim under the age of 18 or who is considered a vulnerable adult under a state or local vulnerable persons statute. (See 2.11 Sexual Abuse and Assault Prevention and Intervention, L. Reporting, Notifications and Confidentiality).

## 4.2 Hunger Strikes

A detainee begins a hunger strike, refuses treatment related to the hunger strike, or when the facility plans to involuntarily feed the detainee. (See 4.1 Food Service, B. Initial Referral and E. Refusal to Accept Treatment)

## 4.3 Medical Care (Special Medical Needs)

1. A detainee requires close medical supervision, including chronic and convalescent care. (See 4.3 Medical Care, M. Special Needs)

2. Any plan for forced medical treatment. (See 4.3 Medical Care, O. Informed Consent)

3. A health care practitioner determines that a detainee's medical or psychiatric condition requires either clearance by the medical staff prior to release or transfer to another facility or requires medical escort during removal or transfer. (See 4.3 Medical Care, Q. Transfer and Release of Detainees)

4. A detainee receives a medical treatment or procedure not generally available but determined to be medically necessary by a medical provider. (See 4.3 Medical Care, R. Medical Experimentation and Research)

5. A detainee's mental illness or developmental or intellectual disability needs exceed the treatment capability of the facility and a referral for an outside mental health facility is initiated. (See 4.3 Medical Care, S. Mental Health)

6. A detainee is pregnant. (See 4.3 Medical Care, U. Women's Medical Care)

**4.5 Significant Self-Harm and Suicide Prevention and Intervention**

Any suicide attempt or suicide. (See 4.5 Significant Self-Harm and Suicide Prevention and Intervention, J. Notification and Reporting)

**4.6 Terminal Illness and Death**

1. A chronically, critically, or terminally ill detainee is to be transferred to an off-site medical facility. (See 4.6 Terminal Illness and Death, A. Terminal Illness)

2. A detainee death. (See 4.6 Terminal Illness and Death, B. Death Occurring in ICE/ERO Custody)

**4.7 Disability Identification, Assessment, and Accommodation**

1. The identification of a detainee with a communication or mobility impairment. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications, 1. Notification of a Detainee with a Communication or Mobility Impairment)

2. The denial of any disability accommodations requests. (See 4.7 Disability Identification, Assessment, and Accommodation, H. External Notifications, 2. Notification of Facility Denials and Provision of Alternative Accommodations)

**5.2 Recreation**

A detainee is denied recreation privileges for a period exceeding 15 days. (See 5.2 Recreation, E. Recreation for Special Management Unit (SMU))

**5.3 Religious Practices**

Before denying a detainee's request to participate in a religious diet or removing a detainee from a religious diet program. (See 4.1 Food Service, F. Religious/Special Diets)

**5.4 Telephone Access**

A detainee is delayed beyond eight (waking) hours from making a direct call to legal service entities or to address a personal or family emergency or to address a compelling need. (See 5.4 Telephone Access, E. Direct Calls and Free Calls)

**5.5 Visitation**

Security reasons preclude any detainee from engaging in legal consultation in person and by telephone. (See 5.5 Visitation, H. Consultation Visits for Detainees Subject to Expedited Removal, 3. Persons Allowed to Visit for Consultation Purposes)

**5.6 Voluntary Work Program**

A detainee is injured while participating in a voluntary work program. (See 5.6 Voluntary Work Program, L. Detainee Injury and Reporting Procedures)

**6.2 Grievance System**

1. Any detainee grievance that contains an allegation of staff misconduct. (See 6.2 Grievance System, F. Allegations of Officer Misconduct and 2.3 Facility Security)
       (This report must be sent directly to the FOD.)

2. A detainee is determined to be filing nuisance grievances, or otherwise abusing the grievance system. (See 6.2 Grievance System, D. Retaliation)

**6.3 Law Libraries and Legal Materials**

1. If the facility does not receive anticipated updates to the electronic library. (See 6.3 Law Libraries and Legal Materials, E. Updating/Replacing Legal Materials)

2. A detainee requests additional legal material not available in the law library. (See 6.3 Law Libraries and Legal Materials, G. Requests for Additional Legal Materials)

**6.4 Legal Rights Group Presentations**

A legal rights group presentation is discontinued or temporarily suspended. (See 6.4 Legal Rights Group Presentations, H. Suspension or Termination)

**6.1 Detention Files**

Notification of any release of detainee medical or detention information. (See 7.1 Detention Files, F. Access to File)

## APPENDIX C

### CONTENTS OF THE LOCAL SUPPLEMENT

Upon admission to a facility, prior to placement in general population, each detainee shall be provided a copy of the ICE/ERO National Detainee Handbook and that facility's local supplement to the handbook. The contents of the ICE/ERO National Detainee Handbook and any local supplement must be effectively communicated to each detainee in a language or manner he or she can understand.

Staff shall require each detainee to verify, by signature, receipt of the handbook, and shall maintain that signed acknowledgement in the detainee's detention file.

While all applicable topics in the ICE/ERO National Detainee Handbook must be addressed, the following topics are recommended for inclusion in the local supplement:

1. the rules, regulations, policies, and procedures with which every detainee must comply;

2. detainee rights and responsibilities;

3. procedures for requesting translation and interpretation services for access to facility programs, services, and activities;

4. procedures for requesting disability-related or other accommodations, including auxiliary aids or services to allow for effective communication;

5. the agency's and the facility's zero tolerance policies for all forms of sexual abuse and assault;

6. the facility's rules of conduct and prohibited acts, the disciplinary severity scale, the sanctions imposed for violations of the rules, the disciplinary process, the procedure for appealing disciplinary findings, and detainees' rights in the disciplinary system, as required by Standard 3.1 "Disciplinary System";

7. information about the facility's grievance system including medical grievances, as required by Standard 6.2 "Grievance System";

8. the facility's policies on telephone access and on the monitoring of telephone calls, if telephone calls are monitored;

9. the facility's visitation rules and hours;

10. rules and procedures governing access to the law library, as required by Standard 6.3 "Law Libraries and Legal Materials";

11. content and procedures of the facility's rules on legal rights group presentations, and the availability of legal orientation programs;

12. the facility's rules on correspondence and other mail, including information on correspondence procedures, as required by Standard 5.1 "Correspondence and Other Mail";

13. the facility's policies and procedures related to personal property, as required by Standard 2.4 "Funds and Personal Property";

14. the facility's marriage request procedures;

15. contact information for the ICE/ERO Field Office and the scheduled hours and days that ICE/ERO staff is available to be contacted by detainees at the facility, as well as the phone number for the Detention Reporting and Information Line (1-888-351-4024); and

16. procedures to submit written questions, requests, or concerns to ICE/ERO staff, as well as the availability of assistance to prepare such requests.

## APPENDIX D

### DEFINITIONS

**A-FILE, ALIEN FILE** – The legal file maintained by DHS for each detainee. Contents include but are not limited to the detainee's identification documents (passport, driver's license, other identification cards, etc.), photographs, immigration history, prior criminal record if any, and all documents and transactions relating to the detainee's immigration case.

**ACA** – American Correctional Association.

**ACCREDITED REPRESENTATIVE** – A person whom the U.S. Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) has found qualified to represent individual aliens before DHS and/or the immigration courts, in accordance with federal regulations (see 8 C.F.R. §§ 292.1 and 292.2).

**ADMINISTRATIVE SEGREGATION** – A non-punitive form of separation from the general population used for administrative reasons. Administrative segregation is available only to ensure the safety of detainees or others, the protection of property, or the security or good order of the facility, as determined by a facility administrator or supervisor. Administrative segregation may be available, among other reasons, for detainees awaiting investigations or hearings for violations of facility rules; detainees scheduled for release, removal, or transfer within 24 hours; and, under more limited circumstances, detainees who require protective custody or separation from the general population for medical reasons. Generally, detainees housed in administrative segregation retain all the rights and privileges available to detainees in the general population.

**ADMISSION/ADMISSIONS PROCESS** – In-processing of newly arrived detainees, which includes an orientation to the policies, programs, rules, and procedures of the facility. Classification, assignment to living quarters, various inspections, medical screening, and safeguarding of funds, valuables and other personal property is completed during this process.

**AMBULATORY RESTRAINTS** – "Soft" or "hard" equipment used to restrict a detainee's movement but leaving him/her able to eat, drink, or attend to basic bodily functions without staff intervention.

**ATTORNEY** – A member in good standing of the bar of the highest court of any State, possession, territory, Commonwealth, or the District of Columbia; who is not under an order of any court suspending, enjoining, restraining, disbarring, or otherwise restricting him/her in the practice of law (see 8 C.F.R. § 1.1(f)).

**AUXILIARY AIDS AND SERVICES** – Services or devices that allow for effective communication by affording individuals with impaired vision, hearing, speaking, sensory, and manual skills an equal opportunity to participate in, and enjoy the benefits of, programs and activities. Such aids or services include interpreters, written materials, note-takers, video remote

interpreting services, or other effective methods of making aurally delivered materials available to detainees with hearing impairments; readers, taped texts, materials or displays in Braille, secondary auditory programs, or other effective methods of making visually delivered materials available to detainees with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions.

**BODY-CAVITY SEARCH** – The visual inspection or physical probing of body openings (anus, vagina, ears, nose, mouth, etc.) where weapons, drugs, or other contraband could be secreted. This is the most intrusive means of searching an individual, reserved for instances where other search techniques have been considered but rejected as ineffective under the particular circumstances of the case. Body-cavity search procedures govern physical probes, but not visual inspections. For example, the procedures would not be appropriate for a visual inspection of the inside of the mouth, nose, or ears, unless contraband is found during the course of that inspection. Body-cavity procedures apply whenever contraband is found, because retrieving or seizing the item will involve physical entry into or probing within the cavity (in this example, the mouth, nose, or ear).

**CAUSTIC** – Capable of burning, corroding, eroding, or destroying by chemical action.

**CHAIN OF COMMAND** – Order of authority (rank): executive, senior management, senior staff, etc. The position titles may vary according to the type of facility and local facility titles. The on-site order of authority at a detention facility descends from the facility administrator to assistant or associate facility administrators to department heads to shift supervisors and other supervisors.

**CHEMICAL** – A substance with a distinct molecular composition produced by or used in a chemical process.

**CHIEF OF SECURITY –** A generic term for the department head in charge of a detention facility's security employees and operations. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a Chief of Security (chief detention enforcement agent, captain, etc.) is organizationally directly under an assistant or associate facility administrator.

**CHRONIC DISEASE –** An illness or condition that affects an individual's well-being for an extended interval, usually at least six months, and generally is not curable but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

**CHRONIC DISEASE PROGRAM (CARE CLINIC) –** Incorporates a treatment plan and regular clinic visits. The clinician monitors the patient's progress during clinic visits and, when necessary, changes the treatment. The program also includes patient education for symptom management.

**CLASSIFICATION** – A process used to make housing and program assignments by assessing detainees on the basis of objective information about past behavior, criminal records, special needs, etc.

**CLINICAL DIRECTOR (CD)** – A designated individual licensed to practice medicine and provide health services with final responsibility for decisions related to medical judgments. A CD and CMA are equivalent positions.

**CLINICAL MEDICAL AUTHORITY (CMA) –** The medical authority is responsible for the delivery of all health care services to the detainee population. These services include, but are not limited to, medical, nursing, dental, mental health and nutritional services. A CD and CMA are equivalent positions.

**COMBUSTIBLE LIQUID** – A substance with a flash point at or above 100° Fahrenheit.

**COMMISSARY** – An area or system where detainees may purchase approved items.

**CONSULTATION VISITATION** – A discussion, either in person or by telephone, between a detainee subject to expedited removal and a person of the detainee's choosing.

**CONTACT VISIT** – A meeting between detainee and another person authorized to take place in an area free of obstacles or barriers that prevent physical contact.

**CONTAINER** – Any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or other vessel holding a hazardous chemical; does not include pipes or piping systems.

**CONTRABAND** – Any unauthorized item in the facility; an item that is illegal, prohibited by facility rules, or otherwise posing a threat to the security or orderly operation of the facility. This includes unauthorized funds.

**CONTRACTOR –** A person who or entity that provides services on a recurring basis pursuant to a contractual agreement with the agency or facility.

**CORRESPONDENCE** – Letters, postcards and other forms of written material not classified as packages or publications. Large envelopes containing papers qualify as correspondence, but boxes, sacks, and other shipping cartons do not. Books, magazines, newspapers and other incoming printed matter are not "correspondence."

**CRIMINAL ALIEN** – A foreign national convicted of one or more crimes.

**DHS** – Department of Homeland Security.

**DETAINEE HANDBOOK** – The policies and procedures governing detainee life in the facility: daily operations, rules of conduct, sanctions for rule violations, recreation and other programs, services, etc.; defined in writing and provided to each detainee upon admission to the facility.

**DETENTION FILE** – Contents include receipts for funds, valuables, and other personal property; documentation of disciplinary action; reports on detainee behavior; detainee's written requests, complaints, and other communications; official responses to detainee communications; records from Special Management Unit, etc.  Applicable contents may also be maintained in a retrievable electronic format.

**DETENTION STANDARDS** – The detention standards are guidelines to establish consistent conditions of confinement, program operations, and management expectations within the ICE detention system.

**DIETICIAN** – A professional trained in foods and the management of diets (dietetics) who is credentialed by the Commission on Dietetic Registration of the American Dietetic Association, or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education.

**DISABILITY –** An individual with a disability is an individual who has a physical or mental impairment that substantially limits one or more major life activities, or an individual who has a history or record of such impairment. "Major life activities" are basic activities that a detainee without a disability in the general population can perform with little or no difficulty, including, but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. A major life activity can also include the operation of major bodily functions, like the immune, endocrine, and neurological systems; normal cell growth; digestion, respiration, and circulation; and the operations of the bowel, bladder, and brain.

**DISCIPLINARY HEARING** – Non-judicial administrative procedure to determine whether substantial evidence supports finding a detainee guilty of a rule violation.

**DISCIPLINARY COMMITTEE** – One or more impartial staff members who conduct and/or oversee a disciplinary hearing. A lower-level committee (Unit Disciplinary Committee) investigates a formal Incident Report and may impose minor sanctions or refer the matter to a higher-level disciplinary committee. A higher-level committee (Institution Disciplinary Panel) conducts formal hearings on Incident Reports referred from the lower-level committee and may impose higher level sanctions for higher level prohibited acts. Also see Institution Disciplinary Panel.

**DISCIPLINARY SEGREGATION** – A punitive form of separation from the general population used for disciplinary reasons. Disciplinary segregation is available only after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation.

**DRY CELL –** A cell or room without running water where a detainee can be closely observed by staff until the detainee has voided or passed contraband or until sufficient time has elapsed to preclude the possibility that the detainee is concealing contraband. Dry cells may be used when there is reasonable suspicion that a detainee has ingested contraband or concealed contraband in a body cavity.

**EPA –** Environmental Protection Agency.

**EXIGENT CIRCUMSTANCES –** Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**EMERGENCY CHANGES** – Measures immediately necessary to maintain security or to protect the health and safety of staff and detainees.

**ETA** – Estimated time of arrival.

**EXPOSURE/EXPOSED** – Subjected or potentially subjected to a hazardous substance by any means (inhalation, ingestion, skin contact, absorption, etc.).

**FACILITY ADMINISTRATOR –** A generic term for the chief executive officer of a detention facility. The formal title may vary (warden, Officer in Charge, sheriff, jail administrator, etc.).

**FIELD OFFICE DIRECTOR (FOD) –** ICE/ERO Officer with chief responsibility for facilities in an assigned geographic area.

**FLAMMABLE LIQUID** – A substance with a flash point below 100° Fahrenheit (37.8° Centigrade).

**FLASH POINT** – The minimum temperature at which the vapor of a combustible liquid can form an ignitable mixture with air.

**FOOD SERVICE ADMINISTRATOR (FSA)** – The official responsible for planning, controlling, directing and evaluating Food Service Department operations.

**FORCE** – The physical actions necessary to overcome resistance, to gain control, contain, or restrain a detainee.

**FOUR- / FIVE-POINT RESTRAINT** – A restraint system that confines an individual to a bed or bunk in either a supine or prone position. Ordered by the facility administrator when a detainee's unacceptable behavior appears likely to continue, risking injury to self or others.

**FUNDS** – Cash, checks, money orders, and other negotiable instruments.

**GENERAL CORRESPONDENCE** – All correspondence other than "special correspondence."

**GENERAL POPULATION** – Detainees whose housing and activities are not specially restricted. The term is ordinarily used to differentiate detainees in the "general population" from those in Special Housing Units.

**GRIEVANCE** – A complaint based on a circumstance or incident perceived as unjust.

**GROUP PRESENTATION ON LEGAL RIGHTS** – Informational session held in a detention facility by an attorney or other legal representative to inform all interested detainees about U.S. immigration law and procedures; not a forum for providing confidential or case-specific legal advice.

**HARD CONTRABAND** – Any item that poses a serious threat to the life, safety or security of the facility detainees or staff.

**HEALTH ASSESSMENT** – The process whereby an individual's health status is evaluated. This process will address the patient's physical, dental and mental health appropriate to the patient's condition and will include, as determined by the health care provider, questioning the patient about symptoms, a physical examination appropriate to the complaint and, as appropriate, review of screening information, collection of additional information relating to mental, dental and medical health issues, immunization histories, laboratory and diagnostic tests, other examinations, review of results, initiation of therapy and development of a treatment plan.

**HEALTH AUTHORITY** – The health services administrator (HSA), clinical director (CD), or agency responsible for the provision of health care services at a facility or system of facilities. The responsible physician may be the health authority. Health authority may also be referred to as the medical department.

**HEALTH CARE PRACTITIONER** – Defined as an individual who is licensed, certified, or credentialed by a state, territory or other appropriate body to provide health care services within the scope and skills of the respective health care profession.

**HEALTH HAZARD** – Includes carcinogens, toxic agents, reproductive toxins, irritants, corrosives, sanitizers, hepatotoxins, nephrotoxins, neurotoxins, and other agents that act on the hemopoietic system or damage the lungs, skin, eyes, or mucous membranes.

**HEALTH SCREENING** – A system for preliminary screening of the physical and mental condition of individual detainees upon arrival at the facility; conducted by health care personnel or by a specially trained health officer. The combination of structured inquiry and observation is designed to obtain immediate treatment for new arrivals who are in need of emergency health care, identify and meet ongoing current health needs, and isolate those with communicable diseases.

**HEALTH SERVICES ADMINISTRATOR (HSA)** – Executive responsible for the facility's health care program; may also serve as Clinical Director.

**HOLD ROOM** – A secure area used for temporary confinement of detainees before in-processing, institutional appointments (court, medical), release, transfer to another facility, or deportation-related transportation.

**HOLY DAY** – A day specified for religious observance.

**HUNGER STRIKE** – A voluntary fast undertaken as a means of protest or manipulation. Whether

or not a detainee actually declares that he or she is on a hunger strike, staff are required to refer any detainee who is observed to not have eaten for 72 hours for medical evaluation and monitoring.

**ICE** – U.S. Immigration and Customs Enforcement.

**ILLEGAL CONTRABAND** – Any item prohibited by law, the possession of which constitutes grounds for felony or misdemeanor charges.

**ICE HEALTH SERVICES CORPS (IHSC)** – The U.S. Public Health Service division charged with advancing global disease prevention through the delivery of health care to ICE/ERO detainees. IHSC is responsible for all aspects of planning, policy formulation, and program direction and management, including coordination and liaison activities, for all health matters concerning ICE/ERO detainees.

**INDIGENT** – Without funds, or with only nominal funds. Ordinarily, a detainee is considered "indigent" if he or she has less than $15.00 in his or her account for ten (10) days.

**INFORMAL COUNT** – Population count conducted according to no fixed schedule, when detainees are working, engaged in other programs, or involved in recreational activities. Unless a detainee is missing, these counts are not reported; also called "census check" or "irregular count."

**INFORMAL GRIEVANCE –** An oral complaint or concern received from a detainee. Informal grievances may be handled at the lowest level in the organization possible to effectively resolve the complaint with no written response.

**INFORMAL RESOLUTION** – Brings closure to a complaint or issue of concern to a detainee, satisfactory to the detainee and staff member involved; does not require filing of a written grievance.

**INFORMED CONSENT** – An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken.

**IN-PROCESSING** – Administrative processing of a detainee arriving at a detention facility (See "Admissions").

**INSTITUTIONAL DISCIPLINARY PANEL (IDP)** – Review board responsible for conducting disciplinary hearings and imposing sanctions for cases of detainee misconduct referred for disposition following the hearing.

**INTERGOVERNMENTAL SERVICE AGREEMENT (IGSA)** – A cooperative agreement between ICE/ERO and any state, territory, or political subdivision for the construction, renovation, or acquisition of equipment, supplies, or materials required to establish acceptable conditions of confinement and detention services. ICE/ERO may enter into an IGSA with any such unit of government guaranteeing to provide bed space for ICE/ERO detainees, and to provide the clothing,

medical care, food and drink, security, and other services specified in the ICE/ERO detention standards; facilities providing such services are referred to as "IGSA facilities."

**INVESTIGATING OFFICER** – An individual of supervisory or higher rank who investigates alleged misconduct and was not involved in the incident; usually a supervisory detention enforcement officer or shift supervisor.

**JUVENILE** – Any person under the age of 18.

**LEAST INTRUSIVE** – In the context of a search, terminology used to refer to alternative means of finding contraband, such as questions, metal detectors, pat down searches and boss chairs, prior to conducting a strip search.

**LEGAL ASSISTANT** – An individual (other than an interpreter) who, working under the direction and supervision of an attorney or other legal representative, assists with group presentations and in representing individual detainees. Legal assistants may interview detainees, assist detainees in completing forms and deliver papers to detainees without the supervisory attorney being present.

**LEGAL CORRESPONDENCE –** See "special correspondence."

**LEGAL REPRESENTATIVE** – An attorney or other person representing another in a matter of law, including law students, law graduates not yet admitted to the bar; "reputable individuals"; accredited representatives; accredited officials; and attorneys outside the United States (see 8 CFR § 292.1, "Representation and Appearances").

**LIFE-SUSTAINING PROCEDURE (LIFE SUPPORT)** – A medical intervention or procedure that uses artificial means to sustain a vital function.

**LIMITED ENGLISH PROFICIENT/PROFICIENCY (LEP)** – A person who does not speak English as his or her primary language and who has a limited ability to read, speak, write, or understand English. LEP individuals may be competent in English for certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing).

**MAIL INSPECTION** – Examination of incoming and outgoing letters, packages, etc., for contraband, including cash, checks and money orders.

**MAINTENANCE SUPERVISOR** – Individual at the facility responsible for oversight and supervision of the general repairs and preventative maintenance.

**MASTER COUNT** – Total number of detainees housed at a facility.

**MEDICAL DISCHARGE PLAN** – The discharge plan includes: admission diagnosis; discharge diagnosis; brief medical history including the chief complaint and any essential physical findings discovered; all diagnostic test (e.g., x-rays, lab results, ECG's, etc.) results; list of any medications prescribed; a brief summary of care provided, the detainee's response to treatment, medical complications encountered, any outside health care referrals that may have interrupted the infirmary period or that be pending; and continuity of care plan.

**MEDICAL PERSONNEL** – Includes all qualified health care professionals as well as administrative and support staff (e.g. health record administrators, laboratory technicians, nursing and medical assistants, clerical workers).

**MENTAL HEALTH PROVIDER** – Psychiatrist, clinical or counseling psychologist, physician, psychiatric nurse, clinical social worker or any other mental health professional who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

**MESSENGER** – A person (neither a legal representative nor a legal assistant) whose purpose is to deliver or convey documents, forms, etc., to and from the detainee; not afforded the visitation privileges of legal representatives and legal assistants.

**MINOR** – A juvenile; a person under the age of 18.

**NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE** (NCCHC) – Establishes the standards for health service in correctional facilities on which accreditation is based.

**NATIONAL FIRE PROTECTION ASSOCIATION** (NFPA) – Principal source of fire protection standards and codes.

**NON-CONTACT VISIT** – Visitation with a barrier preventing physical contact between the detainee and his or her visitors.

**NON-MEDICAL EMERGENCY ESCORTED TRIP** – Authorized detainee visit to a critically ill member of his/her immediate family, or to attend the funeral of a member of his/her immediate family. "Immediate family" member refers to a parent (including stepparent and foster parent), child, spouse, sister, or brother of the detainee.

**OSHA** – Occupational Safety and Health Administration.

**OUTDOOR RECREATION AREA** – Open-air space for exercise or other leisure activities, large enough to allow 15 square feet per detainee for the largest group expected to use the area at any one time; but not less than 1,500 square feet.

**PAT-DOWN SEARCH** – A sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses contraband.

**PHYSICAL EXAMINATION** – A thorough evaluation of an individual's physical condition and medical history conducted by or under the supervision of a licensed medical professional acting within the scope of his or her practice.

**PLAN OF ACTION** – Describes steps the facility will take to convert a condition that has caused a determination of noncompliance with a standard.

**POST ORDERS** – Written orders that specify the duties of each position, hour-by-hour, and the procedures the post officer will follow in carrying out those duties.

**PROGRESSIVE RESTRAINTS** – Control the detainee in the least restrictive manner required, until and unless the detainee's behavior warrants stronger and more secure means of inhibiting movement.

**PROTECTIVE CUSTODY (PC)** – Administrative segregation for the detainee's own safety.

**QUALIFIED HEALTH CARE PROFESSIONALS** – Include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law and within their scope of practice to evaluate and care for patients.

**REASONABLE ACCOMMODATIONS** – Any change or adjustment in detention facility operations, any modification to detention facility policy, practice, or procedure, or any provision of an aid or service that permits a detainee with a disability to participate in the facility's programs, services, activities, or requirements, or to enjoy the benefits and privileges of detention programs equal to those enjoyed by detainees without disabilities. Examples of "reasonable accommodations" include, but are not limited to, proper medication and medical treatment; accessible housing, toilet, and shower facilities; devices like bed transfer, accessible beds or shower chairs, hearing aids, or canes; and assistance with toileting and hygiene. In these standards, reasonable accommodations, disability-related modifications, and auxiliary aids and services are collectively referred to as "accommodations" or "reasonable accommodations."

**REASONABLE SUSPICION** – Not intuition, but specific, articulable facts that would cause a reasonable law enforcement officer to suspect that a particular person is concealing a weapon, contraband, or evidence of a crime.

**RELIGIOUS PRACTICES** – Worship, observances, services, meetings, ceremonies, etc., associated with a particular faith; access to religious publications, religious symbolic items, religious counseling and religious study classes; and adherence to dietary rules and restrictions.

**SAFETY DATA SHEET (SDS)** – Basic information about a hazardous chemical, prepared and issued by the manufacturer, in accordance with Occupational Safety and Health Administration

regulations (see 29 CFR 1910.1200; see also OSHA Form 174); among other things, specifies precautions for normal use, handling, storage, disposal and spill cleanup. (Formerly referred to as Material Safety Data Sheets (MSDS).)

**SALLY PORT** – An enclosure situated in the perimeter wall or fence surrounding the facility, containing double gates or doors, of which one cannot open until the other has closed, to prevent a breach in the perimeter security; handles pedestrian and/or vehicular traffic.

**SANITATION** – The creation and maintenance of hygienic conditions; in the context of food, involves handling, preparing, and storing items in a clean environment, eliminating sources of contamination.

**SATELLITE FEEDING** – Food served and consumed in a location other than where prepared.

**SEGREGATION** – Confinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons.

**SHIFT SUPERVISOR** – A generic term for the detention security supervisor in charge of operations during a shift. The position titles may vary according to the type of facility and local facility titles. Ordinarily, a shift supervisor (detention operations supervisor, lieutenant, etc.) is, organizationally, directly under the Chief of Security (chief detention enforcement agent, captain, etc.).

**SOFT CONTRABAND** – Any unauthorized item that does not constitute hard contraband, i.e., does not pose a serious threat to human safety or facility security; includes that quantity of an item possessed in an amount exceeding the established limit.

**SPECIAL CORRESPONDENCE OR LEGAL MAIL –** Detainees' written communications to or from any of the following:
    a. private attorneys and other legal representatives;
    b. government attorneys;
    c. judges and courts;
    d. embassies and consulates;
    e. the president and vice president of the United States;
    f. members of Congress;
    g. the Department of Justice (including the DOJ Office of the Inspector General);
    h. the Department of Homeland Security (including U.S. Immigration and Customs Enforcement, ICE Health Services Corps, ICE Enforcement and Removal Operations, ICE Office of Professional Responsibility, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of the Inspector General);
    i. outside health care professionals;
    j. administrators of grievance systems; and
       representatives of the news media.

**SPECIAL MANAGEMENT UNIT (SMU)** – A housing unit for detainees in administrative or disciplinary segregation.

**SPECIAL NEEDS DETAINEE** – A detainee whose mental and/or physical condition requires different accommodations or arrangements than a detainee who does not have special needs would receive. Special needs detainees include, but are not limited to, those detainees who are chronically ill or infirm, those with disabilities, and those who are addicted to or in withdrawal from drugs or alcohol.

**SPECIAL VULNERABILITIES** – Detainees with special vulnerabilities include those who are elderly, pregnant, or nursing; those with serious physical or mental illness, or other disability; those who would be susceptible to harm in general population due to an identified risk of victimization or abusiveness; and those who have been victims of sexual assault, torture, trafficking, or abuse.

**STRIP SEARCH** – A search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

**TERMINALLY ILL DETAINEE** – A detainee whose physical condition has deteriorated to the point where the prognosis is less than a year to live.

**TOXIC** – Poisonous; capable of causing injury or death.

**TRAINED INVESTIGATORS –** A person who has been trained in investigative techniques to include interview techniques for victims and proper procedures for collecting and storing evidence.

**TRAINING** – An organized, planned, and evaluated activity designed to achieve specific learning objectives and enhance personnel performance. Training may occur on site, at an academy or training center, an institution of higher learning, professional meetings, or through contract service or closely supervised on-the-job training. Training programs usually include requirements for completion, attendance records, and certification of completion. Meetings of professional associations are considered training where there is clear evidence of the direct bearing on job performance. In all cases, the activity must be part of an overall training program.

**UNENCUMBERED SPACE** – Open, usable space measuring at least seven feet in at least one dimension, free of plumbing fixtures, desk, locker, bed, and other furniture and fixtures (measured in operational position).

**UNAUTHORIZED FUNDS** – Negotiable instruments (checks, money orders, etc.) or cash in a detainee's possession exceeding the facility-established limit.

**UNAUTHORIZED PROPERTY** – Not inherently illegal, but against the facility's written rules.

**UNIT DISCIPLINARY COMMITTEE** – See **DISCIPLINARY COMMITTEE**.

**VOLUNTEER –** An individual who donates time and effort on a recurring basis to enhance the

activities and programs of the agency or facility.

**VOLUNTEER GROUP** – Individuals who collectively donate time and effort to enhance the activities and programs offered to detainees; selected on basis of personal qualities and skills (recreation, counseling, education, religion, etc.).

**WORK ASSIGNMENT** – Carpentry, plumbing, food service, and other operational activities included in the facility's Voluntary Work Program, for which a detainee may volunteer.