# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNEAPOLIS AREA SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, MINNESOTA CONFERENCE OF THE UNITED CHURCH OF CHRIST, and FATHER CHRISTOPHER COLLINS, SJ, | Case No. 26-cv-1576 (JWB/DTS) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | |
| Defendants. | |

## **INTRODUCTION**

Defendants' actions have prevented Plaintiffs from providing core pastoral care—including prayer, spiritual care, and sacramental ministry—to detainees held inside the Bishop Henry Whipple Federal Building. These restrictions substantially burden Plaintiffs' ability to freely exercise their religion. A preliminary injunction is necessary to allow Plaintiffs leaders to provide pastoral care, including the religious practices necessary to make that care meaningful.

The principal dispute between the parties is whether Defendants' alleged post-litigation policy change renders this case moot. Defendants contend that they have voluntarily implemented procedures that purportedly afford faith leaders the access Plaintiffs seek. But voluntary cessation of unlawful conduct rarely moots a case, particularly where—as here—the change occurred only after litigation began. The Supreme Court has repeatedly held that a defendant seeking dismissal on this basis bears a "formidable burden," *FBI v. Fikre*, 601 U.S. 234, 241 (2024), to demonstrate that it is "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *U.S. v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)). That demanding standard exists for good reason—without it, defendants could suspend challenged conduct once sued and later "pick up where [they] left off." *Fikre*, 601 U.S. at 241. Because Defendants remain free to reinstate the very restrictions that prompted this lawsuit, the case is not moot, and judicial relief remains necessary.

The case is not moot for the additional reason that Defendants have failed to provide complete relief. Even if Defendants have adopted certain procedures[1] permitting clergy access, they have not agreed to the full set of accommodations necessary to ensure that faith leaders can provide meaningful pastoral care. Defendants continue to impose restrictions, including limits on physical contact and access conditioned on unspecified "operational needs," that substantially burden the religious practices at issue. Where a defendant's voluntary policy change does not afford complete relief, a case remains live because the Court can still grant meaningful relief to the plaintiffs. *Friends of the Earth*, 528 U.S. at 189-90. Because Defendants have not addressed each component of the relief Plaintiffs seek, the Court retains authority to grant effective relief.

## **ARGUMENT**[2]

I. **The Case Is Not Moot Because Defendants Remain Free to Resume Their Unlawful Conduct**

Defendants contend that this case is moot because they have implemented procedures permitting clergy access to detainees. (Dkt. No. 52 at 11.) That argument fails under settled Supreme Court and Eighth Circuit precedent.

---

[1] Notably, it remains unclear what such procedures are, other than Defendants apparently consider clergy access on a case-by-case basis, with no written policy or procedures to guide that decision-making. (*See* Dkt. No. 53 at ¶¶ 12, 14.)

[2] Defendants contend that Plaintiffs must satisfy a purported "heightened mandatory-injunction standard." (Dkt. No. 52 at 9.) That is incorrect. The only circumstance in which a heightened standard applies is when a plaintiff seeks to enjoin a duly enacted statute or regulation. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). This case involves no such challenge. Plaintiffs seek relief from discretionary executive conduct—not the enforcement of a statute "developed through presumptively reasoned democratic processes." *See id.*

Voluntary cessation of challenged conduct moots a case only where it is "'*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth*, 528 U.S. at 189 (quoting *Concentrated Phosphate Export*, 393 U.S. at 203) (emphasis added). This is a "stringent" standard, *id.*, that imposes a "formidable burden" squarely on the defendant. *Fikre*, 601 U.S. at 241.[3]

That burden is intentionally demanding. If it were otherwise, defendants could halt unlawful conduct once sued, secure dismissal, and then "pick up where [they] left off," repeating the cycle until they achieve their unlawful objectives. *Id.* Courts are therefore particularly skeptical of mootness claims where a defendant's policy change occurs only after litigation begins, raising concerns that the change is designed to "manipulate [the court's] jurisdiction to insulate a favorable decision from review." *Mille Lacs Band of Ojibwe v. Cnty. of Mille Lacs, Minnesota*, No. 17-cv-05155 (SRN/LIB), 2022 WL 624661, at *5 (D. Minn. Mar. 3, 2022) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000)). Courts routinely reject mootness arguments where, as here, Defendants suspend challenged conduct only after litigation has commenced. *See, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (refusing to dismiss a challenge to a repealed ordinance because the city remained free to reenact it); *Parents Involved in*

---

[3] Defendants argue that the "capable of repetition yet evading review" exception to mootness is applied "'only in exceptional circumstances'" that are not present here. (Dkt. No. 52 at 13 (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)).) To be clear, Plaintiffs are not arguing that particular exception applies; rather, the voluntary cessation exception applies, which does *not* require exceptional circumstances and is, instead, a "formidable burden" for the government to overcome. *See Fikre*, 601 U.S. at 241.

*Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 719 (2007) (declining to find mootness years after voluntary cessation); *Jama v. Peters*, No. 23-cv-3075 (JMB/SGE), 2024 WL 4444710, at *3 (D. Minn. 2024) (declining to find case moot and noting that defendants did not explain why it was not until litigation occurred that the challenged conduct ceased). In all events, it is Defendants—not Plaintiffs—who must establish that the challenged conduct cannot reasonably be expected to recur. *See Fikre*, 601 U.S. at 243. Defendants fall short of carrying their burden.

The Supreme Court's recent decision in *Fikre* is particularly instructive. There, the government removed the plaintiff from the no-fly list and represented that he would not be relisted based on "currently available information." *Id.* at 242. The Court nonetheless held the case was not moot because the government failed to demonstrate that the challenged conduct could not reasonably recur. *Id.* at 243. Critically, the Court rejected the government's reliance on speculation about future circumstances, emphasizing that the relevant inquiry concerns the defendant's own conduct and constraints, not conjecture about what might happen next. *Id.*

Those same deficiencies are present here. Defendants offer no binding assurance that the challenged restrictions will not return. Instead, they assert only that "much has changed" and that the alleged violations occurred during a "different phase" of operations. (Dkt. No. 40 at 7.) But shifting "phases" of operations underscore, rather than eliminate, the risk of recurrence. Nothing in the record prevents Defendants from instituting yet another phase—complete with new protocols and renewed constitutional violations.

Recent developments confirm that the situation remains fluid. Although Defendants announced a drawdown on February 12, 2026, public filings indicate that approximately 650 federal agents remain in Minnesota—hundreds more than typical levels. Leadership changes, including the Secretary of the Department of Homeland Security, further underscore the absence of stability. In these circumstances, Defendants cannot plausibly claim that it is "absolutely clear" the challenged conduct will not recur.

Equally telling, Defendants have failed to define the contours of their purported policy change. Access to detainees, they assert, will be permitted only so long as it does not interfere with undefined "operational needs," (Dkt. No. 40 at 5), and will be handled on a "case-by-case" basis. (Dkt. No. 53 ¶ 14.) Defendants do not identify what those needs are, when they arise, or who is responsible for identifying them. Nor do they explain how such restrictions would be implemented in a manner consistent with constitutional requirements. The discretion to implement such restrictions—untethered to any written policy or guidelines—is precisely what enabled the challenged conduct, and it remains fully intact.

Defendants' own evidentiary submissions reinforce this point. Deputy Field Officer Director Tauria Rich states only that she oversaw the facility during Operation Metro Surge and continues to do so. (Dkt. No. 53 ¶¶ 2-3.) Conspicuously absent is any explanation of why clergy were excluded, what standards governed that decision, or what safeguards now prevent its recurrence. There is likewise no account of the role of "outside leadership" in imposing those restrictions, nor any assurance that similar directives will not issue again. The absence of written standards applicable at Whipple is underscored by the submission

of National Detention Standards setting forth standards for religious exercise that Defendants state do not apply at the Whipple. (Dkt. No. 53 ¶¶ 8, 10, Ex. 2.) Religious practice at the Whipple, on the other hand, appears to be a constitutional black hole in the government's eyes. (*See id.* at ¶ 10 ("In contrast to Holding Facilities [like Whipple], Detention Centers exist to provide detainees with their Constitutional Due Process minimums.")) Where, as here, the record contains no meaningful explanation of the prior conduct and no constraints on future decision-making, the government falls far short of its burden of establishing mootness. *See Fikre*, 601 U.S. at 242-43; *Jama*, 2024 WL 4444710, at *4.

Defendants' reliance on a purported "invitation" to visit Whipple further underscores the point. Defendants represented to Plaintiffs that pastoral visits would be accommodated "unless they cannot"—a statement that is as revealing as it is insufficient. That qualification confirms that access remains discretionary and subject to unilateral revocation at any time. It is not a commitment to respect constitutional rights; it is a reservation of authority to override them. It does nothing to ensure regular, reliable access for religious ministry, and it does not address the systemic barriers at issue in this case.

In sum, Defendants have neither renounced the challenged conduct nor adopted binding policies and trained government officials accordingly to prevent its recurrence. Defendants retain the same broad discretion, under similarly undefined standards, that gave rise to Plaintiffs' claims in the first place. Because it is far from "absolutely clear" that the violations will not recur, this case is not moot, and judicial intervention remains necessary. *See Friends of the Earth*, 528 U.S. at 189.

## II. Defendants Misstate the Standard of Review Governing Plaintiffs' Free Exercise Claim

Defendants also mischaracterize the governing First Amendment standard of review. They argue that the challenged restrictions are neutral and generally applicable under *Employment Division v. Smith*, 494 U.S. 872 (1990), and therefore subject only to rational basis review. (Dkt. No. 52 at 15.) That argument fails because Defendants' own account establishes the presence of individualized, discretionary decision-making that triggers strict scrutiny.

Even under *Smith*, strict scrutiny applies where the government maintains a system of individualized exemptions but fails to extend those exemptions to religious exercise without a compelling justification. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537, 542 (1993). The Constitution does not permit a regime in which officials make "judgment-by-judgment" determinations about when religious exercise will be allowed. *Espinoza v. Montana Department of Revenue*, 591 U.S. 464, 484 (2020). To the contrary, "[t]he protections of the Free Exercise Clause do not depend on" such ad hoc determinations. *Id.* (quoting *Medellín v. Texas*, 552 U.S. 491, 514 (2008)).

Courts have consistently recognized that broad, standardless discretion in the hands of government officials makes constitutional violations more—not less—likely. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)). This principle applies with equal force here.

Defendants admit that clergy access to detainees is handled on a case-by-case basis. (Dkt. No. 53 at ¶ 14; *see also* Dkt. No. 52 at 11.) But a regime that relies on ad hoc,

discretionary determinations—without clear standards, criteria, or procedural safeguards—is the very definition of an individualized exemption system. Such systems trigger strict scrutiny. *See Espinoza*, 591 U.S. at 484; *Axson-Flynn*, 356 F.3d at 1298-99.

Defendants' recent statements only reinforce the point. Their assurance that clergy access will be permitted "unless [it] cannot" confirms that decisions will be made case by case, based on unspecified considerations, by unidentified decisionmakers. That is precisely the kind of "judgment-by-judgment" regime the Supreme Court has rejected. *See Espinoza*, 591 U.S. at 484.

In short, Defendants' system of discretionary, case-by-case decision-making triggers strict scrutiny. Because Defendants cannot demonstrate that their restrictions are narrowly tailored to serve a compelling governmental interest, Plaintiffs are likely to succeed on the merits of their First Amendment claim.

### III. Defendants Have Not Met Their Burden of Demonstrating That Their Restrictions Are the Least Restrictive Means

Under RFRA, the government bears the burden of demonstrating that any substantial burden on religious exercise is the least restrictive means of advancing a compelling governmental interest. *Gonzales v. O Centro Esiírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). "The least-restrictive-means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). At the preliminary injunction stage, those burdens "track the burdens at trial," meaning it is Defendants—not Plaintiffs—who must satisfy strict scrutiny. *Gonzales*, 546 U.S. at 429. Defendants have not met that burden.

9

**A.      Vague and Undefined "Operational Interruptions" Cannot Justify Burdens on Religious Exercise**

Although Defendants agree to certain limited accommodations, they refuse to permit pastoral care whenever it would "interrupt" operations at the Whipple Federal Building. That limitation is fatally vague. Defendants do not identify which functions cannot be interrupted, what constitutes an "interruption," who makes such determinations, or how such determinations are made.

RFRA requires far more than generalized assertions. The government must provide specific, evidence-based justifications demonstrating why less restrictive alternatives are inadequate. Courts consistently reject conclusory claims of administrative burden where the government fails to quantify or substantiate its concerns. *See Shakur v. Schriro*, 514 F.3d 878, 887 (9th Cir. 2008); *Hunafa v. Murphy*, 907 F.2d 46, 48 (7th Cir. 1990); *Ward v. Walsh*, 1 F.3d 873 (9th Cir. 1993); *see also Advocates for Human Rights v. DHS*, 2026 WL 404457, at *29–30 (D. Minn. Feb. 12, 2026) ("Defendants allocated substantial resources to sending thousands of agents to Minnesota, detaining thousands of people, and housing them in their facilities. Defendants cannot suddenly lack resources when it comes to protecting detainees' constitutional rights.").

Here, Defendants provide no evidence regarding the duration or sequencing of core functions such as intake processing, fingerprinting, database checks, or detainee transport[4]. And perhaps most notably, Defendants have failed to address many of the factual inquiries

---

[4] Defendants also did not provide this information in response to Plaintiffs' inquiries at the parties' meet-and-confers.

this Court asked them to address. (*See* Dkt. No. 18 at 3.) Specifically, Defendants have not addressed the "average, median, and maximum length" of holding at the Whipple, "specific security risks posed by clergy access," whether those risks "differ materially from those posed by attorney access," whether certain security measures would mitigate risks, and any prior incidents involving clergy access. (*See id.* at 3-4.) Without such information, Defendants have not satisfied their burden under RFRA to demonstrate that they cannot accommodate brief pastoral visits without meaningful disruption.

The absence of any governing policy further underscores the problem. Defendants concede that no written protocol exists governing pastoral care at the Whipple facility. There are no defined standards, no uniform procedures, and no training guiding officials in evaluating requests. Instead, decisions are left to ad hoc discretion—creating a substantial risk that the same unlawful denials will recur.

Defendants' request for deference fares no better. Their reliance on *Cutter v. Wilkinson*, 544 U.S. 709 (2005), and *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), is misplaced. Those cases arose in the prison context under RLUIPA, where courts afford limited deference to prison administrators managing convicted populations. This case involves civil immigration detention—not incarceration following criminal conviction— and the heightened deference contemplated in *Cutter* does not apply.

Even if some deference were appropriate, Defendants have still failed to meet their burden. In *Fowler*, the government provided a concrete alternative that allowed the plaintiff to practice his religion. 534 F.3d at 939–40. The *Fowler* court also noted that "security concerns must be grounded on more than mere speculation, exaggerated fears, or

11

post-hoc rationalizations." *Id.* at 939. Moreover, even where deference is warranted, the Supreme Court has cautioned that such deference does not equate to "unquestioning acceptance" and "does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015); *see also Roth v. Austin*, 603 F. Supp. 3d 741, 761 (D. Neb. 2022) ("[W]hile courts should 'respect' the military's expertise in certain matters, they must still apply RFRA's 'rigorous standard,' which this Court concludes means without deference as to any determination required by RFRA.") (quoting *Holt*, 574 U.S. at 364). Here, Defendants offer no meaningful alternative—only the vague assurance that pastoral care will be permitted "unless [it] cannot" be accommodated.

That response is no answer at all. It leaves entirely unanswered who makes these decisions, what criteria govern them, and whether any limits constrain official discretion. Defendants admit that even before Operation Metro Surge, such determinations were made on a "case-by-case basis." (Dkt. No. 53 at ¶ 12.) Yet Defendants provide no evidence regarding who made those decisions or what standards applied.

The practical implications are significant. Could a faith leader be denied access because a transfer is scheduled hours later, even if time exists for pastoral care? Could access be denied during gaps in processing? Could individual agents, lacking guidance or training, deny access based on their own ad hoc judgments? The record provides no answers, nor were any provided at the parties' meet-and-confers.

Indeed, Defendants acknowledge that processing delays can last hours, particularly when newer agents are involved. In such circumstances, Defendants cannot plausibly claim

that brief pastoral visits would meaningfully disrupt operations. Defendants' position rests on speculation, not evidence. RFRA does not permit such speculation to justify burdens on religious exercise. Defendants' vague and unsupported invocation of "operational interruption" falls far short to satisfy strict scrutiny.

### B. Defendants Have Not Justified Prohibiting Faith Leaders from Offering Pastoral Care Directly

Defendants also oppose allowing faith leaders to announce their presence—even through existing glass-partitioned areas—and offer pastoral care directly to detainees. That restriction imposes a substantial burden and is not the least restrictive means of advancing any legitimate interest.

For many faith traditions, pastoral care requires an affirmative offering of ministry—not merely responding to requests filtered through government officials. Requiring detainees to affirmatively request pastoral care through government personnel creates an additional—and unnecessary—barrier. Individuals in civil immigration detention are often unfamiliar with the facility, isolated, and dependent on authorities for basic needs. Under those circumstances, detainees may reasonably fear that requesting religious services could draw unwanted attention or negatively affect their treatment. Conditioning access on such a request therefore chills religious exercise.

Allowing faith leaders to briefly announce their presence would eliminate that barrier while preserving institutional control. Pastoral care would still be provided only to detainees who voluntarily choose to receive it.

At a minimum, less restrictive alternatives are readily available. Defendants could (1) read a clear, court-ordered script informing detainees when pastoral care is available,[5] and (2) provide and post written notices in multiple languages, including English, Spanish, Hmong, and Somali, upon intake and in holding areas.[6]

### C.   A Categorical Ban on Physical Contact Is Not the Least Restrictive Means

Defendants also categorically prohibit faith leaders from engaging in physical contact with detainees—even where such contact is a core component of religious practice, including the laying on of hands, holding hands in prayer, and administering sacraments

---

[5] The proposed script could read: "You have the right to receive pastoral care, spiritual care, ministry, and prayer from a faith leader if you would like to receive it. Right now, there is a faith leader here who can offer you pastoral care if you wish to receive it. The faith leader's name is [TITLE NAME]. They can meet with you privately to provide pastoral care. [If faith leader tells ICE/DHS that they can offer a group service, then also say: The faith leader can also meet with a group of individuals to provide pastoral care to the group, if you would like to join the group service.] The faith leader can provide pastoral care to anyone of any religious or faith background – you don't need to have the same religion as the faith leader. If you choose to meet with the faith leader, the government will not treat you differently or worse here at the Whipple, or at any other holding or detention facility. It is illegal for the government to retaliate against you for exercising your right to religious freedom."

[6] The proposed text of the written statement provided to detainees and posted in holding cells could read: "You have the right to receive pastoral care, spiritual care, ministry, and prayer from a faith leader if you would like to receive it. Please let us know if you would like to receive pastoral care. If a faith leader is present, they can meet with you privately to provide pastoral care. The faith leader may also be able to meet with a group of individuals to provide pastoral care to the group, if you would like to join the group service. The faith leader can provide pastoral care to anyone of any religious or faith background – you don't need to have the same religion as the faith leader. If you choose to meet with the faith leader, the government will not treat you differently or worse here at the Whipple, or at any other holding or detention facility. It is illegal for the government to retaliate against you for exercising your right to religious freedom."

such as communion or the imposition of ashes. That blanket prohibition cannot satisfy strict scrutiny.

Plaintiffs do not seek unfettered access. When and where they are seeking to provide pastoral care with appropriate physical contact, Plaintiffs are willing to comply with reasonable security measures, including identification, background checks, screening, and escorted access. The relevant question under RFRA is whether Defendants can accommodate religious exercise under such conditions—not whether they can prohibit it entirely.

The answer is clear—Defendants can certainly accommodate Plaintiffs. In *Coalition for Spiritual and Public Leadership v. Noem*, No. 25-cv-14168 (N.D. Ill. Feb. 12, 2026), a federal court ordered the government to permit communion and the imposition of ashes at a comparable federal facility. The government complied without incident, using standard security protocols. That experience demonstrates that such practices can be safely accommodated at facilities like the Whipple Federal Building.

Courts have repeatedly required similar accommodations in custodial settings. *See, e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 436–37 (2022); *Atwood v. Shinn*, 2022 WL 2047759, at *9 (D. Ariz. June 6, 2022); *Gonzales v. Collier*, 610 F. Supp. 3d 963, 973 (S.D. Tex. 2022). Even in prisons—and even in the context of executions—courts have required accommodation of religious contact where it can be safely managed.

Defendants attempt to justify their categorical ban by treating civil immigration detention as indistinguishable from criminal incarceration. Defendants erroneously claim that case law supports their position, but the law recognizes the opposite: civil detention

and criminal incarceration are meaningfully distinct.[7] *See Pesci v. Budz*, 730 F.3d 1291, 1297 (11th Cir. 2013) (recognizing "the salient differences between civil detention and criminal incarceration"); *Marsh v. Florida Department of Corrections*, 330 F. App'x 179, 182 (11th Cir. 2009) ("[A]s a civil detainee, Marsh is arguably entitled to more protection than a criminal prisoner with regard to his First Amendment free exercise claim.").

That distinction matters here. Individuals held at the Whipple are in civil immigration detention—they are not being held on criminal charges. Individuals arrested on federal criminal charges are processed through local county jails, not the Whipple facility. Any attempt to equate civil detainees at Whipple with individuals detained for

---

[7] Defendants mischaracterize the cases they cite. (*See* Dkt. No. 52 at 11 n.5 (citing cases).) In fact, each case cited by Defendants support Plaintiff's position that civil and criminal detention are meaningfully different. Indeed, in each of the cases cited by Defendants the court held that because the government was treating immigration detainees as though they were in criminal confinement, the detainees' relief was warranted *because* the law dictates that civil immigration detention is not the same as criminal confinement. *See Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 902–03 (D. Minn. 2020) (noting that habeas petitioner's conditions of confinement that were "indistinguishable from criminal confinement" weighed in favor of habeas relief because "[t]he fact remains . . . that persons detained under [immigration statute] *are subject to civil detention not criminal incarceration.*" (emphasis added)); *Abdirizak Mohamed A. v. Brott*, 2020 WL 1062913, at *4 (D. Minn. Mar. 5, 2020) ("If the conditions of confinement are more like those one would expect to encounter in a criminal as opposed to civil confinement scenario, then the factor weighs in favor of ordering a bond hearing."); *Abshir H.A. v. Barr*, 2019 WL 3719414, at *2 (D. Minn. Aug. 7, 2019) (noting that the fact that petitioner was "being held in a penal setting, even though aliens held under § 1226(c) are subject to civil detention rather than criminal incarceration, weighed in favor of a bond hearing; *Khan v. Whiddon*, 2016 WL 4666513, at *6 (M.D. Fla. Sept. 7, 2016) (holding that "*Petitioner's* civil immigration detention does not appear to be meaningfully different from criminal detention in a penal institution" and concluding that that factor, amongst others, warranted granting petitioner's request for a bond hearing (emphasis added)). Stated simply, these cases emphasize that immigration detention is different than criminal detention other than the actual fact that the government is detaining an individual.

violent criminal offenses is therefore misplaced and cannot justify the sweeping restrictions Defendants impose.

But even if the Court were to accept Defendants' flawed analogy to criminal detention, their position would still fail. Courts have repeatedly rejected categorical bans on religious practices where reasonable alternatives exist, including in short-term detention settings. *See, e.g.*, *Jarrard v. Sheriff of Polk County*, 115 F.4th 1306, 1320 (11th Cir. 2024); *O'Bryan v. Saginaw County*, 437 F. Supp. 582, 589–91 (E.D. Mich. 1977); *Thompson v. Smeal*, 2012 WL 719085, at *5 (M.D. Pa. Feb. 3, 2012).

RFRA requires a comparative inquiry: when other institutions successfully accommodate a religious practice, the government generally must explain why it cannot do the same. *See Holt*, 574 U.S. at 367. Defendants have made no such showing. They identify no specific risks, no failed alternatives, and no reason why supervised physical contact cannot be safely permitted.

A categorical ban is the opposite of the least restrictive means. Because Defendants have not meaningfully attempted to accommodate these practices—and have offered no evidence that accommodation is infeasible—they cannot satisfy RFRA's demanding standard.

## **CONCLUSION**

Defendants' purported policy changes—unwritten, undefined, and wholly discretionary—do not moot this case or come close to satisfying the First Amendment's and RFRA's strict-scrutiny standard. Nothing prevents Defendants from reinstating the same restrictions tomorrow, and nothing in the record justifies the ongoing burdens on

17

Plaintiffs' religious exercise. The law does not permit constitutional rights to hinge on shifting, ad hoc assurances. Only a court order can ensure that Plaintiffs' constitutional rights are respected. The Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: March 18, 2026                    Respectfully submitted,

*/s/ Erin Westbrook*
Erin Westbrook (MN #0393072)
Katherine S. Barrett Wiik (MN #0351155)
Kaitlin Yira (MN #0403458)
**SAUL EWING LLP**
33 South 6th Street, Suite 4750
Minneapolis, MN 55402
612-225-2946
erin.westbrook@saul.com
katie.barrettwiik@saul.com
kaitlin.yira@saul.com

Irina Vaynerman (MN #0396759)
Chelsea Walcker (MN #0396792)
**GROUNDWORK LEGAL**
1650 West End Blvd., Suite 100
St. Louis Park, MN 55416
(612) 208-9349
irina@groundworklegal.org
chelsea@groundworklegal.org

*Attorneys for Plaintiffs*