UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MINNEAPOLIS AREA SYNOD OF THE THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, ET AL., | File No. 0:26-CV-01576 (JWB-DTS) |
| Plaintiffs, | |
| v. | Minneapolis, Minnesota March 20, 2026 10:00 A.M. |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ET AL. | |
| Defendants. | |

---

BEFORE THE HONORABLE JERRY W. BLACKWELL

UNITED STATES DISTRICT COURT JUDGE

**(MOTION FOR PRELIMINARY INJUNCTION HEARING)**

Proceedings recorded by mechanical stenography; transcript produced by computer.

**APPEARANCES**:

For the Plaintiff Minneapolis Area Synod of the Evangelical Lutheran Church in America:

Erin E. Westbrook, Esquire
Kaitlin Yira, Esquire
SAUL EWING
33 South Sixth Street
Suite 4750
Minneapolis, Minnesota 55402
(612) 225-2800
erin.westbrook@saul.com
kaitlin.yira@saul.com

- and -

Irina Vaynerman, Esquire
GROUNDWORK LEGAL
1650 West End Boulevard
Suite 100
St. Louis Park, Minnesota 55416
(612) 217-2141
irina@groundworklegal.org

For the Defendants:

David W. Fuller, Esquire
Joseph Teirab, Esquire
UNITED STATES ATTORNEY'S OFFICE
300 South Fourth Street
Suite 600
Minneapolis, Minnesota 55415
(612) 664-5627
david.fuller@usdoj.gov
joseph.teirab@usdoj.gov

Court Reporter and Transcriber:

Lori Morrow, RDR, CRR, CRC
300 South Fourth Street
1005 U.S. Courthouse
Minneapolis, Minnesota 55415

**(REPORTER'S NOTE**: *Quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.)*

Proceedings reported by a certified court reporter.

**P R O C E E D I N G S**

**IN OPEN COURT**

(Commencing at 10:07 a.m.)

THE COURT: Please be seated.

Would you please call the case.

THE COURTROOM DEPUTY: We are here in the matter of Minneapolis Area Synod of Evangelical Lutheran Church of America, et al., versus U.S. Department of Homeland Security, et al. Case Number 26-CV-1576-JWB-DTS.

THE COURT: Can I have the parties note their appearances, starting with the plaintiffs' counsel.

MS. WESTBROOK: Good morning, your Honor. Erin Westbrook of Saul Ewing on behalf of Plaintiffs.

THE COURT: Good morning.

MS. VAYNERMAN: Good morning, your Honor. Irina Vaynerman from Groundwork Legal on behalf of Plaintiffs.

MS. YIRA: Good morning, your Honor. Kaitlin Yira, Saul Ewing, on behalf of Plaintiffs.

THE COURT: Good morning to you all. You may be seated.

And for the defense.

MR. FULLER: Good morning, your Honor. David Fuller, Assistant U.S. Attorney.

THE COURT: Good morning.

MR. TEIRAB: Good morning, your Honor. Joseph

Teirab, Assistant United States Attorney, on behalf of the United States.

THE COURT: Good morning. You may be seated as well.

And for those in the gallery, I think your phones have all been pouched this morning. But in the event anybody has anything that records, then there's no recording allowed in these proceedings. So no photography, no recording of any kind.

We are here this morning on the plaintiffs' motion for preliminary injunction. So let me first hear from each side for maybe 15 minutes. We'll see how it goes. And then we'll have an exchange. And I intend to -- well, let me just hear from each side. So why don't -- is it Ms. Westbrook? Ms. Westbrook?

MS. WESTBROOK: Yes, your Honor.

THE COURT: Why don't you come up to the podium.

While you are getting yourself organized, kind of think about this, because I have read the government's papers, and they explain that conditions have changed at Whipple, that Operation Metro Surge, well, the surge has receded. And so is this really at this point a ripe issue, or does a return to normalcy not address the issues and the concerns that you're raising on behalf of your clients?

MS. WESTBROOK: Your Honor, do you want -- would

you like me to answer that right now, or --

THE COURT: That's why I asked it.

MS. WESTBROOK: -- do you want me to consider it?

Your Honor, this case isn't moot. I think that it's very clear under the case law, under *Fikre*, under *Friends of the Earth*, that this falls within the Voluntary Cessation Doctrine.

First of all, Operation Metro Surge has ended according to the government, but things continue to remain in flux. And I would also offer that, your Honor, there's really no policy here related to access to -- or access to -- to give faith leaders access to provide pastoral care. There was a declaration submitted that said they consider these things on a case-by-case basis. We were told that faith leaders would be accommodated unless they cannot, which isn't a policy, your Honor. It doesn't, you know, it doesn't give anybody any confidence that our clients would be permitted to provide pastoral care.

The government has stated during our meet and confers that one of the main concerns related to this case-by-case analysis is operational interruption. So, you know, there was a comment that faith leaders would be given access unless it would cause disruption to the operations. So we attempted to dig into that, right? Understand the intake process, understand the process of transferring

detainees from the Whipple, and we really didn't get very much information. At our first meet and confer, we talked a little bit about the intake process, but it was not any specific information that would allow us to kind of agree on parameters without kind of giving complete discretion to really an unknown government actor. We don't know who would make the decision about operational interruption. So without being able to kind of come up with any parameters or get information to help both parties reach some agreement on those parameters, we didn't really have any ability to have confidence that our clients would be given access under this, you know, operational, vague needs standard.

At the second meet and confer we tried to dig into this more, how we could come up -- per your Honor's order, we wanted to try to reach agreement with the government, and we were really stonewalled at the second meet and confer and said that's not what we're here to discuss, the process that happens at Whipple.

So to answer your Honor's question, no, the case isn't mooted. We still have no -- there's no policy that's been clearly changed. There's no standard. There's no written standard here. There really is no policy. And I think particularly in light of the declaration submitted with the government's submission that said -- that basically said the Whipple is a holding facility and in contrast to a

detention facility doesn't exist to provide constitutional minimums, I think particularly in light of that statement, we have no ability to, you know, have confidence that the First Amendment rights of our clients will be respected.

THE COURT: Well, what's your position on how long persons are detained at Whipple?

MS. WESTBROOK: Your Honor, that's a great question. We tried to get that information from the government as well. I don't think the government answered the questions in your order on that. They have said three hours. They have said we hope to not have them detained any more than 24 hours. We are aware of instances where they were -- detainees were detained for days. So I don't know how we can take a position when we haven't been given a straight answer on that.

THE COURT: All right. Please continue.

MS. WESTBROOK: Your Honor, in addition to addressing the mootness question, I think the primary question for your Honor to consider today is whether the defendants have a compelling interest and are meeting the exceptionally demanding standard of using the least restrictive means to further that compelling interest.

Turning to the operational needs piece that we just spoke about, setting aside the mootness issues related to that, the case law is clear that kind of vague concerns

about operational needs are not a compelling interest. Even the *Fowler* case that the defendants rely upon heavily says that, you know, speculation, exaggerations, et cetera, related to operational or security concerns are not enough to constitute a compelling interest. And so this vague concern about operational needs or avoiding operational disruption when there's no written policy, there's no identification of who is making that decision, that's simply not a compelling interest, and the case law is very clear on that.

Even if we consider the operational needs to be a compelling interest, we can't even really evaluate whether the government is using the least restrictive means because, again, we don't know what those means are. We don't know what the guidance is -- there is no guidance. We don't know who is making the decision. And there's really no means being used to base a decision on. We don't know if an agent is just -- you know, feels like it would be an inconvenience to allow faith leaders access. We really have no idea. And the government has not given us that information despite our inquiry.

THE COURT: So what's your response to the assertion that this is a short-term holding facility, not a detention facility, and the argument being that remote pastoral care under these circumstances as for this type of

facility should be sufficient? Why is in-person pastoral care necessary?

MS. WESTBROOK: Your Honor, the fact that it's a short-term holding facility doesn't mean that we just leave our constitutional rights at the door. You know, I think everything in our clients' declarations and in our submissions show that, you know, these are sincerely held beliefs that in-person care, every single one of the declarations that were submitted --

THE COURT: Slow down just a little bit in your cadence.

MS. WESTBROOK: Sure. Every single declaration that was submitted refers to the importance of in-person pastoral care and how remote care does not accommodate that.

To the extent that there is a question about, you know, receiving that care or providing that care at long-term facilities, there are a number of problems with that. We have had people who have encountered issues at the county jails, and we don't necessarily know where people are being transferred. Sometimes the transfers are, you know, at county jails hours outside of -- outside of the Twin Cities. They're out of state, obviously. And so the fact that it's a holding facility really isn't sufficient to deny those constitutional rights. And there's case law to that effect that we cited in our briefs, your Honor. There's the

*Jarrard* case out of the 11th Circuit referring to county jails as short-term holding places, and there's really no support for the idea that the fact that it's a holding facility should be different.

In addition, recently, most recently out of the Northern District of Illinois, the *Coalition for Spiritual Leadership* case related to a similar facility, the Broadview facility, also granted a preliminary injunction allowing faith leaders to visit detainees in a similar type of situation.

So in any event, your Honor, the fact that it's a holding facility is really -- it's really not relevant to the analysis.

To the extent that the government has argued that this Court should afford, you know -- and their argument seemed to say this Court should afford basically complete deference to the government's decisions about, you know, what should happen at the facility. That's simply not the case. The Supreme Court's decision in *Holt* makes that very clear that while there is some legislative history related to *RLUIPA* related to affording deference, that doesn't prevent the Court from applying the rigorous standard of requiring the government to show that they are using the least restrictive means.

THE COURT: Help me a little bit more with that

sort of ripeness of the issue. Since the ending of Operation Metro Surge, do you have specific examples where pastors have attempted to get access where they were completely denied?

MS. WESTBROOK: Well, your Honor, we have the examples that we included in our declarations, some of which were after the operation of metro surge -- after the drawdown of Operation Metro Surge, although probably, you know, considered during the drawdown phase.

We have no specific examples of attempting to access Whipple again. Going back to --

THE COURT: I did see the one instance where a pastor sought access, was given it, but there were no detainees present. But they weren't denied access.

MS. WESTBROOK: I did see that as well, your Honor. And I think this really goes back to the whole Voluntary Cessation Doctrine where we can't just say that all of a sudden because this lawsuit was filed the government has stopped the unlawful conduct, particularly in light of what we have been told that the government is using this case-by-case, vague standard and that faith leaders will be allowed or will be accommodating --

THE COURT: I remember the arguments you made previously in that regard. I'm just trying to understand factually where we are and --

MS. WESTBROOK: Sure.

THE COURT: -- whether or not since the cessation of Operation Metro Surge, at least as we knew it here with the 3,000 or so ICE officials in the state, do you have specific examples since it's receded.

MS. WESTBROOK: I do not have specific examples, your Honor.

THE COURT: All right. Please proceed.

THE WITNESS: Thank you.

So going back to the operational needs, I think that it's very clear the Court does not owe deference to the government in this area, particularly given that they have no written standards and the Supreme Court in whole has explicitly stated the Court is still obligated to apply the rigorous standard that -- in that case *RLUIPA*, but the same applies for *RFRA* -- requires as to the government's burden to establish the least restrictive means.

As to security concerns, your Honor, it's really the same. The government has argued that the Court owes essentially complete deference to the government as to security concerns, and *Holt* makes clear that that's not the case. The Court is obligated to apply the rigorous standard in the statute.

The government has asserted some security concerns, and *RFRA* requires an analysis of those concerns as

to the person seeking to exercise their religion. The government hasn't been able to or really tried to provide information about the specific concern -- security concerns as they relate to the plaintiffs themselves. And again, even under *Fowler*, which the government cites, the Eighth Circuit has said that, you know, speculation, exaggerated fears, et cetera, are just not sufficient to state a compelling interest.

Again, even if it was a compelling interest, the government hasn't shown least restrictive means. There's a categorical ban on physical contact, for example, and we have multiple cases that we've cited in our briefs, *Ramirez* from the Supreme Court and its progeny, where physical contact is allowed even in, you know, high security criminal situations. And this, your Honor, is not a criminal confinement. It's civil detention.

And so a categorical ban on physical contact without analysis of whether that would apply --

THE COURT: Were either of the cases you cited, did the facts involve detention facilities that were holding facilities where the detainees are intended to be detained for short periods of time?

MS. WESTBROOK: They were not, your Honor. I don't think this -- this doesn't appear to arise -- there weren't cases either way. I didn't find anything that arose

in that instance.

But again, I don't think that it -- I don't think that we're required to drop our constitutional rights at the door based on the government's classification --

THE COURT: You don't need to argue that. The Constitution does apply at federal detention facilities, including the First Amendment. So what the dispute here is about is how to tailor it.

MS. WESTBROOK: Correct, your Honor. And I think there's no reason that there can't be consideration of physical contact in certain situations.

Contrary to what the argument said, we're not asking for just completely unfettered access whenever we want with no, you know, no security considerations. The Plaintiffs have no problem going through any security measures, you know, any reasonable security measures that the government would ask for. We've offered to go through background checks, obviously would go through the standard metal detectors that are there. We are -- the Plaintiffs are willing to have, you know, monitoring, supervision in instances where physical contact occurs. But it is very clear that, you know, physical contact is an important part of every one of the people who submitted a declaration and, again, the plaintiffs' faith, that it's very a significant core belief of theirs. And a categorical ban is just not

the least restrictive means. And the government, again, has the burden to establish that, and they have not done that to the person as Whipple requires.

THE COURT: Why don't you take a couple more minutes and then wrap it up.

MS. WESTBROOK: Okay. Thank you, your Honor.

I'm assuming you don't have any more questions about mootness at this time. But please let me know if you do. But otherwise we would just argue that the Voluntary Cessation Doctrine applies.

The last thing I wanted to just discuss briefly is the *Dataphase* factors, the remaining *Dataphase* factors. I think it's clear under the case law that a First Amendment violation always constitutes irreparable harm. And so there's really no question on, you know, on whether that factor is met. And at the same rate, the public interest also favors vindicating constitutional rights, and so an injunction is warranted here. And so we would just ask that your Honor find that the plaintiffs are likely to succeed on the merits of their claims and that the government has failed to establish a compelling interest or that that compelling interest is furthered by the least restrictive means.

THE COURT: Thank you, Ms. Westbrook. You'll have a chance to respond.

So Mr. Fuller for the government.

MR. FULLER: Thank you, your Honor.

THE COURT: So let me start with you where I started with Ms. Westbrook. And I want you to take me back to January of this year, the time period from January to date. Can you give me a range of how long persons were detained at the Whipple facility?

MR. FULLER: Well, I know that it varied, and I know that the operational practices changed during that --

THE COURT: Range means numbers. I know it varies. That's why I asked for a range. But could you give me a sense, because what I saw in your papers referred to Whipple being designed as a short-term holding facility, but it wasn't clear to me. What is the range of time detainees have actually been held there if we go back to January to date?

MR. FULLER: In general, my understanding is that it's been approximately between three hours and twelve hours --

THE COURT: So were --

MR. FULLER: -- with some exceptions.

THE COURT: Excuse me. Were any persons ever detained there overnight?

MR. FULLER: I expect that there were, yes.

THE COURT: Were any persons ever detained there

for more than a day?

MR. FULLER: I believe so, yes.

THE COURT: Then how many days at the outer limits would you say someone was detained at Whipple?

MR. FULLER: I don't have the answer to that. I have had the sense that it would have been no more than two or three days.

THE COURT: All right. Thank you.

MR. FULLER: I'll just start with the Court's questions to plaintiffs' counsel. First of all, there is no categorical ban. Now, there may have been a mere categorical ban during the surge, but that was justified at the time, and because it's no longer in place there's no imminent or irreparable injury or harm that's impending that would justify preliminary injunctive relief at this time. The --

THE COURT: How do you respond to Ms. Westbrook's argument that voluntary cessation does not in any way lessen or ameliorate the government's burden nor does it shift the merits of the Court's assessment, nor should it?

MR. FULLER: Well, the Voluntary Cessation Doctrine is real, and the government is required -- has a burden to show that the conduct has in fact ceased. And that is what -- how this event would be done. The Rich declaration is uncontradicted.

And I have submitted a case that wasn't cited in the briefs, *Prouse* under the Eighth Circuit, that we're just citing -- I'm just bringing it to the Court's attention for that very limited proposition. I think that the case has been overruled on other grounds or superseded by the Supreme Court in certain ways. But when it comes to the concept that an uncontested affidavit may be enough, that's the reason I provided that case, *Prouse*.

So the plaintiffs then still have the burden to show concrete, particularized injury in fact, and, you know, they face a harm that is certainly impending. And they cannot show that. There have been no recent visits. The most recent visit we're aware of is described in the Rich affidavit, and it's the March 6 visit that your Honor mentioned where the person was not turned away. And I guess I would just leave it at that when it comes to voluntary cessation.

Counsel mentions that there's no policy here at Whipple. There is a written policy. It's been submitted. It was Exhibit 1 to the Rich declaration. There doesn't have to be a written policy on everything that happens. So perhaps there's no specified guidelines on exactly how to handle such things as a clergy visit. But I will note, looking at that policy at Section 2.4, which is on page two, this relates to the religious rights of the detainees. But

it says that operational "personnel shall be sensitive to detainees' cultural and religious practices. Taking into account safety" --

(The court reporter requests clarification.)

THE COURT: I'm sorry, just one moment. I think you needed to slow down. Would you repeat that for the court reporter?

MR. FULLER: And then it goes on to say, "Taking into account safety or security concerns, whenever possible, detainees' religious beliefs and practices shall be accommodated." That is part of the written policy that applies at Whipple.

In general, the Court has also asked about the short-term nature of this facility. I would liken it to the hold rooms that exist in a courthouse like this or in the Minneapolis courthouse where I've worked for years. I come into the building, there's many offices, there's much activity of various sorts that happens inside the courthouse, inside the building. But there's also sort of a secret area, separate elevators where the Marshals bring detained persons in for hearings in criminal cases. I've never been there. I've worked in the building for 18 years. I don't think I'm allowed in there. I don't know if even their own lawyers are allowed in there. I certainly don't think clergy are allowed in there. That doesn't mean they

don't have religious freedom. That doesn't mean their constitutional rights aren't important. But these things need to be modified, and reality needs to be taken into account.

So we're not arguing with the cases that we cited. We're certainly not arguing for unfettered discretion or absolute discretion on the part of the government, but --

THE COURT: Well, help me to understand this because -- and this is my characterization and not what Ms. Westbrook necessarily said explicitly. But there is a concern that the clergy access is ad hoc, that it is arbitrary. And you've seen the *Wizard of Oz* presumably.

MR. FULLER: Sure.

THE COURT: And when Dorothy wants to get into the kingdom, the Wizard opens a little window and decides whether they're allowed to enter or not on an ad hoc, arbitrary basis. And from what I gather from the petitioner's case, that getting access to Whipple feels like that, completely arbitrary, it's opaque, we don't know what standards are applied, and it's kind of left up to the subjective determinations of whomever in Whipple as to whether they are allowed access or not, or they may have been allowed access and there's nobody there, so it's not even matching up when they will be permitted to enter, when detainees are even present. How is that the best the

government can do?

MR. FULLER: So again, the Plaintiffs are characterizing this as if it's a hundred percent unfettered discretion. And I acknowledge, we acknowledge there's no written policy at this time on this issue.

THE COURT: Let me just pause you there because I really do want an answer to that question. That ended with a question: How is that the best the government can do under the circumstances? Help me to understand what case by case means as a standard for allowing clergy entry into Whipple.

MR. FULLER: Case by case, I believe, is intended to acknowledge the importance of security concerns and operational concerns. And I am not in a position here today to flush this out a hundred percent.

THE COURT: Well, can you tell the Court case by case in whose estimation? Who is making the decision on each kind of case that comes up? Is it just depending on who happens to be working there at the time and what their own sensitivities or sensibilities might be?

MR. FULLER: At this time, that probably is the situation.

THE COURT: And how is that the best the government can do?

MR. FULLER: Well, the government is willing to

continue this dialogue with the plaintiffs. I'm aware that there is, even continuing today, an evidentiary hearing going on in a, what I consider a quite related case with Judge Brasel relating to the right of access to counsel. That's the *Advocates for Human Rights* lawsuit where there has already been a TRO in place that, you know, arose during the surge or during the drawdown phase of the surge. I believe whatever comes out of that --

THE COURT: I'm sorry to interrupt you, but I just want to put a bow at least on my understanding.

So as to the standard of admission on a case-by-case basis, you're not aware of any kind of a written or specific understood criteria for how that gets applied by the persons who are making the decisions. Is that an accurate statement?

MR. FULLER: That is an accurate statement. I agree with that.

THE COURT: All right. Please proceed.

MR. FULLER: So to the extent that the Court is concerned about that and would like to see something a little more clear, more firm, the reason I brought up the other case is that I just have the idea that perhaps the parties in this case would benefit from waiting to see what happens in that case. I really don't think there's -- the exigency that existed arguably at the time that this case

was initially filed no longer exists. So I would just submit that giving us a little bit more time could lead to something that would be perhaps more satisfactory to the Court in answer to your question.

THE COURT: But the attorneys have access to Whipple now, don't they?

MR. FULLER: I believe that that TRO is still in place. And my understanding is that they would in any event because the surge is ended. Yes.

THE COURT: All right. Please proceed.

MR. FULLER: And so, again, I guess my concept was, perhaps this case would be appropriate for mediation either before Magistrate Judge Schultz or, as it happened in the *Advocates* case, Retired Judge -- I'm drawing a blank on his name. But I'll think of it.

THE COURT: It's all right. It's not necessary.

MR. FULLER: Boylan. He was brought in to help the parties mediate in that case.

The other case that I provided today that had not been cited in the briefs is *Block versus Rutherford*.

THE COURT: So why did you this morning give me a case that was decided in 1984 when it's 2026?

MR. FULLER: Well, it was brought to my attention last night, and I think it's actually highly pertinent here. The main -- one of the main sticking points, again, there's

no categorical ban --

THE COURT: But it is a real question. I mean, you submitted your papers and stated the government's position. This isn't a case that just came down.

MR. FULLER: Absolutely.

THE COURT: Why am I being handed this morning a case from 1984? I had hair in 1984.

MR. FULLER: The premise is not that it's a new case. It did just come to my attention last night.

THE COURT: All right. Please proceed.

MR. FULLER: Sure. And so the reason *Block* seems quite pertinent here is that one of the sticking points -- there's no categorical ban on visits, but there is a categorical ban on in-person contact, and that applies to clergy, but it applies to anyone and everyone. That's just not something that's ever happened here with detainees and visitors being able to touch each other.

But in that case, 468 U.S. 576 at pages -- oh, I'm missing the page numbers. I'm sorry.

I'll quote it so that we can find the quote.

I'm sorry. Let me grab it.

THE COURT: And you've given petitioners a copy of this case?

MR. FULLER: Yes, I have. This would be at page 589. I'll just quote a couple of -- it relates to --

THE COURT: Well, here, let me get there. I'm going to read it with you.

All right. Please proceed.

MR. FULLER: A blanket ban on in-person contact. And the Court says, "The Central Jail's blanket prohibition on contact visits is an entirely reasonable, nonpunitive response to legitimate security concerns." And a bit later it says, "Totally disallowing contact visits is not excessive in relation to the security and other interests at stake." And then a bit further down it says, "Nothing in the Constitution requires that detainees be allowed contact visits."

And so that case applies not only to prisons where someone has been convicted of a crime but also to pretrial detention situations. And I would just point out that *Bell versus Wolfish*, which we did cite in our briefs, similarly applies to both convicted prisoners and pretrial detainees, which I would submit is analogous to immigration detention.

I don't necessarily have anything further unless your Honor has questions.

THE COURT: All right. No. Thank you.

Let's hear from Ms. Westbrook, and then, Mr. Fuller, you'll be able to have the last word.

MR. FULLER: Thank you.

MS. WESTBROOK: Thank you, your Honor. I want to

start just by briefly addressing the *Block* case that Mr. Fuller just discussed. Again, it's a 1984 case. The biggest issue with it though is that it's not a *RFRA* case; it's not a religious freedom case. I think Mr. Fuller read a quote that said the Constitution does not require physical contact. But the Constitution does require respect for religious freedom and use of the least restrictive means, and so that standard simply doesn't apply here.

I would also note that we vehemently disagree, as we state in our reply brief, that criminal and civil confinement are the same. And so there's a difference here.

THE COURT: Do you feel that the access that the clergy should have should be different in nature than the access attorneys have?

MS. WESTBROOK: Your Honor, we do feel that way. And in fact, the government has agreed with us in the joint status report that the parties submitted in the first instance. I think it's docket number 40. But that is one thing that the parties agreed on. There is some difference here because of *RFRA*, because of the First Amendment rights at stake, because of our clients' religious liberties. And so it's not -- there are, of course, some similarities in terms of how, you know, structurally or operationally how it could be enforced, but they are different.

And we don't think that there is any validity to

the idea that your Honor should wait to make a decision until after this hearing that's happening today. Our clients are continuing to be irreparably harmed every day that this is -- you know, that their rights are being denied. And there's really just no basis for complying with Mr. Fuller's request to basically wait for another case, particularly where both parties agree it is different. It's not exactly the same.

Another point I wanted to address, your Honor, is the government's statement that they simply have the burden to show that the government has stopped the unlawful conduct in connection with the Voluntary Cessation Doctrine. That --

THE COURT: Their argument is that with respect to voluntary cessation, all that they have to show is that there is a cessation in fact.

MS. WESTBROOK: Your Honor, that's not the burden. Under *Fikre* in fact, there's a formidable burden, and under *Friends of the Earth*, which are both Supreme Court decisions, they had to show that it is absolutely clear that the conduct cannot reasonably be expected to occur. And the affidavit from Ms. Rich doesn't do that here.

The *Prouse* case that was submitted also is distinguishable in that case. There was an affidavit submitted where the person attested that essentially the

plaintiff had received every part of the relief they had requested. And we don't have that here. We don't have the relief we've requested, and we certainly have no assurance that it's absolutely clear that the conduct can't be expected to recur. So that's the burden the government has, and I don't think it's met here.

I also wanted to raise one issue, and I apologize for not bringing this to your Honor's attention. You had asked if there was a case regarding physical contact in a holding facility context. I had mentioned the *Broadview* case in a different context. In that case though there was physical contact. The plaintiffs were permitted to provide the imposition of ashes on Ash Wednesday and communion as well, I believe. So there is an analogous situation in a holding facility context. And that's the Northern District of Illinois case.

Your Honor, I think your *Wizard of Oz* analogy is quite right, and we've -- that's what our experience has been where the plaintiffs have entered the facility, they have been told by the person sitting at the desk that there is no -- there is no right to access detainees, and even with this new case-by-case standard, we still don't know who makes the decision; we don't know if it's the person at the front desk; we don't know if it's an ICE agent; we don't know if it's Ms. Rich. And while it's not required to have

a written policy, certainly unfettered discretion -- and I know Mr. Fuller has said there isn't unfettered discretion, but he hasn't given us any other information on what might be considered. And we can certainly imagine all of the scenarios where whoever is making the decision may decide not to for whatever reason. There's no requirement that reason is stated. We really don't know here. And that's clearly not in line with our plaintiffs' constitutional rights.

To your point, your Honor, about how is that the best the government can do, that's exactly the question that the *RFRA* test related to the least restrictive means asked, and frankly, I just don't think it was answered.

This discretion case-by-case basis, it can't be the least restrictive means. It's not even really a means. We don't know what it is. And so I think the government has not met its burden with respect to that test.

And, your Honor, unless you have any more questions, we would just again assert that the plaintiffs are likely to succeed on the merits, and we would request a preliminary injunction.

THE COURT: Thank you, Ms. Westbrook.

MS. WESTBROOK: Thank you.

THE COURT: Mr. Fuller.

MR. FULLER: When it comes to narrow tailoring and

the least restrictive means, if the Court is inclined to grant injunctive relief, I would again just propose that more factual development is needed here. For example, we don't know how this facility in particular compares to the Broadview facility in Chicago. We do have fairly detailed information, evidence in the record here about the nature of the government's concerns both during the surge where there was unrest happening outside the building and all kinds of heightened activity happening inside, but then, more importantly, even today the nature of the potential risks that could be faced by other detainees, faced by staff, and faced by visitors should there be some kind of a requirement to allow in-person physical contact. It's never been done before. It would be changing the status quo, and additional factor development really would help, I think, with the narrow tailoring question should the Court be inclined to grant some sort of injunctive relief here.

THE COURT: All right. Thank you, Mr. Fuller.

MR. FULLER: Thank you.

THE COURT: Anything further?

MS. WESTBROOK: No, your Honor.

THE COURT: Well, thank you all. Thank you all for your submissions and for the arguments this morning. I am prepared to rule on the plaintiffs' motion for preliminary injunction.

This case sits at the intersection of two important interests. On the one side are sincerely held religious obligations, here, the obligation of clergy to provide in-person pastoral care to individuals who are detained oftentimes in vulnerable and under uncertain circumstances. On the other side are the government's legitimate interests in operating a secure, short-term, federal holding facility, including during periods when the facility experiences a significant increase in the number of individuals who are being processed through there in a short period of time.

The question at this stage is not who ultimately prevails but whether plaintiffs have met the requirements for preliminary relief under the *Dataphase* factors, *Dataphase Systems versus C L Systems*, the operative Eighth Circuit decision. And I will address those *Dataphase* factors now in turn.

Plaintiffs bring their claim under *RFRA*, R-F-R-A, which stands for the Religious Freedom Restoration Act. That statute prohibits the government from substantially burdening a person's religious exercise unless the government can show that that burden is the least restrictive means of advancing a compelling government interest.

Plaintiffs assert, the petitioners here assert

their own religious exercise, that is, the obligation to provide in-person pastoral care and not merely the rights of detainees to receive pastoral care. And this Court evaluates the burden on that exercise.

Now, *RFRA* binds the Federal Government and all of its operations, including detention, unless and until Congress says otherwise. To establish a likelihood of success, plaintiffs have to show that the government has substantially burdened their religious exercise. The availability of alternative forms of ministry, such as remote communication or prayer outside the facility, does not eliminate the burden where plaintiffs' religious exercise specifically requires in-person pastoral care at the time of detention. The record that is before this Court includes multiple declarations from clergy describing both the centrality of in-person pastoral care to their religious obligations and their efforts to gain access to the Whipple facility. For example, Bishop Nagel, or Nagel, explains that providing in-person pastoral care to individuals who are detained or otherwise isolated is a required part of her ministry and not a discretionary activity. She further describes presenting herself at the facility on Ash Wednesday to provide prayer, counseling, and the imposition of ashes, and being denied access under what she was told was a facility wide policy. Other of the declarations that

I read reflect similar experiences. And those experiences as characterized are not rebutted.

The government though for its part has submitted evidence that the Whipple facility is a processing center, as it is called, rather than a traditional detention facility. Detainees are often held for short periods of time, sometimes a matter of hours, and ideally a matter of hours, and the facility operates under space, staffing, and security constraints that limit visitation. Now, at the same time, the record reflects that some detainees are held for longer periods of time, up to three days potentially as discussed this morning, and that even short periods of detention can be significant though from a pastoral perspective.

So the government further represents that following the initial period at issue, that is, the height of Operation Metro Surge, clergy access has been permitted on a case-by-case basis. So the record here reflects both points, the two important points: So there were periods, particularly during Operation Metro Surge, where access was apparently categorically denied. And now there are representations that access is permitted but only if the circumstances align. Access permitted if circumstances align, what I mean by that, meaning that the clergy have to be approved, that detainees still have to be present, and

staff and space must be available all at the same time, which can be difficult for petitioners, the clergy, to know when those stars have all aligned when they arrive at the facility. And so what's not clearly established in the record is a pattern of identified detainees requesting pastoral care and being denied after a shift in the policy. That was the point of my question asking who has been denied and what's the circumstance since Operation Metro Surge has receded. And I was told this morning there wasn't a specific, concrete example of a denial since the shift in the metro surge policy.

And so that does go to the issue whether or not the burden has been established.

Now, being able to show this individualized burden is not the only way though that a burden can arise. The absence of evidence that a specific detainee requested and was denied pastoral care does not altogether resolve the inquiry. A substantial burden may still arise where a system, as implemented, makes religious exercise practically unavailable even without individualized denials. Here the burden is practical. Clergy, for example, may be allowed access, but there's no way, dependable way to make that access actually happen. A minister may arrive and find no detainees available; a detainee may be present but transferred before a visit can occur; and there is no

established system to connect the two in a timely way.

So putting this simply, access is possible, taking the government at its word, but it's not dependable, again based on what I've even heard this morning. That is why the government's representation that it now permits case-by-case access does not moot the issue, as the record reflects no consistent or enduring system that ensures that such access will actually occur in practice.

The government also argues that any prior restrictions were tied to Operation Metro Surge and that the conditions have now returned to normal such that injunctive relief is no longer necessary. I do take those representations seriously, but the issue here is not whether the prior policy has been discontinued in name. The question is whether the current system as it operates provides a meaningful opportunity for religious exercise. A defendant's voluntary change in conduct does not by itself resolve the issue where there is no showing that the challenged conduct cannot be reasonably expected to recur or that the current approach adequately addresses the asserted burden.

On this record, the government's shift to a case-by-case access does not establish that the burden has been eliminated. The evidence reflects no consistent or reliable process by which clergy and detainees can actually

meet. For that reason, I'm not persuaded that the request for relief is moot or that injunctive relief is unnecessary. At this stage, what we have here is sufficient for plaintiffs to show a likelihood, a likelihood though not a certainty, of establishing a substantial burden under *RFRA*, R-F-R-A.

The government argues that plaintiffs seek a mandatory injunction -- I'll just address this because this was in the papers -- and that the plaintiffs are required to meet a heightened standard. And I do recognize that this heightened standard may apply in some circumstances. But even assuming a more demanding standard applies, which I am not deciding at this point, plaintiffs have made a sufficiently strong showing here given the nature of the burden and the limited scope of the relief that I will order in just a moment.

The analysis then turns to whether the government has shown that its approach is the least restrictive means of advancing a compelling interest. There is no serious dispute that institutional security and orderly operations are compelling interests. But the current approach where access depends on whether all conditions happen to align at the same time without any consistent process to facilitate that has not been shown on this record to be the least restrictive means. The government has identified real

constraints, but it has not demonstrated that a more organized and predictable method of allowing clergy access subject to those same constraints cannot be in fact implemented.

Going to the question I asked, is that the best the government can do, or to quote Winston Churchill, which I don't think I've ever done, that "Sometimes it is not even enough to do your best. You must do what's required." And here I think it's probably not the best. And again, as Mr. Fuller acknowledged, that with more discussion and time for additional negotiations, perhaps there can be improvements.

So it's true that the parties did make progress in their discussions, and the joint status report, the reports reflect agreement on a number of points, but they haven't reached a complete resolution, and the remaining disagreements affect whether access will occur in practice rather than merely in theory. So for this reason, the first *Dataphase* factor, likelihood of success on the merits, weighs in plaintiffs' favor.

The second factor is irreparable harm. The loss of the ability to engage in religious exercise constitutes irreparable harm because it cannot be remedied after the fact. Once the opportunity to engage in a religious practice tied to a particular moment is missed, it cannot be

recreated later. The record here does provide a clear example. Ash Wednesday occurs once a year. The opportunity to administer ashes to detainees at that time cannot be replaced. More broadly, where detention is brief and transfers may occur without notice, the opportunity for in-person ministry may disappear before it can be realized. The harm here is not speculative. It follows directly from the nature of religious practice and the way the facility operates. So this factor strongly favors plaintiffs.

Third, balance of the harms. I have to weigh the burden on plaintiffs against the burden on the government. An order requiring unrestricted access, physical contact, or group ministry would raise legitimate operational and security concerns, particularly in a short-term processing environment. But that is not what this Court will require. I will instead require the government to, number one, remove any blanket prohibition on clergy access and then, two, to implement a workable process for facilitating access subject to reasonable security and operational limitations. And by blanket prohibition, I mean a rule that bars clergy access in all circumstances without regard to whether access could safely occur. A requirement that the government adopt a functioning access process while preserving its authority to impose reasonable limits does not on this record impose an undue hardship on the government. So the balance of the

harm, this factor favors plaintiffs.

Fourth, the *Dataphase* factor, the public interest. The public has a strong interest in both the protection of religious liberty and the secure and orderly operation of federal facilities. A narrowly tailored order that respects both interests serves the public interest.

So that brings me now to the appropriate scope of relief. Preliminary relief must be no broader than necessary, and this Court will not kind of fall into the temptation to attempt to manage the day-to-day operations of the Whipple facility. That is not the province of the Court. At the same time, this Court cannot leave in place a system where access exists only on paper but cannot reliably occur. As I said, the Constitution, including the First Amendment, applies in the Whipple facility.

So for this reason, the plaintiffs' motion for preliminary injunction will be granted in part. The government will be required to permit clergy access to detainees at the Whipple facility subject to reasonable, neutral, and generally applicable security protocols, protocols that I didn't hear today in the discussion of what case by case means. And it seems to be in the eye of the beholder depending on who in the Whipple facility is deciding it at the moment with no established standards, no written standards, no even understood standards. It appears

to be completely blue sky subjective. And so that's not acceptable. So what I have in mind here is that the clergy will have access at the facility subject to reasonable, neutral, and generally applicable security protocols, that is, rules that related to safety, identification, supervision, and facility operations that apply in a consistent and nondiscriminatory manner. The government may impose limits necessary to maintain safety and operations, including limits on timing, on duration, supervision, and the number of visitors.

So at this stage at least, I will not require physical contact of group ministry. Those forms of access may raise additional operational and safety concerns in a short-term processing facility, and the present record as it stands does not establish that such measures are necessary to provide meaningful pastoral care in all circumstances. So I do accept that the government has a compelling interest in maintaining safety, security, and orderly operations and that those interests necessarily require limits on access in a short-term detention facility.

But *RFRA* requires more than simply identifying those interests. It requires the government to show that the way it has chosen to implement those limits is the least restrictive means of achieving them. So on this record, the government has shown that some limits are necessary, but it

has not yet shown that a system in which access depends entirely on happenstance without a consistent method for facilitating contact is the least restrictive way to achieve those interests. A more structured process, even if limited and subject to operational constraints, may allow the government to maintain security while reducing the burden on religious exercise. The government must therefore implement a process that, while respecting operational constraints, provides a reasonable opportunity for clergy to provide in-person pastoral care when detainees are present. That may be accomplished through scheduling, communication, or other coordination mechanisms appropriate to the facility.

The question isn't whether the government may impose limits. It may. The question is whether it has shown that its current way of doing so, without a consistent process to make access possible, is the least restrictive means of achieving its interest. Currently it is not. It is not the best the government can do.

So the parties will be ordered to meet and confer promptly and, in any event, within four days of today's ruling with the same requirements for who should be present and represented as in the prior order where I required the parties to meet and confer.

And then within seven business days of this hearing, the parties must file a joint status report

attaching either a proposed protocol or competing proposals with each side identifying the specific points of this agreement and the reasons for them. I hope that this ruling this morning provides some additional guidance and structure over some of the points you are discussing, as some of those should no longer be points of argument with the clarifications that I've set forth.

Any remaining disputes will be resolved then promptly by this Court or referred to a magistrate judge or other appointee for expedited determination.

So then, in summing this up, I will kind of end where I started with the need for reasoned judgment on all sides. I read somewhere the quote that, "In all thy getting, get thee understanding." And some of you in the courtroom have heard that before. And that's a call for reasonableness. And that principle applies here, too. Plaintiffs recognize, and I agree, that a detention facility cannot be transformed into a place of worship, and nothing in this ruling requires that. Be reasonable. I mean, we're not going to turn a detention facility into a church where you put a baptismal font on wheels and roll it in there. On the other hand, this is not the Land of Oz where the government can act like the Wizard and open a small window and either say in or, you know, "Back, you whippersnappers" or something, which I'm not suggesting either side has taken

the position to that extreme at all. But it is a call for reasonableness. And that, you know, the record reflects that attorneys are afforded access to detainees as a matter of course and not subject to a TRO. Religious exercise, no less than legal representation, occupies a respected space under our law. A workable system can be designed that respects both operational needs and religious obligations, and so -- and I would just simply say quit trying to have it all and find a reasonable space that's in the middle here that will bring about the workable exercise of religious obligations and respect the operational needs of the facility.

So the parties then are directed to go back to meet and confer promptly within the time frames the Court set forth in good faith to implement a process that's consistent with this ruling. And I expect that effort to be guided not by positions taken in the litigation. I don't really want to hear that. If you come back here with it, I will hear it, of course, but I want that process to be done in good faith and guided by practical judgment and a shared commitment to ensure that access is meaningful in practice and not just in theory and not just on paper and not just completely subjective, and I want it to represent something that's closer to the best the government can do.

So for these reasons, the plaintiffs' motion for a

preliminary injunction is granted in part and denied in part consistent with the limitations that I have described.

So that is the Court's ruling.

Is there anything further from the plaintiff?

MS. WESTBROOK: No, your Honor. Thank you very much.

THE COURT: From the government?

MR. FULLER: Yes, your Honor. Just a clarification on the timing. You had said four days, and then you said seven business days.

THE COURT: Yeah, four business days and seven business days. In actual short order that will follow, I will set four specific dates so you don't have to guess what I mean by business days.

MR. FULLER: Thank you.

THE COURT: Since I understand how hard you all work and Saturdays are business days, too. All right. If nothing further, the Court will stand adjourned.

*(Proceedings adjourned at 11:11 a.m.)*

* * *

I, Lori Morrow, RDR, CRR, CRC, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

______________________________ Date: March 23, 2026
Lori Morrow, RDR, CRR, CRC